UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

REVITALIZING AUTO COMMUNITIES
ENVIRONMENTAL RESPONSE TRUST and
RACER PROPERTIES LLC,

**COMPLAINT**

Civil Action No.: 5:18-cv-1267 [DNH/ATB]

                        Plaintiffs,

**TRIAL BY JURY
DEMANDED**

      vs.

NATIONAL GRID USA, NIAGARA MOHAWK
POWER CORPORATION, CARRIER CORPORATION,
UNITED TECHNOLOGIES CORPORATION,
CARLYLE AIR CONDITIONING COMPANY, INC.,
CENTER CIRCLES LLC, GENERAL ELECTRIC
CORPORATION, BRISTOL-MEYERS SQUIBB
COMPANY, NEW PROCESS GEAR CORPORATION,
MAGNA POWERTRAIN USA, INC., CHRYSLER
GROUP LLC, SOLVENTS AND PETROLEUM
SERVICE, INC., THOMPSON CORNERS LLC,
METALICO SYRACUSE REALTY, INC.,
METALICO NEW YORK, INC., ALERIS PARTNERS LLC,
COOPER CROUSE-HINDS, LLC, GARDNER
DENVER, INC., PRESTOLITE ELECTRIC
INCORPORATED, ONX1 LLC,
ONONDAGA POTTERY COMPANY, INC.,
SYRACUSE CHINA COMPANY, LIBBEY GLASS INC.,
AMPARIT INDUSTRIES, LLC, 6181 THOMPSON
ROAD, LLC, CARRIER CIRCLE BUSINESS COMPLEX
LLC, TELESECTOR RESOURCES GROUP, INC.,
WESTERN ELECTRIC COMPANY, INCORPORATED,
FULTON IRON & STEEL CO. INC., SYRACUSE
LEPAGE LLC, LENNOX INDUSTRIES INC.,
DEERE & COMPANY, SYRACUSE DEERE ROAD
ASSOCIATES, LLC, JAGAR ENTERPRISES, INC.,
BURKO CORPORATION, EMPIRE PIPELINE
CORPORATION, CALOCERINOS AND SPINA,
C & S ENGINEERS, INC., and JOHN DOES,

                      Defendants.
_____

Plaintiffs Revitalizing Auto Communities Environmental Response Trust ("RACER Trust") and RACER Properties LLC ("RACER Properties") (collectively, "plaintiffs"), by their attorneys, **KNAUF SHAW LLP**, for their Complaint, allege as follows:

## INTRODUCTION

1.      In this action, plaintiffs complain that in addition to plaintiff RACER Trust and Motors Liquidation Company ("MLC"), formerly known as General Motors Corporation ("GM") and its wholly owned subsidiaries Remediation and Liability Management Company, Inc. ("REALM") and Environmental Corporate Remediation Company, Inc. ("ENCORE") (MLC, GM, REALM, and ENCORE are collectively referred to in this Complaint as the "GM Debtors"), which owned and/or operated the GM Syracuse Inland Fisher Guide ("IFG") Facility ("Former GM IFG Plant"), numerous other industrial parties known to either or both the New York State Department of Environmental Conservation ("NYSDEC") and the United States Environmental Protection Agency ("USEPA"), are also responsible to contribute toward the cost of past and future investigation and remediation (together "Environmental Response") to address contamination (the "Contamination") in and around the 30 square-mile Ley Creek watershed ("Ley Creek Watershed"), located in Onondaga County, New York, including Contamination originating from properties (the "Defendants' Properties") in the Ley Creek Watershed that defendants, their predecessors, successors or assigns, either currently or previously own or owned, or operate or operated, or on or from which they disposed of or released contaminants ("Contaminants"), including but not limited to polychlorinated biphenyls ("PCBs") and other substances deemed to be hazardous by the State of New York and by USEPA ("Hazardous Substances"), and petroleum and petroleum-based hydrocarbons (together "Petroleum").

2.     The Former GM IFG Plant is part of a Subsite of the Onondaga Lake National Priority List ("NPL") Site; such Subsite is known as the "General Motors Inland Fisher Guide Subsite," or "GM IFG Subsite."  The Former GM IFG Subsite is one of 12 Subsites of the Onondaga Lake NPL Site. The GM IFG Subsite consists of two Operable Units or "OUs" -- OU-1 and OU-2.

3.     OU-1 pertains to the Former GM IFG Plant itself and the surrounding real property on which it is located.  This real property is owned by RACER Properties, and RACER Trust has the obligation to perform the environmental remediation pertaining to OU-1.

4.     OU-2 pertains to an approximately 9,000 linear-foot stretch of Ley Creek from Townline Road to Route 11.  Neither RACER Trust does not own any of the real property that is the subject of OU-2, but RACER Properties apparently owns a portion of Ley Creek along the Ley Creek PCB Dredgings Subsite.

5.     RACER Trust, as successor to the GM Debtors, however, has some obligation to perform the environmental remediation pertaining to OU-2.

6.     This Complaint focuses on the OU-2 portion of the GM IFG Subsite, including the banks of Ley Creek and adjacent and nearby areas where the Contamination is located ("Expanded OU-2 Site").

7.     The GM IFG Subsite is NOT the same Subsite as the "Ley Creek PCB Dredgings Subsite," which RACER Properties owns and on which RACER Trust is obligated to perform operation, maintenance, and monitoring ("OM&M").  The Ley Creek PCB Dredgings Subsite adjoins the OU-2 portion of the GM IFG Subsite to the south of Ley Creek.

8.     The GM IFG Subsite is also not the "Lower Ley Creek Subsite," although OU-2 of the GM IFG Subsite adjoins the Lower Ley Creek Subsite at the east side of the Route 11 bridge.  RACER Properties does not own any portion of the Lower Ley Creek Subsite, and RACER Trust has no

obligation for performing any of the remedial or OM&M work at such Subsite. The GM Debtors, however, settled their potential liability for the Lower Ley Creek Subsite in a separate settlement agreement entered during the GM bankruptcy proceeding. *See* Environmental Response Trust Consent Decree and Settlement Agreement ("Trust Consent Decree")[1] dated October 19, 2010 and Appendix A, in links in *fn* 1 and *fn* 2.

9.      The Contamination of the Expanded OU-2 Site was caused by discharge(s), release(s), spill(s) or leak(s), including excavation, dredging and subsequent spoil material disposal (together the "Releases") of Contaminants into the Ley Creek Watershed, including: (a) dredging of sediments and excavation for Ley Creek realignment from the original approximately 24-foot wide Ley Creek to create an approximately 80-foot wide creek bed (*see* Exhibit "L"), and disposal of the subsequent contaminated dredge spoils on land north and south of Ley Creek from approximately Townline Road west to approximately Route 11, by the Onondaga County Department of Drainage and Sanitation from approximately 1970 to the mid-1980s, following several flooding events and in particular one in 1969; (b) landfilling activities by the Town of Salina into two landfills ("Landfills") known as the Town of Salina Landfill and Mattydale Landfill or Dump, which accepted waste from some defendants including Cooper Crouse Hinds, and Syracuse China, and which waste contained Contaminants that leached into Ley Creek, and which was dredged or evacuated and relocated when the Creek was widened and realigned as part of the flood control project; and (c) direct Releases into Ley Creek by various defendants from their own industrial operations. *See* Map of industrial sites in the Ley Creek Watershed connected

---

[1]      The Trust Consent Decree can be accessed on-line via the RACER Trust website at: http://www.racertrust.org/files/RACERTrustFinalSettlementAgreement.pdf.

by Ley Creek and its tributaries attached as Exhibit "A" and aerial overlay of the creek widening and realignment over current conditions in Exhibit "L."

10.     Some or all of the Releases and/or Contamination occurred in a sudden and accidental manner.

11.     Plaintiffs bring claims for cost recovery and contribution under sections 107(a) and 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a) and 9613(f), *inter alia*, which allows them to recover environmental response costs from other potentially responsible parties ("PRPs").

12.     Plaintiffs also bring claims under state law, including New York State Navigation Law Article 12 ("Oil Spill Act"), and common law and equitable theories.

13.     The Trust Consent Decree, dated October 19, 2010, was entered by the U.S. Bankruptcy Court for the Southern District of New York in the bankruptcy proceeding filed by the GM Debtors in 2009, and called for the creation of an Environmental Response Trust, which would remediate various contaminated sites for which GM was a PRP, using the funding mechanism provided by the Consent Decree.

14.     The Trust Decree was executed by a number of states including New York State, the United States of America, and EPLET, LLC on behalf of the contemplated Environmental Response Trust, and among other things gave certain contribution protection to the contemplated Environmental Response Trust.

15.     RACER Trust was created in 2011 to act as the Environmental Response Trust under the Trust Consent Decree, pursuant to the monetary budget limits contained in that Trust Consent Decree.

16.     By an October 27, 2015 Consent Order executed between NYSDEC and RACER Trust ("October 2015 RACER Trust Consent Order"), RACER Trust agreed to undertake Environmental Response to address Contamination in the Ley Creek Watershed allegedly resulting, at least in part, from the GM IFG Subsite.  A copy of the October 2015 RACER Trust Consent Order is attached as Exhibit "B."

17.     The October 2015 RACER Trust Consent Order provided in Section VII.B that RACER Trust reserved its rights to "seek and obtain contribution, indemnification, and/or any other form of recovery from its insurers and from other potentially responsible parties or their insurers for past or future response and/or cleanup costs or such other costs or damages arising from the contamination at the [GM IFG Subsite OU-1 and OU-2] as may be provided by law, including but not limited to rights provided under CERCLA."  *See* October 2015 RACER Trust Consent Order in attached Exhibit "B."

18.     The Trust Consent Decree includes a Minimum Estimated Property Funding Account and the Reserve Property Funding Account[2] for parcels of real property in 89 locations in 14 States and in one Tribal Nation, as well as monies for post-remediation OM&M that may need continued funding to be operated and maintained.  The Trust Consent Decree ¶¶55-59 also provides for contingency funding, known as Cushion Funding Account funding, which is to be used primarily for unforeseen circumstances found at the RACER Trust sites.

19.     NYSDEC now contemplates remediation of lands outside of the original geographic scope of the OU-2 remedial work ("OU-2 Original Remediation Site"), and which were described not only in the Trust Consent Decree but in a number of legally-binding Consent Orders and Records

---

[2]      *See* the Minimum Estimated Property Funding Account Limits in
http://www.racertrust.org/files/Motors_Liquidation_Settlement_Agreement_Appendix-1.pdf.

of Decision ("RODs") attached to this Complaint, and for which the Minimum Estimated Property and Reserve Property Funding was established.

20.     This Complaint attaches documentation showing that NYSDEC had data dating back to the mid-1980's demonstrating the additional 22 acres it is now attempting to add to GM's responsibility to comprise the Expanded OU-2 Site were areas it knew were contaminated and or should have known were likely to be contaminated, since it knew the Ley Creek flood control project and subsequently dredging spoils were placed on lands north of Ley Creek and both east and west of Townline Road (*see* Exhibits "F"-"J" and "L").  Yet NYSDEC choose not to include these areas in the OU-2 Original Remedial Site, as provided for in the Trust Consent Decree or defined in the October 2015 RACER Trust Consent Order (*see* Exhibit "B"), which relies on the definition of the property for which GM is responsible in a 2015 March ROD.[3]  *See* Figures in Exhibit "F," 2015 ROD; Exhibit "G," 1988 O'Brien & Gere Engineers, Inc. Field Investigation Ley Creek Dredged Material Area Report ("1988 OBG Report") (showing PCB contamination above 27 ppm north of Ley Creek on land owned by New York State); and Exhibit "J," 1997 GM RIFS Consent Order ¶23.

21.     The Trust Consent Decree at ¶ 63 specifically states that "funding with respect to the [GM IFG Subsite] from the Minimum Estimated Property Funding Account and the Reserve Property Funding Account shall be allocated in the following manner: $22,573,341 for remediation within the GM IFG Subsite facility property boundaries [i.e., OU-1] and $8,548,471 for the property extending from the facility property boundaries to the Route 11 Bridge [i.e., OU-2].  These dollar amounts are slightly higher than the final "trued up" Total Property Funding allocation attached to

---

[3]     See also Map in NYSDEC July 2016 Fact Sheet, which does not include areas depicted in Exhibit "E" north of Ley Creek and further downstream:
http://www.dec.ny.gov/docs/remediation_hudson_pdf/finconfactsheet07012016.pdf

the Trust Consent Decree in Appendix A and the actual budget.  In addition, Total Project Funding for the remaining Ley Creek PCB Dredgings Site OM&M work (remediated by GM in 1999 to 2001) was allocated $1,882,342.  *See* links *fn* 1 and *fn* 2, and depictions of these remedial areas in Exhibits "C" and "D."

22.     As part of recent remedial design work for OU-2, NYSDEC directed RACER Trust and its consultants to investigate additional area, ultimately expanding to 22 acres of land, outside of the OU-2 Original Remediation Site, of which only an equivalent of approximately one acre of upland soil and a downstream "hot spot" exists area identified in the March 2015 ROD (*see fn.* 3, and Exhibits "C" and "F").

23.     This additional approximately 22 acres of land is owned by other parties and is not included in the OU-2 Original Remedial Site contemplated by the Trust Consent Decree, for which a certain total project funding amount was allocated (compare Exhibit "E," which depict lands never before included by the NYSDEC in RODs or in Consent Orders with the GM Debtors or RACER Trust), and which remediation would increase the overall remediation budget conservatively to either approximately $93.5 million if the remediation goals remain consistent the March 2015 ROD (*see* Exhibit "F") or approximately $60 million if a less conservative containment remedy that is protective of human health and the environment is applied.

24.     Most of this Contamination is on land owned by New York State for the benefit of the New York State Thruway Authority, which is largely covered with mature forest and which serves as a buffer between Ley Creek and the Thruway, and on which GM could not have directly caused Contamination.

25.     Much of the Expanded OU-2 Site received dredge spoils and therefore was known be contaminated as a result of the dredging, realignment and widening of Ley Creek in the 1970's to

1980's by Onondaga County ("County"). *See* Exhibit "F" (historical description of the dredging and the surrounding industrial area); Exhibit "G" (1988 OBG Report); Exhibit "L" (showing the areas of the actual creek widening overlaid on the current creek).

26.     RACER Trust is compelled to commence this action based on recent negotiations with NYSDEC, during which NYSDEC confirmed it not willing to commit to seek contribution or cost recovery from other PRPs.

27.     The budget for remediation of the GM IFG Subsite was created with full knowledge and input from New York State.

28.     RACER Trust should not be held responsible for Contamination on lands onto which the GM Debtors could not have directly contributed Contamination (*i.e.*, north and east across Ley Creek outside of the direct influence of any historic discharges of the GM Debtors, and which remediation was not contemplated, and for which no money was reserved, pursuant to the Trust Consent Decree, on lands that were known by NYSDEC and the State of New York to be contaminated), particularly since the State of New York is the primary owner of the land that NYSDEC now, many years later, seeks to remediate.

29.     Contamination in the 30 square-mile Ley Creek Watershed is the result of over 150 years of industrial discharges from multiple Releases by or from Defendants' Properties.

30.     Since RACER Trust's funds to accomplish Environmental Response are limited, it has a fiduciary duty to its beneficiary (the United States) to preserve the funds in the Trust while still seeking to accomplish overall remediation goals.

31.     As a result, plaintiffs seek fair and equitable response costs, property damages, injunctive relief, declaratory judgment and other relief due to the Releases, and the resulting Contamination from the defendants for the purposes of facilitating a final remedial action, because there are

insufficient funds in the combined Minimum Estimate Property Funding and Reserve Property Funding Accounts being held by RACER Trust to fund the remediation on its own GM IFG Subsite OU-1 and OU-2.  *See* Exhibit "K."

## PARTIES

32.   Plaintiff RACER Trust is an independent environmental response trust formed under the laws of the State of New York, with its principal place of business at 500 Woodward Avenue, Suite 2650, Detroit, Michigan 48226.

33.   Plaintiff RACER Trust was created in March 2011, pursuant to the Trust Consent Decree.

34.   EPLET, LLC is the Administrative Trustee of the RACER Trust and is a signatory to the Trust Consent Decree prior to creation of RACER Trust.

35.   Plaintiff RACER Properties LLC is Delaware limited liability company doing business in the State of New York, established to hold legal title to the Former GM IFG Plant, with its principal place of business at 500 Woodward Avenue, Suite 2650, Detroit, Michigan 48226.

36.   Defendant National Grid USA, formerly known as Niagara Mohawk Power Corporation, is a Delaware corporation doing business in the State of New York, with its local offices located at 300 Erie Blvd. West, Syracuse, New York 13202.

37.   Defendant Niagara Mohawk Power Corporation is a business corporation doing organized under the laws of the State of New York, with offices located at 300 Erie Blvd West, Syracuse, New York 13202.  National Grid USA and Niagara Mohawk Power Corporation are collectively referred to in this Complaint as "National Grid."

38.   Defendant Carrier Corporation ("Carrier") is a Delaware corporation doing business in the State of New York, with its principal offices located at 6304 Carrier Parkway, East Syracuse, New York 13057.

39.     United Technologies Corporation ("United Technologies") is a Delaware corporation doing business in the State of New York, with its principal offices located at 10 Farm Springs Road, Farmington, Connecticut 06032.

40.     Defendant Carlyle Air Conditioning Company Inc. ("Carlyle") is a business corporation organized under the laws of the State of New York, with its principal offices at 6304 Carrier Parkway, East Syracuse, New York 13057.

41.     Defendant Center Circles LLC ("Center Circles") is a limited liability company organized under the laws of the State of New York, with an address of P.O. Box 186, Syracuse, New York 13208.

42.     Defendant General Electric Corporation ("GE") is a business corporation organized under the laws of the State of New York, with its principal offices located at 41 Farnsworth Street, Boston, Massachusetts 02210.

43.     Defendant Bristol-Meyers Squibb Company ("Bristol-Meyers") is a Delaware corporation doing business in the State of New York, with principal offices located at 430 East 29th Street, 14th Floor, New York, New York 10016.

44.     Defendant New Process Gear Corporation ("New Process Gear") (formerly known as the Management Club of New Process Gear, Division of Chrysler Corporation, which was last owned by Magna Powertrain USA, Inc.) is an inactive Delaware corporation which did business in the State of New York, with offices located at 6600 Chrysler Drive, renamed 6600 New Venture Gear Drive, East Syracuse New York 13057.

45.     Defendant Magna Powertrain USA, Inc. ("Magna") is a Delaware corporation with offices at 1870 Technology Drive Troy, Michigan 48083.

46.     Defendant Chrysler Group LLC, also known as FCA USA LLC, is a Delaware Corporation with an agent for service of process at CT Corporation System 111 Eighth Avenue, New York, New York 10011.

47.     Defendant Solvents and Petroleum Service, Inc. ("S&P"), is a business corporation organized under the laws of the State of New York, with its principal offices located at 1405 Brewerton Road, Syracuse, New York 13208.

48.     Defendant Thompson Corners, LLC ("Thompson Corners") is a limited liability company organized under the laws of the State of New York, with offices at 6225 Thompson Road, Syracuse, New York 13206.

49.     Defendant Metalico Syracuse Realty, Inc. ("Metalico Realty") is a business corporation organized under the laws of the State of New York, with offices at 6225 Thompson Road, Syracuse, New York 13206.

50.     Defendant Metalico New York, Inc. (formerly Metalico Syracuse, Inc.) ("Metalico New York") is a business corporation organized under the laws of the State of New York, with principal offices located at 135 Dermody Street, Cranford, New Jersey 07016.

51.     Defendant Aleris Partners LLC ("Aleris") is a limited liability company organized under the laws of the State of New York, with a designated service address of P.O. Box 46, 124 Grove Avenue, Cedarhurst, New York 11516.

52.     Defendant Cooper Crouse-Hinds, LLC ("Crouse-Hinds") is a Delaware limited liability company doing business in the State of New York, with principal offices located at 1201 Wolf Street, Syracuse, New York 13208.

53.     Defendant Gardner Denver, Inc. ("Gardner Denver") is a Delaware corporation doing business in the State of New York, with principal offices located at 222 East Erie Street, Suite 500,

Milwaukee, Wisconsin 53202, and is the successor to Lamson Corporation and Hoffman Air & Filtration Systems.

54.     Defendant Prestolite Electric Incorporated ("Prestolite") is a Delaware corporation doing business in the State of New York, with principal offices located at 30120 Hudson Drive, Novi, Michigan 48377.

55.     Defendant ONX1 LLC ("ONX1") is a Delaware limited liability company doing business in the State of New York, with a designated service address of 127 W. Fairbanks Avenue #410, Winter Park, Florida, 32789.

56.     Defendant Onondaga Pottery Company, Inc. ("Onondaga Pottery") is a New York business corporation formerly known as Syracuse China Corporation, with principal offices located at 300 Madison Avenue, Toledo, Ohio 43604.

57.     Defendant Syracuse China Company is a Delaware corporation doing business in the State of New York, with principal offices located at 300 Madison Avenue, Toledo, Ohio 43604.

58.     Defendant Libbey Glass Inc. ("Libbey") is a Delaware corporation doing business in the State of New York, with principal offices located at 300 Madison Avenue, Toledo, Ohio 43604, and upon information and belief is a successor to Syracuse China Company.   Libbey, Onondaga Pottery and Syracuse China Company are collectively referred to in this Complaint as "Syracuse China."

59.     Defendant Amparit Industries, LLC ("Amparit") is a limited liability company organized under the laws of the State of New York, with a designated service address of 2435 State Route 5, Utica, New York 13502.

60.     Defendant 6181 Thompson Road, LLC is a limited liability company organized under the laws of the State of New York, with a designated service address of 7050 Cedarbay Road, Fayetteville, New York 13066.

61.     Defendant Carrier Circle Business Complex LLC ("CCBC") is a limited liability company organized under the laws of the State of New York, with a designated service address of 535 East Countyline Road, Suite 15, Lakewood, New Jersey 08701.

62.     Defendant Telesector Resources Group, Inc. ("Telesector") is a Delaware corporation doing business in the State of New York, with principal offices located at 140 West Street, 20th Floor, New York, New York 10007.

63.     Defendant Western Electric Company, Incorporated ("Western Electric") is a Delaware company doing business in the State of New York, with principal offices located at 600 Mountain Ave., Room 63-334, Murray Hill, New Jersey 07974.

64.     Defendant Fulton Iron & Steel Co. Inc. ("Fulton Iron") was a corporation organized under the laws of the State of New York, with a designated service address of 415 South First Street, Fulton, New York 13069, which is currently inactive through dissolution as of September 3, 1992.

65.     Defendant Syracuse Lepage LLC "(Syracuse Lepage") is a New York limited liability corporation with an office address at 1 Lepage Place, Syracuse, New York 13206.

66.     Defendant Lennox Industries Inc. (formerly known as The Lennox Furnace Company) ("Lennox") is a Delaware corporation doing business in the State of New York, with principal offices located at 2140 Lake Park Blvd., Richardson, Texas 75080.

67.     Defendant Deere & Company ("Deere") is a Delaware corporation doing business in the State of New York, with principal offices located at One John Deere Place, Moline, Illinois 61265, and is the successor to Syracuse Chilled Plow Company.

68.     Defendant Syracuse Deere Road Associates, LLC ("Syracuse Deere Road") is a Delaware limited liability company doing business in the State of New York, with a designated service address of 80 State Street, Albany, New York 12207.

69.     Defendant Jagar Enterprises, Inc. ("Jagar') is a corporation organized under the laws of the State of New York, with principal offices at 203 Jasper Street, Syracuse, New York 13203.

70.     Defendant Burko Corporation ("Burko") was a New York corporation dissolved on December 29, 1982, which maintained offices at 145 Orchard Drive East, North Syracuse, 13212.

71.     Defendant Empire Pipeline Corporation ("Empire") was a New York corporation now dissolved, which maintained offices at 300 Hiawatha Blvd., East Syracuse, New York 13208.

72.     Defendant Calocerinos and Spina ("C&S") was a general partnership organized under the laws of the State of New York, which maintained offices at 2100 East Genesee Street, Syracuse, New York.

73.     Defendant C & S Engineers, Inc. ("C & S Engineers") is a corporation organized under the laws of the State of New York, with principal offices located at 499 Col. Eileen Collins Blvd., Syracuse, New York 13212, and is the successor to C&S.

74.     Defendants John Does are entities who may be a PRPs but whose identities and addresses are not currently known.

75.     The defendants identified in paragraphs "36" through "69" above, and John Does are referred to in this Complaint as "Owner and Operator Defendants."

76.     The defendants identified in paragraphs "70" through "73" above, and John Does are referred to in this Complaint as the "Dredging Arranger Defendants."

77.     All defendants identified above will be referred to in this Complaint "defendants," or "PRPs."

**BACKGROUND FACTS RELATED TO THE**
**LEY CREEK PCB DREDGING SITE**

78.     From the 1950's until 1993, GM owned and operated the Former GM IFG Plant located at One General Motors Circle (also known as 1000 Townline Road), Salina, New York, along Factory Avenue near the southern bank of Ley Creek, at which GM manufactured automotive parts.  From this plant, GM discharged process waste water and storm water into Ley Creek, with such water containing the specific PCB Aroclors 1242 and 1248 as a result of GM's use of specific hydraulic oils.  *See* Exhibit "G" and Exhibit "H," including the 1999 Consent Order Index No. D7-0008-97-06, between NYSDEC and GM's subsidiary REALM at ¶4 ("1999 REALM Consent Order").

79.     As noted below, however, there were numerous other industrial facilities using hydraulic oils, and data in reports from as early as 1985 and 1988 releasing PCBs in the Ley Creek Watershed with different PCB Aroclors than those NYSDEC acknowledged were used by GM.  *See* Exhibit "G" and Exhibit "I," including the 1988 OBG Report and 1985 Oil & PCB Sampling and Analyses of Portions of Ley Creek Report prepared by EDI Engineering & Science prepared for GM ("1985 EDI Report"); Exhibit "J," 1997 GM Consent Order ¶¶4-5.

80.     Following a major flooding event in 1969, Onondaga County undertook a flood control project that significantly widened and realigned Ley Creek. During this multi-year flood control project, its contractors, including the Dredging Arranger Defendants, excavated and then placed the dredge spoils on lands along the banks north and south of Ley Creek and east and west of Townline Road between about 1970 and 1975, and then again in the early 1980's, for purposes of preventing future flooding.  *See* Exhibits "F," "G," "H," "I" and "L."

16

81.     This work, which cut through the Town of Salina Landfill in the Lower Ley Creek, into which upon information and belief numerous local industries, including various defendants placed their waste, causing the spread Contamination in the Ley Creek Watershed.

82.     The County, with cooperation of the Town of Salina, arranged for the permanent disposal of the dredge spoils on the banks north and south of Ley Creek through contractors Burko and Empire under the direction of C&S, which arranged for the disposal on lands owned by the County, New York State, National Grid, S&P, and Plaza East LLC (which was the owner of the land on which the Town of Salina was operating its landfill) and possibly additional private land.  *See* Exhibits "A," "E," "L," "N" and "O."

83.     PCBs were originally detected in 1983 in smallmouth bass (Micropterus dolomieu) from Onondaga Lake (Sloan, Ronald J., 1985; personal communication).  The mean concentration was 0.625 ppm total PCB, and the maximum was 1.36 ppm. *See* Exhibit "I."

84.     The 1985 EDI Report indicates that the PCB compounds detected in the fish were "Aroclors 1254, 1260, and 1016," that the "source of these PCB's is unknown" and that "Aroclors 1242 and 1248 are present in effluent from the Fisher Guide plant on Ley Creek."

85.     Upon information and belief, NYSDEC was provided with a copy of the 1985 EDI Report because just one month before, on August 12, 1985, GM entered into a Consent Order with NYSDEC to perform a Remedial Investigation of Ley Creek.  *See* Exhibit "H" at ¶ 8 and at 48 of 135 of the attached ROD and Exhibit "I".

86.     As early as this first 1985 environmental investigation report prepared in relation to the PCB Contamination in Ley Creek, NYSDEC was notified of the following facts:

> Ley Creek drains an area of about 30 square miles (77 km$^2$) and is tributary to Onondaga Lake. Onondaga Lake is part of the Oswego River System, which is tributary to Lake Ontario…. In general, the Ley Creek drainage basin, except for the northeast portion, can be described as a highly urbanized area. Portions of the

17

towns and cities of Syracuse, North Syracuse, East Syracuse, Cicero, Clay, Dewitt, Manlius, and Salina are in the Ley Creek watershed. Many industries and commercial establishments are in the watershed. The larger industries include General Motors Corporation, Bristol Laboratories, Carrier Corporation, Syracuse China Corporation, Chrysler, and General Electric. These large factories and their parking1ots cover significant portions of the watershed. In addition, 14 miles of expressway, 8 interchanges, a service facility for the New York State Thruway, the Hancock Field of the U.S. Air Force, and Syracuse International Airport are located in Ley Creek's watershed. Streets, shopping areas, parking lots, and buildings cover other parts of this watershed. Industrial effluents and urban storm runoff discharge into Ley Creek. The northeast part of the watershed is relatively undeveloped. The Ley Creek watershed area was and still is highly industrial.

87.     On April 24, 1987, GM's consultant, O'Brien & Gere Engineers, Inc. ("OBG"), implemented a Hydrogeologic Investigation of Ley Creek, which identified PCBs up to 466 parts per million in soil and groundwater within an approximately 1,300-foot portion of the Creek (OBG-1 through OBG-7C). *Id.*

88.     On November 27, 1987, NYSDEC in cooperation with USEPA designated a portion of Ley Creek as the "Ley Creek PCB Dredgings Subsite," an area bounded by Factory Avenue to the south, Ley Creek to the north, Townline Road to the East, and 4,300 feet downstream to the west (also known as New York State Superfund Site No. 734044). *See* Exhibits "D," depicting the Ley Creek PCB Dredgings Site, and "H," 1999 REALM Consent Order ¶ 6-7 and Exhibit "B" to that Consent Order showing a map of the Ley Creek PCB Dredgings Subsite.

89.     Therefore, despite data in both the 1985 EDI Report and 1988 OBG Report, which included sampling NYSDEC requested to be performed **north** and **south** of Ley Creek (*see* Exhibit "G" and Exhibit "I"), GM's REALM subsidiary was only deemed ultimately responsible to further investigate and eventually remediate areas south of the creek. *See* Exhibits "A," "D," "F" and "G-I."

90.     On May 21, 1991, GM and the NYSDEC entered into a Consent Order Index No. A7-0239 -90-07 to perform a Remedial Investigation/ Feasibility Study ("RI/FS") to complete the

characterization of the areal and vertical extent of contamination on the Ley Creek PCB Dredgings Site and to evaluate alternatives for remediation.  *See* Exhibit "H" at ¶ 10-11.

91.     Six years later, on January 23, 1997, NYSDEC approved the RI/FS submitted by GM/REALM, and prepared a Proposed Record of Decision, which recommended removal and off-Site disposal of the dredge spoils equal to or greater than 50 ppm (which is the federal level of hazardous waste for PCBs pursuant to the Toxic Substances Control Act or "TSCA") and covering remaining soils more than 1 ppm in surface soil and 10 ppm in subsurface soils. *See* Exhibit "H" at ¶12-13.

92.     On a July 15, 1999, REALM entered into a 1999 Consent Order with the NYSDEC to prepare a Remedial Design for the Ley Creek PCB Dredgings Site.  GM, through REALM, was only required to remediate the 19-acre Ley Creek PCB Dredgings Site in the 1999 Consent Order *south* of Ley Creek.

93.     Between 1999 and 2001, GM/REALM remediated this very large Superfund Site.[4]

94.     Therefore, GM/REALM, well before the GM bankruptcy, had already remediated a large amount of Contamination originating from dredge spoils that resulted from 30 square miles of other industrial end users of this watershed in addition to its own Releases.

---

[4]     See RACER Trust Fact Sheet http://www.racertrust.org/files/ley-creek-environmental-fact-sheet.pdf and support documentation http://www.onondagalake.org/Sitedescription/LeyCreekDredgeSpoils/index.htm, explaining that the USEPA concurred with the NYSDEC's 1997 dredging ROD in 1998, and GM performed the work, with the approval and oversight of both agencies, in 1999-2000.  The agencies concluded that, as a result of the work, the potential for direct contact exposure to on-site PCBs has been eliminated and the site is no longer considered a significant threat to human health and the environment.  Moreover, in 2006, EPA conducted a five-year review of the site to determine if the performed remedial activities remained protective of human health and the environment. While the review determined that the remedy continued to be protective of human health and the environment and no additional cleanup work was needed, the review also recommended the implementation of a deed restriction precluding activities on the site that could potentially expose contaminated materials and to ensure that the integrity of the cover is maintained, which is still being implemented by the RACER Trust.  Therefore, as of well before the bankruptcy, GM and its successors certainly thought it had completed all work required of it in relation to the banks of Ley Creek.

95.     In the interim, numerous other defendants have released and were and are continuing to release PCBs and/or other Contaminants into the Ley Creek Watershed both upgradient to the east and downgradient to the west of Former GM IFG Plant as of a century before GM was present, starting in about 1854 to the present, and now 25 years after it ceased manufacturing operations at the Former GM IFG Subsite.  See Exhibits "F,"[5] "G" and "I."

96.     While NYSDEC pursued some of the defendants to contribute to costs to investigate and remediate the Lower Ley Creek Subsite, to the west of both the GM IFG Subsite OU-2 and the Ley Creek PCB Dredgings Site (*see* Exhibit "A" and the left box on the first slide in Exhibit "E"), NYSDEC only sought to compel GM and then RACER Trust to remediate the Contamination in the southern portion of the center of the Ley Creek Watershed, including the 19-acre Ley Creek PCB Dredgings Site south of the Creek.  NYSDEC has completely failed, apparently, to seek contribution from any other PRPs on the north side of Ley Creek or upgradient of the Former GM IFG Plant east of Townline Road, despite evidence of dredging east of this road (*see* Exhibit "L").

97.     At a recent October 17, 2018 meeting, NYSDEC declined to commit to pursue anyone other than the RACER Trust to remediate the Expanded OU-2 Site.  *See* Exhibit "E."

**BACKGROUND RELATED TO
GM IFG SUBSITE OU-1 AND OU-2**

98.     It is important to note that the series of Consent Orders discussed above only relate to the Ley Creek PCB Dredgings Site, even though various Consent Orders, reports, data and other evidence all in NYSDEC's possession, acknowledged that some dredge spoils were placed north

---

[5]     The March 2015 NYSDEC Record of Decision (ROD) for OU-2 (Exhibit "F") at 2 acknowledges that "Industrialization of the area began soon after the completion of the Erie Canal in 1857 and the development of railroads in eastern Syracuse.  Several industries have been located near Ley Creek and its branches since the late 19th and early 20th centuries. The industrial nature of this area, as well as the infrastructure and other development, influenced this site and contributed to its current condition."  Given that GM only commenced operations literally 100 years later than 1857, it is unclear why only GM's operations have been the focus of NYSDEC's Superfund efforts other than it has been more convenient to seek cost recovery and contribution only from the RACER Trust.

of the Creek and some data showed Contamination on lands north of the Creek bed and east of Townline Road.

99.    Pursuant to the March 1997 Ley Creek PCB Dredgings Site Record of Decision (attached to and incorporated into the 1999 REALM Consent Order in Exhibit "H"), even though GM performed some investigation of the groundwater under the dredging soils and surface water and sediments in Ley Creek in the area west of Townline Road and east of the Route 11 bridge (*i.e.* in and around the Ley Creek PCB Dredgings Site), NYSDEC deferred evaluation of the groundwater under the dredging soils and surface water and sediments in Ley Creek in the area west of Townline Road and east of the Route 11 bridge (*i.e.,* in and around the Ley Creek PCB Dredgings Site, designated as "Deferred Media"), later referring to this area as "Operable Unit 2" until the Remedial Investigation of the Former GM IFG Plant (Operable Unit 1) was performed as described below.

100.    NYSDEC and GM entered into an Administrative Order on Consent (Index #D-7-0001-97-06), which became effective on September 25, 1997 for New York State Superfund Site No. 734057 ("1997 GM Consent Order"), requiring GM to conduct an Remedial Investigation/ Feasibility Study (RI/FS) for the GM – IFG Site and Deferred Media (as noted above, later defined as OU-1 and OU-2, respectively) and to implement some Interim Remedial Measures ("IRMs"). *See* Exhibit "J."

101.    Soil, sediment, surface water and biota samples were obtained for chemical analysis as part of the RI.

102.    Three significant Interim Remedial Measures (IRMs) were implemented by GM from 2002 to 2004 to prevent further migration of PCBs to Ley Creek from the Former GM IFG Plant facility that had been closed for almost nine years since 1993:

- Former Landfill IRM:  An industrial landfill at the Former GM IFG Plant that contains chromium- and PCB-contaminated material was capped to prevent contaminants from leaching into the groundwater.  In addition, hot spots associated with the landfill were excavated.

- Former Drainage Swale IRM:  This second action involved the removal of highly contaminated soil from a former discharge swale.  This swale was used in the 1950s and 1960s as a conduit for the discharge of liquid process waste to Ley Creek. The swale was subsequently filled in, but the contaminated soil remained until the performance of this action.  Over 26,000 tons of soils containing PCBs were removed from this area of the Former GM IFG Plant property.

- SPDES Treatment System IRM:  The third action involved the construction of a retention pond and associated water treatment system.  This pond collects all water that accumulates on the Former GM IFG Plant property in any of the storm sewers or abandoned process sewers.  The pond water is then sent through the treatment plant in order to meet permitted discharge limits, prior to discharge to Ley Creek.  The purpose of this response action was to stop the intermittent discharge of PCBs and other contaminants that occur during storm events.[6]

103.    In 2009, the GM Debtors filed for bankruptcy, and in 2010, the Trust Consent Decree was executed.  On March 31, 2011, title to the Former GM IFG Plant and the Ley Creek Dredgings Subsite, and administration of the remedial activities for the GM Debtors were officially taken over by the RACER Trust.

104.    RACER Trust completed the RI/FS for OU-2 summarized in an RI report dated March 2013 and approved by NYSDEC in April 2013.  The FS report (May 2013) and an FS report addendum (June 2014) were approved by NYSDEC concurrent with the issuance of the March 2015 ROD.  *See* Exhibit "F."

105.    These reports, intended to characterize the location of the Contamination for which the GM Debtors were responsible for, did not include the new areas depicted on the maps in Exhibit "E" because these were ***not*** areas for which the GM Debtors were ever deemed responsible.

---

[6]        Reports documenting these efforts can be accessed on the RACER Trust website at http://racertrust.org/Properties/Detail?Id=10100.

## THE RACER TRUST OCTOBER 27, 2015 CONSENT ORDER

106.    On October 27, 2015, RACER Trust, which is defined as a completely distinct legal entity from GM or any of the GM Debtors, entered into its first Consent Order with NYSDEC, Index No. R7-0853-15-06 for Site No. 734057 ("October 2015 RACER Trust Consent Order"), to perform the remaining Remedial Investigation/Feasibility Study ("RI/FS"), Remedial Design ("RD") and Remedial Action ("RA") in relation to the GM-IFG Subsite (OU-1) and a RD/RA for the OU-2, and which Consent Order was intended to complete the necessary Environmental Response.

107.    The October 2015 RACER Trust Consent Order was clearly intended to resolve RACER Trust's statutory and common law liability to the State, pursuant to 6 NYCRR §375-1.5(b)(5), providing that upon the Department's issuance of a Certificate of Completion as provided at 6 NYCRR § 375-1.9 and § 375-2.9 for work performed as required in the Order, RACER Trust "shall not be liable to the department upon any statutory or common law cause of action, except for one for natural resource damages, arising out of the presence of any contaminants in, on or emanating from the site that was the subject of such certificate."  6 NYCRR § 375-2.9(a).

108.    However, since implementing about fifty percent (50%) of the RD work required for OU-2, NYSDEC has required RACER Trust to perform more investigation work well beyond the footprint of the land covered in the map attached as Exhibit "A" to the October 2015 RACER Trust Consent Order (*see* Exhibit "B"), which map was otherwise consistent with the map in the March 2015 ROD (*see* Exhibit "F") and all prior maps in earlier Consent Orders with the GM Debtors, which predate the GM bankruptcy, including but not limited to the 1997 GM RI/FS Consent Order (*see* Exhibit "J") and the Trust Consent Decree.  Compare the maps in Exhibit "E" with all of the maps in the prior orders and RODs in Exhibits "B," "C," "D," "F" and "J".

23

109.    The October 2015 RACER Trust Consent Order acknowledges that RACER Trust is an independent trust created after the GM Debtors' 2009 bankruptcy to cleanup and reposition for redevelopment the GM Debtors' former manufacturing facilities, including the Former GM IFG Plant, and further acknowledges that the Trust was created pursuant to the 2010 Trust Consent Decree, to which the State of New York was a signatory pursuant to the Environmental Action budget limits in that Decree.

110.    NYSDEC should have been well aware of the approximately $31 million total budget earmarked for investigation and remediation of OU1 and OU2 of the GM IFG Subsite, which initial budget was been slightly adjusted down based on monies spent prior to the settlement date. *See* Exhibit "K."

111.    Nothing in this October 2015 RACER Trust Consent Order required RACER Trust to perform investigation or remediation outside the footprint of the defined OU-1 and OU-2 areas depicted in Exhibit "A" to the Consent Order.

112.    The Trust has made every reasonable effort to cooperate with the NYSDEC to address the Contamination in the Ley Creek Watershed.

113.    As noted throughout this Complaint, however, NYSDEC has blamed GM for all of the Contamination recently found in areas outside of former GM's responsibility and whose local manufacturing operations ceased 25 years ago.

114.    As set forth above, the County undertook dredging of Ley Creek and disposal of sediments from Ley Creek on several occasions, which resulted in Releases of PCBs and other Contaminants from numerous industrial defendants, and not just from GM.

115.    The Town of Salina operated two Landfills adjacent to Ley Creek, known as the Town of Salina Landfill and Mattydale Landfills or Dump, into which some of the defendants disposed of waste, and neither of which, upon information and belief, have been properly remediated.

## OWNER AND OPERATOR DEFENDANTS

116.    National Grid (formerly operating as "Niagara Mohawk") is a major landowner of property in the Ley Creek Watershed (*see* Exhibits "A" and "M"), and has also operated since approximately the 1920's an electrical substation containing transformers immediately adjacent to the GM IFG Subsite known as either the Teall Avenue or 800 Factory Avenue Transformer or Substation facility, which, upon information and belief, has contributed PCB and other contamination to Ley Creek ("National Grid Property").

117.    National Grid has had at least five spills on this National Grid Property searchable on the NYSDEC's website between 1995 and 2018: 1995 Spill #9503252 (100 gallons of transformer oil into soil); 2006 Spill # 0601915 (3 gallons of transformer oil into soil); 2014 Spill #1403464 (100 gallons of dieletric fluid onto soil which spill is not closed); 2015 Spill #1503529 (20 pounds of hydraulic oil onto soil from vehicular failure) and 2018 Spill #1802404 (10 gallons of transformer oil).

118.    Not only has RACER Trust recently cleaned up some of the adjacent National Grid Property (the three-acre wetland area), National Grid has been identified as a PRP for Lower Ley Creek.  National Grid is not paying its fair share of the costs associated with the Ley Creek Watershed environmental response, particularly given its recent and ongoing discharges.

119.    GE was the former owner and operator of the TR-1 plant at the Carrier manufacturing facility at 6304 Carrier Parkway, at which it manufactured turbines and engines from

approximately 1940 to 1946, when it sold the site to Carrier, and upon information and belief also discharged PCBs and/or other contaminants into Ley Creek. *See* Ex. A at Map 2, Site E.

120.    GE Aerospace also owned and operated a facility 6417-6437 Deere Road, known as the General Electric - Former Court Street Plant #5, running along Sanders Creek to the north, and Ley Creek South Branch (formerly known as Headsons Creek) to the south (see Exhibits "A" and "M") which, upon information and belief, used PCBs and other Contaminants (notably chlorinated solvents) in the manufacture radar and sonar equipment for the U.S. Government from 1956 to 1991.

121.    According to the NYSDEC Superfund Database listing for this site, (https://www.dec.ny.gov/cfmx/extapps/derexternal/haz/details.cfm?pageid=3): "Spills of solvents from underground solvent storage tanks and an aboveground solvent dispensing pad resulted in the disposal of hazardous waste at the site."

122.    Center Circles is now the owner of the Former Court Street Plant #5, which is listed as a Class 4 State Superfund site #734070 on the New York State Registry of Inactive Hazardous Waste Disposal Sites, where remedial systems are in place and site OM&M is required.

123.    Carrier owned and operated a 175-acre manufacturing facility at 6304 Carrier Parkway ("Carrier Facility") from about 1947 to 2004 along the Sanders Creek, a tributary leading to Ley Creek, and which is the UTC Carrier New York State Superfund Site #734043.  *See* Exhibit "M."

124.    The NYSDEC database for this Superfund Site (https://www.dec.ny.gov/cfmx/extapps/derexternal/haz/details.cfm?pageid=3) states that surface runoff is conveyed to Sanders Creek through established outfalls in the facility's stormwater collection system or as direct, non-point runoff. The database further states:

> Sanders Creek:  Investigations reveled PCBs throughout Sanders Creek and its floodplains above the Ecological SCO of 1 ppm at various depths.  In some areas

concentrations of PCBs exceeded 50 ppm. A&R Building/Former Pond Area:  The Former Pond area had soil detections of SVOCs and PCBs at levels above Protection of Ecological Resources but below the SCO of Industrial Use.  The A&R building area had no soil detections above the Industrial Use SCO.  Former TR-1 Building:  A soil sample at the soil-groundwater interface near Substation I was found to contain Total PCBs at a concentration of 26.4 mg/kg.  Debris Pile:  PCBs were found in concentrations greater than 50 ppm in the Debris Pile during the initial investigations.  On-Site SVI:  VOCs were detected in buildings TR-4, TR-6, TR-18, and TR-18s.  Other occupied building[s] are currently being investigated for VOCs.  Off-Site SVI:  There is no reason to believe there are any site related VOCs North and South of the site.  The potential for soil vapor intrusion to occur east of Kinne Street will be evaluated once the sub-slab and indoor air data has been evaluated at Building TR-20 and the potential for soil vapor intrusion to occur west of the site will be addressed under the landfill area, AOC G.  Landfill Area, AOC G:  Area is still under investigation. Early investigations revealed impacts from Metals, PCBs, SVOCs, and VOCs.  TR-3 / SWTP:  Findings indicated chlorinated VOCs, PCBs, and oil-related impacts to subsurface soils and groundwater in the area, including the area between the wall and Sanders Creek.  Surface water:  PCBs were detected in the TR-18 and Thompson Rd Storm Lines at concentrations up to 67.8 ppm.  PCBs were found in roof runoff in concentrations ranging from 2 ppm to 30,000 ppm.  Groundwater:  Investigations have revealed VOC and PCB impacts in groundwater at several various locations throughout the site.

125.   Despite these significant findings as a result of a study in Ley Creek and certain tributaries east of the GM IFG Plant Site, the NYSDEC is requiring little to no response for the Carrier Facility, based on the following analysis and application of industrial cleanup levels:

The site is in the middle of a secure 85 acre production facility.  There may be some residual groundwater contamination, however, all businesses and residences in the area are served by public water supplies.  The tank has been removed and the site completely paved over, limiting exposures to site contaminants.  Based upon the findings of the corrective measures study (CMS) there could be several areas where additional investigations, monitoring, or corrective measures must be completed. The CMS will look at groundwater, storm sewer bedding, soil vapor/indoor air, and Sanders creek.

126.   The Former GM IFG Plant is also in an industrial area, yet is being held to a residential cleanup standard downgradient from the continuing source of Contamination at the Carrier Facility.

127.    As late as 1995, after GM ceased operations, Carrier was still discharging PCBs into Sanders Creek, which ultimately makes it way to Ley Creek as documented in a 1995 PCB Oil NYSDEC Spill Report #9505910.  In addition, industrial discharges pursuant to SPDES permit #NY000-1163 added both PCB and halogenated solvent Contamination to the Ley Creek Watershed.  *See* Ex. M Upper Ley Creek Map 2, Site E.

128.    United Technologies acquired Carrier in 1979, and was the owner of Carrier and an operator of the Carrier Facility at the time of Carrier's 1995 PCB spill and during discharges into the Ley Creek South Branch, and is named as a responsible party in the Superfund Site listing. *See* Ex. A at Map 2, Site E.

129.    Carlyle has been the owner and operator of a manufacturing facility ("Carlyle Facility") at 6304 Carrier Parkway from 1960 to the present.  This facility is located on a portion along Sanders Creek, which runs into Ley Creek.

130.    A PCB spill occurred on the Carlyle Facility in 1988 Spill Report #8804337 (https://www.dec.ny.gov/cfmx/extapps/derexternal/spills/details.cfm?pageid=2.  *See* Exhibits "A" and "M," Upper Ley Creek Map 2, Site 2.

131.    United Technologies is the owner, and was the owner of Carlyle at the time of a 1988 PCB spill caused by Carlyle, and was an operator of the Carlyle Facility at the time of the disposal at that facility.  *See* Ex. A at Map 2 Site E.

132.    CCBC is the owner of 6500 New Venture Gear Drive located on Sanders Creek, on which it operated Carlyle Compressor Company, which, upon information and belief, has been in existence from about 1960 to present to manufacture materials for engines and turbines using PCBs that were discharged into Sanders Creek, and ultimately into Ley Creek (as documented by a 1988 PCB DEC Spill Report #8804337).

133.   Bristol-Meyers has owned and operated, from 1943 to the present, a large manufacturing facility at 6000 Thompson Road along the Ley Creek South Branch (formerly known as Headsons Creek), a tributary leading to Ley Creek.  *See* Ex. A at Map 2, Site H.

134.   Bristol-Meyers discharged storm and/or waste process water, including Contaminants, and possibly PCBs, into Ley Creek South Branch via SPDES permit #NY0233251; a 1986 spill of diesel fuel (Spill #8604666) in groundwater; another petroleum spill in 1987 (Spill #8607721); a spill of an "unknown substance" from equipment failure (1988 Spill #8802080); and a 1988 spill of kerosene into groundwater (Spill #8802588); all of which are documented on the NYSDEC website (https://www.dec.ny.gov/cfmx/extapps/derexternal/spills/details.cfm).

135.   New Process Gear, which was owned by Chrysler and last owned by Magna, owned and operated a large manufacturing facility along a tributary of Ley Creek at 6600 Chrysler Drive, later known as 6600 New Venture Gear Drive, and discharged Contaminants into the tributary and ultimately into Ley Creek involved in the manufacture of automotive gear and gear housing, including Petroleum and PCB materials used in electrical services including transformers and substations, along with PCB hydraulic fluids.

136.   The New Venture Gear facility, during both Chrysler's and Magna's ownership, had numerous reported spills, including but not limited to: Spill ##8605940 (used oil to surface water unknown quantity); 9005379 (diesel truck spill); 9208676 (gasoline unknown quantity to soil); 9211399 (gasoline unknown quantity to soil); 9412146 (#2 fuel oil to soil); 9603160 (diesel unknown amount to soil); 9603347 (oakite 15 gallons to soil); 9606389 (mercury 3 pounds to soil); 9608003 (1200 gallons of lube oil to sewer); 9700843 (unidentified equipment failure spill); 9712032 (another unidentified spill); 9806403 (unidentified tank farm failure); 9807176 (tank overflow of unknown substance); 9810679 (equipment failure of unidentified substance), 9900368

(waste water and hydraulic oil spill); 9902636 (waste oil into sewer); 9906682 (1000 gallon waste oil spill); 9908428 (40 gallon spill to soil); 101108 (lube oil to soil); 102687 (20 gallons petroleum to sewer); 103886 (motor oil); 104015 (transmission fluid); 104684 (7 gallon floor cleaner); 211099 (used oil); 303470 (unknown 2 gallon spill to soil); 306290 (quenching oil to surface water); 308123 (unknown amount waste oil spill); 308506 (unknown amount waste oil spill); 404337 (unknown spill on dock); 409541 (5 gallon diesel spill); 610876 (unknown amount of cutting oil to soil); 908952 (gasoline on impervious surface); 1011638 (waste oil on impervious surface); 1305935 (15 gallon fuel dispenser pump diesel spill); and 1401116 (diesel tank spill).

137.    ONX1 is the current owner of 6600 Chrysler Drive, also known as 6600 New Venture Gear Drive, which is located on Sanders Creek, and which ultimately discharges into Ley Creek, where numerous spills took place, and upon information and belief, the manufacture of automotive gear and gear housing took place and PCB materials were used in electrical services including transformers and substations, along with PCB hydraulic fluids.

138.    S&P owns and operates a remediation and spill response company, and purchased the site at Brewerton Road from Buckley Petroleum, Inc. who operated on the site beginning in about 1945, which upon information and belief caused spills of Contaminants into Ley Creek.

139.    Thompson Corners is the partial owner of one of two former Roth Brothers Smelting plants (RCRA Site #734064) located at 6225 Thompson Road, which is along the Ley Creek South Branch, on which Releases of PCBs occurred, and which Releases were subject to a 1994 NYSDEC Consent Order #C7-0001-94-10 with Roth Brothers (whose successor is Aleris), that was not fully complied with, and a September 15, 2010 Consent Order #R7-20070627-35 that also included Metalico New York as a respondent, which upon information and belief has not been fully complied with.  *See* Ex. A at Map 2, Site F.

140.     Metalico Realty is the partial owner of one of two former Roth Brothers Smelting plants located at 6225 Thompson Road, on which Metalico New York operates a scrap metal business, which is along the Ley Creek South Branch, on which PCB Releases occurred and which releases were subject to a 1994 NYSDEC Consent Order #C7-0001-94-10 with Roth Brothers (whose successor is Aleris), that has not been fully complied with, and later a September 15, 2010 Consent Order #R7-20070627-35 that also included Thompson Corners as a respondent, which upon information and belief has not been fully complied with.  *See* Ex. A at Map 2, Site F.

141.     Aleris purchased Wabash Aluminum Alloys in 2007, which bought the former Roth Brothers Smelting Site from Phillips Metals in 1999, which merged with Roth Brothers in 1997. Aleris is the successor to Roth Brothers Smelting's liability and is therefore responsible for the remediation of the PCBs released by Roth Brothers Smelting into Ley Creek South Branch, which eventually drains into Ley Creek, and which has not been remediated in accordance with the two Consent Orders executed in relation to this site.

142.     Crouse-Hinds has historically owned and operated a landfill in and around the Lower Ley Creek area, which was used to dispose of wastes from its manufacturing facility, including paint and plastic wastes and waste generated from the facility's wastewater treatment plant.  Upon information and belief, this Contamination in and around Ley Creek was dredged and redeposited east of this facility.  *See* Exhibits "A" and "M."

143.     Gardner Denver, successor to Lamson Corporation (also formerly known as Lamson Company), owned and operated a manufacturing facility ("Lamson Facility") along Ley Creek South Branch (formerly known as Headsons Creek) at 1 Lamson Street from about 1921 to 2000, where, upon information and belief, the Lamson Facility manufactured and designed centrifugal

blowers and exhausters that used PCB materials in hydraulic fluids, heat transfer fluids, and lubricants that drained into Ley Creek.

144.     In addition, on or about August 15, 1986, a spill of an unknown quantity of #4 fuel oil into groundwater at the Lamson Facility was reported to NYSDEC and given Spill # 8603776.  This spill took over nine months to close suggesting remediation work was required.  Upon information and belief, this spill affected groundwater that flows to Ley Creek South Branch.

145.     Jagar Enterprises, Inc. is the current owner of the former Lamson facility.

146.     Syracuse China owned and/or operated a facility ("Syracuse China Facility") at 2801 Court Street from about 1922 to 2009, where it manufactured china products in which PCBs were used in hydraulic fluid.

147.     During operation of the Syracuse China Facility, a drainage ditch and landfill pond, which, upon information and belief, was used to dispose of wastes containing PCBs, lead, and VOCs that were drained into Ley Creek, which were dredged and from which dredge spoils may have been deposited upgradient along creek banks.

148.     The Syracuse China Facility, known as the Syracuse China Superfund Site #734053, is listed as a Class 4 site on the NYS Registry of Inactive Hazardous Waste Disposal Sites since it was closed, but where site OM&M is required.

149.     Amparit Industries is the owner of the Syracuse China Facility, where PCBs and other environmental contaminants were historically used in manufacturing and disposed on site, which upon information and belief, contributes, and/or continues to contribute PCBs and other Contaminants into Ley Creek.

150.     Deere purchased Syracuse Chilled Plow Company, and directly or through Syracuse Chilled Plow Company has owned and operated a manufacturing facility at 6401 Deere Road,

which is along the Ley Creek South Branch and Sanders Creek, from about 1876 to the present and has manufactured plow/tractor blades at the facility using, upon information and belief, PCB-containing hydraulic fluids in hydraulic machinery and/or its manufacturing processes. *See* Exhibit "A."

151.    Syracuse Deere Road is the current owner for the former Deere facility.

152.    Western Electric owned and operated a manufacturing facility at 6360 Thompson Road from about 1952 until 1983, located across Thompson Road from Ley Creek South Branch, where it manufactured electronics and upon information and belief, used PCB materials in hydraulic fluids for machinery and manufacturing purposes.

153.    Based on a 1991 NIOSH health and safety investigation of when NYNEX operations were being conducted at the facility (https://www.cdc.gov/niosh/hhe/reports/pdfs/1991-0022-2118.pdf)

- This plant, formerly part of Western Electric, has been in operation since 1953.  The current workforce of approximately 100 is involved in telephone cable de-reeling, cable cutting, and end-capping.  Over 85% of the facility is now devoted to warehousing.

- Plastic end caps are used to protect the cut ends of telephone cable from moisture and physical damage.  From 1953 to approximately 1982, Western Electric (NYNEX) employees tapped end caps onto the cables.  Beginning in 1982-83, NYNEX employees began using heat-shrinkable end caps for the capping operation.

- A 1990 NYNEX report containing the results of air sampling conducted by the Telesector Resources Group on the materials used in the de-reeling and end capping operation was received by NIOSH on January 3, 1991.  This report detailed area air sampling results for a variety of organic vapors, including total hydrocarbons, cyclohexanone, ethyl acetate and ethyl acrylate.  Air samples were also collected for metals such as nickel, lead, copper, iron, and aluminum.  …All of the measurements, with the exception of TDI, were either non-detectable or below their respective occupational exposure limits.  Toluene diisocyanate was detected in two of nineteen short-term (15 minute) air samples.  The highest of these two samples measured TDI at approximately 0.1 parts per million (ppm), a level which exceeds the Occupational Safety and Health.

154.    Cable operations normally use PCB oils.

155.    Telesector Resources is the current owner of 6360 Thompson Road, across from Ley Creek, which operates under the name Verizon Services Group, and is upon information and belief still conducting cable manufacturing operations at the site.

156.    Prestolite was a historic operator at 219 Lamson Street, where the company manufactured spark plug and electronics equipment ("Prestolite Facility"), which upon information and belief, contained PCBs and other environmental contaminants, and which property drains into Ley Creek and Ley Creek South Branch (formerly Headsons Creek).

157.    On or about August 11, 1988, a spill of an unknown material from abandoned drums was reported at the Prestolite Facility to the NYSDEC as Spill # 8804207.  Prestolite was the operating entity at the time of the spill.  Upon information and belief, this spill affected the site with unknown Contaminants.

158.    Syracuse Lepage LLC is the current owner of the former Presolite Facility, which now has the address of 1 Lepage Place.

159.    6181 Thompson Road, LLC is the current owner of 6181 Thompson Road, which drains into Ley Creek South Branch (formerly known as Headsons Creek), and upon information and belief, was previously used as the Oberdorfer foundry and specialized in railroad relating activities using hydraulic equipment which upon information and belief contained PCB oils.

160.    Lennox Industries operated a furnace manufacturing facility at 400 N. Midler Avenue located on Ley Creek South Branch from about 1947 to 1967, where upon information and belief it used PCBs and/or other Contaminants during the manufacturing process.

**THE DREDGING**

161.    Empire Pipeline Corporation and Burke Corporation dredged Ley Creek on behalf of the County in the 1970's until about 1980, and arranged for disposal of the Contaminants, including

PCBs and other Hazardous Substances, by depositing dredge spoils and/or other materials on both sides of the Creek.

162.    C&S performed, supervised or otherwise arranged for dredging work in and around Ley Creek on behalf of Onondaga County from in the 1970's to about September 1980, and arranged for disposal of Contaminants, including PCBs and other Hazardous Substances, by depositing dredge spoils and/or other materials on both sides of the Creek.

163.    Upon information and belief, C&S became aware that Empire Pipeline Corporation had not removed contaminated excavated material in violation of County bid and contract documents, since they had not "disposed" of spoils, but rather placed unsuitable spoils back in the floodplain, in violation of an NYSDEC permit (see Exhibits "N" and "O"), along the banks of Ley Creek and had not removed contaminated excavated material that it temporarily placed on the County-owned property, which GM had to purchase and became the Ley Creek PCB Dredgings Site, and which should have been removed prior to termination of their lease period.

164.    Upon information and belief, this contaminated material was never removed by these contractors under the oversight of C & S, which arranged for the disposal of the spoils creating hazardous waste landfill areas in locations they knew were still prone to flooding.

165.    The Dredging Arranger Defendants knew or should have known that the material that was dredged from Ley Creek contained or might contain Hazardous Substances.

## DAMAGE TO PLAINTIFFS

166.    Plaintiffs have been and will continue to be damaged by incurring response costs for Environmental Response to the Contamination caused by defendants, some of which was released after GM ceased its manufacturing operations and is continuing to migrate into the Ley Creek

Watershed, well in excess of plaintiffs' own equitable share of liability for such remediation resulting from the GM Debtors' historic ownership and operation.

167.    As a direct, proximate, and natural consequence of the Releases, and the failure of the defendants to promptly and adequately remediate the Contamination, plaintiffs have endured, and will need to endure in the future, Environmental Response activities.

168.    Plaintiff RACER Properties has been and will continue to be damaged by defendants' failure and/or refusal to remediate the Contamination.

169.    Plaintiffs have currently available to them a total of about $19 million for the remediation and long-term OM&M of both OU-1 and OU-2 of the GM IFG Subsite, but it is likely that remediation of these Operable Units will cost significantly more than that.

170.    Upon information and belief, the remediation of the Expanded OU-2 Site may cost as much as around $60 million to around $93 million, for which defendants are jointly and severally liable, or should be required to pay their equitable share.

## PROCEDURAL ISSUES

171.    Plaintiffs have no adequate remedy at law, and no previous application has been made for the relief sought in this action.

172.    This Court has subject matter jurisdiction over the First and Second Causes of Action of this Complaint, pursuant to CERCLA §113(b) (42 U.S.C. § 9613(b)) and 28 U.S.C. § 1331.

173.    This Court has supplemental jurisdiction over the state law claims in the other Causes of Action of this Complaint pursuant to 28 U.S.C. § 1367, since they arise out of a common nucleus of facts.

174.    Venue is proper in this federal District Court pursuant to CERCLA §113(b) (42 U.S.C. §9613(b)), because the Releases occurred and the Contamination is located within the Northern

District of New York, and pursuant to 28 U.S.C. § 1391, because the real property which is the subject of this action is located, and the events related to the claims occurred, within the Northern District of New York.

175.     In addition, the Declaratory Judgements Act, 28 U.S.C. §2201, authorizes this Court to grant declaratory relief in this matter.

**AS AND FOR A FIRST CAUSE OF ACTION**
**FOR COST RECOVERY UNDER CERCLA §107,**
**PLAINTIFFS ALLEGE AS FOLLOWS:**

176.     Plaintiffs repeat and reallege the allegations of paragraphs "1" through "175" of this Complaint, as if set forth in this paragraph at length.

177.     Defendants' Properties and the Expanded OU-2 Site are "facilities," as defined in CERCLA §101(9) (42 U.S.C. §9601(9)).

178.     The Owner and Operator Defendants are "owners" and/or "operators" as defined by CERCLA §101(20) (42 U.S.C. §9601(20)), of one or more of Defendants' Properties, either at the present time, or were such "owners" and/or "operators" at the time of disposal of Hazardous Substances at Defendants' Properties.

179.     The Dredging Arranger Defendants, and many of the Owner and Operator Defendants, are persons who arranged for disposal of hazardous substances, as described in CERCLA § 107(a)(3), at the Expanded OU-2 Site, at Defendants' Properties and/or in the Ley Creek Watershed.

180.     The Hazardous Substances are "hazardous substances" as defined by CERCLA §101(14) (42 U.S.C. §9601(14)).

181.     Pursuant to CERCLA §107(a) (42 U.S.C. §9607(a)), defendants are persons who are strictly liable and responsible for investigation, cleanup, remediation and removal of the Contamination, and plaintiffs' associated past and future response costs.

182.    Plaintiffs have incurred response costs as a result of the Contamination.

183.    All response costs incurred by plaintiffs in connection with the Contamination have been consistent with the National Contingency Plan, and are recoverable pursuant to CERCLA §107(a) (42 U.S.C. §9607(a)).

184.    Accordingly, defendants are strictly, jointly and severally liable under CERCLA §107(a), 42 U.S.C. §9607(a) for all response costs incurred by the plaintiffs, and all response costs necessary in the future, to remediate the Expanded OU-2 Site.

185.    This Court should direct defendants to pay the response costs incurred by plaintiffs, and declare that they are liable for plaintiffs' future response costs for the Expanded OU-2 Site.

**AS AND FOR A SECOND CAUSE OF ACTION**
**FOR CONTRIBUTION UNDER CERCLA,**
**PLAINTIFFS ALLEGE AS FOLLOWS:**

186.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "185" of this Complaint, as if set forth in this paragraph at length.

187.    Pursuant to CERCLA, including CERCLA §113(f)(1) (42 U.S.C. § 9613(f)(1)), CERCLA §107(a) (42 U.S.C. § 9607(a)), and/or otherwise, defendants must contribute their equitable share of the response costs incurred by plaintiffs to investigate and remediate the Contamination at the Expanded OU-2 Site.

188.    This Court should direct defendants to pay their equitable shares of response costs incurred by plaintiffs, and declare that they are liable for their equitable share of plaintiffs' future response costs for the Expanded OU-2 Site.

38

**AS AND FOR A THIRD CAUSE OF ACTION**
**FOR RESPONSE COSTS AND DAMAGES**
**UNDER NAVIGATION LAW §181(5),**
**PLAINTIFFS ALLEGE AS FOLLOWS:**

189.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "188" of this Complaint, as if set forth in this paragraph at length.

190.    Upon information and belief, some of the Contaminants spilled or discharged by defendants at or from the Defendants' Properties included Petroleum.

191.    Owner and Operator Defendants that own or operate, or have owned or operated, Defendants' Properties where Petroleum was discharged and migrated into the Ley Creek Watershed, and the Dredging Arranger Defendants (together the "Discharger Defendants") had the capacity to take action to investigate and clean up the Contamination resulting from the Releases of Petroleum, or defendants discharged Petroleum into Ley Creek, but they failed to effect an immediate cleanup, proximately resulting in Contamination of the Expanded OU-2 Site.

192.    The Discharger Defendants did not have permits from the United States or New York State or any other government authority for the Releases, and the Releases of Petroleum were therefore prohibited by Navigation Law §173.

193.    Pursuant to the Oil Spill Act, including Navigation Law § 181(5), the Discharger Defendants are liable for investigation, cleanup and removal of the Contamination of the Expanded OU-2 Site, and all of the direct and indirect damages of plaintiffs, including attorneys' fees.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**FOR CONTRIBUTION UNDER NAVIGATION LAW §181(5),**
**PLAINTIFFS ALLEGE AS FOLLOWS:**

194.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "193" of this Complaint, as if set forth in this paragraph at length.

195.    Pursuant to the Oil Spill Act, including Navigation Law §176(8), the Discharger Defendants are liable to indemnify or make contribution to plaintiffs for their past and future costs of investigation, remediation, cleanup, and removal, and response, and are responsible for investigation, remediation, cleanup and removal of, and response to, the Contamination (to the extent the Contaminants are Petroleum) of the Expanded OU-2 Site, and declare that they are responsible for future response costs.

**AS AND FOR A FIFTH CAUSE OF
ACTION FOR NEGLIGENCE,
PLAINTIFFS ALLEGE AS FOLLOWS:**

196.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "195" of this Complaint, as if set forth in this paragraph at length.

197.    Defendants owed a duty of care to plaintiffs with regard to their ownership and/or operation of Defendants' Properties and the Contamination originating from Defendants' Properties.

198.    Defendants caused the Releases and Contamination, should have promptly and adequately reported the Contamination to NYSDEC and plaintiffs, and effected an immediate investigation and cleanup.

199.    Defendants (including their officers, agents, servants, and/or employees) acted unreasonably and negligently in failing to prevent, or causing the Releases and Contamination, failing to promptly and adequately report the Contamination to NYSDEC, USEPA and plaintiffs, and/or failing to promptly and adequately investigate and remediate the Contamination, and those acts or omissions were the direct and proximate cause of the continued existence and spread of the Contamination, and damages to plaintiffs.

200.    Defendants, by reason of their negligence, are liable for all of the damages to plaintiffs proximately caused by the Contamination, and investigation, cleanup and removal of the Contamination at the Expanded OU-2 Site.

**AS AND FOR A SIXTH CAUSE
OF ACTION FOR PUBLIC NUISANCE,
PLAINTIFFS ALLEGE AS FOLLOWS:**

201.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "200" of this Complaint, as if set forth in this paragraph at length.

202.    The Releases and resulting Contamination are a public nuisance, because they interfere with rights common to all, including groundwater and surface water.

203.    Defendants caused the Releases and Contamination, and/or having a reasonable opportunity to abate the nuisance by investigating and remediating the Contamination, failed to do so in a reasonably prompt and effective manner, and/or failed to promptly and adequately report them to NYSDEC, USEPA and plaintiffs.

204.    By causing the Releases and Contamination, and/or failing to promptly and adequately report and investigate and remediate the Contamination, defendants (including their officers, agents, servants, and/or employees), have interfered with rights common to all, including groundwater, or have assumed liability for that interference.

205.    Plaintiffs have sustained special damages from this public nuisance.

206.    Defendants, by reason of this public nuisance, are liable for all of the damages to plaintiffs proximately caused by the Contamination, and investigation, cleanup and removal of the Contamination at the Expanded OU-2 Site.

**AS AND FOR A SEVENTH CAUSE OF**
**ACTION FOR RESTITUTION,**
**PLAINTIFFS ALLEGE AS FOLLOWS:**

207.   Plaintiffs repeat and reallege the allegations of paragraphs "1" through "206" of this Complaint, as if set forth in this paragraph at length.

208.   The Contamination poses a threat to the environment and/or public health.

209.   Plaintiffs' actions in responding to the Contamination, which has been maintained and allowed to persist by defendants in violation of law, were immediately necessary to satisfy the requirements of public health.

210.   It would be against equity and good conscience to permit defendants to pass the burden of cleaning up the Contamination to plaintiffs, and for defendants to have had the benefit of enjoyment of the use of their respective Defendants' Properties or their contracts, free of full responsibility for investigation, remediation, cleanup, and removal of, and response to, the Contamination at the Expanded OU-2 Site.

211.   Therefore, defendants should make restitution to plaintiffs for some or all off their expenses, costs, and damages for Environmental Response related to the Expanded OU-2 Site, to the extent not recoverable under CERCLA.

**AS AND FOR AN EIGHTH CAUSE OF**
**ACTION FOR CONTRIBUTION OR INDEMNIFICATION,**
**PLAINTIFFS ALLEGE AS FOLLOWS:**

212.   Plaintiffs repeat and reallege the allegations of paragraphs "1" through "211" of this Complaint, as if set forth in this paragraph at length.

213.   Defendants, including their officers, agents, servants, employees, and/or predecessors, had a non-delegable duty to prevent, clean up or ensure against the Contamination.

214.     Some or all of the Contaminants are classified as hazardous wastes, pursuant to Environmental Conservation Law ("ECL") Article 27, and hazardous substances, pursuant to ECL Article 37.

215.     As a result of the breach of this duty by defendants, including their officers, agents, servants, employees, and/or predecessors, defendants are responsible for plaintiffs' past and future expenses and damages in investigation, remediation, cleanup, and removal of, and response to, the Contamination at the Expanded OU-2 Site, and as a result, defendants should, in equity, indemnify plaintiffs for some or all of its expenses, costs, and damages, to the extent not recoverable under CERCLA.

**AS AND FOR A NINTH CAUSE OF
ACTION FOR A DECLARATORY JUDGMENT,
PLAINTIFFS ALLEGE AS FOLLOWS:**

216.     Plaintiffs repeat and reallege the allegations of paragraphs "1" through "215" of this Complaint, as if set forth in this paragraph at length.

217.     The Declaratory Judgements Act, 28 U.S.C. §2201, authorizes this Court to grant declaratory relief in this matter.

218.     Plaintiffs and defendants have an actual controversy sufficient to allow this Court to declare their rights.

219.     As set forth above, defendants are liable for their equitable share of cleanup of the Expanded OU-2 Site.

220.     Accordingly, plaintiffs request that the Court issue a Declaratory Judgment that defendants are liable for their equitable share of the costs of investigation and remediation of the Expanded OU-2 Site.

          **WHEREFORE**, plaintiffs demand judgment against defendants as follows:

a.  Declaring that defendants are jointly and severally responsible, or alternatively liable for their equitable share, of the costs associated with Environmental Response to the Contamination at the Expanded OU-2 Site, and requiring them to pay those costs to plaintiffs.

b.  Declaring that defendants are responsible for plaintiffs' future damages and Environmental Response costs and to fully investigate and remediate the Expanded OU-2 Site.

c.  Awarding plaintiffs their damages and response costs, with interest.

d.  Granting a permanent injunction ordering defendants to further investigate the Contamination at the Expanded OU-2 Site, and to completely remove and remediate all of the Contaminants and the Contamination from the Expanded OU-2 Site and the Ley Creek Watershed.

e.  Awarding plaintiffs their attorneys' fees, experts' fees and other costs and expenses.

f.  Awarding such other damages and further relief as this Court deems just, proper and equitable.

Dated: Rochester, New York
      October 26, 2018

s/Alan J. Knauf
**KNAUF SHAW LLP**
Attorneys for Plaintiffs
Alan J. Knauf, Esq.,
  Linda R. Shaw, Esq., and
  Jonathan Tantillo, Esq., of Counsel
1400 Crossroads Building
2 State Street
Rochester, New York 14614
Tel.: (585) 546-8430
lshaw@nyenvlaw.com
aknauf@nyenvlaw.com
jtantillo@nyenvlaw.com

## JURY DEMAND

Plaintiffs demand trial by jury, pursuant to F.R.C.P. Rule 38(b).

Dated: Rochester, New York          s/Alan J. Knauf
      October 26, 2018          **KNAUF SHAW LLP**
                                              Attorneys for Plaintiffs

                                              Alan J. Knauf, Esq.,
             Linda R. Shaw, Esq., and
             Jonathan Tantillo, Esq., of Counsel
            1400 Crossroads Building
            2 State Street
            Rochester, New York 14614
            Tel.: (585) 546-8430
            lshaw@nyenvlaw.com
            aknauf@nyenvlaw.com