STATE OF NEW YORK: DEPARTMENT OF ENVIRONMENTAL CONSERVATION
-------------------------------------------------------------------

In the Matter of the
Development and Implementation
of a Remedial Design/Remedial Action for an
Inactive Hazardous Waste Disposal
Site, Under Article 27, Title 13,
and Article 71, Title 27 of the
Environmental Conservation Law
of the State of New York by
by

Remediation and Liability Management Company, Inc.

Respondent.

ORDER
ON
CONSENT
INDEX # D7-0008-97-06

Site Code # 734044

-------------------------------------------------------------------

The New York State Department of Environmental Conservation (the "Department") and the Remediation and Liability Management Company, Inc. ("Respondent") hereby agree to the making and entry of this Administrative Order on Consent ("Consent Order").

WHEREAS,

1.    The Department is responsible for enforcement of Article 27, Title 13 of the Environmental Conservation Law of the State of New York ("ECL"), entitled "Inactive Hazardous Waste Disposal Sites." This Order is issued pursuant to the Department's authority under, inter alia, ECL Article 27, Title 13 and ECL 3-0301.

2.    A.    Pursuant to ECL 27-1313.3.a., whenever the Commissioner of Environmental Conservation (the "Commissioner") "finds that hazardous wastes at an inactive hazardous waste disposal site constitute a significant threat to the environment, he may order the owner of such site and/or any person responsible for the disposal of hazardous wastes at such site (i) to develop an

inactive hazardous waste disposal site remedial program, subject to the approval of the department, at such site, and (ii) to implement such program within reasonable time limits specified in the order."

B.     Any person under order pursuant to ECL § 27-1313.3.a., has a duty imposed by ECL Article 27, Title 13 to carry out the remedial program committed to under such order.  ECL § 71-2705 provides that any person who fails to perform any duty imposed by ECL Article 27, Title 13 shall be liable for civil, administrative and/or criminal sanctions.

C.     The Department also has the power, inter alia, to provide for the prevention and abatement of all water, land, and air pollution.  ECL § 3-0301.1.i.

3.     Respondent is a corporation organized and existing under the laws of the State of Michigan and is doing business in the State of New York.  Respondent is a wholly owned subsidiary of General Motors Corporation ("GM").  GM owns a facility, formerly operated by its Inland Fisher Guide division, in the Town of Salina, County of Onondaga, State of New York, which was used for manufacturing automobile parts until December of 1993 (the "facility"; formerly known as GM: Fisher Guide).  The location of the facility is indicated on the map attached and hereby incorporated into this Consent Order as Exhibit A.

4.     The GM facility began operation in the 1950s and ceased manufacturing operations in December of 1993.  During that time, the GM facility discharged process wastewater and storm water into Ley Creek (the "wastewater").  Testing of these waters on and around the facility has shown and storm water continues to show contamination by polychlorinated biphenyls ("PCBs") (Aroclors 1242 and 1248) and other hazardous substances.  Under SPDES permit # NY-0000566, effective September 25, 1997, GM must comply with specified interim effluent PCB limits in the

0350349.08 7/1/99

discharge of wastewater from the GM facility. GM entered into an Order of Consent (Index #D-7-0001-97-06) pursuant to which it agreed to undertake remedial actions to comply with final PCB effluent limits specified in the permit.

## Site Description

5.     A section of Ley Creek north of the GM facility runs parallel with Factory Avenue flowing in a westerly direction until it empties into Onondaga Lake. Beginning in 1970, Onondaga County conducted channel improvements by dredging the sediments of Ley Creek in an effort to control periodic flooding. The dredging operations continued for a period of years and were concluded sometime subsequent to a September 1975 contract between Onondaga County and an independent construction company. During the dredging operations, sediment was excavated and deposited in piles primarily along the south bank of Ley Creek between Ley Creek and Factory Avenue (the "Site").

6.     The Site is approximately 19 acres in size and is bounded by Factory Avenue on the south and Ley Creek to the north in the Town of Salina, Onondaga County. The New York State Thruway is located immediately to the north of Ley Creek. The eastern limit of the Site is Townline Road and the western limit is located approximately 4,300 feet downstream. A fence runs in an east-west direction along the south side of the Site approximately 10 feet north of Factory Avenue. However, there is no fence restricting access along the south bank of Ley Creek. A map of the Site is attached and hereby incorporated into this Order as Exhibit B.

7.     The Site is an inactive hazardous waste disposal site, as that term is defined by ECL Section 27-1301(2), and it is listed in the Registry of Inactive Hazardous Waste Disposal Sites in New York State as Site Number 7-34-044. On November 27, 1987, the Department classified

-3-

0350349.08 7/1/99

the Site as a Classification "2" pursuant to ECL Section 27-1305(4)(b), which means that the Site presents a "significant threat to the public health or environment - action required."

### Site Investigation

8.    Pursuant to an Order on Consent dated August 12, 1985 (Case # 7-0383) between the Department and GM, GM conducted an investigation of PCB contamination in soil and groundwater in the Ley Creek Area.  On April 24, 1987, GM submitted a Report to the Department entitled "Hydrogeologic Investigation of Fill Area Along Ley Creek," dated April 1987 and prepared by O'Brien & Gere Engineers, Inc. ("O'Brien & Gere").  The Report concluded, among other things, that "[h]igh concentrations of PCB's were identified in soil samples from all soil borings (OBG-1 through OBG-7C)," a distance of approximately 1300 feet. The level of PCB contamination was reported in the range of less than detectable to 466 parts per million (ppm).

9.    As a result of the 1987 investigation, the Department determined that a more comprehensive evaluation of the Ley Creek dredge spoil area would be necessary to define the extent of PCBs along the north and south banks of Ley Creek and to evaluate any impacts to public health and the environment.  GM completed a Field Investigation Report ("FIR") of the Site in 1989 which included sampling of groundwater, dredged material/soil, sediment, and surface water.

10.    Based on the FIR, the Department determined that GM needed to perform a Remedial Investigation/Feasibility Study ("RI/FS") at the Site to complete the characterization of the areal and vertical extent of contamination present and to evaluate alternatives for remediation of the Site.

11.     GM and the Department entered into an Administrative Order on Consent for performance of an RI/FS at the Site, effective May 23, 1991 (Index # A7-0239-90-07).

12.     On January 23, 1997, the Department approved GM's final Feasibility Study Report for the Site, dated October 1996.

13.     On February 6, 1997, the Department, in consultation with the New York State Department of Health, issued a Proposed Remedial Action Plan ("PRAP") for the Site which consisted of the excavation and off-site disposal of dredged materials/soils with PCB concentrations greater than or equal to 50 ppm and the consolidation and covering of the remaining volume of materials with PCB concentrations exceeding 1 ppm at the surface and 10 ppm subsurface.

14.     On March 28, 1997, following a period of public comment, the Department selected a final remedial alternative for the Site in a Record of Decision ("ROD"). The ROD, which is attached hereto as Exhibit C, is hereby incorporated as an enforceable part of this Order. The United States Environmental Protection Agency ("EPA") concurred with the Department's March 28, 1997 ROD by letter dated February 9, 1998 from Jeanne M. Fox, the EPA Region II Administrator, to John Cahill, the Department Commissioner. Attached as Exhibit D to this Order are copies of the EPA's February 9, 1998 concurrence letter, William McCabe's letter to Michael O'Toole, Jr. dated January 8, 1998, and Michael O'Toole's response letter to William McCabe dated January 20, 1998.

15.     The ROD for the Site addresses the piles of dredged materials/soils and contaminated soil located along the banks of Ley Creek in the area designated as the Site. While the groundwater, surface water and sediments in the Creek were also the subject of sampling during the Ley Creek

0350349.08 7/1/99

RI/FS, remedial alternatives for these media will be addressed as part of the comprehensive RI/FS currently being undertaken at the adjacent GM facility pursuant to Order on Consent Index #D-7-0001-97-06.

16.    Respondent represents that, at the time of the issuance of the ROD, the property owners of the Site were the County of Onondaga (the "County"), the Niagara Mohawk Power Corporation, The Pfaltzgraff Co., and the New York State Thruway Authority.  On March 16, 1999, the County conveyed its parcel within the Site to the Respondent and this is reflected on the Site map attached as Exhibit B.  The County uses and maintains a 4-foot diameter sanitary sewer that runs in an east-west direction along the southern portion of the Site, and the County retained ownership of the pipeline when it conveyed its Site parcel to Respondent.  Respondent intends to seek agreement with the other property owners of the Site to convey to Respondent their respective property interests.

## Designation as NPL Subsite

17.    Ley Creek is a tributary of Onondaga Lake.   The Onondaga Lake Site was added to the National Priorities List ("NPL") on December 16, 1994.  The Onondaga Lake NPL Site is composed of the Lake itself, its tributaries and the upland hazardous waste sites which have contributed or are contributing contamination to the Lake (subsites).

18.    The Department has determined that PCBs are hazardous substances under CERCLA and are listed hazardous wastes under ECL Article 27, Title 9.  The confirmed presence of PCBs at the Site and the proximity and discharge of PCBs to Ley Creek establishes that the hazardous substance contamination at the Site represents a release or threat of release of hazardous substances to the Onondaga Lake NPL Site pursuant to §§ 101 and 104 of CERCLA.  By letter

0350349.08  7/1/99

dated June 23, 1997, the Department and EPA notified GM of their determination that the Ley Creek PCB Dredgings Site is a subsite.

19.    The Department and Respondent agree that the goals of this Order are for Respondent to (i) develop and implement, in accordance with the ROD, an inactive hazardous waste disposal site remedial program ("Remedial Design/Remedial Action") for the Site that shall include design and implementation, and operation, maintenance, and monitoring of the selected remedial alternative; and (ii) reimburse the Department's administrative and oversight costs as set forth in Paragraph IX of this Consent Order.

20.    Respondent waives its right to any hearing provided for by law, and consents to the issuance and entry of this Consent Order and agrees to be bound by its terms.  Respondent's consent to and compliance with this Consent Order does not constitute, and shall not be construed as, Respondent's admission of liability or an admission by Respondent of law or fact or the applicability of any law to the conditions at the Site, the GM facility or the Onondaga Lake NPL Site.  Respondent consents to and agrees not to contest the authority or jurisdiction of the Department to issue or enforce this Consent Order, and agrees not to contest the validity of this Consent Order or its terms.

NOW, having considered this matter and being duly advised, IT IS ORDERED THAT:

I.    Remedial Design

A.    The Respondent shall submit to the Department a remedial design to implement the remedial alternative for the Site selected by the Department in the ROD (the "Remedial Design").  To satisfy this requirement, the Respondent has submitted the following documents:

-7-

0350349.08 7/1/99

(1)    Remedial Design ("RD") Report (February 1999, O'Brien & Gere), updated to include the following documents:

    a.    Revised pages submitted under cover of O'Brien & Gere's letter to the Department dated March 22, 1999;

    b.    O'Brien & Gere's letter to the Department dated April 21, 1998, including enclosures regarding the New York State Office of Parks, Recreation, and Historic Preservation correspondence (see Appendix D to the RD Report); and

    c.    Respondent's letter dated February 5, 1999, regarding Respondent's proposed wetland mitigation plan (see Exhibit E to the RD Report).

A copy of the RD Report, updated to include the documents referenced in subparagraphs I.A.(1) a. - c., is attached as Exhibit E to this Order and it is hereby incorporated as an enforceable part of this Order.

(2)    Contract Drawings (February 1999, O'Brien & Gere), updated to incorporate the revised sheets submitted to the Department under cover of O'Brien & Gere's letter dated March 22, 1999.

(3)    Technical Specifications and Special Provisions (February 1999, O'Brien & Gere), updated to include the revised pages submitted to the Department under cover of O'Brien & Gere's letter dated March 22, 1999.

0350349.08  7/1/99

(4)    Hydraulic Analysis and Floodplain Assessment Report (February 1999, O'Brien & Gere).

(5)    Wetland Delineation Report (January 1998, O'Brien & Gere).

(6)    Wetland Assessment Report (May 1998, O'Brien & Gere).

(7)    Revised Former Drainage Swale Evaluation (June 18, 1998 letter, O'Brien & Gere).

B.    The O'Brien & Gere documents set forth at paragraph I.A.(1)-(7) of this Order and the following documents shall be hereinafter referred to under this Order as the "Remedial Design Documents:"

(1)    May 14, 1998 letter from the Department's Wildlife Resources Center, regarding endangered species;

(2)    May 18, 1998 letter from the United States Department of the Interior, regarding endangered species; and

(3)    August 28, 1998 letter from the United States Army Corps of Engineers, authorizing the implementation of the Department-approved remedial alternative set forth in the ROD under Nationwide Permit #38.

The Remedial Design Documents are hereby incorporated into and made an enforceable part of this Order.

C.    By letter to Respondent, dated June 30, 1999, the Department conditionally approved the Remedial Design and authorized Respondent to proceed with the implementation of the Remedial Design (the "Remedial Construction"). A copy of the Department's June 30, 1999

0350349.08 7/1/99

letter is attached as Exhibit F to this Order. Notwithstanding the foregoing, the Remedial Design shall also include and the Respondent shall remain obligated to submit the following:

(1)    a revised time schedule to implement the Remedial Design containing the elements set forth in Section 8 of the RD Report. The time schedule shall be prepared by the Remedial Action ("RA") Contractor and submitted by the Respondent to the Department prior to the commencement of Remedial Construction;

(2)    the parameters, conditions, procedures, and protocols to determine the effectiveness of the Remedial Design, including a schedule for periodic sampling of groundwater monitoring wells to be submitted to the Department after the completion of Remedial Construction. This shall be provided as a part of the Operation, Maintenance and Monitoring Plan ("O&M Plan"), which is to be submitted by the Respondent in accordance with paragraph III.C of this Order. The number, selection and placement of the groundwater monitoring wells and the monitoring schedule shall be evaluated concurrently with the performance of the Remedial Investigation for the Ley Creek Deferred Media under the Department's RI/FS Order on Consent with GM (Index #D-7-0001-97-06). However, the evaluation of the appropriate data to determine the effectiveness of the Remedial Design set forth and required herein remains the

0350349.08 7/1/99

obligation of the Respondent pursuant to the terms and conditions of this Order;

(3)    a contingency plan to be implemented if any element of the Remedial Design fails to achieve any of its objectives or otherwise fails to protect human health or the environment. The Respondent shall submit the contingency plan to the Department as a part of the O&M Plan under paragraph III.C of this Order;

(4)    a copy of the health and safety plan which is to be prepared by the RA Contractor for the protection of persons at and in the vicinity of the Site during Remedial Construction. A copy of the plan, which is to be prepared in accordance with 29 CFR 1910 by a certified health and safety professional, shall be submitted by the Respondent to the Department prior to the commencement of Remedial Construction; and

(5)    an approvable wetland mitigation plan in accordance with the terms of the ROD and paragraph I.D of this Order.

D.    1.    Under cover of its letter dated February 5, 1999, Respondent submitted to the Department a proposed wetland mitigation plan whereby it offered to pay the sum of $30,000 for use by the Department for a wetland restoration project on the shore of Onondaga Lake at the mouth of Ley Creek (the "Ley Creek Project Site"). The suitability of this area for the creation of wetlands is under review by the Department's Region 7 Office and a site characterization study may be performed in connection with wetland permits issued by the

-11-

Department and the Army Corps of Engineers ("Army Corps") to the County and the Central New York Regional Transportation Authority.

      2.    Respondent shall monitor the progress of the site characterization study and submit periodic written status reports to the Project Manager identified at paragraph XIII.E of this Order.  Until the site characterization study of the Ley Creek Project Site is complete, the Respondent shall submit its reports not less frequently than every six (6) months, with the first report due on September 15, 1999.

      3.    If the site characterization study and corresponding report are completed, the Respondent shall, within 30 days of the submittal of the report to the Department's Region 7 Office, notify the Project Manager and request a copy of the report.  The Department's Region 7 Office and the Army Corps  may evaluate the findings of the site characterization report to determine if the Ley Creek Project Site is suitable for wetland use.  The Respondent has requested that it be notified in writing by the Department's Region 7 Office if and when the Army Corps and the Department have made a determination on this issue.  The date of Respondent's receipt of a writing indicating the Army Corps and the Department's consensus determination on this issue shall be referred to herein as the "Date of Notification".

      a.    If the Ley Creek Project Site is found to be appropriate for wetland use, the  Respondent shall submit to the Department for approval a corresponding wetlands mitigation proposal ("Wetlands Mitigation Proposal").  Within thirty (30) days after its receipt of the Department's written comments on the Wetlands Mitigation Proposal, Respondent shall: (i) accept the Department's comments and conditions for the use of the Ley Creek Project Site; (ii)  require approval of an extension of time to negotiate the terms and conditions specified

0350349.08 7/1/99

by the Department, which approval shall not be unreasonably withheld; (iii) submit an alternative wetland mitigation plan to the Department for review; or (iv) seek dispute resolution under paragraph VI of this Order on the issue of whether the Department's proposed conditions exceed the requirement for a wetland mitigation plan under the terms of the ROD.

b.    If the Ley Creek Project Site is found not to be suitable for wetland use, the Respondent shall within sixty (60) days after the Date of Notification submit an alternative wetland mitigation plan to the Department for approval.

c.    The Respondent reserves the right to withdraw its Ley Creek Project Site proposal, prior to the Department and the Army Corps completing their evaluation of the suitability of the Ley Creek Project Site for wetland use, and to submit an alternative wetland mitigation plan to the Department for approval which does not involve the Ley Creek Project Site.

d.    Any alternative wetland mitigation plan submitted for consideration under subparagraph I.D. of this Order shall be considered to be a submittal under paragraph V of this Order and shall be reviewed by the Department under the terms and conditions of paragraph V. The Department's determinations on its review of any alternative wetland mitigation plan shall be subject to the Respondent's right of dispute resolution set forth in paragraph VI of this Order.

e.    Notwithstanding anything in this Order to the contrary, the Department agrees that any wetland mitigation plan to be approved shall not require any modification to the Remedial Design. The Department further agrees that Respondent shall not be required to satisfy its obligation under the ROD to provide for wetland mitigation in any area

-13-

of the Ley Creek PCB Dredgings Site as that term is defined under this Order unless it otherwise agrees in writing.

        4.      The Respondent's implementation of a Department-approved wetland mitigation plan under paragraph I.D of this Order shall satisfy the Respondent's obligation to implement a wetland mitigation plan under the ROD and this Order.

        E.      By letter dated April 6, 1999, the EPA (i) stated that the March 22, 1999 letter from O'Brien & Gere to the Department adequately addressed EPA's remaining comments on the Respondent's proposed Remedial Design; and (ii) agreed that restoration of wetlands at the Ley Creek PCB Dredgings Site is not feasible. A copy of the EPA's April 6, 1999 letter is attached herein as Exhibit G to this Order.

II.    <u>Community Relations</u>

Respondent shall cooperate and assist the Department in providing information relating to the work required hereunder to the public. As requested by the Department, Respondent shall participate in the preparation of all appropriate information disseminated to the public and in public meetings that may be held or sponsored by the Department to explain activities at or concerning the Site.

III.    <u>Remedial Construction</u>

        A.      Within sixty (60) days after the effective date of this Order, the Respondent shall commence the implementation of the Department-approved Remedial Design ("Remedial Construction").

0350349.08 7/1/99

B.      During implementation of all construction activities identified in the Remedial Design, Respondent shall have on-site a full-time representative who is qualified to supervise the work done.

C.      1.      Within sixty (60) days after completion of the construction activities identified in the Department-approved Remedial Design, Respondent shall submit to the Department a detailed post-Remedial Construction O&M Plan, "as-built" drawings and a final engineering report (each including all changes made to the Remedial Design during construction) and a certification that the Remedial Design was implemented and that all construction activities were completed in accordance with the Department-approved Remedial Design and were personally witnessed by a professional engineer or by a person under his or her direct supervision. The O&M Plan, "as built" drawings, final engineering report, and certification must be prepared, signed, and sealed by a professional engineer.

2.      The O&M Plan shall include the "Management Plan for County Maintenance Work" (O'Brien & Gere July 1998), which has been approved by the County of Onondaga by agreement with Respondent and GM (agreement effective February 18, 1999). A copy of this Management Plan is attached as Exhibit H to this Order. By letter dated August 5, 1998, the Department has agreed that, so long as the County performs its maintenance work in accordance with the terms and conditions of the Management Plan, the County will not violate the state superfund prohibitions set forth in 6 NYCRR § 375-1.2(e). A copy of the Department's August 5, 1998 letter is attached as Exhibit I.

D.      Upon the Department's approval of the O&M Plan, Respondent shall implement the O&M Plan in accordance with the requirements of the Department-approved O&M Plan.

-15-

0350349.08  7/1/99

E.    After receipt of the "as built" drawings, final engineering report, and certification, the Department shall notify Respondent in writing whether the Department is satisfied that all construction activities have been completed in compliance with the Department-approved Remedial Design.

F.    If the Department determines that any element of the Department-approved Remedial Design/Remedial Action is failing to achieve the remedial objectives set forth in the Department-approved Remedial Design, or otherwise fails to protect human health and/or the environment, it shall advise the Respondent in a writing which sets forth the basis for its determination and the additional work which the Department deems necessary.

G.    In the event Respondent is required to modify the Remedial Design and Construction in accordance with the terms of this Order, it shall perform the work in accordance with a reasonable time schedule which the Department, after consultation with Respondent, shall prescribe.

IV.   Progress Reports

A.    Respondent shall submit to the parties set forth in Subparagraph XIII.B, in the numbers specified therein, copies of written monthly progress reports describing the actions taken toward achieving compliance with this Consent Order during the previous month, including:

(1)    a brief description of all results of sampling and tests, and all other data received or generated by Respondent or Respondent's contractors or agents in the previous month, whether conducted pursuant to this Consent Order or conducted independently by Respondent;

0350349.08  7/1/99

(2)    all actions, including, but not limited to, data collection and implementation of work plans, that were performed during the month and other information relating to the progress of work being performed pursuant to this Consent Order;

(3)    information regarding percentage of completion, unresolved delays encountered or anticipated that may affect the future schedule for implementation of the Respondent's obligations under the Order, and efforts made to mitigate those delays or anticipated delays;

(4)    any modifications to any work plans that Respondent has proposed to the Department or that the Department has approved;

(5)    all activities to be undertaken in the next month;

(6)    difficulties encountered during the reporting period and the actions taken to rectify the problems; and

(7)    any changes in key personnel.

B.    Respondent shall submit these progress reports to the Department by the tenth day of every month beginning with the first full month after the effective date of this Consent Order until the final engineering report and certification referenced at paragraph III.C of this Order is approved by the Department.  However, Respondent shall continue to submit reports concerning the implementation of any O&M Plan that may be required under this Order in accordance with that Plan's requirements.

C.    Respondent also shall allow the Department to attend, and shall provide the Department at least seven (7) days advance notice of any of the following relating to the Remedial

0350349.08 7/1/99

Construction: prebid meetings with construction contractors, regularly scheduled construction progress meetings, substantial completion meeting and inspection, and final inspection meeting.

V.    <u>Review of Submittals</u>

A.    The Department shall review each of the submittals Respondent makes pursuant to this Consent Order to determine whether the submittal was prepared, and whether the work done to generate the data and other information in the submittal was done, in accordance with this Consent Order and generally accepted technical and scientific principles.  The Department shall notify Respondent in writing of its approval or disapproval of the submittal, except for any health and safety plans submitted by Respondent pursuant to this Consent Order.  All Department-approved submittals shall be incorporated into and become an enforceable part of this Consent Order.

B.    Because the Site has been designated as a subsite on the NPL, the Department shall seek EPA's written comments on any of the required submittals under this Order.

C.    If the Department disapproves a submittal, it shall so notify Respondent in writing, specify the reasons for its disapproval, and offer Respondent a timely opportunity to meet with the Department's staff to discuss the measures necessary to obtain the Department's approval. Within thirty (30) days after the date of its receipt of the Department's written disapproval of the submittal, or the date of the Respondent-Department meeting to review the basis for the Department's disapproval, whichever is later (or within such other period of time otherwise agreed upon by the parties), Respondent shall make a revised submittal to the Department that addresses all of the Department's stated reasons for disapproving the first submittal.

0350349.08  7/1/99

D.     After receipt of the revised submittal, the Department shall notify Respondent in writing of its approval or disapproval and if disapproved. set forth the basis for the disapproval. If the Department disapproves the revised submittal, Respondent shall be in violation of this Consent Order and the Department may take any action or pursue whatever rights it has pursuant to any provision of statutory or common law unless, within thirty (30) days of its receipt of the Department's written notice of disapproval, Respondent invokes the Dispute Resolution procedure set forth in Paragraph VI.   If the Department approves the revised submittal, it shall be incorporated into and become an enforceable part of this Consent Order.

E.     1.     Respondent shall modify and/or amplify and expand a submittal upon the Department's written direction to do so if the Department determines, as a result of reviewing data generated by an activity required under this Consent Order or as a result of reviewing any other data or facts, that further work is necessary to attain the remedial objectives set forth in the Department-approved Remedial Design or to protect human health and/or the environment and sets forth the basis of that determination in writing.

2.     The Respondent may challenge the Department's determination that further work is necessary under the Dispute Resolution provisions of Paragraph VI of this Consent Order by requesting the required meeting with the Director of the Department's Division of Environmental Remediation within thirty (30) days after receipt of the Department's written direction to undertake the further work.

VI.   Dispute Resolution

A.     If the Department disapproves a revised submittal pursuant to Paragraph V.D, or demands the performance of additional work pursuant to Paragraphs III.F or V.E, and Respondent

-19-

0350349.08 7/1/99

fails to perform such work, Respondent shall be in violation of this Order unless, within thirty (30) days of its receipt of the Department's written notice of disapproval of a revised submittal, or within thirty (30) days of its receipt of the Department's written demand for additional work, Respondent serves on the Department's Director of the Division of Environmental Remediation ("the Director"):

> (1)    a written request to meet with the Director to discuss the Department's objections to the revised submittal and/or the Department's demands for additional work; and

> (2)    a written statement of the issues in dispute, the relevant facts upon which the dispute is based, factual data, analysis, or opinion supporting its position and all supporting documentation on which the Respondent relies (the "Statement of Position").

B.    The Department shall provide the Respondent with an opportunity to meet with the Director to discuss the Department's objections to the revised submittal and/or the Department's demands for additional work.  Respondent and the Department shall meet at a mutually agreed upon time (the "meeting").

C.    An administrative record of any dispute under this Paragraph VI shall be maintained by the Department.  The record shall include the Statement of Position of the Respondent and any other relevant information, including any information submitted by either party up to and including the time of the meeting.  The record shall be available for review by all parties and the public.

0350349.08  7/1/99

D.     Upon review of the administrative record as developed pursuant to this Paragraph VI and taking into consideration the discussion of the parties at the meeting with the Director, the Director shall issue a final written decision, resolving the dispute (the "Director's Decision"). The period of time for revision of a submittal or commencement of additional work shall be set forth in the Director's Decision.

E.     The invocation of formal dispute resolution procedures under Subparagraphs A - through D of Paragraph VI, shall excuse, toll and/or suspend ("tolling"), during the pendency of the dispute resolution process, the compliance obligation or deadline which is in dispute, and any other obligation or deadline which is dependent upon the matters in dispute, but shall not toll or suspend any of Respondent's other obligations under this Consent Order.

F.     In the event of the Respondent's submission of the required modified submittal, the Department shall notify Respondent in writing of its approval or disapproval thereof.  If the modified submittal fails to adequately address the Department's comments contained in the Director's Decision, as modified, and the Department disapproves the modified submittal for this reason, Respondent shall be in violation of this Consent Order and ECL Article 71, Title 27.

VII.   Force Majeure

A.     Respondent's failure to comply with any term of this Consent Order constitutes a violation of this Consent Order and ECL Article 71, Title 27.

B.     Respondent shall not suffer any penalty under this Consent Order or be subject to any proceeding or action if it cannot comply with any requirement hereof because of war, riot, adverse weather conditions, or any fact or circumstance beyond the Respondent's reasonable control ("force majeure event").  Respondent shall, within five (5) days of when it obtains

0350349.08 7/1/99

knowledge of any such condition, notify the Department in writing. Respondent shall include in such notice the measures taken and to be taken by Respondent to prevent or minimize any delays and shall request an appropriate extension or modification of this Consent Order. Failure to give such notice within such five (5) day period constitutes a waiver of any claim that a delay is excusable under this subparagraph and not subject to penalties. Respondent shall have the burden of proving that an event is a defense to compliance with this Consent Order pursuant to this subparagraph.

VIII.   Entry Upon Site

Respondent hereby consents to the entry upon the Site or areas in the vicinity of the Site which may be under the control of the Respondent, by any duly designated employee, consultant, contractor or agent of EPA, the Department or any New York State agency, at reasonable times, for purposes of inspection, sampling, and testing and to ensure Respondent's compliance with this Consent Order. Any such individual authorized to enter the Site pursuant to this paragraph shall comply with any applicable health and safety plan for the Site. During Remedial Construction, Respondent shall provide the Department with suitable office space at or in the vicinity of the Site, including access to a telephone.

IX.   Payment of State Costs

A.   The Department will use its best efforts to issue an itemized invoice of response costs to Respondent on an annual basis. Within thirty (30) days after receipt of an itemized invoice from the Department, beginning with the calendar quarter ending December 31, 1997, Respondent shall pay to the Department a sum of money which shall represent reimbursement for the State's expenses at the Site including, but not limited to, direct labor, fringe benefits, indirect

-22-

costs, travel, analytical costs, and contractor costs incurred by the State of New York for work performed under the terms of this Consent Order, as well as for negotiating this Consent Order, reviewing background information, reviewing and revising submittals made pursuant to this Consent Order (including the review of Remedial Design submittals made prior to the effective date of this Consent Order), overseeing activities conducted pursuant to this Consent Order, and collecting and analyzing samples. The foregoing shall not include activities relating to the Onondaga Lake NPL that are unrelated to the implementation of this Consent Order which may overlap with the oversight being conducted by the Department's Division of Environmental Remediation under this Order. Payment shall be made by check payable to the Department of Environmental Conservation. Payment shall be sent to the Director, Bureau of Program Management, Division of Environmental Remediation, N.Y.S.D.E.C., 50 Wolf Road, Albany, NY 12233-7010.

B.    Itemization of the costs shall include an accounting of personal services indicating the employee name, title, biweekly salary, and time spent (in hours) on the project during the billing period, as identified by an assigned time and activity code. This information shall be documented by reports of Direct Personal Service. The Department's approved fringe benefit and indirect cost rates shall be applied. Non-personal service costs shall be summarized by category of expense (e.g., supplies, materials, travel, contractual) and shall be documented by the New York State Office of the State Comptroller's quarterly expenditure reports.

C.    The accrual of State costs for reimbursement under this Consent Order shall cease after the final engineering report and certification referenced at paragraph III.C of this Order have been approved by the Department.

-23-

D.      Respondent may request clarification of an invoice for State costs if it believes the invoice: (i) reflects a clerical error, (ii) is based upon inaccurate information or (iii) is not attributable to the State's activities reimbursable under this Order.  If Respondent questions a State invoice issued pursuant to Paragraph IX of this Consent Order, Respondent shall do so by identifying in writing, within thirty (30) days of its receipt, the items in question.  This request should be directed to the Director of the Bureau of Program Management at the above cited address.  The Bureau of Program Management's written decision issued in response to this inquiry shall be a final agency determination for purposes of seeking review under Article 78 of the CPLR.  If the Department revises the invoice, Respondent shall pay the revised invoice within thirty (30) days of its receipt of the revision.

E.      Respondent's failure to pay the revised invoice within thirty (30) days of receipt thereof or, if the Department determines that the invoice need not be revised, Respondent's failure to pay the original invoice within thirty (30) days of receipt of the Department's written decision, shall be a violation of this Consent Order and subject to whatever enforcement action is within the Department's jurisdiction unless, within thirty (30) days after receipt of the Department's written decision, Respondent commences an action for review of the Department's written decision pursuant to Article 78 of the CPLR.

X.      Department Reservation of Rights

A.      Nothing contained in this Consent Order shall be construed as barring, diminishing, adjudicating, or in any way affecting any of the Department's rights, except as specified within this Consent Order.

-24-

0350349.08 7/1/99

B.    Nothing herein shall be construed as barring, diminishing, adjudicating, or in any way affecting any legal or equitable rights or claims, actions, suits, causes of action or demands whatsover that the Department may have against anyone other than Respondent, its directors, officers, employees, agents, successors and assigns (including, but not limited to, GM).

C.    Nothing contained in this Consent Order shall be construed to prohibit the Commissioner or his or her duly authorized representative from exercising any summary abatement powers.

D.    Nothing herein is intended to be a release or settlement of any claim for personal injury or property damage by any person not a party to this Consent Order against Respondent.

E.    For violations of this Consent Order and ECL Article 71, Title 27, the Department may elect to pursue any remedy, penalty, and/or sanction, including enforcement of this Consent Order.

F.    Nothing contained in this Consent Order represents a satisfaction, waiver, release, or covenant not to sue, of any claim of the State of New York against Respondent relating to the Site including, but not limited to, claims to require Respondent to undertake further response actions, and claims to seek reimbursement of response costs and/or natural resource damages pursuant to Section 107 of CERCLA, except as specified within this Consent Order.

XI.    Indemnification

Respondent shall indemnify and hold the Department and the State of New York, and their representatives and employees, harmless for all claims, suits, actions, damages, and costs of every name and description arising out of or resulting from the fulfillment or attempted fulfillment of this Consent Order by Respondent, and/or Respondent's directors, officers, employees, servants,

0350349.08 7/1/99

agents, successors, and assigns.    Said indemnification shall not include indemnification in any form for any unlawful, willful, malicious or grossly negligent acts or omissions on the part of the Department or the State of New York, or their representatives and employees.

XII.    Public Notice

A.    Within thirty (30) days after the effective date of this Order, Respondent shall file a Declaration of Covenants and Restrictions in the form attached as Exhibit J with the Onondaga County Clerk for those portions of the Site for which it has an ownership interest.  Respondent shall file a Declaration of Covenants and Restrictions using the specified form for those portions of the Site to which it acquires an ownership interest after the effective date of this Order within thirty (30) days after acquiring that interest.

B.    If Respondent proposes to convey any portion of the Site in which it has an ownership interest, it shall, not fewer than sixty (60) days before the date of conveyance, notify the Department in writing of the identity of the transferee and of the nature and proposed date of the conveyance and shall notify the transferee in writing, with a copy to the Department, of the applicability of this Order.

XIII.    Communications

A.    All written communications required by this Consent Order shall be transmitted by United States Postal Service, by private courier service, or hand delivered as follows:

Communication from Respondent shall be sent to:

1.    George Harris, Section Chief
Division of Environmental Remediation
Bureau of Construction Services, NYSDEC
50 Wolf Road, Room 222
Albany, New York 12233-7010

-26-

2.  Ms. Henri Hamel
    New York State Department of Health
    677 South Salina Street
    Syracuse, New York  13202

3.  Kenneth Lynch, Esq.
    Regional Director
    Region 7, NYSDEC
    615 Erie Blvd. West
    Syracuse, New York 13204-2400

4.  George A. Shanahan, Esq.
    Assistant Regional Counsel
    EPA Region 2
    290 Broadway
    New York, New York 10007-1866

5.  Robert Nunes
    Onondaga Lake Project Manager
    EPA Region 2
    290 Broadway, 20th Floor
    New York, New York 10007-1866

6.  Carol Conyers, Esq.
    Senior Attorney
    NYSDEC
    Division of Environmental Enforcement
    50 Wolf Road, Room 410A
    Albany, New York 12233-5550

B.  Copies of work plans and reports shall be submitted as follows:

1.  Five copies (one unbound hard copy with associated figures and one on 3-1/2" computer disk(s) in Word Perfect version
    6.0 or compatible word processing
    format and any associated figures in Auto Cad or
    compatible format) to:
    George Harris,  NYSDEC

2.  One copy to:
    Henri Hamel, NYSDOH

-27-

0350349.08 7/1/99

3.      One copy to:
Kenneth Lynch, Region 7 Director

4.      Two copies to:
Robert Nunes

5.      One copy of the transmittal letter only to:
Carol Conyers, Esq., NYSDEC, and George Shanahan, Esq., EPA

6.      Upon receiving formal approval of a submittal by the Department, Respondent shall submit three copies of such submittal to the Department for placement in the designated Document Repository(s) and one copy to EPA.

C.      Communication to be made from the Department to the Respondent shall be sent to:

1.      William E. Kochem, Jr.
GM-Worldwide Facilities Group
1 General Motors Drive
Syracuse, New York 13206

2.      James Hartnett
Remediation and Liability Management Company, Inc.
c/o GM Remediation Project Office
Route 37 East, PO Box 460
Massena, New York 13662-0460

3.      General Motors Corporation
Legal Staff (Attn: Don A. Schiemann, Esq.)
New Center One Building
3031 West Grand Blvd.
Mail Code 482-208-815
Detroit, Michigan 48202

0350349.08 7/1/99

4.     Bond, Schoeneck & King, LLP
Attn:  Barry R. Kogut, Esq.
One Lincoln Center
Syracuse, New York 13202

D.     The Department and Respondent reserve the right to designate additional or different addressees for communication or written notice to the other.

E.     The Department's Project Manager for the work to be done under this Consent Order shall be Michael Cruden of the Department's Division of Environmental Remediation ("DER") and DER shall coordinate the technical review and involvement of the EPA and any Division of the Department, which is involved with regulatory or remedial decision making at the Site.  The Department reserves the right to designate a different Project Manager upon written notice to the Respondent.

XIV.   Record Keeping

Respondent shall preserve, during the pendency of this Consent Order, and for a minimum of five (5) years after the final engineering report and certification referenced at paragraph III.C of this Order have been approved by the Department, all records and documents in the possession of the Respondent, or in the possession of any division, employees, agents, accountants, contractors, or attorneys of the Respondent, which relate in any way to the implementation of the selected remedial alternative under this Consent Order, whether or not prepared pursuant to this Consent Order and despite any document retention policy to the contrary.  After this five (5) year period, the Respondent shall notify the Department in writing within sixty (60) days prior to destruction or disposal of any such documents.  Upon the request of the Department, Respondent

-29-

shall make available to the requester all or any such records, or copies of all or any such records, unless the records may be kept confidential and privileged under applicable law.

XV.    Miscellaneous

A.    All activities Respondent is required to undertake under this Order are ordinary and necessary expenses for the continued operation of Respondent.

B.    Respondent shall retain professional consultants, contractors, laboratories, quality assurance/quality control personnel, and third party data validators acceptable to the Department to perform the technical, engineering, and analytical obligations required by this Order.  The Respondent has retained O'Brien & Gere Engineers, Inc. and O'Brien & Gere Laboratories to perform the technical, engineering and analytical obligations required by this Order, and they are acceptable to the Department.  If the Respondent chooses to substitute another firm to perform any of the foregoing obligations under this Order, it shall submit that firm's respective experience, capabilities and qualifications to the Department for prior approval, which approval shall not be unreasonably withheld or delayed.  The responsibility for the performance of the professionals retained by Respondent shall rest solely with Respondent.

C.    1.    With respect to the work to be performed under this Consent Order, the Department shall have the right to obtain split samples, duplicate samples, or both, of all substances and materials sampled by Respondent, and the Department also shall have the right to take its own samples.   Respondent shall notify the Department at least seven (7) business days in advance of any sample collection activity and the Department shall provide the Respondent with a reasonable opportunity to take split samples of all substances and materials sampled by the Department.

-30-

0350349.08  7/1/99

2.     Respondent and the Department shall make available to each other the results of all sampling and/or tests or other data generated by the Respondent or the Department (the "information") with respect to the performance of work under this Consent Order. Respondent shall submit the information in accordance with Paragraph IV of this Consent Order and the Department shall submit any information to the Respondent in a manner which allows for timely consideration by the Respondent in its preparation of submittals required under this Consent Order.

D.     Respondent shall notify the Department at least seven (7) business days in advance of any field activities to be conducted pursuant to this Order.

E.     1.     Respondent shall use its best efforts to obtain whatever permits, easements, rights-of-way, rights-of-entry, approvals, or authorizations that are necessary to perform Respondent's obligations under this Order (the "authorizations"). Respondent shall promptly notify the Department in the event of Respondent's inability to obtain such authorizations on a timely basis. In the event Respondent is unable to obtain the necessary authorizations, the Department may, consistent with its legal authority, assist in obtaining all such authorizations which Respondent was unable to obtain despite its best efforts, or which Respondent could not obtain without unreasonable terms or conditions. If Respondent cannot obtain such authorization on a timely basis, the time for performance of any obligation dependent upon such authorization shall be appropriately extended and the Order appropriately modified.

2.     Notwithstanding anything in this subparagraph XV.E.1 to the contrary, the Respondent and its contractors and representatives shall not be required to obtain State or local

-31-

permits pursuant to 6 NYCRR § 375-1.7 for on-site Remedial Construction activities. However, Respondent shall comply with the substantive requirements for applicable state permits.

F.     Respondent and Respondent's officers, directors, agents, servants, employees, successors, and assigns shall be bound by this Order. Any change in ownership or corporate status of Respondent including, but not limited to, any transfer of assets or real or personal property shall in no way alter Respondent's responsibilities under this Order. Respondent's officers, directors, employees, servants, and agents shall be obliged to comply with the relevant provisions of this Order in the performance of their designated duties on behalf of Respondent.

G.     Respondent shall provide a copy of this Order to each contractor hired to perform work required by this Order, and to each person representing Respondent with respect to the Site, and shall condition all contracts entered into in order to carry out the obligations identified in this Order upon performance in conformity with the terms of this Order. Respondent or Respondent's contractors shall provide written notice of this Order to all subcontractors hired to perform any portion of the work required by this Order. Respondent shall nonetheless be responsible for ensuring that Respondent's contractors and subcontractors perform the work in satisfaction of the requirements of this Order.

H.     All references to "professional engineer" in this Order are to an individual registered as a professional engineer in accordance with Article 145 of the New York State Education Law. If such individual is a member of a firm, that firm must be authorized to offer professional engineering services in the State of New York in accordance with Article 145 of the New York State Education Law.

0350349.08 7/1/99

I.     All references to "days" in this Order are to calendar days unless otherwise specified.

J.     The paragraph headings set forth in this Order are included for convenience of reference only and shall be disregarded in the construction and interpretation of any of the provisions of this Order.

K.     1.     The terms of this Consent Order shall constitute the complete and entire Consent Order between Respondent and the Department concerning the Site. No term, condition, understanding, or agreement purporting to modify or vary any term of this Consent Order shall be binding unless made in writing and subscribed by the party to be bound. No informal advice, guidance, suggestion, or comment by the Department regarding any report, proposal, plan, specification, schedule, or any other submittal shall be construed as relieving Respondent of Respondent's obligation to obtain such formal approvals as may be required by this Consent Order.

2.     If Respondent desires that any provision of this Consent Order be changed, Respondent shall make timely written application, signed by the Respondent, to the Department setting forth reasonable grounds for the relief sought. Copies of such written application shall be delivered or mailed to NYSDEC Attorney Carol Conyers at the address set forth at Paragraph XIII.A of this Order. The Department shall advise the Respondent in writing if the application should be sent to another Department representative.

0350349.08 7/1/99

L.    The effective date of this Order shall be the date it is signed by the Commissioner of the Department or his authorized representative.

DATED:        Albany, New York
              July 15 , 1999

                        JOHN P. CAHILL
                        Commissioner
                        New York State Department
                        of Environmental Conservation

                        By: _____
                            Michael J. O'Toole, Jr.

-34-

0350349.08  7/1/99

    L.      The effective date of this Order shall be the date it is signed by the Commissioner of the Department or his authorized representative.

DATED:     Albany, New York
                July     , 1999

                              JOHN P. CAHILL
                              Commissioner
                              New York State Department
                              of Environmental Conservation

                              By:_____
                                  Michael J. O'Toole, Jr.

0350349.08 7/1/99

## CONSENT BY RESPONDENT

Respondent hereby consents to the issuing and entering of this Consent Order, waives Respondent's right to a hearing herein as provided by law, and agrees to be bound by this Consent Order.

REMEDIATION AND LIABILITY
MANAGEMENT COMPANY, INC.

By: *William J. McFarland*

Name: William J. McFarland

Title: President

Dated:   July   , 1999

STATE OF MICHIGAN )
                  ) SS:
COUNTY OF WAYNE  )

On the 2nd day of July, 1999 before me, the undersigned, a notary public in and for said state, personally appeared William J. McFarland , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument the individual, or the person upon behalf of which the individual acted, executed the instrument.

*Carolyn E. Stoehr*
Notary Public    CAROLYN E. STOEHR
                 Notary Public, Wayne County, MI
                 My Commission Expires July 9, 2000

0350349.08  7/1/99

LIST OF EXHIBITS

Exhibit A          Map of GM Facility

Exhibit B          Map of Ley Creek PCB Dredgings Site

Exhibit C          Department's March 28, 1997 ROD

Exhibit D          EPA's February 9, 1998 ROD concurrence letter, William
                   McCabe's letter to Michael O'Toole dated January 8, 1998,
                   and Michael O'Toole's response letter to William McCabe
                   dated January 20, 1998

Exhibit E          O'Brien & Gere Remedial Design Report

Exhibit F          Department's letter of June 30, 1999, approving the
                   Remedial Design

Exhibit G          EPA's April 6, 1999 concurrence letter with the Remedial
                   Design and agreement on the scope of the wetland
                   mitigation plan

Exhibit H          Management Plan for County Maintenance Work

Exhibit I          Department's letter of August 5, 1998 on the Management
                   Plan for County Maintenance Work

Exhibit J          Form of Declaration of Covenants and Restrictions

EXHIBIT A

GENERAL MOTORS CORP.
FORMER INLAND FISHER
GUIDE FACILITY

SYRACUSE, NEW YORK

FACILITY MAP

FILE NO. 5858.024-090

O'BRIEN&GERE
ENGINEERS INC.



FACILITY LOCATION

MANUFACTURING BUILDING

Exhibit B



Ley Creek PCB Dredgings Inactive Hazardous Waste Site, Site No. 7-34-044
RECORD OF DECISION

03/28/97
PAGE 7

 Department of Environmental Conservation

Division of Environmental Remediation

# Record of Decision
## Ley Creek PCB Dredgings Site
## Salina (T), Onondaga County
## Site Number 7-34-044

# March 1997

New York State Department of Environmental Conservation

GEORGE E. PATAKI, *Governor*    JOHN P. CAHILL, *Acting Commissioner*

# DECLARATION STATEMENT - RECORD OF DECISION

## Ley Creek PCB Dredgings Inactive Hazardous Waste Site
## Salina (T), Onondaga County, New York
## Site No. 7-34-044

### Statement of Purpose and Basis

The Record of Decision (ROD) presents the selected remedial action for the Ley Creek PCB Dredgings inactive hazardous waste disposal site which was chosen in accordance with the New York State Environmental Conservation Law (ECL). The remedial program selected is not inconsistent with the National Oil and Hazardous Substances Pollution Contingency Plan of March 8, 1990 (40CFR300).

This decision is based upon the Administrative Record of the New York State Department of Environmental Conservation (NYSDEC) for the Ley Creek PCB Dredgings Inactive Hazardous Waste Site and upon public input to the Proposed Remedial Action Plan (PRAP) presented by the NYSDEC. A bibliography of the documents included as a part of the Administrative Record is included in Appendix B of the ROD.

### Assessment of the Site

Actual or threatened release of hazardous waste constituents from this site, if not addressed by implementing the response action selected in this ROD, presents a current or potential threat to public health and the environment.

### Description of Selected Remedy

Based upon the results of the Remedial Investigation/Feasibility Study (RI/FS) for the Ley Creek PCB Dredgings Site and the criteria identified for evaluation of alternatives the NYSDEC has selected the excavation and off-site disposal of dredge materials/soils contaminated with poly-chlorinated biphenyls (PCBs) at concentrations greater than 50 mg/kg and the consolidation and covering of the remaining volume of materials with concentrations exceeding 1 mg/kg at the surface and 10 mg/kg subsurface. The components of the remedy are as follows:

- Excavation and removal of dredge material/soils that contain PCBs at concentrations exceeding 50 ppm to a permitted hazardous waste landfill. It is estimated that up to 5000 cubic yards could be excavated from the areas identified.

- Consolidation and covering of the remaining PCB contaminated dredge materials where concentrations are less than 50 mg/kg but exceed the remedial level of 1 mg/kg at the surface and 10 mg/kg for subsurface areas. The dredged materials will be removed, at

a minimum, from the first twenty five feet of the floodway area to restore this area to appropriate elevation. After restoration to floodway elevations, any remaining materials above the remedial level remaining in the floodway will be covered with a geomembrane or clay and then twelve inches of soil or the gravel roadway. In areas outside of the floodway, the dredged material to be addressed will be graded and covered with a vegetated soil cover which will consist of twelve (12) inches of soil. The total area that will be covered is approximately 17 acres.

- To provide Onondaga County crews access to maintain Ley Creek as a part of the existing drainage district, a gravel access road will be provided adjacent to the southern bank of the Creek to allow for future maintenance and/or dredging. The four existing drainage swales from Factory Avenue will be graded back, covered with the vegetated cover and the flow channel lined with a half pipe or formed concrete spillway where they pass through the area of covered dredge spoils. Access pads and pathways, as well as gates in the fence, will be provided to allow access for maintenance of the County sewer line which is also located in the area to be covered.

- Since the remedy will result in dredge materials/soils with elevated levels of PCBs remaining untreated, but covered at the site, a long term monitoring program will be instituted. In addition, yearly reviews will be conducted to allow the effectiveness of the selected remedy to be evaluated and to determine whether the remedy continues to be protective of human health and the environment.

## New York State Department of Health Acceptance

The New York State Department of Health concurs with the remedy selected for this site as being protective of human health.

## Declaration

The selected remedy is protective of human health and the environment, complies with State and Federal requirements that are legally applicable or relevant and appropriate to the remedial action to the extent practicable, and is cost effective. This remedy utilizes permanent solutions and alternative treatment or resource recovery technologies, to the maximum extent practicable, and satisfies the preference for remedies that reduce toxicity, mobility, or volume as a principal element.

_____3/28/97_____
Date

Michael J. O'Toole, Jr., Director
Division of Environmental Remediation

# TABLE OF CONTENTS

**SECTION**                                                                                      **PAGE**

1:      Site Description . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

2:      Site History  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.1     Operational/Disposal History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        2.2     Remedial History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

3:      Current Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        3.1     Summary of Remedial Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        3.2     Interim Remedial Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        3.3     Summary of Human Exposure Pathways . . . . . . . . . . . . . . . . . . . . . . . . . 12
        3.4     Summary of Environmental Exposure Pathways . . . . . . . . . . . . . . . . . . . 13

4:      Enforcement Status  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5:      Summary of Remediation Goals  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . : . . . 14

6:      Summary of the Evaluation of Alternative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        6.1     Description of Remedial Alternatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        6.2     Evaluation of Remedial Alternatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

7:      Summary of the Selected Alternative  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

8:      Highlights of Community Participation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27


**Figures**           -       Figure 1: Site Map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
                      -       Figure 2: Proposed Excavation and Disposal Areas . . . . . . . . . . . 30
                      -       Figure 3: Extent of Low Permeability Cover  . . . . . . . . . . . . . . . . 31
                      -       Figure 4: Proposed Floodway Remediation Plan   . . . . . . . . . . . . . 32
                      -       Figure 5: Soil Cover   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**Tables**   -   Table 1:   Nature and Extent of Contamination . . . . . . . . . . . . 11
         -   Table 2:   Summary of 1993 RI Sampling  . . . . . . . . . . . . . . . 11
         -   Table 3:   Remedial Alternative Costs   . . . . . . . . . . . . . . . . . 29


**Appendices**   -   Appendix A:   Responsiveness Summary . . . . . . . . . . . . . . . . . . . . .
           -   Appendix B:   Administrative Record . . . . . . . . . . . . . . . . . . . . . . .

# RECORD OF DECISION

# LEY CREEK PCB DREDGINGS SITE
### Salina (T), Onondaga County, New York
### Site No. 7034-044
### March 1997

## SECTION 1: SITE LOCATION AND DESCRIPTION

The Ley Creek PCB Dredgings Site is approximately 18 acres in size and is located along the south bank of Ley Creek in the Town of Salina, Onondaga County, New York. A site location map and study area map are included as Figure 1. The Site is bounded by Factory Avenue on the south and Ley Creek to the north. The New York State Thruway is located immediately to the north of Ley Creek. The eastern limit of the site is the General Motors Outfall 003, which is located just west of Townline Road, and the western limit is located approximately 4,000 feet downstream near the Town of Salina Highway Department garage. A fence extends along the south side of the study area approximately 10 feet north of Factory Avenue and to the east and west, however, access along the bank of Ley Creek, which forms the northern site boundary, remains unrestricted.

In the vicinity of the site, Ley Creek is generally less than 15 feet wide and less than 2 feet deep. The dredged materials were generated during channel improvement programs for Ley Creek, conducted by the Onondaga County Department of Drainage and Sanitation from 1970-1983, and for the most part are located on the south bank. The PCB contamination is the result of discharges of contaminated water primarily from the General Motors (GM)-Inland Fisher Guide Plant. Ley Creek drains an area of approximately 30 square miles and is part of the Onondaga County Ley Creek Drainage District. Portions of the cities and towns of Syracuse, North Syracuse, East Syracuse, Cicero, Clay, Dewitt, Manlius, and Salina are located in the Ley Creek drainage basin.

The Ley Creek PCB Dredgings Site is adjacent to the northern boundary of the General Motors; Fisher Guide Site, Site No 7-34-057, and the Syracuse China Site, Site No. 7-34-053 (see Figure 1).

## SECTION 2: SITE HISTORY

### 2.1: Operational/Disposal History

Prior to the early 1970's, the combination of poor channel conditions and large impermeable areas in the Ley Creek watershed resulted in extensive flooding, some of the worst of which was near

the GM facility in 1969. The formation of the Ley Creek Drainage District and clearing and dredging of the creek channel was initiated following the 1969 flooding event. Dredging of Ley Creek was performed by the Onondaga County Department of Drainage and Sanitation. In 1970, the section of the creek between Route 11 and Seventh North Street was dredged and in 1971 additional portions of the creek between Seventh North Street and Onondaga Lake were dredged. Additional dredging of Ley Creek from Townline Road to Onondaga Lake took place in 1975 and in 1983, the section of the Creek between Town line Road and Route 11 was dredged. Dredged materials generated during these activities were placed along the south bank of the creek or used for land restoration projects. The presence of PCBs in the stream sediments was not identified prior to 1985.

This PRAP addresses only the piles of dredge materials and contaminated soil located on the banks of Ley Creek in the area designated as the site. While the groundwater, surface water and sediments in the Creek were also the subject of sampling during the Ley Creek RI/FS, alternatives for these media will be addressed as part of a comprehensive RI/FS to be undertaken for the adjacent GM; Fisher Guide site.

## 2.2:    Remedial History

**1985:**  A Hydrogeologic Investigation Report, dated September 1985, performed pursuant to a SPDES Consent Order with GM, identified the presence of PCBs in the dredged materials at the site. This investigation which included sampling for volatile and semivolatile organic compounds, as well as metals, ruled out these other compounds as contaminants of concern. The major source of the PCBs was believed to be oil used in hydraulic equipment for die casting operations at the GM plant.

**1985:**  A program to evaluate the occurrence and concentration of PCBs in the sediments and water of Ley Creek was completed by GM. Sediment and water were collected at 500 foot intervals along a 4,000 foot length of Ley Creek, which included a 1,000 foot length upstream of the GM Outfall 003. The pattern of PCB occurrence observed in sediments was irregular and this irregularity was attributed to the Ley Creek dredging program conducted from 1970 to 1983.

During this study, fish from Ley Creek were also sampled and analyzed for PCBs. Elevated levels of PCBs were identified in the fish tissue.



**1987:** Pursuant to a NYSDEC consent order, GM completed an investigation of dredged material/soil and ground water in the area between Factory Avenue and Ley Creek beginning at Townline Road and continuing for 1600 feet downstream. Groundwater flow was determined to be north towards Ley Creek. PCBs were detected in dredged material/soil and ground water samples.

While the investigation was underway, the NYSDEC Division of Environmental Enforcement (DEE), NYSDOH and the Onondaga County Department of Health also sampled offsite areas that had received some of the Creek dredge material as fill. This resulted in an agreement between GM and Onondaga County for a soil removal program in the Meadowbrook Road/Hookway area. The soils were removed by Onondaga County and brought back to the GM Plant for placement in a former treatment lagoon that was subsequently closed under the oversight of the NYSDEC RCRA program.

**1989:** As a result of the 1987 investigation, NYSDEC determined that a more comprehensive evaluation of the Ley Creek dredged material/soil would be necessary, to define the extent of PCBs along the north and south banks of Ley Creek and to evaluate any impacts to public health and the environment. GM completed a Field Investigation Report (FIR) of the site in 1989 which included sampling of groundwater, dredged material/soil, sediment, and surface water.

**1991:** Based on the FIR, NYSDEC determined that GM needed to perform a Remedial Investigation/Feasibility Study (RI/FS) at the site to complete the characterization of the areal and vertical extent of contamination present. GM was also required to prepare a habitat based assessment according to NYSDEC guidelines. GM and NYSDEC entered into an Administrative Order on Consent for performance of a RI/FS at the site, effective May 23, 1991.

**1991:** GM performed an Interim Remedial Measure (IRM) soil removal program under a June 1991 NYSDEC Consent Order. The IRM was conducted to allow the installation of a sewer force main on Factory Ave through an area of identified PCB subsurface soil contamination. This IRM is discussed in more detail in Section 4.2.

**1992:** The Work Plan for the Ley Creek RI/FS was approved and field work commenced in July 1992.

**1993:** The RI was completed in accordance with the RI/FS Work Plan. The GM; Fisher Guide site was listed on the Registry of Inactive Hazardous Waste Disposal Sites, as a Class 2 site, in July of 1993.

**1994:** GM submitted the first draft of the Ley Creek Feasibility Study to the NYSDEC. As a component of the RI/FS, a leachability study was undertaken for the dredge material.

**1995:** Property owner input was sought in the review of remedial alternatives when multiple site owners, other than the county, were identified.

**1996:** The Feasibility Study was approved.

## SECTION 3: CURRENT STATUS

In response to a determination that the presence of hazardous waste at the Site presents a significant threat to human health and the environment, General Motors has recently completed a Remedial Investigation/Feasibility Study (RI/FS).

### 3.1: Summary of the Remedial Investigation

The purpose of the RI was to define the nature and extent of any contamination resulting from previous activities at the site.
The RI was conducted in two phases. The first phase was conducted between July and August of 1992 and the second phase between July and August of 1993. A report entitled "Ley Creek Dredged Material Area, November 1993" has been prepared describing the field activities and findings of the RI in detail.

The RI included the following activities:

■   Installation of soil borings and monitoring wells for analysis of soils and groundwater as well as physical properties of soil and hydrogeologic conditions.

■   Sampling of the Creek sediments, water and fish.

To determine which media (soil, groundwater, etc.) contain contamination at levels of concern, the RI analytical data was compared to NYS Standards, Criteria, and Guidance (SCGs). Groundwater, drinking water and surface water SCGs identified for the Ley Creek site were based on NYSDEC Ambient Water Quality Standards and Guidance Values and Part V of NYS Sanitary Code. NYSDEC TAGM 4030 soil cleanup guidelines for the protection of groundwater, background conditions, and risk-based remediation criteria were used as SCGs for soil and the Division of Fish and Wildlife Technical Guidance for Screening Contaminated Sediments is used for surface water sediments.

Based upon the results of the remedial investigation in comparison to the SCGs and potential public health and environmental exposure routes, certain areas and media of the site require remediation. These are summarized below. More complete information can be found in the RI Report. Chemical concentrations are reported in mg/kg (parts per million). For comparison purposes, SCGs are given for each medium.

### 3.1.1  Nature of Contamination

As described in the RI Report, many soil, groundwater and sediment samples were collected at the Site to characterize the nature and extent of contamination.  Preliminary investigations at the site had narrowed the contaminant of concern to the PCBs which had been released  from the GM Plant.

The PCBs were constituents of a hydraulic fluid used at the GM Plant in the operation of their injection molding machines.  PCBs are comprised of a number of chemical isomers, which are generally referred to by the trade name "Aroclor" followed by a number which indicates the number of carbon atoms and the percentage of chlorine by weight for that Aroclor.  The PCBs found at the Ley Creek Site are primarily Aroclor 1242 and Aroclor 1248.

### 3.1.2  Extent of Contamination

Table 1 summarizes the extent of PCB contamination  in the dredge materials, surface and subsurface soils and compares the data with the proposed remedial action levels (SCGs) for the Site.  The following is a summary of the findings of the investigation.  As stated previously, the groundwater, sediments and surface water will be addressed as part of the RI/FS  for the adjacent General Motors; Fisher Guide Site.

### Dredge Materials/Soils

The dredge spoil piles along the south bank of Ley Creek extend for over 4,000 feet.  Aroclors 1242 and 1248 have been found to be the major constituents of the PCB contamination at the site.  Elevated PCB levels have been identified throughout the dredged materials at the site.  The PCB concentrations range from non-detect to 466 mg/kg.  An area where elevated concentrations of PCBs were detected also exists along the north bank of Ley Creek, around soil boring B-19.

The dredge piles have been intermixed with the surface and subsurface soils and, as they have been on the banks of the Ley Creek for more than 20 years, are overgrown with vegetation.  The volume of materials to be addressed which exceeds the remedial goals of 1 mg/kg at the surface and 10 mg/kg in the subsurface is approximately 110,000 cubic yards.

Table 1
Nature and Extent of Contamination

| MEDIA | CLASS | CONTAMINANT OF CONCERN | CONCENTRATION RANGE | FREQUENCY EXCEEDING SCG | SCG |
|---|---|---|---|---|---|
| Dredge Material/Soil | Poly Chlorinated Biphenyls (PCBs) | Aroclor 1242/1248 | ND-470 ppm | 61/185 | 1 ppm [1] surface 10 ppm [1] subsurface [2] |
| Fish Tissue [3] | Poly Chlorinated Biphenyls (PCBs) | Aroclor 1248 | 110 - 1100 ppb | 11 of 11 | 110 ppb [1,4] |
| | | Aroclor 1260 | ND - 700 ppb | 4 of 11 | 110 ppb [1,4] |

[1] Total PCBs
[2] Subsurface = greater than 12" deep
[3] Summary of outfall and downstream sampling locations
[4] "Niagara River Biota Contamination Project: Fish Flesh Criteria for Piscivorous Wildlife"; Newell, et al.; July 1987; NYSDEC

Table 2
Summary of 1993 RI Sampling

| Distance from Outfall | # samples > SCG | # samples > 50 ppm | # locations > 50 ppm |
|---|---|---|---|
| 0-1000' | 36 of 83 | 11 | 7 |
| 1000-2000' | 10 of 19 | 1 | 1 |
| 2000-3000' | 6 of 21 | 2 | 1 |
| 3000-4000' | 7 of 28 | 0 | 0 |

> greater than

As shown by the RI data presented in Table 2, the concentrations and frequency of PCBs identified in the dredge materials and soils at levels exceeding SCGs decreases as the sampling locations move downstream from the outfall. The greatest number of detections exceeding the SCGs occurred in the first two reaches, with the number of locations exceeding 50 ppm significantly higher in the first reach than in any of the others. This is consistent with the location of the outfall/drainage swale area being the primary source of PCBs detected at the site and also

demonstrates, based on the distribution, that the PCBs are present throughout the area in question at levels requiring remediation.

## 3.2    Interim Remedial Measures:

Interim Remedial Measures (IRMs) are conducted at sites when a source of contamination or exposure pathway can be effectively addressed before completion of the RI/FS.

GM performed an Interim Remedial Measure (IRM) under a NYSDEC IRM consent order in 1991. The IRM was conducted to allow for the installation of a sanitary sewer force main south of Factory Avenue, which encountered an area of PCB subsurface soil contamination. This contamination was attributed to a filled in drainage swale from the GM Facility prior to the construction of outfall pipe 003. The IRM involved sampling to identify the limits of the PCB contaminated buried swale and once the swale was located, the excavation and off-site disposal of the contaminated soils. Sheet piling was then put in place so that the installation of the 48 inch sanitary sewer force main could proceed.

At the time, this IRM was performed in 1991, the contamination identified was believed to be associated with the Ley Creek Site. However, since then the GM Plant has been listed as a class 2 inactive Hazardous Waste Site, in part due to the migration of the PCBs, some of which were addressed by this IRM. Based on the information generated and the location of the IRM, this contamination will now be addressed as part of the GM; Fisher Guide Site.

## 3.3    Summary of Human Exposure Pathways:

This section describes the types of human exposures that may present added health risks to persons at or around the site.

An exposure pathway is how an individual may come into contact with a contaminant. The five elements of an exposure pathway are 1) the source of contamination; 2) the environmental media and transport mechanisms; 3) the point of exposure; 4) the route of exposure; and 5) the receptor population. These elements of an exposure pathway may be based on past, present, or future events.

Soil and dredge materials present at the site exceed the soil cleanup criteria of 1 mg/kg at the surface and 10 mg/kg subsurface (greater than 12 inches in depth), established for PCB contaminated soils (USEPA Guidance on Remedial Actions for Superfund Sites with PCB Contamination, EPA/540G-90/607, August 1990), therefore the NYSDOH has determined that action is necessary to be protective of human health. Completed pathways which are known to or may exist at the site include:

- Dermal contact with, or ingestion of dredge materials/soils by workers maintaining the sewer or power lines and by the public should they enter the site.

■    Inhalation of dust leaving the site.

■    Ingestion of fish from Ley Creek in the vicinity of the site.  Fish tissue sampling shows the presence of PCBs similar to those at the site in fish from Ley Creek.  This may be an indicator that larger species could be contaminated as well.

There is a fish consumption advisory covering Onondaga Lake and its' tributaries.  A copy of this advisory is available at the document repositories identified in Section 1 of this PRAP.


## 3.4    Summary of Environmental Exposure Pathways:

This section summarizes the types of environmental exposures which may be presented by the site. The Fish and Wildlife Impact Assessment included in the RI presents a more detailed discussion of the potential impacts from the site to fish and wildlife resources, including  any impacts to endangered species or protected environments.   The following pathways for environmental exposure have been identified:

■    Dredge materials/soils and sediments in Ley Creek have been contaminated with PCBs in excess of NYSDEC soil criteria for the protection of groundwater and NYSDEC sediment guidance criteria for identifying potential risk to aquatic life.

■    Groundwater beneath the dredge materials/soils contains PCBs in excess of groundwater standards.

■    Dredge materials placed in areas of the regulated fresh water wetland along Ley Creek, prior to 1975, have impacted the function of the wetland.

■    Soils at the surface adjacent to the Creek exceed 1 mg/kg PCBs, which represents a potential continued loading of PCBs to the Creek  and sediments by surface runoff or from erosion.  These soils also represent a potential exposure pathway to terrestrial wildlife or birds from contacting the soil or eating soil organisms.

■    Fish from Ley Creek have been shown to contain the same PCBs in their tissue as found on the site.  This results in exposure not only of the fish to the detrimental effects of PCB contamination, but also  piscivorous (fish eating) wildlife higher on the food chain, as well.

The dredge material/soils have been determined to represent a threat to the environment as a contributing  source of PCBs to the fish, sediments and groundwater in the vicinity of the site. Ecological risk calculations have also indicated that the unremediated PCB-contaminated dredge material/soils at the site may pose an unacceptable risk to terrestrial species and their predators, such as the short-tailed shrew and the red-tailed hawk.  The Division of Fish, Wildlife and Marine

Resources has accepted a site specific surface soil remedial level of 1 mg/kg for PCBs at this site. This decision was based on the expected significant reduction in fish and wildlife exposure; practical limitations (see evaluation of alternatives in Section 6.2); plans for reviews to monitor the effectiveness of the remedy in protecting the environment and future remedial efforts at the adjacent GM; Fisher Guide Plant site.

## SECTION 4: ENFORCEMENT STATUS

Potentially Responsible Parties (PRPs) are those who may be legally liable for contamination at a site. This may include past or present owners and operators, waste generators, and haulers.

The NYSDEC and the General Motors Corporation entered into Consent Orders for the investigation and an IRM for this site. Upon issuance of the Record of Decision the NYSDEC will approach the PRPs to implement the selected remedy under an Order on Consent.

The following is the chronological enforcement history of this site.

| Date | Index No. | Subject of Order |
|------|-----------|------------------|
| 10/30/87 | A7-0129-87-09 | PCB Invest. |
| 5/23/91 | A0239-90-07 | RI/FS |
| 6/10/91 | S7-0263-91-5 | IRM-Sewer |

## SECTION 5: SUMMARY OF THE REMEDIATION GOALS

Goals for the remedial program have been established through the remedy selection process stated in 6 NYCRR Part 375-1.10. The overall remedial goal is to meet all Standards, Criteria, and Guidance (SCGs) and be protective of human health and the environment.

At a minimum, the remedy selected should eliminate or mitigate all significant threats to the public health and to the environment presented by the hazardous waste disposed at the site through the proper application of scientific and engineering principles.

The goals selected for this site are:

- Reduce, control, or eliminate the PCB contamination present within the dredge materials/soils on the site.

- Eliminate the threat to surface waters and sediments by eliminating any future contaminated surface run-off from the contaminated dredge material/soils on site.

- Eliminate a source of PCBs for uptake by fish and other organisms in Ley Creek.

- Eliminate the potential for direct human or animal contact with the contaminated dredge materials/soils on site.

- Prevent, to the extent possible, migration of contaminants into the groundwater.

The remedial level chosen to achieve these goals has been determined to be 1 mg/kg for surface soils and 10 mg/kg for the subsurface.


## SECTION 6: SUMMARY OF THE EVALUATION OF ALTERNATIVES

The selected remedy should be protective of human health and the environment, be cost effective, comply with other Federal and State laws and utilize permanent solutions, alternative technologies or resource recovery technologies to the maximum extent practicable. Potential remedial alternatives for the Ley Creek site were identified, screened and evaluated in a Feasibility Study. This evaluation is presented in the report entitled "Feasibility Study, Ley Creek PCB Dredged Material Area Site", dated October 1996.

A summary of the detailed analysis follows. As used in the following text, the time to implement reflects only the time required to implement the remedy, and does not include the time required to design the remedy, procure contracts for design and construction or to negotiate with responsible parties for implementation of the remedy.

### 6.1: Description of Alternatives

The potential remedies that pass the initial screening are intended to address the contaminated dredge material/soils found at the site. Various sampling efforts have demonstrated that the GM Plant continues to act as a source of PCBs to the groundwater beneath the dredge material and the sediments in Ley Creek. Therefore, remedies for the contaminated groundwater identified in the area and the contaminated sediments found in Ley Creek will be evaluated as part of the RI/FS to be conducted at the GM Plant. The Ley Creek Site, Site No. 7-34-044, will therefore be evaluated along with the GM; Fisher Guide Site, No. 7-34-057.

The Alternatives discussed below were evaluated by the FS for a range of cleanup values. This PRAP, however, will only evaluate the Alternatives which would meet the site remedial goals for PCBs of 1 mg/kg at the surface and 10 mg/kg subsurface, with the exception of the incineration alternative which utilized 25 mg/kg. This allows the PRAP to concentrate on those alternatives which meet the remedial goals and evaluation criteria.

### Alternative 1: No Action, Groundwater Monitoring, Deed Restrictions, Fencing:

| | |
|---|---|
| Present Worth: | $ 216,000 |
| Capital Cost : | $ 5,500 |
| Annual O&M: | $ 12,000 |
| Time to Implement: | 3 months |

The no action alternative is evaluated as a procedural requirement and as a basis for comparison. It requires continued monitoring only, allowing the site to remain in an unremediated state. This alternative would leave the site in its present condition and would not provide any additional protection to human health or the environment, other than the installation of a fence and deed restrictions to limit future use of the site.

### Alternative 2: Twelve (12) Inch Vegetated Soil Cover, Ground Water Monitoring, Deed Restriction, Fencing and Maintenance Access Provisions:

| | |
|---|---|
| Present Worth: | $ 2,327,000 |
| Capital Cost: | $1 ,665,000 |
| Annual O&M: | $ 41,000 |
| Time To Implement: | 6-9 months |

Alternative 2 is a containment alternative, which would cover all areas of the site where PCB contamination exists at levels greater than 1 mg/kg at the surface or 10 mg/kg in the subsurface. The cover would consist of soil with a permeability less than or equal to the underlying dredge material and soils and be capable of sustaining vegetation. Alternative 2 would also include deed restrictions (i.e., restrictions on future use and disturbance of the remedial areas), fencing, ground water monitoring and long term maintenance of the cover.

The property comprising the majority of the site is owned by Onondaga County and the remaining area of the site, not owned directly by the County, include County utility easements or rights of way. Access by the County would be required to maintain the existing sanitary sewer which parallels Factory Avenue on the southern portion of the site and to maintain Ley Creek which is a significant feature of the surface drainage district for the surrounding area. To address concerns raised by the County relative to these maintenance responsibilities, the following access provisions would be incorporated into the remedy: (l) Cross culverts directing storm water from Factory Avenue would be lined and pathways provided for access; (2) Sanitary sewer manholes would be modified to match final grades, asphalt work pads would be installed around each and fencing would be modified to provide gates for direct access to the maintenance area; and (3) An access road would be constructed on the south bank of Ley Creek to provide a work area for future creek maintenance activities by the County. The constructed remedy components, including the Onondaga County access provisions, would be routinely inspected and maintained.

## Alternative 3: Dredged Material/Soil Excavation and Offsite Landfill Disposal, Groundwater Monitoring:

| | |
|---|---|
| Present Worth: | $ 28,860,000 |
| Capital Cost: | $ 28,860,000 |
| Annual O&M: | $          0 |
| Time To Implement: | 6-9 months |

Alternative 3 is a removal alternative which would include the excavation and removal of all PCB contaminated dredged materials/soils with surface concentrations greater than 1 mg/kg and sub-surface concentrations of 10 mg/kg for disposal at an off site landfill permitted for the disposal of PCBs. Excavation of approximately 110,000 cubic yards (cyds.) of contaminated material would be required. The excavated areas would be regraded and backfilled as necessary, with clean fill.

Due to the high cost of off-site disposal, the NYSDEC requested and GM evaluated, the feasibility of removing all the PCB dredge materials/soils greater than 50 mg/kg for disposal at a permitted facility as hazardous waste, with disposal of the remaining 91,000 cyds. of material, below 50 mg/kg, on the GM plant site. Disposal was considered possible in two areas of the site, an old landfill and the location of former treatment lagoons, where the Ley Creek material could have been utilized as contouring fill for the closure of these areas. Due to the limited acreage available and overhead transmission line easement restrictions, sufficient area to accept the entire volume was not available at these locations. Approximately 78,000 cyds. of PCB contaminated dredge material/soils would still have required disposal in an off site landfill. Due to the continued need to dispose of a large volume of this material off-site and the still significant cost associated with this disposal, partial disposal of PCB contaminated dredge material/soils on the GM Main Plant property was not considered a feasible option and not developed into a separate alternative.

## Alternative 4: Dredged Material/Soil Excavation and Incineration, Groundwater Monitoring, Deed Restrictions, Fencing and Maintenance Access Provisions:

| | |
|---|---|
| Present Worth: | $ 8,760,000 |
| Capital Cost: | $ 7,039,000 |
| Annual O&M : | $   110,000 |
| Time To Implement: | 12-18 months |

Alternative 4 is a removal and treatment alternative which would consist of the excavation and on-site incineration of the contaminated dredged materials/ soils. PCB contaminated soils greater than 25 mg/kg would be excavated and the PCBs in the material destroyed in a transportable hazardous waste incinerator which would be brought to the site. The area would then be backfilled with the treated soil, or clean topsoil if needed, and graded. Alternative 4 would also include deed restrictions, fencing, ground water monitoring for the remaining area where PCB concentrations

exceed the 1 and 10 mg/kg remedial levels. The maintenance access provisions detailed in Alternative 2 would also be included and would be routinely inspected and maintained.

### Alternative 5: Dredged Material/Soil Excavation, Thermal Desorption Treatment, Replacement, Groundwater Monitoring:

| | |
|---|---|
| Present Worth: | $ 43,762,000 |
| Capital Cost: | $ 43,762,000 |
| Annual O&M: | $          0 |
| Time To Implement: | 12 months |

Alternative 5 is also a removal, treatment and replacement alternative which would require excavation of dredge materials/soils containing PCBs greater than 1 and 10 mg/kg remedial levels. Excavated material would then be treated on-site using the thermal desorption technology. This technology heats the soil, volatilizing the PCBs and removing them from the soil matrix. The PCBs are them condensed and either subject to further treatment onsite or sent to an off site incinerator. Treated dredged material would be backfilled into the excavated areas, as necessary to achieve proper grades for the floodway. Alternative 5 would also include ground water monitoring.

### Alternative 6: In-Situ Biological Treatment of Dredged Material/Soil, Groundwater Monitoring, Deed Restrictions, Fencing and Maintenance Access Provisions:

| | |
|---|---|
| Present Worth: | $ 2,761,000 |
| Capital Cost: | $   486,000 |
| Annual O&M: | $   449,000 |
| Time to Implement: | Indefinite |

Alternative 6 would provide for an in situ treatment alternative, rather than requiring the excavation of the contaminated material. For treatment, the contaminated soils would remain in place while the existing site bacteria would be encouraged to use the PCBs as a food source. Since the time required to achieve the cleanup goals would be several years, at best, Alternative 6 would include deed restrictions, fencing, and monitoring of the in situ biological treatment of dredged material/soil as well as groundwater. The access provisions detailed in Alternative 2 would also be required and would be routinely inspected and maintained.

### Alternative 7: Dredged Material/Soil Excavation and Offsite Landfill Disposal ≥ 50 mg/kg PCBs 12 Inch Vegetated Soil Cover Groundwater Water Monitoring, Fencing and Maintenance Access Provisions:

| | |
|---|---|
| Present Worth: | $ 6,112,448 |
| Capital Costs: | $ 4,788,582 |
| Annual O&M: | $    84,309 |
| Time To Implement: | 9-12 months |

Alternative 7 is an excavation, disposal and containment alternative. Based upon current estimates, excavation of up to 5000 cubic yards of PCB contaminated dredge material/soils greater than 50 mg/kg would be required. Excavated materials would be transported offsite to a permitted hazardous waste landfill. The excavated areas would be regraded and backfilled, as necessary with the remaining dredge materials.

The remaining dredged materials/soil with concentrations of PCBs exceeding 1 mg/kg surface soils and 10 mg/kg subsurface soils would be covered with a minimum of 12 inches of topsoil. The areas to be covered would total approximately 17 acres. Dredged material/soils would be graded to a minimum of 4 percent grade. Riprap or sheeting would be placed along the creek to minimize erosion.

Alternative 7 would also include deed restrictions to prevent disturbance of the cover, fencing, and ground water monitoring. The maintenance access provisions detailed for Alternative 2 would also be required. The constructed remedy components, including the Onondaga County access provisions, would be routinely inspected and maintained.

### Alternative 8: Excavation and Off Site Disposal of Dredged Material /Soil > 50 mg/kg PCBs, Regrading of Material in the Floodway with Low Permeability Cover, 12-inch Vegetated Soil Cover Over the Remaining Material, Groundwater Monitoring, Deed Restrictions, Fencing and Maintenance Access Provisions:

| | |
|---|---|
| Present Worth: | $ 6,671,453 |
| Capital Costs: | $ 5,249,798 |
| Annual O&M: | $ 90,671 |
| Time To Implement: | 9-12 months |

This alternative would involve the excavation and off site disposal of dredged material/soil containing PCBs at concentrations greater than 50 mg/kg as in Alternative 7. The remaining dredged material/ soils with concentrations greater than 1 mg/kg for surface soils and 10 mg/kg for the subsurface will be handled as follows: (1) Contaminated material will be regraded out of the first 25 feet of the floodway south of Ley Creek, to appropriate elevations, and the entire area within the floodway will be covered with a geomembrane or clay overlain by a twelve (12) inch vegetated soil cover or a gravel access road; (2) Material relocated from the floodway will be consolidated under the cover south of the floodway and north of the existing sewer right of way; and, (3) All remaining areas exceeding the remedial criteria would be covered with a twelve (12) inch vegetated soil cover. The estimated extent of the cover would be 17 acres.

The maintenance access provisions discussed in Alterative 2 would also be included, as would fencing, deed restrictions and groundwater monitoring. The constructed remedy components, including the Onondaga County access provisions, would be routinely inspected and maintained.

## 6.2    Evaluation of Remedial Alternatives

The criteria used to compare the potential remedial alternatives are defined in the regulation that directs the remediation of inactive hazardous waste sites in New York State (6 NYCRR Part 375). For each of the criteria, a brief description is provided followed by an evaluation of the alternatives against that criterion. A detailed discussion of the evaluation criteria and comparative analysis is contained in the Feasibility Study.

**The first two evaluation criteria are termed threshold criteria and must be satisfied in order for an alternative to be considered for selection.**

**1. Compliance with New York State Standards, Criteria, and Guidance (SCGs).**
Compliance with SCGs addresses whether or not a remedy will meet applicable environmental laws, regulations, standards, and guidance.

Alternative 1 would leave hazardous waste levels of PCBs in the surface and subsurface of the dredged material/soil. Accordingly, the no action alternative would not satisfy NYS SCGs.

Alternative 2 would also leave levels of PCBs in the subsurface soils at levels that are a hazardous waste. The vegetative soil cover as proposed in this alternative would not meet SCGs since hazardous waste at concentration greater than 50 mg/kg would be left in a condition that is non-compliant with U.S. Environmental Protection Agency (USEPA) guidance for capping PCB contaminated media and the Toxic Substances Control Act (TSCA).

Alternatives 3, 4, 5, 7 and 8 would all remove PCBs greater than 50 mg/kg, however the 25 mg/kg remedial level used for Alternative 4 would not comply with the Technical and Administrative Guidance Memorandum (TAGM) #4046 level of 1 mg/kg in the surface and 10 mg/kg subsurface (1/10). Alternatives 3,5, 7 and 8 would address all contamination above the TAGM levels.

Alternative 6 would rely on bioremediation to address all contamination leaving the PCBs greater than 50 mg/kg exposed during the process. It is also questionable whether the remedial goals for the site would ever be achieved by a bioremediation process.

**2. Protection of Human Health and the Environment.** This criterion is an overall evaluation of the health and environmental impacts to assess whether each alternative is protective.

Alternatives 1 and 2 leave behind unacceptable levels of PCBs that are a hazardous waste in the surface and or subsurface of the dredged materials/soils. Therefore, alternatives 1 and 2 are not protective of human health and the environment.

Alternatives 3, 4, 5, 7 and 8 remove and/or treat the hazardous levels of PCBs in the Ley Creek dredging materials/ soils. Contaminated surface soils with concentrations of greater than 1 mg/kg

and subsurface soils with concentration of 10 mg/kg PCBs would be addressed by only Alternatives 3,5,7 and 8. Alternatives 7 and 8 remove all PCBs at 50 mg/kg. Alternative 8, however, offers a greater degree of environmental protection than Alternative 7 since contaminated materials would be relocated out of the floodway and enhanced erosion control would be provided by the impermeable cover. The incineration of soils under Alternative 4 only addresses contamination down to 25 mg/kg, relying on deed restriction and fencing to address the remaining areas and is not as protective as the other alternatives, while the ability of Alternative 6 to achieve these levels is not proven. Therefore, only Alternatives 3,5, 7 and 8 would be protective of human health and the environment, as stated in Sections 3.3 and 3.4.

**The next five "primary balancing criteria" are used to compare the positive and negative aspects of each of the remedial strategies.**

**3. Short-term Effectiveness.** The potential short-term adverse impacts of the remedial action upon the community, the workers, and the environment during the construction and implementation are evaluated. The length of time needed to achieve the remedial objectives is also estimated and compared with the other alternatives.

Alternatives 1, 2 and 6 would not require the movement of any of the contaminated dredging materials/soils. Therefore short term impacts from the material would be minor and limited to the workers engaged in installing the cover. Any potential exposure to construction workers would be mitigated by implementation of the health and safety plan.

Alternatives 3, 4, 5, 7 and 8 all would require excavation of the dredged material/soils that are hazardous waste at concentrations exceeding 50 mg/kg. Alternatives 3, 4, and 5 entail excavation of all contaminated materials at the site. Alternative 3 would result in a significant volume of off site truck traffic as the material is removed to a permitted facility and Alternatives 4 and 5, in addition to the excavation would require considerable handling and processing at the site before treatment. In addition, Alternative 4 would result in air emissions from the incineration process. These impacts would have to be dealt with by implementing reasonably available control technologies for any resulting air emissions. Alternative 5 would also require similar considerations due to the use of the thermal desorption technology, however, the emission rate and control considerations are significantly lower than for Alternative 4.

Alternatives 7 and 8 would involve much less excavation and off site traffic in that only the hazardous waste would be removed. However, both alternatives would require movement of some volume of the contaminated material around the site during the consolidation efforts. Alternatives 2, 7 and 8 would require increased truck traffic, associated with the delivery of the soil for use in the cover, however, given the remote location and industrial nature of the area, this would not be a significant concern. These alternatives would involve the use of standard protective measures to address any short term impacts from fugitive emissions due to excavation and materials handling. Alternative 6 would have minimal short term impacts since the contaminated material would remain in place with little intrusive activity taking place at the site.

## 4. Long-term Effectiveness and Permanence.

This criterion evaluates the long-term effectiveness of alternatives after implementation of the response actions. If wastes or treated residuals remain on site after the selected remedy has been implemented, the following items are evaluated: 1) the magnitude of the remaining risks, 2) the adequacy of the controls intended to limit the risk, and 3) the reliability of these controls.

Alternative 1 would not be effective in the long term since no additional protection would be implemented. Alternatives 3 and 5 would be most protective since all of the contaminated materials present at the site would either be removed or treated. Alternative 4 and 5 offer the greatest permanence since the PCBs would be destroyed in the treatment processes but Alternative 4 would not be as protective for the site since this alternative only addressees contaminated media above 25 mg/kg. Alternative 6 would have questionable long term effectiveness since bioremediation of PCB contaminated material has yet to effectively demonstrate the ability to meet the remedial goals for the site. Alternatives 2 and 7 offer similar levels of protection from identified exposure pathways for the vast majority of the contaminated materials, with Alternative 7 offering slightly greater protection since the contaminated material greater than 50 mg/kg would be removed. Alternative 8, while addressing the same material as Alternative 7, would be more protective in the long term since it would remove material from the most critical area of the floodway and provide for a low permeability component in the cover in the area, as well as significantly reducing the likelihood of erosion of the covered area impacting the Creek or breaching the containment system. Alternative 8 also includes provision for the addition of rip rap or other additional flood protection, as determined necessary during design, to insure the integrity of the remedy.

## 5. Reduction of Toxicity, Mobility or Volume.
Preference is given to alternatives that permanently and significantly reduce the toxicity, mobility or volume of the wastes at the site.

Alternative 1 would not reduce the toxicity, mobility or volume of the hazardous waste or the contaminated soils present at the Site. Alternative 2 would result in a decrease in the mobility however, it would not address the hazardous waste present at the site so there would be no reduction in toxicity or volume.

Alternatives 3, 4, and 5 would all significantly reduce the mobility, toxicity and volume of the contaminants at the site, however Alternative 4 would be less effective due to the higher action level. Both Alternatives 4 and 5, since they involve treatment which would destroy the PCBs, would be the most effective in achieving a reduction in the toxicity and volume of the contaminant. Alterative 6 would not be expected to be as effective in reducing the mobility, toxicity or volume of the contaminants.

Alternatives 7 and 8 present similar degrees of reduction in toxicity of the wastes present in the dredge spoils at the site, by eliminating the pathways for exposure, and volume by removing the volume of material representing hazardous waste. Both Alternatives 7 and 8 would also reduce

the mobility of the PCBs in the environment, however, Alternative 8 would result in a greater reduction in mobility than Alternative 7 due to the consolidation of material out of the floodway and the enhanced erosion control provided by the low permeability cover proposed for this alternative.

**6.    Implementability.**    The technical and administrative feasibility of implementing each alternative is evaluated. Technically, this includes the difficulties associated with the construction, the reliability of the technology, and the ability to monitor the effectiveness of the remedy. Administratively, the availability of the necessary personnel and material is evaluated along with potential difficulties in obtaining specific operating approvals, access for construction, etc.

Alternative 1 would be easily implemented from a construction standpoint since the only action involves fencing, however the administrative issue of deed restrictions would likely require some negotiation. Alternative 2 would be fairly easily implemented as the technology for covering the site is readily available.

Alternative 3 would be somewhat more difficult than Alternative 1 and 2 to implement since total excavation of all contaminated soils would be involved, however, these are more logistic concerns as the technology to safely excavate and haul these materials is standard in the industry.

Alternatives 4 and 5 would be the most difficult to implement because they involve treatment of the materials excavated from the site above and beyond what is required for Alternative 3. Alternative 4 which involves incineration, would face the greater level of regulatory and administrative issues than Alternative 5. They would require the most stringent health and safety, monitoring and pollution control equipment of any of the alternatives. These technologies would require greater time and diligence to implement, however both have been utilized successfully in similar instances.

Alternative 6 would be easier to implement than all the other alternatives other than Alternative 1 since this is an in-situ (in-place) technology that encourages naturally occurring bacteria to break down PCBs to an acceptable level. However, a pilot test on the dredge material has demonstrated that existing site conditions are not favorable for enhancing the current limited breakdown of PCBs that are found at the site. This is mainly due to the higher chlorinated Aroclors of the PCB mixture being resistant to breakdown.

Alternatives 7 and 8 would be straightforward and while Alternative 8 would be somewhat more difficult to implement than Alternative 7, due to the greater handling of material and the low permeability cover in the floodway, both rely on standard technologies for covering the site which would be readily available.

**7.  Cost.** Capital and operation and maintenance costs are estimated for each alternative and compared on a present worth basis. Although cost is the last balancing criterion evaluated, where two or more alternatives have met the requirements of the remaining criteria, cost effectiveness

can be used as the basis for the final decision. A remedy is cost effective if the cost of the remedy is proportional to its' overall effectiveness. The costs for each alternative are presented in Table 3.

8. **Community Acceptance.** Concerns of the community regarding the RI/FS reports and the Proposed Remedial Action Plan have been evaluated. The "Responsiveness Summary" included as Appendix A presents the public comments received and the Department's response to the concerns raised. No significant public comments were received at the public meeting, however, extensive written comments were received from General Motors, Onondaga County, Syracuse China/Pfaltzgraff and the New York State Thruway Authority. In general these comments were supportive of the selected remedy, while raising several specific concerns with certain aspects of the project, such as flood protection and possible impacts to the property owners resulting from the remedy. These concerns should either be addressed by the ongoing negotiation between GM and the various property owners or, for the more technical issues, will be addressed during the design of the remedy.

## SECTION 7: SUMMARY OF THE PREFERRED REMEDY

Based upon the results of the RI/FS, and the evaluation presented in Section 7, the NYSDEC has selected **Alternative 8: Excavation and Off Site Disposal of Dredged Material /Soil > 50 mg/kg PCBs, Regrading of Material in the Floodway with a Low Permeability Cover, 12-inch Vegetated Soil Cover Over the Remaining Material, Groundwater Monitoring, Deed Restrictions, Fencing and Maintenance Access Provisions** as the remedy for this site. This selection is based upon this alternative's ability to meet New York State Standards, Criteria and Guidance, be protective of human health and the environment, and offer the best balance of the five remaining evaluation criteria presented in Section 7.

This selection is based upon the evaluation of the eight alternatives developed for this site. Alternative 8 will be protective of human health and the environment, as discussed in Sections 3.3 and 3.4, by removing PCB contamination above hazardous waste levels from the site and consolidating the remaining materials out of the floodway. These remaining contaminated areas, approximately 17 acres, exceeding the remedial goals will be covered with a minimum of a twelve (12) inch vegetated soil cover, with the exception of the areas in the floodway where this cover will consist of a geomembrane or clay layer overlain with the twelve (12 inch vegetated soil cover or the gravel access road. This will prevent exposures to the PCBs below 50 mg/kg which will remain on the site. While Alternatives 3 and 5 would offer greater long term protection, their respective costs would be excessive in comparison to the increased effectiveness and the risk presented by the remaining contamination. Alternative 8 will be effective in the short term, since much of the contaminated material will remain undisturbed. Alternative 8 will also address the volume and toxicity of the most highly contaminated material and reduce the mobility of the remaining contaminants present at the site, however, not to as high a degree as the removal or treatment alternatives. Alternative 8 is significantly lower in cost than the removal and treatment

alternatives and since it equally satisfies the other criteria, including the threshold criteria, it is the preferred alternative.

The area in which the remedy will be located is a Class 2 freshwater wetland. The original deposition of the PCB dredge material occurred before the September 1, 1975 Article 24 regulation regarding the filling in of wetlands. The consolidation of the contaminated PCB soils will occur in areas that are designated as wetland. However, the NYSDEC Division of Fish, Wildlife and Marine Resources was consulted and has determined that while Alternative 8 will result in the continued loss of several acres of regulated freshwater wetland along the shore of Ley Creek, the potential reduction in PCB contamination to Ley Creek and Onondaga Lake outweighs the loss of wetlands. This will be consistent with the intent of Article 24, Environmental Conservation Law (ECL) Section 663.5 and will comply with Executive Order 11990: Protection of Wetlands.

The preferred remedy also will comply with the Fish and Wildlife Coordination Act, 16 U.S.C. 661, which requires consultation with state and federal wildlife agencies when wetlands/water resources are impacted, the Endangered Species Act, 16 U.S.C. 1531, which requires consultation with the U.S. Fish and Wildlife Service regarding endangered or threatened species and/or their habitat and any substantive requirements of Section 404 of the Clean Water Act for discharge of dredged or fill material in a wetland.

The estimated present worth cost to implement the remedy will be $6,671,453. The cost to construct the remedy is estimated to be $5,249,798. The estimated average annual operation and maintenance cost for 30 years will be $90,671.

The elements of the selected remedy are as follows:

1.    A remedial design program to verify the components of the conceptual design and provide the details necessary for the construction, operation and maintenance, and monitoring of the remedial program. Uncertainties identified during the RI/FS, specifically the identification and characterization of any PCB contamination which may be associated with known or suspected drainage swale(s) which historically conveyed surface runoff from the GM; Fisher Guide Site. This sampling will be conducted as a pre-design activity for this site. The investigation will involve subsurface sampling in the area of the swale encountered during the sewer installation as well as in areas of identified historic swales which may have drained the GM site, to determine the nature and extent of any subsurface PCB contamination, in the area which will be addressed by the remedy. Based upon this sampling, appropriate modifications to the proposed alternative, will be implemented prior to or in conjunction with, the construction of the remedy to avoid the necessity of future disturbance of the remediated site.

2.   Excavation and removal of dredge material/soils that contain PCBs at concentrations exceeding 50 ppm to a permitted hazardous waste landfill. It is estimated that up to 5000 cubic yards could be excavated from the areas identified on Figure 2.

3.   Consolidation and covering of the remaining PCB contaminated dredge materials where concentrations are less than 50 mg/kg but exceed the remedial level of 1 mg/kg at the surface and 10 mg/kg for subsurface areas. The dredged materials will be removed, at a minimum, from the first twenty feet of the floodway area to restore this area to appropriate elevation, with the excavated material consolidated in the area shown on Figure 2. After restoration to floodway elevations, any remaining materials above the remedial level remaining in the floodway will be covered with a geomembrane or clay and then twelve inches of soil or the gravel access road (see Figure 3 and 4). The floodway is the area defined by the Federal Emergency Management Agency August 23,1982 Flood Boundary and Floodway Map for the Town of Salina (Community Panel Number 360591 0007). In areas to be addressed outside of the floodway the dredged material will be graded and covered with a vegetated soil cover which will consist of twelve (12) inches of soil, with a permeability equal to or less than the material to be covered. Figure 5 shows the approximate 17 acre area that will be covered.

4.   Dredged material/soils in the vicinity of boring B-19, located on the north bank of Ley Creek (See Figure 2), will be excavated from an area of approximately 6200 square feet to a depth of 3 feet to achieve the remedial levels for the site. The excavated material is expected to be less than 50 ppm and will be consolidated with the rest of the material on the south bank.

5.   A hydraulic analysis and floodplain assessment to assure compliance with Executive Order 11988 (Floodplain Management) will be completed during the remedial design for the consolidated capped materials to insure that the material to be left in the floodplain and floodway will not result in any significant change in flood elevations and to ensure that there will not be any adverse impact to the remedy from a 100 or 500 year flood. If necessary, based on this analysis, additional material will be consolidated out of the floodway/flood-plain. Rip rap or other stabilization/flood protection techniques will also be applied as determined necessary during the design, to assure the integrity of the cover during flood events.

6.   To provide Onondaga County crews access to maintain Ley Creek as a part of the existing drainage district, a gravel access road will be provided adjacent to the southern bank of the Creek to allow for future maintenance and/or dredging. The four existing drainage swales from Factory Avenue will be graded back, covered with the vegetated cover and the flow channel lined with a half pipe or formed concrete spillway where they pass through the area of covered dredge spoils.

Gravel access pathways and asphalt working pads will be constructed to allow maintenance crews access to the sewer for routine maintenance activities, without coming into contact with potentially contaminated soil. Gates will be provided in the fence to provide direct access to the above maintenance locations to avoid having to travel over the covered area. During the remedial design consideration will be given to the removal of dredge material from the existing sewer right of way, if additional material will be needed to achieve final cover contours.

7.     Access agreements and deed restrictions will have to be negotiated with Onondaga County and other impacted property owners to allow the implementation of the remedy. The deed restrictions will be used to preclude activities which could potentially expose contaminated materials and to insure the integrity of the cover is maintained.

The area where PCBs will remain will be fenced and all gates locked, with keys provided to appropriate Onondaga County agencies. The fence identified for this remedy is intended to limit accesss to the site in order to assure the integrity of the cover system is maintained. However, alternative means of limiting access or activities which could result in damage to the cover (i.e.use of ATVs) may be proposed as part of the design. The agreement negotiated for access to implement the remedy will also have to address the potentially increased costs to Onondaga County which may be associated with sewer repair or installation and future widening of Factory Avenue in the areas where PCBs remain covered at the site.

8.     Since the remedy will result in dredge materials/soils with elevated levels of PCBs remaining untreated, but covered at the site, a long term monitoring program will be instituted. In addition, yearly reviews will be conducted to allow the effectiveness of the selected remedy to be evaluated and to determine whether the remedy continues to be protective of human health and the environment. This long term monitoring program will be a component of the operations and maintenance for the site and will be developed in accordance with New York State Standards, Criteria and Guidance.

9.     The remedial design would include provision for the completion of a Stage 1A Cultural Resources Survey, and any additional investigations required, to be consistent with the requirements of the National Historic Preservation Act (16 U.S.C. 470).

10.    An operation and maintenance program would be implemented to maintain the site and the integrity of the cover.

11.    Further evaluation of the groundwater beneath the dredged material, as well as, surface water and sediments in Ley Creek would be included in the scope of work for the RI/FS for the General Motors; Fisher Guide Site.

## SECTION 8:  HIGHLIGHTS OF COMMUNITY PARTICIPATION

As part of the remedial investigation process, a number of Citizen Participation (CP) activities were undertaken in an effort to inform and educate the public about conditions at the site and the potential remedial alternatives.  The following public participation activities were conducted for the site:

■   A repository for documents pertaining to the site was established.

■   A site mailing list was established which included nearby property owners, local political officials local media and other interested parties.

■   In February 1997 a Fact Sheet was sent to the mailing list announcing the availability of the Proposed Remedial Action Plan (PRAP) and the planned public meeting to accept comments on the PRAP.

■   On February 7, 1997, a legal notice was published in the Post-Standard and Syracuse Herald-Journal announcing the availability of the PRAP for review and the date of the public meeting.

■   On February 26, 1997 the NYSDEC and NYSDOH held a public meeting to explain the State's proposed remedy and accept comments on the PRAP.

■   In March 1997 a Responsiveness Summary was prepared and made available to the public, to address the comments received during the public comment period for the PRAP.

**Table 3**
Remedial Alternative Costs

| Remedial Alternative | Capital Cost | Annual O&M | Total Present Worth |
|---|---|---|---|
| **Alternative 1: No Action, Groundwater Monitoring, Deed Restrictions, Fencing** | $5,500 | $12,000 | $ 216,000 |
| **Alternative 2: Twelve (12) Inch Vegetated Soil Cover, Ground Water Monitoring, Deed Restriction, Fencing and Maintenance Access Provisions** | $1,665,000 | $41,000 | $2,327,000 |
| **Alternative 3: Dredged Material/Soil Excavation and Offsite Landfill Disposal, Groundwater Monitoring** | $28,860,000 | 0 | $28,860,000 |
| **Alternative 4: Dredged Material/Soil Excavation and Incineration, Groundwater Monitoring, Deed Restrictions, Fencing and Maintenance Access Provisions** | $7,039,000 | $110,000 | $8,760,000 |
| **Alternative 5: Dredged Material/Soil Excavation, Thermal Desorption Treatment, Replacement, Groundwater Monitoring:** | $43,762,000 | 0 | $43,762,000 |
| **Alternative 6: In-Situ Biological Treatment of Dredged Material/Soil, Groundwater Monitoring, Deed Restrictions, Fencing and Maintenance Access Provisions:** | $486,000 | $449,000 | $2,761,000 |
| **Alternative 7: Dredged Material/Soil Excavation and Offsite Landfill Disposal >50 mg/kg PCBs, 12 Inch Vegetated Soil Cover, Groundwater Water Monitoring, Fencing and Maintenance Access Provisions:** | $4,788,582 | $84,309 | $6,112,448 |
| **Alternative 8: Excavation and Off Site Disposal of Dredged Material /Soil >50 mg/kg PCBs, Regrading of Material in the Floodway with a Low Permeability Cover, 12-inch Vegetated Soil Cover Over the Remaining Material, Groundwater Monitoring, Deed Restrictions, Fencing and Maintenance Access Provisions:** | $5,249,798 | $90,671 | $6,671,453 |



FIGURE 2: PROPOSED EXCAVATION AND CONSOLIDATION AREAS

LEY CREEK PCB DREDGINGS
NYSDEC SITE No. 7-34-044
DIVISION OF ENVIRONMENTAL REMEDIATION

LEGEND:

—— SEWER

—— PROPERTY BOUNDARY

PROPOSED CONSOLIDATION AREA

>50 PPM, TO BE EXCAVATED

PROPOSED NORTH BANK EXCAVATION, TO CONSOLIDATION AREA



**FIGURE 3: EXTENT OF LOW PERMEABILITY COVER**

LEY CREEK PCB DREDGINGS
NYSDEC SITE No. 7-34-044
DIVISION OF ENVIRONMENTAL REMEDIATION



FIGURE 4: PROPOSED FLOODWAY REMEDIATION PLAN



FIGURE 5: SOIL COVER

LEY CREEK PCB DREDGINGS
NYSDEC SITE No. 7-34-044
DIVISION OF ENVIRONMENTAL REMEDIATION

LEGEND:
———— SEWER
———— PROPERTY BOUNDARY
▨ PROPOSED EXTENT OF SOIL COVER

Appendix A

# RESPONSIVENESS SUMMARY

**Ley Creek PCB Dredgings Site**
**Proposed Remedial Action Plan**
**Salina(T),Onondaga County**
**Site No. 7-34-044**

The Proposed Remedial Action Plan (PRAP) for the Ley Creek PCB Dredgings Site, was prepared by the New York State Department of Environmental Conservation (NYSDEC) and issued to the local document repository on February 6, 1997. This Plan outlined the preferred remedial measure proposed for the remediation of the poly-chlorinated biphenyls (PCBs) contaminated dredge materials/soils at the Ley Creek Site. The selected remedy is the excavation and off-site disposal of dredge materials/soils contaminated with PCBs at concentrations greater than 50 mg/kg and the consolidation and covering of the remaining volume of materials with concentrations exceeding 1 mg/kg at the surface and 10 mg/kg subsurface.

The release of the PRAP was announced via a February 6, 1997 notice to the mailing list, informing the public of the PRAP's availability.

A public meeting was held on February 26, 1997 which included a presentation of the Remedial Investigation (RI) and the Feasibility Study (FS) as well as a discussion of the proposed remedy. The meeting provided an opportunity for citizens to discuss their concerns, ask questions and comment on the proposed remedy. These comments have become part of the Administrative Record for this site. Written comments were received from the General Motors Company, Onondaga County, Syracuse China/Pfaltzgraff and the New York State Thruway Authority.

The public comment period for the PRAP closed on March 10, 1997.

This Responsiveness Summary responds to all questions and comments raised at the February 26, 1997 public meeting and to the written comments received.

The following are the comments received, with the NYSDEC's responses:

**COMMENT 1:**      What is the class of the site now and what will it be after the remediation?

**RESPONSE 1:**      The site is currently a class 2 which indicates that the site represents a potential threat to human health and/or the environment. Once the remedy is in place, the site will most likely be reclassified as a Class 4 site which

is a site where remediation has been completed and only continued operation and maintenance of the remedy is required.

**COMMENT 2:**    Would PCB levels in fish be monitored?

**RESPONSE 2:**    Additional fish monitoring will likely be a component of the RI/FS for the GM; Fisher Guide Plant site, which is expected to be initiated in the near future. Based upon the findings of this RI, and the need for any further remediation resulting from the FS, long term monitoring of the fish may be determined necessary. Additional monitoring of the Ley Creek remedy is anticipated, primarily to insure that the integrity of the cap is maintained.

The following comments were included in a letter dated March 10, 1997 received from Mr. William Kochem of General Motors:

**COMMENT 3:**    The Department suggests that pre-design soil sampling be conducted to determine the nature and extent of PCBs in the area of the drainage swales as part of the selected remedy. This language should be deleted in the final ROD, because the investigation has already been done.

As part of the Remedial Investigation, additional soil borings were installed to evaluate (I) if the former drainage ditch swale extended to the north side of Factory Avenue and (ii) if PCBs, which were detected in soils south of Factory Avenue and outside of the interim remedial measure (IRM) work area, extended north of Factory Avenue (see sections 2.06.4, 2.07.4, and Figure 2 of the Remedial Investigation Report ("RI")). The results of the investigation are set forth at section 3.06.2.1 of the RI, and in view of the findings, there is no need for any additional pre-remedial investigation.

**RESPONSE 3:**    The work from the RI, cited above as providing confirmation that the swale was investigated and found not to exist, is considered inadequate to make such a determination. The soil borings identified as having been installed to determine if the swale exists, B-25 to B-29 and B-34 to B-43, do not support this conclusion. Out of the 11 borings in question, only 3 appear to have been to sufficient depth to pass through the dredge spoils and possibly detect the existing swale. Furthermore, no evaluation was presented relating the location and elevation of the high levels of PCB contamination in the soil encountered during the sewer construction, to the location and depth of any of the installed borings. Additional investigations

designed to identify the drainage swales will continue to be required by the ROD.

**COMMENT 4:**    The following reference in the PRAP should be corrected to insert the language in bold type face: . . . "the entire area within the floodway will be covered with a geomembrane or clay overlain by a twelve (12) inch vegetated soil cover **"or a gravel access road"**. The gravel access road is to be installed within the first 15 feet of the floodway.

**RESPONSE 4:**    Agreed, this revision will be incorporated in the Record of Decision (ROD).

**COMMENT 5:**    The hydraulic analysis, which is required as part of Alternative 8, is to confirm that the elevations set within the floodway as part of the remedy do not result in any significant rise in the flood levels in the community, using the February 16, 1982 Federal Emergency Management Agency (FEMA) Flood Insurance Study for the Town of Salina, New York and the August 16, 1982 FEMA Floodway Boundary and Floodway Map as benchmarks (see page 62 of the FS). To the extent the PRAP is requiring further analysis as part of the remedy, it needs to be revised

**RESPONSE 5:**    The hydraulic analysis contemplated by the PRAP, and which will be required by the ROD, is that necessary to comply with Executive Order 11988, which is the basis for the FEMA requirements cited above. Therefore, no revision to this language is considered necessary in the ROD to address this comment, however the floodway elevation has been included to clarify this issue.

**COMMENT 6:**    The soil/dredged material PCB cleanup criteria used by the Department at this site are 1 mg/kg at the surface and 10 mg/kg (subsurface). The source of these criteria is incorrectly listed as the EPA OSWER Guidance on Remedial Actions for Superfund Sites with PCB Contamination, EPA/54OG90/607, August 1990. The correct reference is the Department's TAGM 4046, "Determination of Soil Cleanup Objectives and Cleanup Levels" (see pages 58 and 61 of the FS).

**RESPONSE 6:**    The basis for the 1 and 10 ppm cleanup criteria is the OSWER Guidance cited above. The acceptance and use of these concentrations by the NYSDOH as remedial cleanup criteria and their subsequent incorporation into the NYSDEC TAGM 4046 is based on the risk assessment presented

in Appendix B of this OSWER document. Therefore, the citation of this document in the Section of the PRAP which discusses the Human Exposure Pathways resulting from the site is appropriate and no revision to this language in the ROD is necessary.

**COMMENT 7:**    Table 1 at page 7 of the PRAP lists 110 ppb as a SCG for fish tissue and cites the "Niagara River Biota Contamination Project: Fish Flesh Criteria for Piscivorous Wildlife" as the supporting authority. The reference should be deleted for two reasons: (1) Impact on surface waters has been deferred to the RI/FS review on the GMIFG Main Plant Site and so this issue is not properly a subject of this PRAP and (2) There is no discussion in the PRAP to support the view that the Niagara River study is a proper SCG for this site as required under 6 NYCRR §375-1.10(c)(1)(ii). It is GM's view that there are differences between the receptors in the Niagara River study and the receptors present in Ley Creek and this will impact the analysis.

**RESPONSE 7:**    The Newell reference is appropriate for use here, for the following reasons: (1) While selection of a remedy for the surface waters and sediments may have been deferred, the assessment of any impacts by site contaminants from the dredge material itself on surface waters and offsite has not been deferred to the Main Plant investigation, specifically the impact of erosion or other migration of the contaminated sediments to the Creek. The fish tissue data collected shows an impact to the environment attributable to the dredge spoils and these results of the investigation are available, relevant and appropriate to share with the public at this time in this document. (2) These environmental criteria were developed for chemicals for which none existed. They were intended to protect piscivorous wildlife not only along the Niagara River, but anywhere in the State, and have been applied as such since their development. The Newell criterion is consistent with, but slightly less conservative than the 0.1 mcg/g in fish set by the International Joint Commission as the objective for protection of fish and wildlife.

**COMMENT 8:**    The eastern limit of the site is described as Townline Road, but the site does not actually extend that far. The eastern terminus of the site is described in the Department's Registry notice as the vicinity of the Fisher Guide discharge point (that is, Outfall 003), rather than all the way down to Townline Road (see page 1 of the RI). A revision reflective of the Registry description should be made.

**RESPONSE 8:**   The ROD will be modified to conform with the Registry description of the eastern site boundary.

**COMMENT 9:**   The PRAP identifies the source of PCBs as the result of discharges of contaminated water "primarily" from the discharge of wastewater from GM's former Inland Fisher Guide manufacturing facility. Although GM does not deny that PCBs were detected in the discharge from its outfall into Ley Creek, the GM-IFG facility was not the only facility that was permitted to discharge PCBs into Ley Creek or the only potential source of PCBs in the dredgings (see page 3 of the RI). GM also cannot confirm where all the dredgings were taken from Ley Creek or even if there are dredgings taken from other areas within Onondaga County. The text should be revised accordingly.

**RESPONSE 9:**   Based upon the distribution and concentration of PCBs identified in the dredge spoils (ref. Table 2 of the ROD), as well as the Aroclors present, the NYSDEC considers the GM Plant as the primary source of the contamination in question. As such, no change will be made in the ROD language.

**COMMENT 10:**   The PRAP indicates that "ecological risk calculations have also indicated that the PCB-contaminated dredge material/soils at the site may pose an "unacceptable risk to terrestrial species such as the short-tailed shrew and the red tailed hawk" and that this led to the establishment of a 1 mg/kg surface soil standard for PCBs. A quantitative ecological risk assessment was not conducted by GM as part of the RI. Therefore, please provide us with the site-specific quantitative risk assessment that is the basis for the statement in the PRAP.

**RESPONSE 10:**   The risk calculations have been provided to GM and are included in the Administrative Record for this ROD.

**COMMENT 11:**   Has the EPA reviewed and approved the proposed remedial alternative? The remedial review process for this site followed that set forth under New York State's superfund program (Article 27, Title 13 of the Environmental Conservation Law), rather than the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). However, it is our understanding that the Department concurs that the selection of the proposed remedy will be consistent with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP") as consistency with the

NCP is also a requirement under the state's superfund program (see 6 NYCRR § 375- 1. 10 (c)).

**RESPONSE 11:**    The USEPA has reviewed the FS and the PRAP and has assured the Department that it finds the selected remedy to be protective of human health and the environment. It is the Department's position, as indicated in the Declaration to this ROD, that the remedial program selected is not inconsistent with the National Oil and Hazardous Substances Pollution Contingency Plan of March 8, 1990 (40CFR300).

**COMMENT 12:**    Page 5 of the PRAP refers to a previous soil removal program occurring in the "Meadowbrook Road" area. The reference should be corrected to read: "Meadowbrook/Hookway" area.

**RESPONSE 12:**    The ROD has been modified to reflect this comment.

**COMMENT 13:**    At page 14 of the PRAP, it is correctly noted in Alternative 8 that areas outside of the floodway are to be covered with a 12 inch vegetated cover. However, at page 21, there is a tag line to the effect that the soil cover is to have a "permeability equal to or less than the material to be covered." The language on permeability should be deleted. As explained at page 63 of the FS, the objective of the soil cover is to minimize direct contact, rather then to minimize infiltration.

**RESPONSE 13:**    It is acknowledged that the purpose of the cover is primarily to address exposure resulting from direct contact, not to minimize infiltration into the contaminated materials. This requirement, while likely resulting in reduced infiltration, is intended to preclude the situation where a more permeable layer, overlaying a less permeable material, becomes saturated leading to sloughing or other erosion of the cap. Use of a material of a predetermined low permeability is not contemplated by this requirement, the intent is to require a cover material similar in nature (permeability) to that which it will cover. This requirement is intended to insure the structural integrity of the cover particularly in the event of a flood, therefore, this requirement will remain as a performance standard in the ROD.

The following comments were included in a letter dated March 10, 1997 received from Mr. Robert S. McEwan, Jr. of Nixon Hargraves, Devans and Doyle on behalf of the Pfaltzgraff and Syracuse China Companies:

**COMMENT 14:**    Alternative 8 contemplates, in part, removal and off-site disposal of soil taken from certain "hot spot" areas (Final Feasibility Study, dated October 1996, "Final FS", p 59). However, the "hot spot" areas may not be the only areas of significant PCB contamination.

According to the map entitled Proposed Excavation and Consolidation Areas (Final FS, Figure 10), none of the "hot spot" areas to be excavated appear to be located on the Ryacuss parcel. However, the closest excavation point seems to be less than 200 feet away (Id.). The maps containing the soil boring locations included with the appendices of the Remedial Investigation Report ("RI") and the Final FS do not delineate the boundary of the Ryacuss parcel making it difficult to determine soil boring locations in relation to the Ryacuss property boundary.

It is possible that either or both soil borings designated as B7 and BB lie within the Ryacuss property boundary (Final FS, Figure 2).

Because there is no pattern of distribution of the PCBs throughout the Study Area and PCBs are present throughout the area in question at levels requiring remediation (see, PRAP, p 8), given the available data it should be assumed for the purposes of remediation that elevated levels of PCBs exist within the soils of the Ryacuss parcel. Even if there are no "hot spots", there is contaminated soil that, if left behind, has the potential to cause health or environmental problems. The soil from the Ryacuss parcel ought to be excavated and removed for off-site disposal.

**RESPONSE 14:**    The location of all soil borings have been reviewed relative to the Ryacuss parcel. After the reviewing the RI data in response to this comment it was identified that the location identified in the Feasibility Study and the PRAP as boring location B-6 was in fact boring location B-6M. The actual location of B-6 is near the northeast corner of the Ryacuss parcel. The correct location of boring B-6 is shown on a revised Figure 2 in the ROD.

The selected remedy provides for the removal of all areas of contaminated dredge spoils and soils where PCB concentrations have been identified in excess of 50 ppm, which is the level of PCBs which defines a substance as a hazardous waste. Based upon the above, there is now one location on the

Ryacuss parcel, Boring B-6, where sampling identified levels of PCBs in excess of 50 ppm. This area will be excavated to remove this material, however, PCBs will remain on the balance of the parcel at concentrations less than 50 ppm. The soil cover, included in the selected remedy, will cover the entire parcel, mitigating any identified human health and environmental exposures, which may result from the contaminants remaining at the site. While the selected remedy will be protective of human health and the environment Syracuse China/Pfaltzgraff, as the property owner, is free to attempt to negotiate with GM other reasonable considerations as a condition of access to their property.

**COMMENT 15:**  According to the Final FS, there is one monitoring well on the Ryacuss parcel. However, given the way that the well location map is presented, it is not possible to determine from that map which monitoring well it is. Based upon an estimated location, it may be MW 12 or MW 13 (Final FS, Figure 5). Data from MW 12 and MW 13 indicate the presence of PCBs above the *NYS Class* GA groundwater standard of 0.1 ug/l

**RESPONSE 15:**  Based upon the review of the mapping, MW 12 is located on the Ryacuss property. Based upon the results of the RI, the groundwater beneath the property is contaminated above groundwater standards, as indicated by this comment. As stated in the PRAP and ROD, the groundwater contamination is believed to be related not just to the Ley Creek site, but also is influenced by the GM; Fisher Guide site, therefore further action to address the groundwater has been deferred to the RI/FS for this site.

**COMMENT 16:**  The basis for the decision to defer the remediation of groundwater contamination appears to lie in the fact that there is a hydraulic connection in the groundwater under the Study Area and the upgradient groundwater underlying the Main Plant site (Final FS, p 22). The extent of that hydraulic connection is not discussed.

**RESPONSE 16:**  As stated in the PRAP and ROD, it is anticipated that additional groundwater investigations will be carried out as part of the RI/FS for the General Motors: Fisher Guide Site. The extent of the hydraulic connection of the groundwater and any associated contamination at the GM; Fisher Guide site to Ley Creek and this site has yet to be fully defined. For this reason, a groundwater remedy was not identified for the Ley Creek PCB Dredgings site by this ROD.

**COMMENT 17:**   It may be possible to install a groundwater trench in a manner to sever the hydraulic connection between the Main Plant site and the Study Area to intercept PCB laden groundwater and prevent its continuing discharge into Ley Creek. If a groundwater trench were deemed appropriate, it could be installed as an Interim Remedial Measure (see, TAGM HWR-92-4042 and TAGM HWR-92-4048) pending the final remedial plan for the Main Plant site.

One of the remedial goals set forth in the PRAP is to eliminate the threat to surface waters by eliminating contaminated surface run-off (PRAP, p 10). The threat to surface waters may be further reduced by the installation of a groundwater trench.

**RESPONSE 17:**   Such a collection trench may be a potential remedy to be evaluated by the FS for the Plant site, or as a possible IRM as suggested, once a better understanding of the area-wide groundwater system and the nature and extent of any contamination has been gained by the investigations to be conducted during the GM Site RI.

**COMMENT 18:**   The PRAP does not indicate the appropriate elevations to which the dredgings will be placed. This issue was addressed in a letter prepared by General Motors' counsel dated August 30, 1995. In that letter a portion of the remedial plan is described as the moving and regrading of the dredgings away from the " ... first 25 feet of floodway south of Ley Creek to create elevations of 370 feet or less ... ".

We assume that the term "floodway", as it is used in the Final FS, means that portion of the 100 year flood plain as identified on the 1982 Federal Emergency Management Agency Flood Boundary and Floodway Map provided as Exhibit C of the Final FS. The floodway appears to be an estimate of some sort (Final FS, Figure 8 which shows the "approximate floodway" 11 ... plotted from 1982 [FEMAI flood boundary and floodway map").

**RESPONSE 18:**   The ROD has been revised to reference the floodway area as defined by the above referenced FEMA mapping. A specified elevation is not generated in the definition of the map of the floodway, as is the case when defining the 100 and 500 year flood events. The assumption regarding the term floodway is correct and the area in question is as defined on the map.

**COMMENT 19:** A remedial alternative that proposes to re-grade only the first 25 feet of the floodway to remove PCB contaminated soil contemplates leaving the balance of the PCB contaminated soil, even soil located within the floodway, in place. There is no explanation in the Final FS or the PRAP regarding what measures will be taken, if any, to prevent flooding of the Study Area. Apart from the referenced language regarding erosion controls, the Final FS does not include any flood control measures. In fact the large mounds of soil that presently exist along the southern banks of Ley Creek will be leveled and graded. Without flood control measures in place, the potential exists for flooding to carry contaminants downstream, even those overlain with impermeable materials such as clay or a geomembrane cover. No provision appears to have been made to prevent the influence of flood waters upon the Study Area.

**RESPONSE 19:** As stated in this comment, there are no measures proposed by the ROD to prevent flooding of the site. There are however several measures to insure the structural integrity of the components of the remedy against the effects of flooding. Alternative 8 was developed in recognition of this need, including the provision for the use of a low permeability cover in areas of the floodway, to enhance the protection and stabilization of the cover. In addition, the gravel roadway will serve a dual function by providing increased protection to the first fifteen feet of the cover along the creek bank. Also, the requirement for comparable soil permeability between the cover and the material being covered, is also intended to mitigate any deleterious impacts of saturation during flooding on the cover. The remedy as described in the FS also provides for the use of rip rap of the creek channel as determined necessary during design and this has been noted in the ROD. Finally, the long term operation, maintenance and monitoring program required by the ROD will include inspections and repairs to the cover, as well as the required review of the effectiveness of the remedy and its protectiveness of human health and the environment.

**COMMENT 20 :** Section 6 NYCRR 373-2.2(j) provides that hazardous waste storage facilities that are located in the 100 year flood plain must be designed, constructed, operated, and maintained to prevent washout of any hazardous waste unless the owner or operator can demonstrate that procedures are in effect that allow removal of the hazardous wastes before flood waters can reach the facility. For existing waste sites the owner or operator must demonstrate that there will be no adverse effects on human health or the environment if a washout occurs.

No such demonstration is contained in the Final FS.  The referenced provisions of Part 373 should be adopted as guidance for the remediation of the Site and the Site operator should make the required demonstration. In absence of a demonstration that there will be no adverse effects on human health or the environment in the event of a washout, the contaminated soil should be removed from the flood plain or flood control measures should be put in place. One of the stated goals of this remedial program is to eliminate the threat to surface waters and sediments by eliminating any future contaminated surface run-off from the dredge soils on site (PRAP, p 10). There is nothing contained in the Final FS that indicates that Alternate 8 will fulfill that goal, particularly in the event that flooding occurs.

**RESPONSE 20:**   This site is an inactive hazardous waste disposal site and therefore not directly subject to the requirements of Part 373.  As a result of the selected remedy's requirement that all PCBs in excess of 50 ppm be removed from the site,  no hazardous waste will remain which is subject to regulation. Although the Part 373 demonstration is not applicable for this remedy,  the substantive requirements of Part 373 will be considered in the course of the design of the remedy.  Section 7.2-4 of the PRAP addressed the selected remedy's compliance with the remedial goal cited in this comment.  This Section of the ROD has been modified to reflect the rip rap and other flood proofing provisions discussed in Response 20.

**COMMENT 21:**   We are unable to determine whether the institutional control that is proposed would have any impact upon Syracuse China facility operations. Any type of control that is imposed within the Study Area must be examined so that it does not impact operations of facilities located outside of the Study Area.

**RESPONSE 21:**   Based on the historic lack of any activity by Syracuse China at the Ruckuses parcel, it is not anticipated that there should be any impact  upon operations at the Syracuse China facility.  No land use controls associated with the remedy are anticipated beyond the immediate site boundary (Study Area), which is defined in Section 1 of the ROD.

**COMMENT 22:**   An innocent landowner should not be subject to institutional controls and face further liability as a result of a remedial plan that calls for leaving contaminated soil in place in a potential flood prone area.  An appropriate remediation of the Ryacuss parcel (which is approximately 1.3 acres in size)

could be undertaken without much additional cost. Given the location of the site and the USEPA regulations that have been referenced or identified as guidance for this project, excavation soil from the Ryacuss parcel for disposal off site or consolidation elsewhere on the site is warranted.

**RESPONSE 22:**    The State considers the selected remedy to be protective of human health and the environment for the entire 17 acre site. While it may be technically feasible to remove the material from the 1.3 acre parcel in question, taken in the context of the entire site and the need for a site wide remedy, there is no remedial justification to alter the selected remedy, as suggested. Future liability concerns of a landowner are not a factor in determining the feasibility of a proposed remedy. The property owner is however free to raise such considerations with the PRP during the negotiations for access to this parcel to implement the remedy.

**COMMENT 23:**    The Final FS concluded that the PCB-contaminated soil in the Study Area would lead to insignificant exposure to certain forms of wildlife and that a remedial action objective for the dredged materials based on risk reduction is not warranted (Final FS, p 14). This finding appears to be based, at least in part, upon "the infrequent study area use by terrestrial wildlife,, (id.).

However, NYSDEC notes that this area is an "island of wildlife habitat" and "that the resident wildlife are concentrated within the area, spending the majority of their feeding activity here" (Final FS, Exhibit E). NYSDEC believes that some of species identified at risk include raccoon, mink and hawk (id). Other species upon which these animals would prey, and are typically found in the cover type identified in the Study Area, would include mice, shrews, reptiles and amphibians (RI, Exhibit D).

Many of these smaller species would likely (1) burrow into the contaminated PCB dredge piles and (2) feed on invertebrates that utilize the dredge piles as a habitat. Given the variety of species found in the Study Area, and the findings in the Fish and Wildlife Impact Analysis that provide that dredged material/soil, surface water, sediment, and food chain pathways are complete" (Final FS, p 12), risk to the referenced species should have been quantified. As a consequence, the Final FS incorrectly asserts that a remedial action objective for the dredged materials based on risk reduction is not warranted. Such a risk analysis ought to be performed and, if appropriate to the findings of the risk analysis, a remedial action objective should be developed and implemented.

**RESPONSE 23:**    The NYSDEC agrees with the above and a remedial goal to address this concern was included as the fourth bullet in Section 4.4 of the PRAP and is now in Section 3.4 of the ROD. An analysis has been performed which included some of the species identified in this comment, specifically the red tailed hawk and shrew. This assessment, which identified a risk to these terrestrial species, is included in the Administrative Record for this ROD.

**COMMENT 24:**    The Final FS notes that detectable PCB concentrations measured in sediments at the Study Area during the RI "exceed wildlife residue criteria for PCBs" (Final FS, p 20). However, the Final FS does not address contamination in these wetlands. A remedial investigation of these wetlands should be conducted and if PCBs are detected and exceed wildlife residue criteria for PCBs a remedial plan should be developed and implemented as a part of the final PRAP.

**RESPONSE 24:**    Dredged sediments were deposited in an area of designated wetland, prior to the September 1, 1975 Article 24 regulations governing the filling of wetlands. It has been determined that due to the prior placement of this material and the overall benefit to the environment derived from this project, removal of the material would not be required and consolidation of additional material in this area was considered appropriate. This decision, which was documented in the PRAP and in the third paragraph of Section 7 of the ROD, is based on the Division of Fish and Wildlife memo dated December 6,1995, which has been included in the Administrative Record.

**COMMENT 25:**    In an attempt to minimize the contamination of Ley Creek surface water, sediments, and aquatic wildlife, the site owner presented to the Department a hazard evaluation. This hazard evaluation purports to quantify the risk to the great blue heron resulting from exposure to PCBs found in Ley Creek surface water, sediments and fish (Id.). The great blue heron was chosen as a representative species of the area. The results of that evaluation are presented in the Final FS at Appendix D.

We note that the great blue heron study limited its scope of review to a diet of fish, even though the bird includes other small invertebrates and mammals, such as those that would live in or adjacent to the dredge piles and dredged spoil wetlands, as its source of food. These other sources of food have been demonstrated to bioaccumulate PCBs to harmful levels. According to Exhibit E of the Final FS, past studies show fish and

amphibians from Ley Creek have body burdens of PCBs up to 5 ppm or higher which significantly exceed fish flesh criteria.

In addition, we question the value of the great blue heron study given (1) that toxicity data for the great blue heron was taken from a different species and (2) other species appear to be more representative of the Study Area (Final FS, Exhibit E). Department comments indicate that the great blue heron should" ... not be considered as a representative species in ... response to contaminant problems" (Id.).

**RESPONSE 25:**    The PRP's specific HQ calculations for the great blue heron have not been validated by the Department, however, the unremediated site constitutes a significant risk to fish and wildlife, and therefore will be remediated. Future assessment of the area as part of the GM; Fisher Guide site RI/FS, and remediated dredge spoil site impacts to surface water, sediments and biota, especially those of Ley Creek, will be evaluated by DEC and EPA risk evaluators as soon as data are available. Appropriate follow up actions will then be taken to alleviate significant remaining impacts, if any.

**COMMENT 26:**    It appears that the Final FS suggests that the results of the hazard evaluation allow departure from the standards set forth in the Sediment Criteria (Final FS p 20). Please note that Pfaltzgraff and Syracuse China continue to question whether the Sediment Criteria is appropriate guidance setting soil cleanup standards, however, the contaminated material in question for this Study Area is sediment from an open water body - precisely the medium for which the sediment criteria was designed. By way of contrast, NYSDEC rejected arguments that the wetland soils located adjacent to the Syracuse China landfill were not "sediments" as defined in scientific literature but were soils. The Department insisted that *Cleanup Criteria for Aquatic Sediments* (NYSDEC 1993) be applied to the establishment of cleanup levels for those wetland soils.

**RESPONSE 26:**    Sediment criteria for this project are not being applied since the soils in question are located in upland areas and not in inundated or low areas, as was the case for the referenced site.

**COMMENT 27:**    The dredged soils are now piled adjacent to Ley Creek and within what appears to be a l00 year flood plain. The chances for erosion or flooding to wash this material into the creek is realistic. This possibility of flooding

should be as much an environmental concern as the concern of the Department toward the soils in the wetland adjacent to the Syracuse China landfill where the Sediment Criteria were applied.

**RESPONSE 27:**    The concern relative to the migration of contaminants from the soil piles into Ley Creek is documented in the PRAP as a remedial goal and was a major concern in the development of the selected remedy. The soils in this case are being relocated away from the Creek and covered to address this concern. In the case of the Syracuse China site, the contaminated sediments to be removed are present in the wetland. They will be removed and placed in an upland area on the landfill, where they will be covered. In addition, an area of the landfill where material was placed in the wetland after September 1, 1975 is being removed from the wetland. A significant portion of the landfill material which was placed prior to this time, however, will be allowed to remain in place, the material removed from the wetlands consolidated in the area and then the area will be covered, similar to what will occur in the Ley Creek remedy in question.

**COMMENT 28:**    To complete the remediation of the Syracuse China Landfill, contaminated soil must be removed from a low quality wetland (Syracuse China ROD, § 7). In contrast, the Final FS recommends that soil contaminated with PCBs be left in place within a wetland and the flood plain of a creek that leads to Onondaga Lake, a very sensitive ecosystem. The Department should apply the Sediment Criteria consistently.

**RESPONSE 28:**    The appropriate application of the Sediment Criteria, applied on a case specific basis, is how the Department ensures consistency. The relevant issue analyzed in this case was how the remedy selected best accomplished the goal of protecting human health and the environment, by removal or containment, not the application of the sediment criteria. At Ley Creek, all of the material in question is located out of areas regularly inundated, while this is not the case for the Syracuse China site.

The following comments were included in a letter dated March 7, 1997 received from Mr. David Coburn, Director of the Office of the Environment for Onondaga County:

**COMMENT 29:**    The County has previously submitted comments to the DEC relative to the Ley Creek Site. We are incorporating by reference all previously submitted comments.

**RESPONSE 29:**    During the development of the PRAP two letters commenting on various issues associated with the project were received from Onondaga County by the Department.  The first, a September 25, 1996 letter from County Executive Nicholas J. Pirro and the second, a September 30,1996 letter from David Coburn, the Director of the Onondaga County Office of the Environment.  The majority of the issues raised by these letters have either already been addressed in the final version of the PRAP or are the subject of ongoing negotiations (see comment 31) between the County and GM.  Therefore, no additional response has been provided to these comments.  Those County concerns not previously, or in the process of being addressed by the ongoing negotiations, have been responded to below.

**COMMENT 30:**    The County is negotiating a contract with GM whereby the County will seek transfer of the property, plus defense and indemnification from GM relative to the PCBs.  The County is also seeking, through the contract negotiation, to address other issues raised in our previous comments concerning the County's ability to carry out ongoing work at the site.  We hope that the negotiations will be successful, but additional issues still need to be resolved.

If an agreement is successfully negotiated, the transfer of the property must still receive County Legislative approval.  There is no guarantee that the Legislature will approve such a measure.

**RESPONSE 30:**    The NYSDEC delayed issuance of the PRAP from October 1996 until February 1997 at the County's request, in order to allow time for the County and GM to begin discussions relative to the County concerns detailed in the letters discussed in Response 30.  Based upon the apparent success of the ongoing negotiations, which typically NYSDEC would view as a post-ROD activity, the decision was made to proceed with remedy selection for the site, so that the remediation could proceed in a timely manner.  Given the progress made to date, the NYSDEC is confident that the necessary agreements can and will be completed to allow the remedy to be implemented.

The following comments are from the Onondaga County September 25 and 30, 1996 letters discussed in Comment 30 above:

**COMMENT 31:**    The PRAP is misleading in that it fails to notify the public that it (the public) may bear the financial burdens associated with the long term

management, care and possible corrective action costs associated with a hazardous waste management unit created as a result of the proposed remedy.

**RESPONSE 31:**   The PRAP is not misleading since it is not intended that the public bear any costs associated with the selected remedy.  The PRP, General Motors, will be implementing the remedy and responsible for the operation and long term management of the site.  The PRAP and ROD also identify the need for the PRP to bear any "potentially increased costs to Onondaga County which may be associated with sewer repair or installation and future widening of Factory Avenue in areas where PCBs remain covered at the site."  It is the State's understanding that this indemnification is part of the ongoing discussions between the County and GM, referenced above.

**COMMENT 32:**   The PRAP should also state that the site is a subsite of the Onondaga Lake NPL, and that future releases from the site will further contaminate Onondaga Lake.

**RESPONSE 32:**   No discussion of sub-site status was considered appropriate at this time.  The selected remedy for this site does address future migration of PCBs from the dredge material/ soil at the site to Ley Creek and Onondaga Lake and the impacts to surface water and the sediments will be the subject of the GM; Fisher Guide site RI/FS, as discussed in several of the preceding comments.

**COMMENT 33:**   The PRAP implies that the actual extent and locations of the PCB contamination at the site has been well characterized and is known.  As the County has stated in previous correspondence with the State, the site has been poorly characterized and it is likely that unsampled areas comprised of soils with high concentrations of PCBs will be left on the site under the proposed remedy.

**RESPONSE 33:**   The NYSDEC considers the site to have been adequately characterized to allow the remedy to proceed.  The ROD also provides for additional sampling, notably where swales have been identified as possible historic migration pathways for PCBs from the Plant area, prior to the implementation of the remedy.

**COMMENT 34:**   The PRAP implies in the section dealing with human exposure pathways (page 9) that there would only be incidental contact by workers

"maintaining" facilities on the site in the future. The County is already on the record with its concern about the potential for extensive exposure to workers in the not unlikely event the buried trunk sewer needs to be repaired or replaced.

**RESPONSE 34:**   Provisions are included in the remedy to mitigate any exposure to County workers from contact with the soils, which will remain at the site, during the course of routine maintenance of the utilities present at the site. These are detailed in Section 7, item 6 of the ROD. In addition the NYSDEC is aware that the ongoing negotiations with GM are developing operation and maintenance plans to ensure that proper health and safety plans and contingencies are in place so there should be no adverse impacts to County or contractor workers in the event repairs or replacement of the sewer should be necessary.

**COMMENT 35:**   The PRAP declares that the removal of all soils contaminated with PCB concentrations of less than 50 ppm to the main plant site is not feasible because there is insufficient room for the volume of material that would require relocation. The State limited this evaluation of the main plant site to the "former landfill" and two small treatment lagoons. Based on the limited capacity of these small areas, the alternative was rejected. The PRAP does not explain why other, more extensive space on the main plant site was not considered for this material, and the County will not accept rejection of this alternative until this approach is satisfactorily evaluated.

**RESPONSE 35:**   In proposing this as an alternative to be considered for disposal, the NYSDEC limited possible locations at the main plant for the Ley Creek material to those where the disposal would not interfere with the need to complete the remedial investigation or where remediation may be needed to address another problem. It was not considered appropriate to place this material in an uncontaminated area of the site. This limited the area available to those areas which had previously been characterized by investigations as contaminated and where placement of this material could serve as contouring fill for a final closure. Needless to say, the area available was rather limited and this was further constrained by the presence of high tension power lines which limited the allowable height.

**COMMENT 36:**   The PRAP fails to include the future cost of RCRA compliance for any of the alternatives noted. These can be substantial.

**RESPONSE 36:**  Since the PCBs over 50 ppm are being removed, there will be no need for RCRA compliance since no RCRA regulated waste will remain at the site.

**COMMENT 37:**  The proposed remedy in the PRAP indicates that as much of the contaminated dredge materials/soils "as possible" will be removed from the existing sewer easement (page 19). This language commits GM to nothing and is at the heart of the County's concerns about future worker exposures and future costs associated with maintenance, repair and/or replacement of the Ley Creek Trunk Sewer.

**RESPONSE 37:**  This language is intended to highlight that if possible more of the contaminated material than identified by the FS may be able to be removed and consolidated on the site out of the sewer easement. It is unlikely that all or even a significant portion will in fact be addressed due to the limited area available. As indicated in previous responses, future costs and a mechanism for dealing with the eventual repair of the sewer line are part of the ongoing negotiations between GM and the County for access to the property. The ROD clearly identifies this expectation.

**COMMENT 38:**  "Cost" is identified as a criterion for evaluating alternatives in the PRAP (page 17). The draft PRAP states, "Although cost is the last balancing criterion evaluated, where two or more alternatives have met the requirements of the remaining criteria, cost effectiveness can be used as the basis for the final decision." It remains the County's position that the proposed remedy does not meet the requirements for a final PRAP, and therefore this should be considered an interim PRAP. Further, the State has limited consideration of costs in the draft PRAP to its impacts on the generator, GM. The PRAP does not discuss or consider the impact of the proposed PRAP on the County and its taxpayers. It appears that the State has opted to minimize the cost to the generator (GM) at the expense of the taxpaying public, who according to the proposed PRAP will remain the owner of a hazardous waste management unit in perpetuity. The draft PRAP is misleading because the general public will not recognize the burden being placed on them with the proposed remedy.

**RESPONSE 38:**  The PRAP, and now the ROD, recognized the potential for this impact and stated that the remedy would have to address potential increased costs to the County that may result from the material being left on County property. This is also discussed in Response 32 above.

The following comments were received from the New York State Thruway Authority:

**COMMENT 39:**     It should be noted that Factory Avenue is located just south of the proposed site location. For obvious highway safety reasons, access should be gained to the site using this road instead of the Thruway.

**RESPONSE 39:**     With the exception of the small area located on the north bank of Ley Creek, designated as the B-19 area, it is not expected that access will be required to the Thruway property north of the Creek. To remediate the B-19 area, however, it most likely will be necessary to enter this area from the Thruway right of way. This will be a limited action and of short duration and it is recognized that all applicable Thruway rules and regulations to protect the users of the highway, as well as the roadway and infrastructure will have to be complied with by the remedial contractors.

**COMMENT 40:**     The Syracuse Division will need to know GM's and their contractor's plans for any work on Thruway property in advance of remediation. GM and DEC should be told that any work on Thruway property will require an approved work permit from the Syracuse Division. Traffic control will need to be incorporated into the design if plans affect the Thruway traffic flow patterns in any way.

**RESPONSE 40:**     The need for any permits will be brought to GM's attention and the Thruway Authority will be consulted during the design of the remedy.

**COMMENT 41:**     Have the necessary endorsements been received from the Corps of Engineers and other DEC programmatic areas?

**RESPONSE 41:**     All necessary Federal and State reviews, permits, etc. will be obtained prior to the implementation of the remedy.

Appendix B

# ADMINISTRATIVE RECORD
for the
Record of Decision

### Ley Creek PCB Dredgings Site
### Salina(T),Onondaga County
### Site No. 7-34-044

The following documents constitute the Administrative Record for the Ley Creek PCB Dredgings Inactive Hazardous Waste Disposal Site Record of Decision.

<u>Documents</u>

*Oil and PCB Sampling and Analyses of Portions of Ley Creek*, EDI Engineering and Science (EDI), September 1985

*Hydrogeological Investigation*, EDI, September 1985

*Hydrogeologic Investigation of Fill Area Along Ley Creek*, O'Brien and Gere (OBG) , April 1987

*Field Investigation Report: Ley Creek Dredged Material Area*, OBG, July 1989

*Remedial Investigation Report: Ley Creek Dredged Material Area*, OBG, September 1993

*Feasibility Study Final Report: Ley Creek Dredged Materia Area Site*, OBG, October 1996

NYSDEC Proposed Remedial Action Plan, February 1997

<u>Correspondence</u>

<u>Fish and Wildlife Issues</u>

Memorandum dated April 11, 1990 from Jack Cooper, NYSDEC Division of Fish and Wildlife (DFW) to Steven Scharf, NYSDEC Division of Hazardous Waste Remediation (DHWR), Re: Ley Creek Site

Inter-Office Memo (handwritten) dated March 5, 1993 from Jack Cooper, DFW to Bob Schick, DHWR, Re: Ley Creek Site

Memorandum dated August 16, 1994 from Jack Cooper, DFW to Steve Scharf, DHWR, Re: Ley Creek Fish and Wildlife Impact Analysis September 1993

Memorandum dated December 6, 1995, from Emmy Thomee, DFW to Steve Scharf, DHWR, Re: GM Proposal for Remediation of Ley Creek PCB Dredgings

Memorandum dated January 30, 1997 from Gina Ferreira, U.S. Environmental Protection Agency (USEPA), ERRD, PSB, Technical Support Team to Alison Hess, USEPA Remedial Project Manager, ERRD, SPB, Sediments Projects/Caribbean Team, Re: Hazard Quotient Calculations for Terrestrial Wildlife at the Ley Creek PCB Dredgings Site

Health Issues

Letter dated January 13, 1994, from Ron Heerkens of the New York State Department of Health (NYSDOH) to Robert Schick of the NYSDEC, DHWR

Letter dated April 8, 1994, from Ron Heerkens of the NYSDOH to Robert Schick of the NYSDEC, DHWR

Letter dated February 21, 1995, from Ron Heerkens of the NYSDOH to Steven Scharf of the NYSDEC, DHWR

Notice of Deferral of Groundwater and Sediment Remedy for the Ley Creek Site

Letter dated January 14, 1994, from Robert Schick of the NYSDEC, DHWR to William Kochem, General Motors - Inland Fisher Guide Division

PRAP Comments

Letter dated March 7, 1997, from David Coburn, of the Onondaga County, Office of the Environment to Robert Schick of the NYSDEC, Division of Environmental Remediation (DER). Included by reference in this letter were the following:

•       Letter dated September 25, 1996, from Nicholas Pirro, Onondaga County Executive to Robert Davies of the NYSDEC Division of Environmental Enforcement (DEE)

- Letter dated September 30, 1996, from David Coburn, of the Onondaga County Office of the Environment, to Robert Davies of the NYSDEC, DEE

Letter dated March 10, 1997 from William Kochem of General Motors to Robert Schick of the NYSDEC, DER

Letter dated March 10, 1997 from Robert S. McEwen, Jr. of Nixon, Hargraves, Devans and Doyle, on behalf of the Syracuse China and Pfaltzgraff Companies, to Robert Schick of the NYSDEC, DER

An undated and unsigned fax from the New York State Thruway Authority received by the NYSDEC on March 12, 1997

Exhibit D



FEB - 9 1998

John P. Cahill
Commissioner
New York State Department
 of Environmental Conservation
50 Wolf Road
Albany, New York 12233-7010

Re: Ley Creek PCB Dredging Sub-site, Onondaga Lake NPL Site

Dear Commissioner Cahill:

On March 28, 1997, the New York State Department of Environmental Conservation ("NYSDEC") issued a Record of Decision ("ROD") for the Ley Creek Dredging Sub-site pursuant to the State's Environmental Conservation Law ("ECL"). NYSDEC staff subsequently requested that the United States Environmental Protection Agency ("EPA") concur with this ROD.

By letter dated January 8, 1998 to Michael J. O'Toole, Jr., NYSDEC's Director of Environmental Remediation, William McCabe, EPA Region II's Deputy Director, Emergency and Remedial Response Division identified six points that needed to be addressed to provide a basis for EPA's concurrence with the ECL ROD for purposes of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"). Under cover of a letter dated January 20, 1998, Mr. O'Toole enclosed responses to the points of concern that had been raised by EPA. I am pleased to inform you that EPA has determined that these responses satisfactorily address EPA's concerns.

As referenced in the enclosures to Mr. O'Toole's January 20, 1998 letter, NYSDEC will supplement the Administrative Record for this Sub-site for purposes of CERCLA with additional documents, including Mr. McCabe's January 8, 1998 letter, Mr. O'Toole's January 20, 1998 letter in reply, and this letter. EPA hereby concurs on the NYSDEC's March 28, 1997 ROD, as supplemented by these additions to the Administrative Record.

EPA looks forward to a continuing productive relationship with the NYSDEC in our ongoing efforts to remediate Onondaga Lake.

Sincerely,

William J. Muszynski

Jeanne M. Fox
Regional Administrator



FEB 1 9 1998

DIVISION
ENVIRONMENTAL



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

JAN   8 1998

Michael J. O'Toole, Jr., Director
Division of Environmental Remediation
New York State Department of
 Environmental Conservation
50 Wolf Road
Albany, NY 12233-7010

Re: Ley Creek PCB Dredgings Sub-site, Onondaga Lake NPL Site

Dear Mr. O'Toole:

As agreed during our July 14, 1997 meeting in New Paltz, the U.S. Environmental Protection
Agency ("EPA") has reviewed the March 28, 1997 Record of Decision ("ROD") issued by New
York State pursuant to its Environmental Conservation Law.

EPA's review identified six major issues that need to be resolved prior to EPA concurrence
pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, as
amended ("CERCLA"). Enclosed is a detailed description of these issues, which are listed
below.

- floodplains
- wetlands
- ARARs
- risk assessment/PRGs
- statutory determinations
- drainage swale investigation

We believe that all of these CERCLA issues can be addressed now or during remedial design and
look forward to resolution of this matter. Please contact me at (212) 637-4405 if you have any
questions.

Sincerely yours,

William McCabe, Deputy Director
Emergency and Remedial Response Division

Enclosure

LT44S2

Enclosure
CERCLA Issues Regarding the March 28, 1997 ECL ROD
Ley Creek PCB Dredgings

• Floodplains

The selected remedy calls for moving the PCB-contaminated dredge material/soils out of the first 25 feet of the floodway, capping them within the 100-year floodplain, and using "rip rap or other stabilization/flood protection techniques to assure the integrity of the cover during flood events" (ROD, p. 26). If the dredge material/soils are to remain within the 100-year floodplain, the selected remedy must ensure that the PCBs will be prevented from entering Ley Creek. The use of rip-rap alone may be insufficient to eliminate erosion of the PCB-contaminated materials into Ley Creek. An engineered structural barrier, such as a wall along the length of the cap on the creek side, may be necessary to prevent the dredge material/soils from serving as a continuous source of PCBs to Ley Creek. For purposes of CERCLA, erosion control within the floodplain should be considered during remedial design.

The ROD (p. 26) states that the selected remedy will comply with Executive Order 11988: Floodplain Management. To comply with this Executive Order, a floodplain assessment must be performed during the remedial design to ensure that the remedy is protective of the environment. The floodplain assessment includes an evaluation of the impact to the floodplain by the remedy and the impact to the remedy by 100-year and 500-year floods. Engineering specifications developed during remedial design must be protective of the 100-year floodplain and must consider the additional cost of being protective of the 500-year floodplain. As stated in the ROD (p. 26), additional dredge material may be consolidated out of the floodplain based on the results of the floodplain assessment.

• Wetlands

The ROD (p. 25) states that the selected remedy will comply with the Executive Order 11990: Protection of Wetlands. To comply with this Executive Order, actions must be taken to minimize the destruction, loss, or degradation of wetlands and to preserve and enhance the natural and beneficial values of wetlands. Specifically, remedial design of the selected remedy must include a) a field delineation of wetlands using the 1987 U.S. Army Corps of Engineers Wetlands Delineation Manual, b) a wetlands functions and values assessment, typically performed using the Wetland Evaluation Technique Method, and c) a wetlands impact mitigation plan designed to avoid or minimize impacts to wetlands and mitigate any losses; this is done, if necessary, through restoration of the impacted wetlands, enhancement of other existing wetlands, or wetlands replacement through creation of new wetlands from upland areas. Any necessary replacement would be required to provide equal value, but not necessarily equal acreage.

• ARARs

The ROD (p. 9) states that site data were compared to NYS Standards, Criteria, and Guidance (SCGs). For purposes of CERCLA, the documents that comprise a CERCLA ROD must identify and compare site data to applicable or relevant and appropriate requirements (ARARs). Although there is overlap between the two approaches, SCGs are not the same as ARARs. The location-specific, action-specific and chemical-specific ARARs should be identified for each

2

alternative, an evaluation of whether the alternative would comply with each ARAR should be made, and the additional steps, if any, that would be required to attain compliance should be described. Such ARARs include the following:

Executive Order 11990: Protection of Wetlands: see comment above.
Executive Order 11988: Floodplain Management: see comment above.

Toxic Substances Control Act, 15 U.S.C. 2601-2671: This statute and its implementing regulations at 40 CFR Part 761 are an ARAR for dredge material/soils with PCB concentrations > 50 mg/kg.

National Historic Preservation Act, 16 U.S.C. 470 (ROD, p. 27): The NHPA requires that a Stage 1A Cultural Resources Survey be completed prior to remedial action and requires further investigation of cultural resources if indicated by the conclusions of the Stage 1A Survey.

Endangered Species Act, 16 U.S.C. 1531 (ROD, p. 25): NYSDEC, as lead agency, is responsible for initiating informal consultation with the U.S. Fish and Wildlife Service to determine whether endangered or threatened species and/or their habitats exist on or in the vicinity of the site.

Fish and Wildlife Coordination Act, 16 U.S.C. 661 (ROD, p. 25): In accordance with the FWCA, the appropriate state and federal wildlife agencies must be consulted when wetlands/water resources are impacted.

Other ARARs that may apply to one or more alternatives include the Occupational Safety and Health Standards for Hazardous Responses and General Construction Activities (29 CFR Sections 1904, 1910, and 1926) and the Department of Transportation Rules for Hazardous Materials Transport (49 CFR Parts 107 and 171-177).

•     Risk Assessment/PRGs

Under CERCLA, the decision to remediate must be based on a finding of unacceptable risk to human health or the environment (or both), based on a comparison of site data to ARARs, the results of a baseline risk assessment, and preliminary remediation goals (PRGs). For purposes of CERCLA, the results of the risk assessment should be summarized and each pathway with unacceptable risk should be identified. In addition, the technical rationale for selecting cleanup levels of 1 mg/kg PCBs at the surface and 10 mg/kg in the subsurface should be presented.

Inhalation of dust leaving the site is listed as an exposure route (ROD, p. 13). The rationale provided by the PRPs in the RI for not quantitatively evaluating this exposure route (incomplete pathway based on non-detections during pre-RI air monitoring) is not valid for the future maintenance worker or the future construction worker scenario. However, this exposure route can be evaluated qualitatively rather than quantitatively in this case because the risk posed by

3

inhalation of PCBs is known to be less than the risk posed by ingestion and dermal contact. Therefore, adding the contribution of the inhalation exposure route to the calculated excess cancer risk for the Site would not change the conclusions of the human health risk assessment.

Consistent with the EPA's risk assessment guidance (NCP, p. 8709-9711), the main sources of uncertainty associated with the human health and ecological risk calculations should be identified. For example, the PCB slope factor was revised downward in Fall 1996, and it should be noted that use of the current slope factor would result in lower risks than those calculated in the September 1993 RI.

•    Statutory Determinations
The Declaration Statement and p. 15 of the ROD contain language that closely tracks, but is not identical to, the statutory determinations required under CERCLA. For purposes of CERCLA, the documents that comprise a CERCLA ROD must cite CERCLA Section 121, 42 U.S.C. §9621 and describe how the selected remedy meets the statutory requirements:  (1) it is protective of human health and the environment; (2) it attains a level or standard of control of the hazardous substances, pollutants and contaminants, which at least attains the legally applicable or relevant and appropriate requirements (ARARs) under federal and state laws (or justifies a waiver), (3) it is cost-effective; (4) it utilizes permanent solutions and alternative treatment (or resource recovery) technologies to the maximum extent practicable; and (5) it satisfies the statutory preference for remedies that employ treatment to reduce the toxicity, mobility, or volume of the hazardous substances, pollutants or contaminants at a site. In addition, the following should be stated:

a) The Ley Creek PCB Dredgings Site is a sub-site of the Onondaga Lake site on EPA's National Priorities List (NPL).

b) The selected remedial action for the Ley Creek PCB Dredgings inactive hazardous waste disposal site was chosen in accordance with the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (CERCLA), 42 U.S.C. §9601 et seq., and to the extent practicable, the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), 40 CFR Part 300. There should also be an identification of the principal threats posed by conditions at the site and a statement as to whether and how this response action addresses the principal threats.

c) Actual or threatened release of hazardous substances from this site, if not addressed by implementing the response action selected in this ROD, may present an imminent or substantial endangerment to public health, welfare, or the environment.

d) The Administrative Record is established pursuant to the NCP, 40 CFR §300.800. For purposes of CERCLA, OSWER Directive 9833.3A-1, "Final Guidance on Administrative Records for Selecting CERCLA Response Actions," dated December 3, 1990, should be reviewed and any additional documents that form the basis of the remedial decision

4

should be added to the CERCLA Administrative Record, including, but not limited to, the public participation documents described in Section 8 of the ROD and this letter.

- Drainage Swale Investigation

The selected remedy calls for a pre-design sampling program to further characterize the former drainage swale underneath the area where the dredge material/soils will be capped.  EPA has received a copy of the September 16, 1997 report submitted by GM to NYSDEC, which summarizes the investigation of this portion of the drainage swale conducted to date.  EPA and NYSDEC should discuss this report before the scope of the additional investigation is finalized.

**New York State Department of Environmental Conservation**
50 Wolf Road, Albany, New York 12233-7010



**JOHN P. CAHILL**
*Commissioner*

VIA REGULAR MAIL                              JAN 20 1998

Richard Caspe
Director
Emergency and Remedial Response Division
USEPA, Region II
290 Broadway
New York, New York 10007-1866

      Re:    <u>Ley Creek PCB Dredging Sub-site, Onondaga Lake NPL Site</u>

Dear Mr. Caspe:

      This letter responds to William McCabe's letter to me dated January 8, 1998, outlining the U.S. Environmental Protection Agency's ("EPA's") concerns with the New York State Department of Environmental Conservation's (the "Department's") March 28, 1997 Record of Decision ("ROD") for the above referenced site. The letter identifies six points that needed to be resolved prior to receiving EPA concurrence with the Department's ROD for the Ley Creek PCB Dredging Site. The enclosed point-by-point responses provide the substantive and procedural clarification sought by EPA regarding the Environmental Conservation Law process followed by the Department when issuing and implementing the Ley Creek PCB Dredging Site ROD.

      The Department believes that the enclosed responses adequately resolve the concerns of EPA and provide the basis for EPA concurrence pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"). Should you and your staff agree, please send me a letter of EPA concurrence for the Ley Creek PCB Dredging Site ROD at your earliest convenience.

      Please contact me at (518) 457-5861 if you have any further questions in regard to this matter.

                  Sincerely,

                  Michael J. O'Toole, Jr.
                  Director
                  Division of Environmental Remediation

Enclosure

bcc:    ~~Commissioner Cahill (w/out encl.)~~
        Frank Bifera (w/out encl.)
        M. O'Toole file (2)
        Tom Quinn (w/out encl.)
        Charles Sullivan, Jr. (w/out encl.)
        Steve Hammond (w/encl.)
        Bill Little (w/encl.)
        Bill Daigle (w/encl.)
        Sue Benjamin (w/encl.)
        Robert Davies (w/encl.)

Enclosure
DEC Responses to EPA Issues of Concern
Ley Creek PCB Dredging Site

- Floodplains

    As noted, the ROD (p. 26, Paragraph 5) addresses erosion concerns and requires that the selected remedy comply with Executive Order 11988: Floodplain Management. NYSDEC will ensure that all of EPA's concerns regarding these issues are addressed during the remedial design.

- Wetlands

    As noted, page 25 of the ROD states that the remedy will comply with Executive Order 11990: Protection of Wetlands. Steps necessary to comply with Executive Order 11990 are underway as the PRP has developed a Wetlands Delineation Work Plan. Any requisite mitigative measures resulting from the delineation work will be addressed during remedial design and construction.

- ARARs

    Location-specific, action-specific and chemical-specific ARARs for Alternatives 1-7 are contained in the Feasibility Study, dated October 1996; in addition, all of these alternatives, except for Alternative 1: No Action, would comply with Executive Orders 11988 and 11990, the National Historic Preservation Act, the Endangered Species Act, and the Fish and Wildlife Coordination Act. ARAR Table (attached as Appendix I) contains the ARARs for Alternative 8, the selected remedy.

- Risk Assessment/PRGs

    Under CERCLA, remediation goals equate to a cumulative excess carcinogenic risk over an individual's lifetime in the range of $10^{-4}$ to $10^{-6}$ (i.e., an excess cancer risk of 1 in 10,000 to 1 in 1,000,000) or less and a maximum Hazard Index, which reflects noncarcinogenic effects for a human receptor, equal to 1.0 or less. A Hazard Index greater than 1.0 indicates a potential for non-carcinogenic health effects. Please note that GM submitted a human health risk assessment as part of the RI, which indicates that the carcinogenic risk associated with the dredge material/soils at the Site is below the CERCLA risk range for all current and future receptors. For example, the excess carcinogenic risk for current maintenance workers from ingestion and dermal contact with PCB-contaminated dredge materials/soils was calculated to be $5.0 \times 10^{-7}$ (5 in 10 million) and the excess carcinogenic risk for a child trespasser was calculated to be $3.3 \times 10^{-7}$ (3 in 10 million). The Hazard Index for the current maintenance worker was 0.007 and for the child trespasser was 0.003, which are both less than 1 and therefore not indicative of unacceptable non-carcinogenic health effects. The State disagreed with certain elements of GM's human health risk assessment. The New York State Department of Health ("NYSDOH") nevertheless determined, as stated in the ROD, that the remedy selected is protective of human health. The risks to human receptors calculated in the RI may be overestimated, because the PCB slope factor used in the calculations has since been revised downward by EPA. However, it is important to note that, regardless of the calculated risk, the selected remedy would further protect human health by lowering the risk posed by PCBs at the Site.

The ecological risk assessment is presented in Appendix D of the FS (for aquatic wildlife as exemplified by the great blue heron) and in a January 30, 1997 EPA memorandum (for terrestrial wildlife as exemplified by the short-tailed shrew and the red-tailed hawk). The results of the ecological risk assessment indicate that the current conditions at the Site pose an unacceptable risk to the shrew and hawk (Hazard Indices of 65.2 and 14.5, respectively). Further, calculation of the ecological risk using the remediation goals of 1 mg/kg PCBs in surface soil and 10 mg/kg in subsurface soil indicates that the selected remedy is protective of the environment.

The procedures and inputs used to assess risks at the Site, as in all such risk assessments, are subject to a variety of uncertainties. In general, the main sources of uncertainty include those associated with environmental chemistry sampling and analysis, environmental parameter measurement, fate and transport modeling, exposure parameter estimation, and toxicological data. Some of the uncertainty has been addressed by making conservative exposure assumptions that are likely to overestimate the risk posed by the Site.

•    Statutory Determinations

The ROD addresses the Ley Creek PCB Dredgings site, which is site No. 7-34-044 on the NYSDEC Registry of Inactive Hazardous Waste Sites and a sub-site of the Onondaga Lake Superfund site on EPA's National Priorities List. The selected remedy was chosen in accordance with the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (CERCLA), 42 U.S.C. §9601 et seq., and to the extent practicable, the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), 40 CFR Part 300. The selected remedy addresses the principal threats to human health and the environment that are posed by conditions at the Site. Exposure to PCB-contaminated dredge material/soils with concentrations greater than 50 mg/kg of PCBs will be addressed by excavation and off-site disposal at a TSCA-permitted landfill; concentrations in the remaining dredge material/soils above 1 mg/kg of PCBs in the surface and 10 mg/kg in the subsurface will be addressed by consolidation and covering using a geomembrane or clay cover in the floodway and a soil cover in areas outside the floodway.

The selected remedy is protective of human health and the environment because all dredge material/soils with concentrations of PCBs above the Site-specific remedial action levels will be either disposed of off-site or consolidated and covered. The selected remedy complies with all federal and state requirements that are legally applicable or relevant and appropriate to the remedial action (see Appendix I: ARAR Table). The remedy is cost-effective because it offers a high degree of effectiveness at an intermediate cost of approximately $6.7 million.

The remedy provides the best balance of trade-offs among the alternatives with respect to the evaluation criteria and utilizes permanent solutions and alternative treatment technologies to the maximum extent practicable. Off-site disposal of the most highly contaminated dredge material/soils will significantly reduce the toxicity, mobility, and volume of PCBs at the Site and offers a permanent solution to the risks posed by these hazardous substances at the Site. The remedy does not satisfy the statutory preference for remedies that employ treatment to reduce the toxicity, mobility, or volume of the hazardous substances, pollutants, or contaminants. Treatment alternatives, including an alternative treatment technology, were evaluated but determined not to be cost-effective, i.e., any increase in effectiveness of the remedy was disproportionate to the increase in cost. The conditions at the Site would require treatment of a large volume of dredge material/soils (110,000 cubic yards) over a large area (18 acres).

A review of the Site will be conducted no later than five years after commencement of the remedial action to ensure that the remedy continues to provide adequate protection of human health and the environment, because this remedy will result in hazardous substances remaining on-site above environmentally-based levels.

An administrative record containing the documents that form the basis for NYSDEC's selection of the remedial action under CERCLA has been compiled pursuant to the NCP, 40 CFR §300.800. The list of documents in the Administrative Record File is attached as Appendix II.

There are no significant changes from the preferred alternative presented in the Proposed Remedial Action Plan issued in February 1997 pursuant to the ECL and the subsequent ECL Record of Decision issued in March 1997.

• <u>Drainage Swale Investigation</u>

The initial step related to pre-design sampling of the former drainage swale area is for DEC to review the data compiled to date by the PRP pertinent to the issue. This data should assist in scoping the requisite sampling program. DEC will treat the sampling program work plan as any other project deliverable, which includes opportunity for EPA review and comment.

Appendix I

**Applicable or Relevant and Appropriate Requirements (ARARs)**
for the Ley Creek PCB Dredgings Sub-site
Onondaga Lake NPL Site

Selected Remedy--Excavation and off-site disposal of dredged material/soils with concentrations of PCBs > 50 mg/kg at a TSCA-approved, RCRA-permitted landfill; consolidation of dredged material/soils with concentrations of PCBs at surface (top 12 inches) >1 mg/kg and in subsurface >10 mg/kg; capping of consolidated dredged material/soils with 12-inch vegetative soil cover or clay/membrane cap; long-term monitoring; deed restrictions; fencing; and Five-Year Reviews.

**Location-Specific ARARs**

Executive Order 11988: Floodplain Management
The selected remedy will comply with Executive Order 11988. A floodplain assessment will be performed during remedial design to ensure that the remedy as constructed is protective of the floodplain.

Executive Order 11990: Protection of Wetlands
The selected remedy will comply with Executive Order 11990. Actions will be taken to minimize any destruction, loss, or degradation of wetlands and to preserve and enhance the natural and beneficial values of wetlands. During remedial design, a field delineation and a wetlands functions and values assessment will be performed and a wetlands impact mitigation plan will be developed, if necessary, to ensure that construction of the selected remedy avoids or minimizes any impact to wetlands and mitigates any losses.

National Historic Preservation Act, 16 U.S.C. 470
The selected remedy will comply with the National Historic Preservation Act. A Stage 1A Cultural Survey will be performed during remedial design and further action will be taken regarding cultural resources as necessary.

Fish and Wildlife Coordination Act, 16 U.S.C. 661
The selected remedy will comply with the Fish and Wildlife Coordination Act. NYSDEC will consult with the appropriate state and federal wildlife agencies during remedial design regarding any impact by the selected remedy to wetlands and/or water resources.

Endangered Species Act, 16 U.S.C. 1531
The selected remedy will comply with the Endangered Species Act. NYSDEC will consult with the U.S. Fish and Wildlife Service during remedial design to determine whether endangered or threatened species and/or their habitats exist on or in the vicinity of the sub-site.

**Location-specific TBC**

Land Use Guidance
The selected remedy is consistent with EPA's policy entitled, "Land Use in the CERCLA Remedy Selection Process," OSWER Directive No. 9355.7-04, dated May 25, 1995.

**Chemical-specific ARARs**

None
Although there are no chemical-specific ARARs for dredge material or soil, the selected remedy sets forth standards for dredged material/soils remaining at the sub-site that are protective of human health and the environment.

**Action-Specific ARARs**

Occupational Safety and Health Act, 29 U.S.C. Part 651 et seq., 29 CFR Sections 1904, 1910, and 1926
The selected remedy will comply with OSHA and its implementing regulations, including requirements for hazardous responses and general construction activities.

Toxic Substances Control Act, 15 USC 2601-2671, 40 CFR Part 761
The selected remedy will comply with TSCA and its implementing regulations. Dredged material/soils with concentrations of PCBs > 50 mg/kg will be disposed of at a TSCA-approved landfill. Marking and decontamination of PCB containers will meet TSCA requirements. Dredged material/soils with concentration > 50 mg/kg of PCBs to be disposed of off-site will be manifested. An EPA Identification Number will be obtained for PCB waste generation and EPA Notification of PCB Waste Activity forms will be filed by the generator for on-site storage more than 30 days prior to disposal and by the transporter.

Solid Waste Disposal Act as amended by the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Part 6901 et seq., 40 CFR Part 260 et seq.
The selected remedy will comply with RCRA and its implementing regulations. Dredged material/soils with concentrations of PCBs > 50 mg/kg will be disposed of at a RCRA-permitted landfill.

Federal Hazardous Materials Transport Law, 49 U.S.C. Part 5101 et seq., 49 CFR Parts 100-185
The selected remedy will comply with the Department of Transportation regulations. Requirements for marking and decontamination will be complied with as necessary during transportation of PCB-contaminated dredge material/soils.

6 NYCRR Part 364- Waste Transporter Permits
The selected remedy will comply with 6 NYCRR Part 364. The dredge material/soils will be transported off-site by a hauler permitted under 6 NYCRR Part 364.

Appendix II

Administrative Record File Index of Documents
Ley Creek PCB Dredgings Sub-site
Onondaga Lake NPL Site

1.0    SITE IDENTIFICATION

1.1    Site Background
Notice of inclusion of Onondaga Lake on the National Priorities List, 59 Federal Register 65206, December 16, 1994.

Report: Oil and PCB Sampling and Analyses of Portions of Ley Creek, prepared by EDI Engineering and Science, September 1985.

Report: Hydrogeological Investigation, prepared by EDI Engineering and Science, September 1985.

Report: Hydrogeologic Investigation of Fill Area Along Ley Creek, prepared by O'Brien and Gere Engineers, Inc., April 1987.

Report: Field Investigation: Ley Creek Dredged Material Area, prepared by O'Brien and Gere, Engineers, Inc., July 1989.

Report: Interim Remedial Measure Ley Creek Relief Interceptor Area, prepared by O'Brien and Gere Engineers, Inc., March 1992.

3.0    REMEDIAL INVESTIGATION (RI)

3.3    Work Plans
Plan: Remedial Investigation/Feasibility Study Work Plan: Ley Creek Dredged Material Area, prepared by O'Brien and Gere Engineers, Inc., February 1992.

3.4    Remedial Investigation Reports
Report: Remedial Investigation: Ley Creek Dredged Material Area, prepared by O'Brien and Gere Engineers, Inc., September 1993.

3.5    Correspondence
Letter dated August 25, 1993 from Robert Schick of NYSDEC to William Kochem of General Motors Corporation, conditionally approving Remedial Investigation Report.

4.0    FEASIBILITY STUDY (FS)

4.2    Feasibility Study Work Plans
        see Section 3.3.

4.3    Feasibility Study Reports
        Report: Feasibility Study; Ley Creek Dredged Material Area, prepared by O'Brien and Gere
        Engineers, Inc., October 1996.

4.4    Proposed Plan
        Proposed Remedial Action Plan; Ley Creek PCB Dredgings Site, issued by NYSDEC, February
        1997.

4.6    Correspondence
        Letter dated June 28, 1994 from Nicholas Pirro, Onondaga County Executive to William Little of
        the NYSDEC, Re: Information on County plans for the future use of the Ley Creek Dredgings
        Site.

        Memorandum dated January 30, 1997 from Gina Ferreira of EPA to Alison Hess of EPA, Re:
        Hazard Quotient Calculations for Terrestrial Wildlife at the Ley Creek PCB Dredgings Site.

        Letter dated February 6, 1997 from Robert Schick of NYSDEC to David Coburn of Onondaga
        County transmitting NYSDEC's February 1997 proposed plan, its fact sheet, and announcing
        public meeting and opportunity for public comment.

        Letter dated February 6, 1997 from Robert Schick of NYSDEC to Philip Harvard of Syracuse
        China transmitting NYSDEC's February 1997 proposed plan, its fact sheet, and announcing
        public meeting and opportunity for public comment.

        Letter dated February 6, 1997 from Robert Schick of NYSDEC to William Kochem of General
        Motors Corporation transmitting NYSDEC's February 1997 proposed plan, its fact sheet, and
        announcing public meeting and opportunity for public comment.

        Letter dated February 6, 1997 from Robert Schick of NYSDEC to Charles Randal of the New
        York State Thruway Authority transmitting NYSDEC's February 1997 proposed plan, its fact
        sheet, and announcing public meeting and opportunity for public comment.

        Letter dated February 6, 1997 from Robert Schick of NYSDEC to William Weiss of Niagara
        Mohawk Power Corporation transmitting NYSDEC's February 1997 proposed plan, its fact
        sheet, and announcing public meeting and opportunity for public comment.

5.0    RECORD OF DECISION (ROD)

5.1    Record of Decision
        Record of Decision; Ley Creek PCB Dredgings Site, Salina (T), Onondaga County, Site Number

7-34-044; issued by NYSDEC, March 1997.

January 8, 1998 letter from William McCabe of EPA identifying CERCLA requirements for ROD.

January 15, 1998 letter from Michael J. O'Toole of DEC responding to EPA's January 8, 1998 letter and requesting EPA concurrence on selected remedy for purposes of CERCLA.

[date3] letter from Jeanne M. Fox of EPA to Michael J. O'Toole of NYSDEC responding to [date2] letter requesting EPA concurrence on selected remedy for purposes of CERCLA.

6.0   SUPPORT AGENCY COORDINATION

6.3   Correspondence
Letter dated April 4, 1994 from Steven Scharf of NYSDEC to Herbert King of EPA transmitting September 1993 Remedial Investigation Report.

Letter dated December 20, 1996 from Susan Benjamin of NYSDEC to Alison Hess of EPA transmitting October 1996 Feasibility Study.

7.0   ENFORCEMENT

7.3   Administrative Orders
In the matter of a Field Investigation to Identify Any Significant Threat to the Environment Caused by the Disposal of Hazardous Wastes at Ley Creek, Index # A7-0129-87-09, November 1987.

In the matter of a Remedial Investigation and Feasibility Study of the Ley Creek Dredged Material Site, Index # A7-0239-90-07, May 1991.

In the matter of the Implementation of an Interim Remedial Measure to Complete Construction of the Ley Creek Service Area Improvements, Index #A7-0263-91-05, June 1991.

7.7   Notice Letters
Letter dated June 23, 1997 from Michael J. O'Toole of NYSDEC and Richard L. Caspe of EPA to David Coburn of the Onondaga County Office of the Environment, providing notice of liability under CERCLA.

Letter dated June 23, 1997 from Michael J. O'Toole of NYSDEC and Richard L. Caspe of EPA to Philip Harvard of Syracuse China, providing notice of liability under CERCLA.

Letter dated June 23, 1997 from Michael J. O'Toole of NYSDEC and Richard L. Caspe of EPA to Michelle Fisher of General Motors Corp., providing notice of liability under CERCLA.

Letter dated June 23, 1997 from Michael J. O'Toole of NYSDEC and Richard L. Caspe of EPA

CERCLA.

Letter dated June 23, 1997 from Michael J. O'Toole of NYSDEC and Richard L. Caspe of EPA to William C. Weiss of the Niagara Mohawk Power Corp., providing notice of liability under CERCLA.

8.0    HEALTH ASSESSMENTS

8.1    ATSDR Health Assessments
       Report: Public Health Assessment; Onondaga Lake, Syracuse, Onondaga County, New York, CERCLIS No. NYD986913580; prepared by New York State Department of Health, Under Cooperative Agreement with the Agency for Toxic Substances and Disease Registry, July 24, 1995.

9.0    NATURAL RESOURCE TRUSTEES

9.1    Notice
       Letter dated August 19, 1997 from William Daigle of NYSDEC to Andrew Raddant of U.S. Department of the Interior and Anton Geidt of U.S. Department of Commerce, National Oceanic and Atmospheric Administration NOAA, requesting written confirmation regarding national resource trustee interest in Onondaga Lake NPL Site.

9.4    Correspondence
       Letter dated November 20, 1997 from William Daigle of NYSDEC to Anton Geidt of U.S. Department of Commerce, National Oceanic and Atmospheric Administration, reiterating request for written confirmation regarding national resource trustee interest in Onondaga Lake NPL Site.

       Letter dated November 20, 1997 from William Daigle of NYSDEC to Andrew Raddant of U.S. Department of the Interior, reiterating request for written confirmation regarding national resource trustee interest in Onondaga Lake NPL Site.

10.0    PUBLIC PARTICIPATION

10.1    Comments
        Letter dated March 7, 1997, from David Coburn, of the Onondaga County, Office of the Environment to Robert Schick of NYSDEC. Included by reference in this letter were the following:

        •    Letter dated September 25, 1996 from Nicholas Pirro of Onondaga County Executive Office to Robert Davies of NYSDEC

        •    Letter dated September 30, 1996 from David Coburn of Onondaga County Office of the Environment to Robert Davies of NYSDEC

Letter dated March 10, 1997 from William Kochem of General Motors Corporation to Robert Schick of NYSDEC.

Letter dated March 10, 1997 from Robert S. McEwen, Jr. of Nixon, Hargraves, Devans and Doyle, on behalf of the Syracuse China Company and Pfaltzgraff Co., to Robert Schick of NYSDEC.

Undated and unsigned fax from the New York State Thruway Authority received by the NYSDEC on March 12, 1997.

10.3    Public Notices

Proof of Publication, <u>The Post-Standard/Syracuse Herald-Journal</u>, County of Onondaga, Proposed Remedial Action Plan, Public Meeting Notice for the Ley Creek PCB Dredgings Site, dated February 7, 1997.

10.4    Public Meeting Record

Sign-In Sheet dated February 26, 1997 for the Proposed Remedial Action Plan Public Meeting

10.6    Fact Sheets and Press Releases

Fact Sheet dated April 1997, <u>Notice of Availability of the Record of Decision for the Ley Creek PCB Dredgings Site</u>, issued by NYSDEC.

Mailing List (confidential).

Exhibit E

REPORT

# Remedial Design
# Ley Creek PCB Dredgings Site
# Syracuse, New York

**Remediation and Liability Management Company, Inc.**

**February 1999**



Exhibit F

**New York State Department of Environmental Conservation**
**Division of Environmental Remediation**
Bureau of Western Remedial Action, Room 348
50 Wolf Road, Albany, New York  12233-7010
Phone: (518) 457-4343  FAX: (518) 457-3972



John P. Cahill
Commissioner

June 30, 1999

REALM, Inc.
c/o General Motors Corporation
RT 37 E, Box 460
Massena, NY 13662
Attn: James Hartnett

Re: Ley Creek Dredging Site, Site No. 7-34-044

Dear Mr. Hartnett:

Enclosed is the March 30, 1999 letter from Maureen Markert to me listing the documents proposed to be designated as the remedial design for the Ley Creek PCB Dredgings Site, Site No. 7-34-44. The remedial design (RD), as specified, is approved by the Department subject to the requirements listed below:

- This approval is specifically conditioned upon, and is not effective until, REALM, Inc. enters into a Remedial Design/Remedial Action (RD/RA) consent order with the Department.

- The submission to the Department and the Department's approval of four (4) remaining aspects of the RD, pursuant to the terms of a remedial RD/RA consent order to be executed by the parties:

   - a time schedule to implement the RD;
   - an approvable wetlands mitigation plan;
   - the details of the final Operation and Maintenance Plan for the completed remedy;
   - the site and community Health and Safety Plan to be prepared by the contractor.

- The negotiation of other construction details.

General guidelines for the completion of the above remaining aspects of the RD are provided in the referenced RD documents.

If there are any questions, please call myself or Wayne Mizerak at 518-457-4343.

Sincerely,

Robert W. Schick, P.E.
Chief, Remedial Section A
Bureau of Western Remedial Action
Division of Environmental Remediation

Enclosure

 **O'BRIEN & GERE**
ENGINEERS, INC.



March 30, 1999

Mr. Wayne D. Mizerak
Bureau of Western Remedial Action
Division of Environmental Remediation
New York State Department of Environmental Conservation
50 Wolf Road; Room 222
Albany, New York 12233-7010

                  Re:    Ley Creek PCB Dredgings Site
                             Remedial Design
                  File:   5858.040 #2

Dear Mr. Mizerak:

In accordance with our conversations on March 26, 1999 and March 29, 1999, the following documents comprise the final Remedial Design for the Ley Creek PCB Dredgings site:

- February 1999 Remedial Design (RD) Report – With this letter, we are distributing three copies of the final Remedial Design Report which incorporates the revised pages submitted to you in my letter dated March 22, 1999. Additionally, per your request, we have added one appendix and one exhibit to the RD Report. My letter dated April 21, 1998 regarding the New York State Office of Parks, Recreation, and Historic Preservation correspondence is included as Appendix D to the RD Report, and Jim Hartnett's letter dated February 5, 1999 regarding REALM's wetland mitigation proposal is included as Exhibit E to the RD Report.
- February 1999 Contract Drawings – With this letter, we are distributing three copies of the final contract drawings which incorporate signed copies of the revised sheets submitted to you in my letter dated March 22, 1999.
- February 1999 Technical Specifications and Special Provisions - With this letter, we are distributing three copies of the final technical specifications and special provisions which incorporate the revised pages submitted to you in my letter dated March 22, 1999.
- February 1999 Hydraulic Analysis and Floodplain Assessment Report (distributed with my letter dated February 19, 1999)
- January 1998 Wetland Delineation Report – With this letter, we are distributing three copies of the January 1998 Wetland Delineation Report.
- May 1998 Wetland Assessment Report - With this letter, we are distributing three copies of the May 1998 Wetland Assessment Report.
- May 14, 1998 Letter from NYSDEC Wildlife Resources Center – With this letter, we are distributing three copies of the NYSDEC Wildlife Resources Center letter regarding endangered species.
- May 18, 1998 Letter from United States Department of the Interior - With this letter, we are distributing three copies of the United States Department of the Interior letter regarding endangered species.
- June 18, 1998 Revised Former Drainage Swale Evaluation – With this letter, we are distributing three copies of the revised former drainage swale evaluation submittal.
- August 28, 1998 Letter from the Army Corps of Engineers – With this letter, we are distributing three copies of the Corps letter authorizing remediation activities under Nationwide Permit #38.



Mr. Wayne Mizerak
March 30, 1999
Page 2

Please call me with any questions.

Very truly yours,

O'BRIEN & GERE ENGINEERS, INC.

*Maureen Markert*

Maureen S. Markert, P.E.
Senior Project Engineer

I:\DIV71\PROJECTS\5858040\2_CORRES\finaldist2.doc
Enclosures

cc:    Carol Conyers, Esq. - NYSDEC (cover letter only)
       Ronald Heerkens - NYSDOH (1 copy of Appendix D, Exhibit E)
       Kenneth Lynch, Esq. - NYSDEC Region 7 (1 copy enclosures, 1 copy Appendix D, Exhibit E)
       Robert Nunes - USEPA (2 copies of Appendix D, Exhibit E)
       George A. Shanahan, Esq. - USEPA (cover letter only)
       Don Schiemann, Esq. - GM (1 copy of Appendix D, Exhibit E)
       James F. Hartnett – REALM/GM (1 copy of Appendix D, Exhibit E)
       William E. Kochem - GM (1 copy of Appendix D, Exhibit E)
       Barry R. Kogut, Esq. - Bond, Schoeneck & King (1 copy of Appendix D, Exhibit E)
       Douglas M. Crawford, P.E. - O'Brien & Gere (1 copy of Appendix D, Exhibit E)

Exhibit G



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

April 6, 1999

<u>By E-Mail and</u>
<u>Regular Mail</u>

Wayne Mizerak
Bureau of Western Remedial Action
Division of Hazardous Waste Remediation
New York State Department
  Of Environmental Conservation
50 Wolf Road
Albany, NY 12233

Re:    March 22, 1999 Letter to Robert Schick from Maureen S. Markert
         Ley Creek Dredging Sub-Site, Onondaga Lake NPL Site

Dear Mr. Mizerak:

We have reviewed the March 22, 1999 letter to Robert Schick from Maureen S. Markert which is a response to NYSDEC's comments in your March 10, 1999 letter and EPA's comments in my March 5, 1999 letter regarding the RD for the Ley Creek PCB Dredgings Sub-Site. This is to inform you that the consultant has adequately addressed EPA's comments.

With respect to the response to NYSDEC's comment concerning wetlands mitigation, EPA wishes to express its intention to assist in addressing this issue in a timely manner. Although EPA has communicated preliminary concerns about GM's proposal, as discussed in the February 5, 1999 letter from Jim Hartnett, to mitigate wetlands impact at Ley Creek by partially funding the proposed wetlands project in the area where Ley Creek enters Onondaga Lake, EPA is interested in further evaluating the feasibility of this option and requests that it be provided an opportunity to review any draft sampling plans that are being developed to investigate this area. Principally because of the concern that soils and sediments in this area are significantly contaminated and that the area may not be a suitable location to establish new wetlands, EPA recommends that GM and REALM continue to investigate other off-site options for wetlands mitigation. Although EPA generally prefers that any needed wetlands mitigation take place on-site, EPA agrees that restoration of on-site wetlands at the Ley Creek Sub-Site is not feasible because of space limitation caused by the proposed access road along the Creek and likely disturbances to the wetlands resulting from creek maintenance activities.

Should you have any questions on any of the above, please contact me at (212) 637-4254.

Sincerely,

Robert Nunes
Remedial Project Manager

cc: C. Conyers, NYSDEC
    J. Cantilli, DEPP/WPB

Exhibit H

5858.040

# WORK PLAN

# Management Plan for County Maintenance Work

*General Motors Corporation*
*Syracuse, New York*



James R. Heckathorne, P.E.
Vice President

July 1998

**O'BRIEN & GERE**
ENGINEERS, INC.

5000 Brittonfield Parkway
P.O. Box 4873
Syracuse, New York 13221

Exhibit I

New York State Department of Environmental Conservation
Division of Environmental Enforcement
50 Wolf Road
Albany, New York 12233-5550

Telephone: (518) 457-7821
Fax: (518) 457-7819



John P. Cahill
Commissioner

August 5, 1998

**VIA REGULAR MAIL**

Louis Mendez, Esq.
Onondaga County Civic Center
421 Montgomery Street, 10th Floor
Syracuse, New York 13202

James Hartnett
Remediation and Liability Management Co.
c/o GM Remediation Project Office
Route 37 East, PO Box 460
Massena, New York 13662

Re:     General Motors Corporation
        Ley Creek PCB Dredgings Site (Site No. 7-34-044)
        <u>Management Plan for County Maintenance Work</u>

Dear Gentlemen:

Pursuant to Barry Kogut's request dated July 24, 1998, please be informed that the County's maintenance work, if performed in accordance with the terms and conditions of the July 1998 version of the Management Plan, will not violate the state superfund prohibitions set forth in 6 NYCRR § 375-1.2(e).

Please contact me if either of you have questions regarding this matter. Thank you.

Sincerely,

Robert K. Davies
Senior Attorney

cc:     Barry Kogut
        Bill Daigle
        Bob Schick
        Wayne Mizerak

**RECEIVED**
BOND SCHOENECK & KING

AUG 0 8 1998

AM                                            PM
7|8| | | | |2| | |2| | |4| |5|6|

Exhibit J

## EXHIBIT J

## FORM OF
## DECLARATION OF
## COVENANTS AND RESTRICTIONS

TO WHOM IT MAY CONCERN:

This Declaration of Covenants and Restrictions is being recorded to comply with an Order on Consent (Index # D7-0008-97-06) entered into between Remediation and Liability Management Company, Inc. ("REALM") and the New York State Department of Environmental Conservation ("Department") to design and implement a remedial action at the Ley Creek PCB Dredgings Site (hereinafter the "Order on Consent").

### Background

A section of Ley Creek runs parallel with Factory Avenue in an area north of a former manufacturing facility which was operated by the Inland Fisher Guide Division of the General Motors Corporation. Beginning in 1970, Onondaga County conducted channel improvements by dredging the sediments of Ley Creek in an effort to control periodic flooding. During the dredging operations, sediment was excavated and deposited in piles primarily along the south bank of Ley Creek between Ley Creek and Factory Avenue (the "Site"). Attached as Figure 1 is a copy of a Site Map.

This Site is an inactive hazardous waste disposal site, as that term is defined at the Environmental Conservation Law Section 27-1301(2) and it is listed in the Registry of Inactive Hazardous Waste Disposal Sites in New York State as Site Number 7-34-044. The Site has been placed on the Registry, because polychlorinated biphenyl ("PCB") contamination has been detected in the dredgings.

The Site has been given Classification "2" pursuant to Section 27-1305(4)(b) of the Environmental Conservation Law. The classification means the Department considers the Site to present a "significant threat to the public health or environment" for which action is required. On February 6, 1997, the Department, in consultation with the New York State Department of Health, issued a Proposed Remedial Action Plan ("PRAP") for the Site which consisted of the excavation and off-site disposal of dredge materials/soils with PCB concentrations greater than or equal to 50 ppm and the consolidation and covering of the remaining volume of materials with PCB concentrations exceeding 1 ppm at the surface and 10 ppm subsurface.

On March 28, 1997, following a period of public comment, the Department selected a final remedial alternative for the Site in a Record of Decision ("ROD"). By letter dated February 9, 1998 from EPA's Region II Administrator, Jeanne M. Fox, the EPA concurred with the Department's ROD.

0367325.03

On **[insert date]**, the **[insert name of Grantor]** conveyed to REALM its ownership interest in property within the Site which is described in the legal description set forth in Schedule A to this Declaration.

### REALM's Obligations under Order on Consent

REALM and the Department entered into the Order on Consent to implement the ROD-approved remedial alternative at the Site in July of 1999. A copy of the Order on Consent can be reviewed at the Department's offices at 50 Wolf Road, Albany, New York by contacting George Harris of the Department's Division of Environmental Remediation or by contacting Carol Conyers, Esq. at the Department's Division of Environmental Enforcement.

This Declaration of Covenants and Restrictions is being filed in accordance with paragraph XII of the Order to give all parties who may acquire any interest in property within the Site notice of the Order.

WHEREFORE, the undersigned has signed this Declaration of Covenants and Restrictions to comply with the Order on Consent.

REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC.


By:_____
Name:
Title:
Date:


STATE OF MICHIGAN  )
                   ) ss:
COUNTY OF WAYNE   )

On the _____ day of _____ before me, the undersigned, a notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public


2

**Schedule A**

**Legal Description**



PLOT DATE:

MWH I: \DIV71\PROJEVTS\5858040\DWC\rf\_019.DWG SF: 500

PROPOSED TYPICAL MANHOLE ACCESS

VARIES

20' (MIN)

EXISTING MANHOLE

NOTE:
1. LOCATION OF FENCE AND SANITARY SEWER ARE APPROXIMATE.

REV DATE: 7/1/99

FACTORY AVE.

LANDS NOW OR FORMERLY TOWN OF SALINA

LANDS NOW OR FORMERLY NIMPC

LANDS NOW OR FORMERLY RYKUSS, INC.

LANDS NOW OR FORMERLY NIMPC

LANDS NOW OR FORMERLY REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC.

PROPOSED 12' WIDE GRAVEL ROAD TO RUN ALONG LENGTH OF COVER

LEY CREEK

LANDS NOW OR FORMERLY THE PEOPLE OF THE STATE OF NEW YORK

PROPOSED 20' ACCESS PATH TO MANHOLE (TYP. 11 LOCATIONS) (SEE DETAIL BELOW)

TOWN LINE ROAD

LEGEND

GRAVEL ACCESS ROAD
SANITARY SEWER
PROPERTY BOUNDARY
MANHOLE ACCESS LOCATION
FENCE
PROPOSED EXTENT OF SOIL COVER

FIGURE 1

SITE PLAN

LEY CREEK PCB DREDGINGS SITE
TOWN OF SALINA, NEW YORK

DATE: JULY 1999
FILE NO. 5858.040.019

O'BRIEN & GERE
ENGINEERS, INC.

SCALE IN FEET
0    500    1000'