UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

REVITALIZING AUTO COMMUNITIES
ENVIRONMENTAL RESPONSE TRUST and
RACER PROPERTIES LLC,

**AMENDED COMPLAINT**

Civil Action No.: 5:18-cv-01267-DNH-ATB

Plaintiffs,

**TRIAL BY JURY DEMANDED**

vs.

NATIONAL GRID USA, NIAGARA MOHAWK
POWER CORPORATION, CARRIER CORPORATION,
UNITED TECHNOLOGIES CORPORATION,
CARLYLE AIR CONDITIONING COMPANY, INC.,
CENTER CIRCLES LLC, GENERAL ELECTRIC
COMPANY, BRISTOL-MYERS SQUIBB
COMPANY, NEW PROCESS GEAR CORPORATION,
NEW PROCESS GEAR, INC.,
MAGNA POWERTRAIN USA, INC.,
OLD CARCO LLC f/k/a CHRYSLER LLC,
OLD CARCO LIQUIDATION TRUST , SOLVENTS AND PETROLEUM
SERVICE, INC., THOMPSON CORNERS LLC,
METALICO SYRACUSE REALTY, INC.,
METALICO NEW YORK, INC., ALERIS PARTNERS LLC,
COOPER CROUSE-HINDS, LLC, GARDNER
DENVER, INC., HONEYWELL INTERNATIONAL INC.,
PRESTOLITE ELECTRIC
INCORPORATED, ONX1 LLC,  LOCKHEED MARTIN CORPORATION,
ONONDAGA POTTERY COMPANY, INC.,
SYRACUSE CHINA COMPANY, LIBBEY GLASS INC.,
AMPARIT INDUSTRIES, LLC, 6181 THOMPSON
ROAD, LLC, CARRIER CIRCLE BUSINESS COMPLEX
LLC, TELESECTOR RESOURCES GROUP, INC.,
WESTERN ELECTRIC COMPANY, INCORPORATED,
NOKIA OF AMERICA CORPORATION,
FULTON IRON & STEEL CO. INC., SYRACUSE
LEPAGE LLC, LENNOX INDUSTRIES INC.,
DEERE & COMPANY, SYRACUSE DEERE ROAD
ASSOCIATES, LLC, JAGAR ENTERPRISES, INC.,
BURKO CORPORATION, EMPIRE PIPELINE
CORPORATION, CALOCERINOS AND SPINA,
C & S ENGINEERS, INC., B&B FAMILY LIMITED
PARTNERSHIP, NORTHERN INDUSTRIAL HOLDING, LLC

UNITED STATES HOFFMAN MACHINERY CORPORATION,
THOMPSON NW, LLC, THOMPSON LAWN, LLC,
HAULER'S FACILITY LLC,
NORTHEAST MANAGEMENT SERVICES, INC.,
NORTH MIDLER PROPERTIES LLC,
and JOHN DOES,

                        Defendants.
_____

     Plaintiffs Revitalizing Auto Communities Environmental Response Trust ("RACER Trust") and RACER Properties LLC ("RACER Properties") (collectively, "plaintiffs"), by their attorneys, **KNAUF SHAW LLP**, for their Amended Complaint, allege as follows:

## INTRODUCTION

1.    In this action, plaintiffs complain that in addition to plaintiff RACER Trust and Motors Liquidation Company ("MLC"), formerly known as General Motors Corporation ("GM") and its wholly owned subsidiaries Remediation and Liability Management Company, Inc. ("REALM") and Environmental Corporate Remediation Company, Inc. ("ENCORE") (MLC, GM, REALM, and ENCORE are collectively referred to in this Amended Complaint as the "GM Debtors"), which owned and/or operated the GM Syracuse Inland Fisher Guide ("IFG") Facility ("Former GM IFG Plant"), numerous other industrial parties known to either or both the New York State Department of Environmental Conservation ("NYSDEC") and the United States Environmental Protection Agency ("USEPA"), are also responsible to contribute toward the cost of past and future investigation and remediation (together "Environmental Response") to address contamination (the "Contamination") in and around the 30 square-mile Ley Creek watershed ("Ley Creek Watershed"), located in Onondaga County, New York, including Contamination originating from properties (the "Defendants' Properties") that has migrated or is migrating into Ley Creek and/or five specific tributaries of the Ley Creek Watershed (namely, Headson's Creek, Teall Brook (or

2

Creek), Sanders Creek, the South Branch of Ley Creek and the North Branch of Ley Creek), that defendants, their predecessors, successors or assigns, either currently or previously own or owned, or operate or operated, or on or from which they disposed of or released contaminants ("Contaminants"), including but not limited to polychlorinated biphenyls ("PCBs") and other substances deemed to be hazardous waste or hazardous substances by the State of New York and/or by USEPA (collectively, "Hazardous Substances"), and petroleum and petroleum-based hydrocarbons (together "Petroleum").

2.      The Former GM IFG Plant is part of a Subsite of the Onondaga Lake National Priority List ("NPL") Site; such Subsite is known as the "General Motors Inland Fisher Guide Subsite," or "GM IFG Subsite."  The Former GM IFG Subsite is one of 12 Subsites of the Onondaga Lake NPL Site. The GM IFG Subsite consists of two Operable Units or "OUs" -- OU-1 and OU-2.

3.      OU-1 consists of the Former GM IFG Plant itself, and the surrounding real property on which it is located.  This real property is owned by RACER Properties, and RACER Trust has the obligation to perform the remaining environmental remediation pertaining to OU-1.

4.      OU-2 consists of  an approximately 9,000 linear-foot stretch of Ley Creek from Townline Road to Route 11 located beyond the property boundaries of the Former GM IFG Plant (OU-1).

5.      RACER Trust does not own any of the real property that makes up OU-2.

6.      RACER Properties owns real property along the southern side of Ley Creek called the "Ley Creek PCB Subsite" (discussed below), a portion of which real property overlaps with the OU-2 remedial area (also discussed below) as successor to the GM Debtors, and any remaining environmental remediation pertaining to OU-2 as described in the OU-2 March 2015 Record of Decision (*see* Exhibit "G") and October 2015 OU-2 Consent Order (*see* Exhibit "C").

7.      This Amended Complaint focuses on the sediments, bank soils, and floodplain areas within Ley Creek Watershed including the expanded OU-2 portion of the GM IFG Subsite (beyond that described in the OU-2 March 2015 Record of Decision (*See* Exhibit "G"), including but not limited to the northern banks and floodplain areas of Ley Creek on land predominantly owned by New York State for the benefit of the New York State Thruway Authority ("Thruway Authority"), and adjacent and nearby areas where Contamination has recently been detected by RACER at high PCB concentrations and at  ("Expanded OU-2 Site").

8.      The GM IFG Subsite is NOT the same Subsite as the "Ley Creek PCB Dredgings Subsite," which RACER Properties owns, and on which RACER Trust is obligated to perform OM&M work.  The Ley Creek PCB Dredgings Subsite adjoins the OU-2 portion of the GM IFG Subsite to the south of Ley Creek as depicted in Exhibits B, D and E.

9.      The GM IFG Subsite is also not the "Lower Ley Creek Subsite," although OU-2 of the GM IFG Subsite adjoins the Lower Ley Creek Subsite at the east side of the Route 11 bridge.  RACER Properties does not own any portion of the Lower Ley Creek Subsite, and RACER Trust has no obligation to perform any of the remedial or OM&M work at such Subsite.  The GM Debtors, however, settled their potential liability for the contamination in the Lower Ley Creek Subsite (which Subsite extends from the Route 11 bridge to the mouth of the Creek at Onondaga Lake) in a separate settlement agreement entered during the GM bankruptcy.  *See* Environmental Response Trust Consent Decree and Settlement Agreement ("Trust Consent Decree")[1] effective March 29, 2011 and Appendix A, in links in *fn* 1 and *fn* 2.

---

[1]      The Trust Consent Decree can be accessed on-line via the RACER Trust website at: http://www.racertrust.org/files/RACERTrustFinalSettlementAgreement.pdf.

10.     The Contamination of the Expanded OU-2 Site was caused by discharge(s), release(s), spill(s) or leak(s), including excavation, dredging and subsequent spoil material disposal (together the "Releases") of Contaminants into the Ley Creek Watershed, including: (a) relocation of a portion of the original Ley Creek channel within the OU-2 area from north of its current location to its current location when the New York State Thruway and a new Townline Road bridge over the Thruway were constructed in or about 1951 by the Thruway Authority, before the Former GM IFG Plant was fully constructed and operational (*see* Exhibits "Q" showing 1951 Townline Road construction Drawings and the relocation of the North Branch of Ley Creek and "R" showing the Former GM IFG Plant not yet constructed as of 1951); (b) subsequent dredging of sediments and excavation to widen and realign Ley Creek from the original approximately 24-foot wide Ley Creek banks to create an approximately 80-foot wide creek bed (*see* Exhibit "M" showing the widened Creek in the mid-1970's overlaid on top of a 2017 Ley Creek aerial), and disposal of the subsequent contaminated dredge spoils onto the banks of Ley Creek from approximately Townline Road west to approximately Route 11, by the Onondaga County Department of Drainage and Sanitation from approximately 1970 to the mid-1980s, following several flooding events and in particular one in 1969; (c) landfilling activities by the Town of Salina into two landfills ("Landfills") known as the Town of Salina Landfill and Mattydale Landfill or Dump, which upon information ad belief accepted waste from some defendants including Cooper Crouse-Hinds, and Syracuse China, and which waste contained Contaminants that leached into Ley Creek, and which was dredged or evacuated and relocated onto the banks of Ley Creek within the OU-2 area between Townline Road and Route 11 when the Creek was widened and realigned as part of the flood control project; and (d) direct Releases into Ley Creek by various defendants from their own industrial operations.  *See* Map of industrial sites in the Ley Creek Watershed connected by Ley

Creek and its tributaries attached as Exhibit "B," Exhibit "F" depicting the areas where dredge spoils are likely to have been placed as now more fully delineated, and aerial overlay of the creek widening and realignment over current conditions in Exhibit "M."

11.     Some or all of the Releases and/or Contamination occurred in a sudden and accidental manner.

12.     Plaintiffs bring claims for cost recovery and contribution under sections 107(a) and 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a) and 9613(f), *inter alia*, which allows them to recover environmental response costs from other potentially responsible parties ("PRPs").

13.     Plaintiffs also bring claims under state law, including New York State Navigation Law Article 12 ("Oil Spill Act"), and common law and equitable theories.

## POLYCHLORINATED BIPHENYLS

14.     According to the USEPA and United States Center for Disease Control websites (https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls-pcbs and https://www.atsdr.cdc.gov/toxprofiles/tp17-c5.pdf), PCBs, which are the most prevalent contaminant of concern in the OU-2 area, were domestically manufactured from 1929 until manufacturing and importation was banned in 1979.[2]

15.     Annual U.S. production peaked in 1970 with a total production volume of 85 million pounds of PCB Aroclors.

16.     Upon information and belief, all of the manufacturer defendants in this action used PCBs before 1979, and discharged or caused to be discharged PCB-impacted materials through Releases,

---

[2]  There was a petition process for exemptions, and 11,000 pounds of PCB products were still imported into the United States in 1981.  Current exemptions are still granted, which are primarily related to disposal technology research, microscopy and other R&D research projects.

outfalls and other means into the Ley Creek Watershed, which materials migrated though stream flow and clouding events to the sediments, banks, and floodplains of the OU-2 area, or were otherwise dredged from portions of Ley Creek and placed in the OU-2 area.

17.     Monsanto Chemical Company produced about 99% of the PCBs used by U.S. industry until production was stopped in August 1977.

18.     PCBs were typically present in products and materials produced before the 1979 PCB ban including: (i) transformers and capacitors; (ii) electrical equipment including voltage regulators, switches, re-closers, bushings, and electromagnets; (iii) oil used in motors and hydraulic systems; (iv) old electrical devices or appliances containing PCB capacitors; (v) fluorescent light ballasts; (vi) cable insulation; (vii) thermal insulation material including fiberglass, felt, foam, and cork; (viii) adhesives and tapes; (ix) oil-based paint; (x) caulking; (xi) plastics; (xii) carbonless copy paper; and (xiii) floor finish.

19.     In sum, PCBs were in many industrial products and pieces of equipment and, upon information and belief, were being used by the industrial manufacturer defendants in this action and came to be released on their sites and on real property owned by other defendants in this action through such industrial operations.

### THE TRUST

20.     The Trust Consent Decree, effective March 29, 2011, was entered by the U.S. Bankruptcy Court for the Southern District of New York in the bankruptcy proceeding filed by the GM Debtors in 2009. and called for the creation of an Environmental Response Trust, which would remediate various contaminated sites for which GM was a PRP, using the funding mechanism provided by the Consent Decree.

21.     The Trust Consent Decree was executed by several states including New York State, the United States of America, and EPLET, LLC on behalf of the contemplated Environmental Response Trust, and among other things gave certain contribution protection to the contemplated Environmental Response Trust.

22.     RACER Trust was created in 2011 to act as the Environmental Response Trust under the Trust Consent Decree, pursuant to the monetary budget limits contained in that Trust Consent Decree.

23.     The Trust Consent Decree includes a Minimum Estimated Property Funding Account and the Reserve Property Funding Account[3] for parcels of real property in 89 locations in 14 States and in one Tribal Nation, as well as monies for post-remediation OM&M that may need continued funding to be operated and maintained.

24.     The Trust Consent Decree ¶¶55-59 also provides for contingency funding, known as Cushion Funding Account funding, which is to be used primarily for unforeseen circumstances found at the RACER Trust sites.

**2015 CONSENT ORDER**

25.     By an October 27, 2015 Consent Order executed between NYSDEC and RACER Trust ("October 2015 RACER Trust Consent Order"), RACER Trust agreed to undertake Environmental Response to address Contamination in the Ley Creek Watershed allegedly resulting, at least in part, from the GM IFG Subsite, consistent with the OU-2 ROD.  A copy of the October 2015 RACER Trust Consent Order is attached as Exhibit "C."

---

[3]     *See* the Minimum Estimated Property Funding Account Limits in http://www.racertrust.org/files/Motors_Liquidation_Settlement_Agreement_Appendix-1.pdf.

26.     The October 2015 RACER Trust Consent Order provided in Section VII.B that RACER Trust reserved its rights to "seek and obtain contribution, indemnification, and/or any other form of recovery from its insurers and from other potentially responsible parties or their insurers for past or future response and/or cleanup costs or such other costs or damages arising from the contamination at the [GM IFG Subsite OU-1 and OU-2] as may be provided by law, including but not limited to rights provided under CERCLA."  *See* October 2015 RACER Trust Consent Order in attached Exhibit "C."

27.     NYSDEC now seeks remediation of lands outside of the original geographic scope of the OU-2 remedial work ("OU-2 Original Remediation Site"), and which were described not only in the Trust Consent Decree but in a number of legally-binding Consent Orders and Records of Decision ("RODs") attached to this Amended Complaint, and for which the Minimum Estimated Property and Reserve Property Funding was established.  *See* Exhibits C and G.

28.     This Amended Complaint attaches documentation (*see* Exhibit "H") showing that NYSDEC had data dating back to the mid-1980's demonstrating the additional 22 acres it is now attempting to add to GM's responsibility to comprise the Expanded OU-2 Site were areas it knew were contaminated and or should have known were likely to be contaminated, since the State of New York Thruway Authority relocated a substantial portion of the original Ley Creek when the Thruway and the new Townline Road bridge were constructed in or about 1951, and therefore, should have known that any contamination present in the then-existing Creek bed, banks and floodplains would have been left in place and covered with fill (*see* Exhibit "Q"), and knew the Ley Creek flood control project caused dredging spoils to be placed on lands north of Ley Creek and both east and west of Townline Road in the 1970's and earlier 1980's (*see* Exhibits "G"-"K"

9

and "M"), time periods during which the use and discharge of PCBs by the industries throughout the Ley Creek Watershed were prevalent.

29.     Yet NYSDEC chose not to include these areas in the OU-2 Original Remedial Site, as provided for in the Trust Consent Decree or defined in the October 2015 RACER Trust Consent Order (*see* Exhibit "C"), which relies on the definition of the property for which GM is responsible in the 2015 March ROD.[4]  *See* Figures in Exhibit "G," 2015 ROD; Exhibit "H," 1988 O'Brien & Gere Engineers, Inc. Field Investigation Ley Creek Dredged Material Area Report ("1988 OBG Report") (showing PCB contamination above 27 ppm north of Ley Creek on land owned by New York State); and Exhibit "K," 1997 GM RIFS Consent Order ¶23.

30.     The Trust Consent Decree at ¶ 63 specifically states that "funding with respect to the [GM IFG Subsite] from the Minimum Estimated Property Funding Account and the Reserve Property Funding Account shall be allocated in the following manner: $22,573,341 for remediation within the GM IFG Subsite facility property boundaries [i.e., OU-1] and $8,548,471 for the property extending from the facility property boundaries to the Route 11 Bridge [i.e., OU-2].  These dollar amounts are slightly higher than the final "trued up" Total Property Funding allocation attached to the Trust Consent Decree in Appendix A and the actual budget.   In addition, Total Project Funding for the remaining Ley Creek PCB Dredgings Site OM&M work (remediated by GM in 1999 to 2001) was allocated $1,882,342.  *See* links *fn* 1 and *fn* 2, and depictions of these remedial areas in Exhibits "D" and "E."

31.     As part of recent remedial design work for OU-2, NYSDEC directed RACER Trust and its consultants to investigate additional area, ultimately expanding to 22 acres of land, outside of the

---

[4]        See also Map in NYSDEC July 2016 Fact Sheet, which does not include areas depicted in Exhibit "F" north of Ley Creek and further downstream:  http://www.dec.ny.gov/docs/remediation_hudson_pdf/ finconfactsheet07012016.pdf

OU-2 Original Remediation Site, of which only an equivalent of approximately one acre of upland soil and a downstream "hot spot" area were previously identified in the March 2015 ROD (*see fn. 3*, and Exhibits "C" and "G").

32.     This additional approximately 22 acres of land is predominantly owned by New York State or is owned by other parties, and is not included in the OU-2 Original Remedial Site contemplated by the Trust Consent Decree, for which a certain total project funding amount was allocated (compare Exhibit "F," which depict lands never before included by NYSDEC in RODs or in Consent Orders with the GM Debtors or RACER Trust), and which remediation would increase the overall remediation budget conservatively to either approximately $93.5 million if the conservative 1 part per million (1 ppm) ecological protection remediation goal set forth in the March 2015 ROD (*see* Exhibit "C" and "G") remains operative, or approximately $60 million if a less conservative containment remedy that is protective of human health and the environment is applied.

33.     Most of the Contamination on the north banks and floodplain areas of Ley Creek west of Townline Road is on land owned by New York State for the benefit of the New York State Thruway Authority, and which is largely covered with mature forest, and National Grid transmission lines,  and which serves as an unoccupied, inaccessible buffer between Ley Creek and the Thruway, and on which GM could not have directly caused Contamination.

34.     In other words, this land will most likely never be developed or publicly accessed given the presence of the Thruway.

35.     Much of the Expanded OU-2 Site received dredge spoils and therefore was known be contaminated as a result of the dredging, realignment and widening of Ley Creek in the 1970's to 1980's by Onondaga County ("County").  *See* Exhibit "G" (historical description of the dredging

and the surrounding industrial area); Exhibit "H" (1988 OBG Report); and Exhibit "M" (showing the areas of the actual creek widening from a 1970's aerial map overlaid on a 2017 aerial map depicting the approximate current creek dimensions, which has returned to its prior width of approximately 24 feet).

36.     RACER Trust is compelled to commence this action based on recent negotiations with NYSDEC, during which NYSDEC confirmed it was not willing to commit to seek contribution or cost recovery from other PRPs.

37.     The budget for remediation of the GM IFG Subsite was created with full knowledge and input from New York State.

38.     RACER Trust should not be held responsible for Contamination on lands onto which the GM Debtors could not have directly contributed Contamination (*i.e.*, north and east across Ley Creek outside of the direct influence of any historic discharges of the GM Debtors, and which remediation was not contemplated, and for which no money was reserved, pursuant to the Trust Consent Decree, on lands that were known by NYSDEC and the State of New York to be contaminated), particularly since the State of New York is the primary owner of the land that NYSDEC now, many years later, seeks to remediate.

39.     Contamination in the 30 square-mile Ley Creek Watershed is the result of over 150 years of industrial discharges from multiple Releases by or from the Defendants' Properties.

40.     Since RACER Trust's funds to accomplish Environmental Response are limited, it has a fiduciary duty to its beneficiary (the United States) to preserve the funds in the Trust while still seeking to accomplish overall remediation goals.

41.     As a result, plaintiffs seek fair and equitable response costs, property damages, injunctive relief, declaratory judgment and other relief due to the Releases, and the resulting Contamination

from the defendants for the purposes of facilitating a final remedial action, because there are insufficient funds in the combined Minimum Estimate Property Funding and Reserve Property Funding Accounts being held by RACER Trust to fund the remediation on its own GM IFG Subsite OU-1 and OU-2. *See* Exhibit "L."

## PARTIES

42.    Plaintiff RACER Trust is an independent environmental response trust formed under the laws of the State of New York, with its principal place of business at 500 Woodward Avenue, Suite 2650, Detroit, Michigan 48226.

43.    Plaintiff RACER Trust was created in March 2011, pursuant to the Trust Consent Decree.

44.    EPLET, LLC is the Administrative Trustee of the RACER Trust and is a signatory to the Trust Consent Decree prior to creation of RACER Trust.

45.    Plaintiff RACER Properties LLC is Delaware limited liability company doing business in the State of New York, established to hold legal title to the Former GM IFG Plant, with its principal place of business at 500 Woodward Avenue, Suite 2650, Detroit, Michigan 48226.

46.    Defendant National Grid USA, formerly known as Niagara Mohawk Power Corporation, is a Delaware corporation doing business in the State of New York, with its local offices located at 300 Erie Blvd. West, Syracuse, New York 13202.

47.    Defendant Niagara Mohawk Power Corporation is a business corporation doing organized under the laws of the State of New York, with offices located at 300 Erie Blvd West, Syracuse, New York 13202.  National Grid USA and Niagara Mohawk Power Corporation are collectively referred to in this Amended Complaint as "National Grid."

48.    Defendant Carrier Corporation ("Carrier") is a Delaware corporation doing business in the State of New York, with its principal offices located at 6304 Carrier Parkway, East Syracuse, New York 13057, which is owned by United Technologies Corporation.

49.    United Technologies Corporation ("United Technologies" or "UTC") is a Delaware corporation doing business in the State of New York, with its principal offices located at 10 Farm Springs Road, Farmington, Connecticut 06032.

50.    Defendant Carlyle Air Conditioning Company Inc. ("Carlyle"), a subsidiary of Carrier and owned by United Technologies, is a business corporation organized under the laws of the State of New York, with its principal offices at 6304 Carrier Parkway, East Syracuse, New York 13057.

51.    Defendant B&B Family Limited Partnership is a partnership with an address of P.O. Box 420, Solvay Road, Jamesville, New York 13078.

52.    Defendant Center Circles LLC ("Center Circles") is a limited liability company organized under the laws of the State of New York, with an address of P.O. Box 186, Syracuse, New York 13208.

53.    Defendant General Electric Company ("GE") is a business corporation organized under the laws of the State of New York, with its principal offices located at 41 Farnsworth Street, Boston, Massachusetts 02210.

54.    Defendant Lockheed Martin Corporation ("Lockheed Martin") is a Maryland corporation doing business in the State of New York, with principal offices located at 6801 Rockledge Dr., Bethesda, Maryland, 20817.

55.    Defendant Bristol-Myers Squibb Company ("Bristol-Myers") is a Delaware corporation doing business in the State of New York, with principal offices located at 430 East 29th Street, 14th Floor, New York, New York 10016.

14

56.     Defendant New Process Gear Corporation ("New Process Gear") (formerly known as the Management Club of New Process Gear, Division of Chrysler Corporation, which was last owned by Magna Powertrain USA, Inc.) is an inactive Delaware corporation which did business in the State of New York, with offices located at 6600 Chrysler Drive, renamed 6600 New Venture Gear Drive, East Syracuse, New York 13057 (the "Chrysler Facility").

57.     Defendant New Process Gear, Inc., ("New Process Gear") is a corporation doing business in the State of New York, with principal offices located at 6600 New Venture Gear Drive, E Syracuse, New York, 13057.

58.     Defendant Magna Powertrain USA, Inc. ("Magna") is a Delaware corporation with offices at 1870 Technology Drive Troy, Michigan 48083.

59.     Defendant Old CARCO LLC, f/k/a Chrysler LLC, is a dissolved Delaware limited liability company formerly doing business in the State of New York, with principal offices formerly located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

60.     Defendant Old CARCO Liquidation Trust, which is the trust established to handle claims against Chrysler Corporation, is a bankruptcy trust. The trustee of the Old Carco Liquidation Trust is RJM I, LLC, which has an address of 251 Little Falls Drive, Wilmington, Delaware 19808.

61.     Defendant Solvents and Petroleum Service, Inc. ("S&P"), is a business corporation organized under the laws of the State of New York, with its principal offices located at 1405 Brewerton Road, Syracuse, New York 13208.

62.     Defendant Thompson Corners, LLC ("Thompson Corners") is a limited liability company organized under the laws of the State of New York, with offices at 6225 Thompson Road, Syracuse, New York 13206.

63.     Defendant Metalico Syracuse Realty, Inc. ("Metalico Realty") is a business corporation organized under the laws of the State of New York, with offices at 6225 Thompson Road, Syracuse, New York 13206.

64.     Defendant Metalico New York, Inc. (formerly Metalico Syracuse, Inc.) ("Metalico New York") is a business corporation organized under the laws of the State of New York, with principal offices located at 135 Dermody Street, Cranford, New Jersey 07016.

65.     Defendant Aleris Partners LLC ("Aleris") is a limited liability company organized under the laws of the State of New York, with a designated service address of P.O. Box 46, 124 Grove Avenue, Cedarhurst, New York 11516.

66.     Defendant Cooper Crouse-Hinds, LLC ("Crouse-Hinds") is a Delaware limited liability company doing business in the State of New York, with principal offices located at 1201 Wolf Street, Syracuse, New York 13208.

67.     Defendant Gardner Denver, Inc. ("Gardner Denver") is a Delaware corporation doing business in the State of New York, with principal offices located at 222 East Erie Street, Suite 500, Milwaukee, Wisconsin 53202, and is the successor to Lamson Corporation, Hoffman Air & Filtration Systems, and Oberdorfer Pumps.

68.     Defendant Honeywell International Inc. ("Honeywell") is a Delaware corporation doing business in the State of New York, with principal offices located at 115 Tabor Road, Morris Plains, New Jersey, 07960.

69.     Defendant Prestolite Electric Incorporated ("Prestolite") is a Delaware corporation doing or formerly doing business in the State of New York, with principal offices located or formerly located at Four SeaGate, Toledo, Ohio 43601.

70.    Defendant ONX1 LLC ("ONX1") is a Delaware limited liability company doing business in the State of New York, with a designated service address of 127 W. Fairbanks Avenue #410, Winter Park, Florida 32789.

71.    Defendant Onondaga Pottery Company, Inc. ("Onondaga Pottery") is a New York business corporation formerly known as Syracuse China Corporation, with principal offices located at 300 Madison Avenue, Toledo, Ohio 43604.

72.    Defendant Syracuse China Company is a Delaware corporation doing business in the State of New York, with principal offices located at 300 Madison Avenue, Toledo, Ohio 43604.

73.    Defendant Libbey Glass Inc. ("Libbey") is a Delaware corporation doing business in the State of New York, with principal offices located at 300 Madison Avenue, Toledo, Ohio 43604, and upon information and belief is a successor to Syracuse China Company.   Libbey, Onondaga Pottery and Syracuse China Company are collectively referred to in this Amended Complaint as "Syracuse China."

74.    Defendant Amparit Industries, LLC ("Amparit") is a limited liability company organized under the laws of the State of New York, with a designated service address of 2435 State Route 5, Utica, New York 13502.

75.    Defendant 6181 Thompson Road, LLC is a limited liability company organized under the laws of the State of New York, with a designated service address of 7050 Cedarbay Road, Fayetteville, New York 13066.

76.    Defendant Thompson NW, LLC is a limited liability company organized under the laws of the State of New York, with a designated service address of 7050 Cedarbay Road, Fayetteville, New York 13066.

77.     Defendant Thompson Lawn, LLC is a limited liability company organized under the laws of the State of New York, with a designated service address of 7050 Cedarbay Road, Fayetteville, New York 13066.

78.     Hauler's Facility LLC is a limited liability company organized under the laws of the State of New York, with a designated service address of 6223 Thompson Road, Suite 1000, Syracuse, New York 13206.

79.     Defendant Carrier Circle Business Complex LLC ("CCBC") is a limited liability company organized under the laws of the State of New York, with a designated service address of 535 East Countyline Road, Suite 15, Lakewood, New Jersey 08701.

80.     Defendant Telesector Resources Group, Inc. ("Telesector") is a Delaware corporation doing business in the State of New York, with principal offices located at 140 West Street, 20th Floor, New York, New York 10007.

81.     Defendant Western Electric Company, Incorporated ("Western Electric") is a Delaware company doing business in the State of New York, with principal offices located at 600 Mountain Ave., Room 63-334, Murray Hill, New Jersey 07974.

82.     Defendant Nokia of America Corporation ("Nokia") is a Delaware corporation doing business in the State of New York, with principal offices located at 600 Mountain Avenue, Murray Hill, New Jersey 07974.

83.     Defendant Fulton Iron & Steel Co. Inc. ("Fulton Iron") was a corporation organized under the laws of the State of New York, with a designated service address of 415 South First Street, Fulton, New York 13069, which is currently inactive through dissolution as of September 3, 1992.

84.     Defendant Syracuse Lepage LLC "(Syracuse Lepage") is a New York limited liability corporation with an office address at 1 Lepage Place, Syracuse, New York 13206.

85.    Defendant Lennox Industries Inc. (formerly known as The Lennox Furnace Company) ("Lennox") is a Delaware corporation doing business in the State of New York, with principal offices located at 2140 Lake Park Blvd., Richardson, Texas 75080.

86.    Northeast Management Services, Inc. is a business corporation organized under the laws of the State of New York, with a principal place of business at 400 North Midler Avenue, Syracuse, New York 13206.

87.    North Midler Properties LLC is  a business corporation organized under the laws of the State New York, with a principal place of business at 400 North Midler Avenue, Syracuse, New York 13206.

88.    Defendant Deere & Company ("Deere") is a Delaware corporation doing business in the State of New York, with principal offices located at One John Deere Place, Moline, Illinois 61265, and upon information and belief is the successor to Syracuse Chilled Plow Company.

89.    Defendant Syracuse Deere Road Associates, LLC ("Syracuse Deere Road") is a Delaware limited liability company doing business in the State of New York, with a designated service address of 80 State Street, Albany, New York 12207.

90.    Defendant Jagar Enterprises, Inc. ("Jagar') is a corporation organized under the laws of the State of New York, with principal offices at 203 Jasper Street, Syracuse, New York 13203.

91.    Defendant Northern Industrial Holdings, LLC is a Delaware corporation with a service of process address at Capitol Services, Inc., 1675 South State Street, Suite B, Dover, Delaware, 19901.

92.     Defendant United States Hoffman Machinery Corporation ("Hoffman") is a Delaware corporation doing business in  New York, with a principal place of business at 6181 Thompson Road, Syracuse, New York, and who upon information and belief is or formerly may have been

known as or may have merged with Hoffman Air Filtration Licensco Inc., Hoffman Air Filtration Systems and/or Hoffman Air & Filtration, and all of which have been acquired and /or are operated by Gardner Denver, Inc.

93.     Defendant Burko Corporation ("Burko") was a New York corporation dissolved on December 29, 1982, which maintained offices at 145 Orchard Drive East, North Syracuse, 13212.

94.     Defendant Empire Pipeline Corporation ("Empire") was a New York corporation now dissolved, which maintained offices at 300 Hiawatha Blvd., East Syracuse, New York 13208.

95.     Defendant Calocerinos and Spina ("C&S") was a general partnership organized under the laws of the State of New York, which maintained offices at 2100 East Genesee Street, Syracuse, New York.

96.     Defendant C & S Engineers, Inc. ("C & S Engineers") is a corporation organized under the laws of the State of New York, with principal offices located at 499 Col. Eileen Collins Blvd., Syracuse, New York 13212, and is the successor to C&S.

97.     Defendants John Does are entities who may be a PRPs but whose identities and addresses are not currently known.

98.     The defendants identified in paragraphs "45" through "92" above, and John Does are referred to in this Amended Complaint as "Owner and Operator Defendants."

99.     The defendants identified in paragraphs "93" through "96" above, and John Does are referred to in this Amended Complaint as the "Dredging Arranger Defendants."

100.    All defendants identified above will be referred to in this Amended Complaint "defendants," or "PRPs."

## BACKGROUND FACTS RELATED TO THE
## LEY CREEK PCB DREDGING SITE

101.    From approximately the mid-1950's, when the Former GM IFG Plant was first open for business (see Exhibit "R" showing plant only starting to be constructed in 1951), until 1993, GM owned and operated the Former GM IFG Plant located at One General Motors Circle (also known as 1000 Townline Road), Salina, New York, along Factory Avenue near the southern bank of Ley Creek, at which GM manufactured automotive parts.  From this Plant, GM discharged process waste water and storm water into Ley Creek, with such water containing the specific PCB Aroclors 1242 and 1248 as a result of GM's use of specific hydraulic oils.  *See* Exhibit "H" and Exhibit "I," including the 1999 Consent Order Index No. D7-0008-97-06, between NYSDEC and GM's subsidiary REALM at ¶4 ("1999 REALM Consent Order").

102.    As noted below, however, there were numerous other industrial facilities using hydraulic oils, and data in reports from as early as 1985 and 1988 releasing PCBs in the Ley Creek Watershed with different PCB Aroclors than those NYSDEC acknowledged were used by GM.  *See* Exhibit "H" and Exhibit "J," including the 1988 OBG Report and 1985 Oil & PCB Sampling and Analyses of Portions of Ley Creek Report prepared by EDI Engineering & Science for GM ("1985 EDI Report"); Exhibit "K," 1997 GM Consent Order ¶¶4-5.

103.    Following a major flooding event in 1969, Onondaga County undertook a flood control project that significantly widened and realigned Ley Creek.

104.    During this multi-year flood control project, its contractors, including the Dredging Arranger Defendants, excavated and then placed the dredge spoils on lands along the banks north and south of Ley Creek and east and west of Townline Road between about 1970 and 1975, and then again in the early 1980's, for purposes of preventing future flooding.  *See* Exhibits "G," "H," "I" "M", "O" and "P".

105.    This work, which cut through the Town of Salina Landfill in the Lower Ley Creek, into which upon information and belief numerous local industries, including various defendants placed their waste, causing the spread Contamination in the Ley Creek Watershed.

106.    The County, with cooperation of the Town of Salina, arranged for the permanent disposal of the dredge spoils on the banks north and south of Ley Creek through contractors Burko and Empire under the direction of C&S, which arranged for the disposal on lands owned by the County, New York State, National Grid, S&P, and Plaza East LLC (which was the owner of the land on which the Town of Salina was operating its landfill) and possibly additional private land.  *See* Exhibits "B," "F," "M," "O" and "P."

107.    PCBs were originally detected in 1983 in smallmouth bass (Micropterus dolomieu) from Onondaga Lake (Sloan, Ronald J., 1985; personal communication).  The mean concentration was 0.625 ppm total PCB, and the maximum was 1.36 ppm. *See* Exhibit "J."

108.    The 1985 EDI Report indicates that the PCB compounds detected in the fish were "Aroclors 1254, 1260, and 1016," that the "source of these PCB's is unknown" and that "Aroclors 1242 and 1248 are present in effluent from the Fisher Guide plant on Ley Creek."

109.    Upon information and belief, NYSDEC was provided with a copy of the 1985 EDI Report because just one month before, on August 12, 1985, GM entered into a Consent Order with NYSDEC to perform a Remedial Investigation of Ley Creek.  *See* Exhibit "I" at ¶ 8 and at 48 of 135 of the attached ROD and Exhibit "J".

110.    As early as this first 1985 environmental investigation report prepared in relation to the PCB Contamination in Onondaga Lake and Ley Creek, NYSDEC was notified of the following facts:

> Ley Creek drains an area of about 30 square miles (77 km$^2$) and is tributary to Onondaga Lake. Onondaga Lake is part of the Oswego River System, which is

tributary to Lake Ontario…. In general, the Ley Creek drainage basin, except for the northeast portion, can be described as a highly urbanized area. Portions of the towns and cities of Syracuse, North Syracuse, East Syracuse, Cicero, Clay, Dewitt, Manlius, and Salina are in the Ley Creek watershed.  Many industries and commercial establishments are in the watershed. The larger industries include General Motors Corporation, Bristol Laboratories, Carrier Corporation, Syracuse China Corporation, Chrysler, and General Electric. These large factories and their parking lots cover significant portions of the watershed.  In addition, 14 miles of expressway, 8 interchanges, a service facility for the New York State Thruway, the Hancock Field of the U.S. Air Force, and Syracuse International Airport are located in Ley Creek's watershed. Streets, shopping areas, parking lots, and buildings cover other parts of this watershed. Industrial effluents and urban storm runoff discharge into Ley Creek. The northeast part of the watershed is relatively undeveloped.  The Ley Creek watershed area was and still is highly industrial.

111.    On April 24, 1987, GM's consultant, O'Brien & Gere Engineers, Inc. ("OBG"), implemented a Hydrogeologic Investigation of Ley Creek, which identified PCBs up to 466 parts per million in soil and groundwater within an approximately 1,300-foot portion of the Creek (OBG-1 through OBG-7C).  *Id.*

112.    On November 27, 1987, NYSDEC in cooperation with USEPA, designated a portion of Ley Creek as the "Ley Creek PCB Dredgings Subsite," an area bounded by Factory Avenue to the south, Ley Creek to the north, Townline Road to the East, and 4,300 feet downstream to the west (also known as New York State Superfund Site No. 734044).  *See* Exhibits "E," depicting the Ley Creek PCB Dredgings Site, and "I," 1999 REALM Consent Order ¶ 6-7 and Exhibit "B" to that Consent Order showing a map of the Ley Creek PCB Dredgings Subsite.

113.    Therefore, despite data in both the 1985 EDI Report and 1988 OBG Report, which included sampling NYSDEC requested to be performed **north** and **south** of Ley Creek (*see* Exhibit "H" and Exhibit "J"), GM's REALM subsidiary was only deemed ultimately responsible to further investigate and eventually remediate its own Plant Site (OU-1) and the Ley Creek PCB Dredging Subsite on the south bank of the creek.  *See* Exhibits "B," "E," "G" and "H-J."

114.    On May 21, 1991, GM and NYSDEC entered into a Consent Order Index No. A7-0239 -
90-07 to perform a Remedial Investigation/ Feasibility Study ("RI/FS") to complete the
characterization of the areal and vertical extent of contamination of the Ley Creek PCB Dredgings
Site and to evaluate alternatives for remediation. *See* Exhibit "I" at ¶ 10-11.

115.    Six years later, on January 23, 1997, NYSDEC approved the RI/FS submitted by
GM/REALM, and prepared a Proposed Record of Decision, which recommended removal and off-
Site disposal of the dredge spoils equal to or greater than 50 ppm (which is the federal level of
hazardous waste for PCBs pursuant to the Toxic Substances Control Act or "TSCA") and covering
of the remaining volumes of material with PCB concentrations exceeding more than 1 ppm at the
surface and 10 ppm in the subsurface soils. *See* Exhibit "I" at pp.¶12-13.

116.    On a July 15, 1999, REALM entered into a 1999 Consent Order with NYSDEC to prepare
a Remedial Design for the Ley Creek PCB Dredgings Site.  GM, through REALM, was only
required to remediate the 19-acre Ley Creek PCB Dredgings Site in the 1999 Consent Order on
the ***south*** bank of Ley Creek.

117.    Between 1999 and 2001, GM/REALM remediated this very large Superfund Site.[5]

---

[5]       *See* RACER Trust Fact Sheet  http://www.racertrust.org/files/ley-creek-environmental-fact-sheet.pdf  and
support documentation, http://www.onondagalake.org/Sitedescription/LeyCreekDredgeSpoils/index.htm, explaining
that USEPA concurred with NYSDEC's 1997 dredging ROD in 1998, and GM performed the work, with the approval
and oversight of both agencies, in 1999-2000.  The agencies concluded that, as a result of the work, the potential for
direct contact exposure to on-site PCBs has been eliminated and the site is no longer considered a significant threat to
human health and the environment.  Moreover, in 2006, USEPA conducted a five-year review of the site to determine
if the performed remedial activities remained protective of human health and the environment. While the review
determined that the remedy continued to be protective of human health and the environment and no additional cleanup
work was needed, the review also recommended the implementation of a deed restriction precluding activities on the
site that could potentially expose contaminated materials and to ensure that the integrity of the cover is maintained,
which is still being implemented by the RACER Trust.  Therefore, as of well before the bankruptcy, GM and its
successors certainly thought it had completed all work required of it in relation to the banks of Ley Creek.

118.    Therefore, GM/REALM, well before the GM bankruptcy, had already remediated a large amount of Contamination originating from dredge spoils that resulted from 30 square miles of other industrial end users of this Watershed in addition to its own Releases.

119.    In the interim, numerous other defendants have released, and were and are continuing to release, PCBs and/or other Contaminants into the Ley Creek Watershed both upgradient to the east and downgradient to the west of Former GM IFG Plant as of a century before GM was present, starting in about 1854 to the present, and now 25 years after it ceased manufacturing operations at the Former GM IFG Subsite.  See Exhibits "G,"[6] "H" and "J."

120.    While NYSDEC pursued some of the defendants to contribute to costs to investigate and remediate the Lower Ley Creek Subsite, to the west of both the GM IFG Subsite OU-2 and the Ley Creek PCB Dredgings Site (see Exhibit "A" and the left box on the first slide in Exhibit "E"), NYSDEC only sought to compel GM and then RACER Trust to remediate the Contamination in the southern portion of the center of the Ley Creek Watershed, including the 19-acre Ley Creek PCB Dredgings Site south of the Creek.  NYSDEC has completely failed, apparently, to seek contribution from any other PRPs on the north side of Ley Creek or upgradient of the Former GM IFG Plant east of Townline Road, despite evidence of dredging east of this road (see Exhibit "L").

121.    As further discussed below, while some defendants have entered into agreements with NYSDEC to remediate PCBs on their sites, they have not been held to the same conservative

---

[6]    The March 2015 NYSDEC Record of Decision (ROD) for OU-2 (Exhibit "G") at 2 acknowledges that "Industrialization of the area began soon after the completion of the Erie Canal in 1857 and the development of railroads in eastern Syracuse.  Several industries have been located near Ley Creek and its branches since the late 19th and early 20th centuries. The industrial nature of this area, as well as the infrastructure and other development, influenced this site and contributed to its current condition."  Given that GM only commenced operations literally 100 years later than 1857, it is unclear why only GM's operations have been the focus of NYSDEC's Superfund efforts other than it has been more convenient to seek cost recovery and contribution only from the RACER Trust.

cleanup standards as GM and the RACER Trust or were not required to remediate the Ley Creek tributaries into which Contaminants from their Defendant Property were discharged.

122.    For example, Carrier and UTC were finally required to remediate Sanders Creek in a 2005 Consent Order, but upon information and belief, NYSDEC has not rigorously enforced the Order, and Carrier and UTC have failed to date to actually complete the remediation work in the Creek bed.

123.    Therefore, Carrier has caused, and is continuing to cause, PCB contamination into the OU-2 portion of Ley Creek, since Sanders Creek flows directly into the OU-2 portion of Ley Creek. *See* Exhibits "A" and "B."

124.    Similarly, Bristol-Myers has agreed, in a Voluntary Cleanup Agreement in relation to the former Fulton Iron  & Steel Co. facility ("Fulton Site"), which is highly contaminated with Contaminants including PCBs, which they knowingly acquired, and then in a Brownfield Cleanup Agreement, to remediate a 23-acre portion of the site as a "participant" (responsible party), but was not held to the same conservative cleanup standards, and was not required to perform any remediation of the South Branch of Ley Creek, which directly flows into the OU-2 portion of Ley Creek.

125.    At an October 17, 2018 meeting with RACER Trust representatives, NYSDEC declined to commit to pursue anyone other than the RACER Trust to remediate the Expanded OU-2 Site or to acknowledge the State, as a major landowner within the Ley Creek Watershed since the late 1940's, may also have some remediation responsibility.  *See* Exhibit "F."

## BACKGROUND RELATED TO
## GM IFG SUBSITE OU-1 AND OU-2

126.    It is important to note that the series of Consent Orders discussed above only relate to the Ley Creek PCB Dredgings Site, even though various Consent Orders, reports, data and other

Case 5:18-cv-01267-DNH-ATB   Document 157   Filed 04/30/19   Page 27 of 80

evidence all in NYSDEC's possession, acknowledged that some dredge spoils were placed north of the Creek and some data showed Contamination on lands north of the Creek bed and east of Townline Road.

127.    Pursuant to the March 1997 Ley Creek PCB Dredgings Site Record of Decision (attached to and incorporated into the 1999 REALM Consent Order in Exhibit "I"), even though GM performed some investigation of the groundwater under the dredging soils and surface water and sediments in Ley Creek in the area west of Townline Road and east of the Route 11 bridge (*i.e.* in and around the Ley Creek PCB Dredgings Site), NYSDEC deferred evaluation of the groundwater under the dredging soils and surface water and sediments in Ley Creek in the area west of Townline Road and east of the Route 11 bridge (*i.e.,* in and around the Ley Creek PCB Dredgings Site, designated as "Deferred Media"), later referring to this area as "Operable Unit 2" or "OU-2" until the Remedial Investigation of the Former GM IFG Plant OU-1 was performed as described below.

128.    NYSDEC and GM entered into an Administrative Order on Consent (Index #D-7-0001-97-06), which became effective on September 25, 1997 for New York State Superfund Site No. 734057 ("1997 GM Consent Order"), requiring GM to conduct an Remedial Investigation/ Feasibility Study (RI/FS) for the GM – IFG Site and Deferred Media (as noted above, later defined as OU-1 and OU-2, respectively) and to implement some Interim Remedial Measures ("IRMs"). *See* Exhibit "K."

129.    Soil, sediment, surface water and biota samples were obtained for chemical analysis as part of the RI.

130.    Three significant Interim Remedial Measures (IRMs) were implemented by GM from 2002 to 2004 to prevent further migration of PCBs to Ley Creek from the Former GM IFG Plant facility that had been closed for almost nine years since 1993:

27

- Former Landfill IRM:  An industrial landfill at the Former GM IFG Plant that contains chromium- and PCB-contaminated material was capped to prevent contaminants from leaching into the groundwater.  In addition, hot spots associated with the landfill were excavated.

- Former Drainage Swale IRM:  This second action involved the removal of highly contaminated soil from a former discharge swale.  This swale was used in the 1950s and 1960s as a conduit for the discharge of liquid process waste to Ley Creek. The swale was subsequently filled in, but the contaminated soil remained until the performance of this action.  Over 26,000 tons of soils containing PCBs were removed from this area of the Former GM IFG Plant property.

- SPDES Treatment System IRM:  The third action involved the construction of a retention pond and associated water treatment system.  This pond collects all water that accumulates on the Former GM IFG Plant property in any of the storm sewers or abandoned process sewers.  The pond water is then sent through the treatment plant in order to meet permitted discharge limits, prior to discharge to Ley Creek.  The purpose of this response action was to stop the intermittent discharge of PCBs and other contaminants that occur during storm events.[7]

131.    Despite all of these remedial measures, and the fact that no operations at the Former GM IFG Plant have occurred in the 25 years since 1993 that could have added new PCB contamination to Ley Creek (as all outfalls are now treated through the OU-1 SPDES Treatment System), PCB-contaminated stormwater originating off site enters the Plant's stormwater system from off-site sources, which ends up being treated by the on-site SPDES Treatment System.

132.    In 2009, the GM Debtors filed for bankruptcy, and in 2010, the Trust Consent Decree was executed.  On March 31, 2011, title to the Former GM IFG Plant and the Ley Creek Dredgings Subsite, and administration of the remedial activities for the GM Debtors were officially taken over by the RACER Trust.

133.    RACER Trust completed the RI/FS for OU-2 summarized in an RI report dated March 2013 and approved by NYSDEC in April 2013.  The FS report (May 2013) and an FS report

---

[7]        Reports documenting these efforts can be accessed on the RACER Trust website at http://racertrust.org/Properties/Detail?Id=10100.

addendum (June 2014) were approved by NYSDEC concurrent with the issuance of the March 2015 ROD.  *See* Exhibit "G."

134.     These reports, intended to characterize the location of the Contamination for which the GM Debtors were responsible for, did not include the new Expanded OU-2 Site depicted on the maps in Exhibit "F" because these were ***not*** areas for which the GM Debtors were ever deemed responsible.

## THE RACER TRUST OCTOBER 27, 2015 CONSENT ORDER

135.     On October 27, 2015, RACER Trust, which is defined as a completely distinct legal entity from GM or any of the GM Debtors, entered into its first Consent Order with NYSDEC, Index No. R7-0853-15-06 for Site No. 734057 ("October 2015 RACER Trust Consent Order"), to perform the remaining Remedial Investigation/Feasibility Study ("RI/FS"), Remedial Design ("RD") and Remedial Action ("RA") in relation to the GM-IFG Subsite (OU-1) and a RD/RA for the OU-2, and which Consent Order was intended to complete the necessary Environmental Response.

136.     The October 2015 RACER Trust Consent Order was clearly intended to resolve RACER Trust's statutory and common law liability to the State, pursuant to 6 NYCRR §375-1.5(b)(5), providing that upon the Department's issuance of a Certificate of Completion as provided at 6 NYCRR § 375-1.9 and § 375-2.9 for work performed as required in the Order, RACER Trust "shall not be liable to the department upon any statutory or common law cause of action, except for one for natural resource damages, arising out of the presence of any contaminants in, on or emanating from the site that was the subject of such certificate."  6 NYCRR § 375-2.9(a).

137.     However, since implementing about fifty percent (50%) of the RD work required for OU-2, NYSDEC has required RACER Trust to perform more investigation work well beyond the

footprint of the land covered in the map attached as Exhibit "A" to the October 2015 RACER Trust Consent Order (*see* Exhibit "C"), which map was otherwise consistent with the map in the March 2015 ROD (*see* Exhibit "G") and all prior maps in earlier Consent Orders with the GM Debtors, which predate the GM bankruptcy, including but not limited to the 1997 GM RI/FS Consent Order (*see* Exhibit "K") and the Trust Consent Decree.  Compare the maps in Exhibit "F" with all of the maps in the prior orders and RODs in Exhibits "C," "D," "G" and "K".

138.    The October 2015 RACER Trust Consent Order acknowledges that RACER Trust is an independent trust created after the GM Debtors' 2009 bankruptcy to cleanup and reposition for redevelopment the GM Debtors' former manufacturing facilities, including the Former GM IFG Plant, and further acknowledges that the Trust was created pursuant to the 2010 Trust Consent Decree, to which the State of New York was a signatory pursuant to the Environmental Action budget limits in that Decree.

139.    NYSDEC should have been well aware of the approximately $31 million total budget earmarked for investigation and remediation of OU1 and OU2 of the GM IFG Subsite, which initial budget was been slightly adjusted down based on monies spent prior to the settlement date. *See* Exhibit "K."

140.    Nothing in this October 2015 RACER Trust Consent Order required RACER Trust to perform investigation or remediation outside the footprint of the defined OU-1 and OU-2 areas depicted in Exhibit "A" to the Consent Order.

141.    The Trust has made every reasonable effort to cooperate with the NYSDEC to address the Contamination in the Ley Creek Watershed.

142.    As noted throughout this Amended Complaint, however, NYSDEC has blamed GM for all of the Contamination recently found in areas outside of the responsibility of GM, whose local manufacturing operations ceased 25 years ago.

143.    As set forth above, the State originally moved a portion of the north branch of Ley Creek (*see* Exhibit "Q") in the mid 1950's to provide for the construction of the New York State Thruway and a new Townline Road bridge, and the County undertook subsequent dredging of Ley Creek and disposal of sediments from Ley Creek on several occasions in the 1970's and early 1980's, which resulted in Releases of PCBs and other Contaminants from numerous industrial defendants, and not just from GM.

144.    The Town of Salina operated two Landfills adjacent to Ley Creek, known as the Town of Salina Landfill and Mattydale Landfill or Dump, into which some of the defendants disposed of waste, and neither of which, upon information and belief, have been properly remediated.

## OWNER AND OPERATOR DEFENDANTS

### National Grid f/n/a Niagara Mohawk Corporation

145.    National Grid (formerly operating as "Niagara Mohawk") is a major landowner of property in the Ley Creek Watershed (*see* Exhibits "A" and "M"), and has also operated since approximately the 1920's a large electrical substation containing transformers immediately adjacent to the GM IFG Subsite known as either the Teall Avenue or 800 Factory Avenue Transformer or Substation facility, which, upon information and belief, has contributed PCB and other Contamination to Ley Creek ("National Grid Property").

146.    According to records obtained by USEPA from Monsanto Corporation (the "Monsanto Files"), National Grid purchased approximately 18,000 pounds of Therminol FR-1 Heat transfer Fluid (PCB Aroclor 1242) in 1970 alone.

31

147.    National Grid has had at least five spills on this National Grid Property searchable on

NYSDEC's website between 1995 and 2018 after GM ceased operations at the adjacent Former

GM IFG Plant:

     a.   1995 Spill #9503252 (100 gallons of transformer oil into soil);

     b.   2006 Spill # 0601915 (3 gallons of transformer oil into soil);

     c.   2014 Spill #1403464 (100 gallons of dieletric fluid onto soil which spill is not closed)

        (see photo below);



148.    2015 Spill #1503529 (20 pounds of hydraulic oil onto soil from vehicular failure) and 2018

Spill #1802404 (10 gallons of transformer oil) (see photo of National Grid's last 2018 Spill):



149.    Not only has RACER Trust recently cleaned up some of the adjacent National Grid Property (the three-acre wetland area), National Grid has been identified as a PRP for Lower Ley Creek.   National Grid is not paying its fair share of the costs associated with the Ley Creek Watershed environmental response, particularly given its recent and ongoing discharges. Many of the industrial facilities in the Ley Creek Watershed, including many of the Defendants' Properties, have on-Site large transformers, which are owned by either National Grid or the property owners.

### General Electric

150.    GE was the former owner and operator of the TR-1 plant at the Carrier manufacturing facility at 6304 Carrier Parkway, at which it manufactured turbines and engines from approximately 1940 to 1946, when it sold the site to Carrier, and upon information and belief also discharged PCBs and/or other contaminants into Sanders Creek, which directly discharges into Ley Creek. *See* Exhibits A and B at Map 2, Site E.

151.    GE Aerospace also owned and operated a facility 6417-6437 Deere Road, known as the General Electric - Former Court Street Plant #5, running along Sanders Creek to the north, and Ley Creek South Branch (formerly known as Headson's Creek) to the south (see Exhibits "B" and "N") which, upon information and belief, used PCBs and other Contaminants (notably chlorinated solvents) in the manufacture radar and sonar equipment for the U.S. Government from 1956 to 1991.

152.   According to the NYSDEC Superfund Database listing for this site, (https://www.dec.ny.gov/cfmx/extapps/derexternal/haz/details.cfm?pageid=3): "Spills of solvents from underground solvent storage tanks and an aboveground solvent dispensing pad resulted in the disposal of hazardous waste at the site."

153.    B&B Family Limited Partnership is now the owner of the Former Court Street Plant #5, which is listed as a Class 4 State Superfund site #734070 on the New York State Registry of Inactive Hazardous Waste Disposal Sites, where remedial systems are in place and site OM&M is required.

154.    Upon information and belief, Lockheed Martin has assumed GE's liability for both of these former GE aerospace division properties, and is therefore also a responsible party for any Contamination that has emanated into the Ley Creek Watershed from GE's former operation of the TR-1 plant at the Carrier manufacturing facility at 6304 Carrier Parkway, and from GE's former operations at Former Court Street Plant #5.

155.    GE operated a third facility on 5990 E. Molloy Road, Dewitt, New York 13211, known as the GE Apparatus Service or Syracuse East facility (EPA Registry ID## 110019187128 and 110011542697 and NYD010763290), adjacent to the North Branch of Ley Creek, which according to the EPA Enforcement and Compliance History Database confirmed this was a Commercial and Industrial Machinery and Equipment (except Automotive and Electronic) Repair and Maintenance facility, which upon information and belief used PCB oils during its repair operations.  The site is now an abandoned building, which still has GE's name on the door.

156.    According to an Electronic Data Research ("EDR") Report acquired by Plaintiffs, generated a variety of hazardous wastes at this facility.

157.    Upon information and belief, PCB Contamination found in the approximate location of the pre-1950's Ley Creek channel directly downgradient from this GE facility at least partially resulted from GE's Molloy facility repair operations and contamination near the North Branch of Ley Creek.

**Carrier Corporation/United Technologies**

158.     Carrier owned and / or operated a 175-acre manufacturing facility at 6304 Carrier Parkway

("Carrier Facility") from about 1947 to 2004 along the Sanders Creek, a tributary leading to Ley

Creek, and which is described on NYSDEC's website as the UTC - Carrier New York State

Superfund Site #734043 since United Technologies is listed NYSDEC as the "Current Owner."

*See* https://www.dec.ny.gov/cfmx/extapps/derexternal/haz/details.cfm?pageid=3.

159.     NYSDEC's database for this Superfund Site (https://www.dec.ny.gov/cfmx

/extapps/derexternal/haz/details.cfm?pageid=3) states that surface runoff is conveyed to Sanders

Creek through established outfalls in the facility's stormwater collection system or as direct, non-

point runoff. The database further states:

> Sanders Creek:  Investigations revealed PCBs throughout Sanders Creek and its
> floodplains above the Ecological SCO of 1 ppm at various depths.  In some areas
> concentrations of PCBs exceeded 50 ppm. A&R Building/Former Pond Area:  The
> Former Pond area had soil detections of SVOCs and PCBs at levels above
> Protection of Ecological Resources but below the SCO of Industrial Use.  The A&R
> building area had no soil detections above the Industrial Use SCO.  Former TR-1
> Building:  A soil sample at the soil-groundwater interface near Substation I was
> found to contain Total PCBs at a concentration of 26.4 mg/kg.  Debris Pile:  PCBs
> were found in concentrations greater than 50 ppm in the Debris Pile during the
> initial investigations.  On-Site SVI:  VOCs were detected in buildings TR-4, TR-6,
> TR-18, and TR-18s.  Other occupied building[s] are currently being investigated
> for VOCs.  Off-Site SVI:  There is no reason to believe there are any site related
> VOCs North and South of the site.  The potential for soil vapor intrusion to occur
> east of Kinne Street will be evaluated once the sub-slab and indoor air data has been
> evaluated at Building TR-20 and the potential for soil vapor intrusion to occur west
> of the site will be addressed under the landfill area, AOC G.  Landfill Area, AOC
> G:  Area is still under investigation. Early investigations revealed impacts from
> Metals, PCBs, SVOCs, and VOCs.  TR-3 / SWTP:  Findings indicated chlorinated
> VOCs, PCBs, and oil-related impacts to subsurface soils and groundwater in the
> area, including the area between the wall and Sanders Creek.  Surface water:  PCBs
> were detected in the TR-18 and Thompson Rd Storm Lines at concentrations up to
> 67.8 ppm.  PCBs were found in roof runoff in concentrations ranging from 2 ppm
> to 30,000 ppm.  Groundwater:  Investigations have revealed VOC and PCB impacts
> in groundwater at several various locations throughout the site.

160.     Despite these significant findings as a result of studies of impacted fish in Ley Creek, and studies of certain tributaries east of the GM IFG Plant Site,  NYSDEC apparently has not required any actual remediation of Sanders Creek to date, and has allowed only an industrial level remediation for the Carrier Facility, based on the following analysis and application of industrial cleanup levels:

> The site is in the middle of a secure 85 acre production facility.  There may be some residual groundwater contamination, however, all businesses and residences in the area are served by public water supplies.  The tank has been removed and the site completely paved over, limiting exposures to site contaminants.  Based upon the findings of the corrective measures study (CMS) there could be several areas where additional investigations, monitoring, or corrective measures must be completed.  The CMS will look at groundwater, storm sewer bedding, soil vapor/indoor air, and Sanders creek.

161.     The Former GM IFG Plant is also in an industrial area, yet its remediation of the OU-2 portion of Ley Creek is being held to an ecological cleanup standard, which is equivalent to a residential cleanup standard, downgradient from the continuing source of ongoing PCB Contamination at and emanating from the Carrier Facility into Sanders Creek, which then flows directly into the OU-2 portion of Ley Creek.

162.     As late as 1995, after GM ceased operations, Carrier was still discharging PCBs into Sanders Creek, which ultimately makes it way to Ley Creek as documented in a 1995 PCB Oil NYSDEC Spill Report #9505910.  In addition, industrial discharges pursuant to SPDES permit #NY000-1163 added both PCB and halogenated solvent Contamination to the Ley Creek Watershed.  *See* Ex. "N", Upper Ley Creek Map 2, Site E.

163.     According to hazardous waste manifest database records received from NYSDEC, during their ownership and operation of the Carrier Site, Carrier and/or UTC disposed of thousands of tons of hazardous waste containing PCBs, along with numerous other kinds of hazardous waste,

including solvents and metals.  The hazardous waste manifest database lists Carrier as the generator under No. NYD001317072 for the following PCB containing waste

- B001 PCB Oil from transformers – 1,225,194.3 kg/1,347.71 tons
- B002 PCB Oil >50 ppm - 102,365.27 kg/112.60 kg/ tons
- B003 PCB Oil >500 ppm – 38,736,19 kg/42.61 tons
- B004 PCB Contaminated Articles > 50 ppm < 500 ppm –14,188.27 kg/15.61 tons
- B005 PCB Article > 500 ppm – 6,506.00 kg/7.16 tons
- B006 PCB Transformers – 276,219.74 kg/ 303.84 tons
- B007 PCB contaminated soil, sludges etc. – 3,663,395.2 kg/1,359.73 tons

164.    United Technologies acquired Carrier in 1979, and was the owner of Carrier and an operator of the Carrier Facility at the time of Carrier's 1995 PCB spill and during discharges into Sanders Creek, and is named as a responsible party in NYSDEC's on-line Superfund Site listing for this spill. *See* Ex. "B" at Map 2, Site E.

165.    In addition, in 2006, Carrier, as a "wholly owned subsidiary of United Technologies Corporation," executed a RCRA Order on Consent Index Number: CO 7-20051118-4, also enforceable under the New York State Superfund Law, ECL Article 27 Title 13, requiring corrective action to remediate PCBs in Sanders Creek, among other measures, because PCBs were bypassing its waste treatment plant and entering Sanders Creek beyond Outfalls 10 and 11.

166.    In one of the most recent letters from NYSDEC in relation to the Carrier Facility requesting emerging contaminants sampling in September 2018, the letter was not even addressed to Carrier but rather only addressed to UTC, indicating UTC has taken over the day-to-day hazardous waste management issues at the facility.

167.    Interestingly, the Consent Order was signed after Carrier closed its doors in Syracuse, but this was many years after GM and RACER Trust implemented numerous remedial actions costing millions of the dollars downstream in this same watershed.

168.     Carrier for years later was allowed to add new Contamination to Sanders Creek and Ley Creek, thus recontaminating portions of Ley Creek previously remediated by GM and RACER Trust.

169.     Both Carrier as the owner and operator of the Carrier Facility, and UTC as the operator of the site, are liable under CERCLA to reimburse RACER for remedial costs because of their PCB releases into the Ley Creek Watershed.

### Carlyle Compressor/CCBC

170.     Carlyle, a subsidiary of Carrier, has been the owner and operator, along with UTC and Carrier, of a manufacturing facility ("Carlyle Facility") at 6500 New Venture Gear Drive (formerly 6500 Chrysler Drive) from 1960 to the present, during which time it manufactured air-conditioning and warm air heating equipment and commercial and industrial refrigeration equipment (according to the USEPA FINDS database under EPA #110019426691).  This facility is also located on a portion along Sanders Creek, which runs into Ley Creek.

171.     According to hazardous waste manifest database records received from NYSDEC, during ownership and operation of the Carlyle Site by UTC, Carrier and/or Carlyle, Carlyle disposed of hazardous waste containing PCBs, along with numerous other kinds of hazardous waste, including solvents and metals.  The hazardous waste manifest database lists Carlyle as the generator under No. NYD000688796 for the following PCB containing waste:

- B001 PCB Oil from transformers –21,608 kg /23.77  tons
- B002 PCB Oil >50 ppm - 625.5 kg/0.69 tons
- B003 PCB Oil >500 ppm – 445 kg/.49 tons
- B004 PCB Contaminated Articles > 50 ppm < 500 ppm – 134 kg/0.15 tons
- B005 PCB Article > 500 ppm – 45 kg/0.05 tons
- B006 PCB Transformers – 36,316 kg/39.95 tons
- B007 PCB contaminated soil, sludges etc. – 623.77 kg/0.69 tons

172.     The Carlyle Facility had a number of documented spills.

38

173.    One was in 1987, designated as Spill # 8703556, during which remediation of contaminated an "oily substance" soil under buried tanks was required.

174.    A PCB spill occurred on the Carlyle Facility in 1988, according to Spill Report #8804337 (https://www.dec.ny.gov/cfmx/extapps/derexternal/spills/details.cfm?pageid=2. *See* Exhibits "B" and "N," Upper Ley Creek Map 2, Sites 2 and E.

175.    According to the EDR database information on this facility, United Technologies and Carlyle are jointly named as a large quantity generator for a number of different types of hazardous waste for many years, and there was a Federal TSCA PCB inspection (198808223136 2) at the facility in 1988 by TSCA Inspector F. Frieherr, LP, likely after the PCB spill.

176.    The facility required vapor mitigation to address vapor contamination (Site No. 734068) because of groundwater contamination.

177.    CCBC is the current owner of the Carlyle Facility at 6500 New Venture Gear Drive located on Sanders Creek, on which Carlyle was present and during which ownership PCBs were discharged into Sanders Creek, and ultimately into Ley Creek (as documented by a 1988 PCB DEC Spill Report #8804337).

178.    CCBC is a responsible party by virtue of its current ownership status for any contamination on and migrating from the Carlyle Facility into the Ley Creek Watershed.

**Bristol-Myers**

179.    Bristol-Myers has owned and operated, from 1943 to the present, an original laboratory facility at 3551 Burnet Avenue, East Syracuse, New York 13057 and then purchased parcels and assembled a large manufacturing facility at 6000 Thompson Road, Dewitt, New York, along the Ley Creek South Branch (formerly known as Headson's Creek), a tributary leading to Ley Creek,

part of which was formerly the Fulton Iron & Steel Company, Inc. facility located at 3800 Burnet Avenue in the Village of East Syracuse. *See* Ex. B at Map 2, Site H.

180.    Collectively, the properties owned by Bristol-Myers in the Village of East Syracuse and Town of Dewitt, including but not limited to the Fulton Site, are referred to herein as "BMS Facilities."

181.    The South Branch of Ley Creek and Headson's Creek are both tributaries leading to Ley Creek, which directly transect and surround the BMS Facilities. *See* Exs. A and B at Map 2, Site H.

182.    Bristol-Myers has discharged storm and/or waste process water containing Contaminants, upon information and belief containing PCBs, into the South Branch of Ley Creek via SPDES Permit #NY0233251, and has continued to have spills as part of its ongoing industrial operations at its BMS Facilities, including but not limited to: a 1986 spill of diesel fuel (Spill #8604666) in groundwater; another petroleum spill in 1987 (Spill #8607721); a spill of an "unknown substance" from equipment failure (1988 Spill #8802080); and a 1988 spill of kerosene into groundwater (Spill #8802588); all of which are documented on NYSDEC's website (https://www.dec.ny.gov/cfmx/extapps/derexternal/spills/details.cfm).

183.    Based on Freedom of Information Law/Act ("FOIL") records received from NYSDEC and USEPA, Bristol-Myers purchased, used, and disposed of PCBs at their BMS Facilities.

184.    According to the Monsanto Files, BMS purchased 48,000 and 12,000 pounds of Therminol FR-1 (Heat Transfer Fluid) containing PCBs Aroclor 1242 in 1970 and 1971, respectively.

185.    Under Bristol-Myers' hazardous waste generator number NYD002230902, Bristol-Myers has disposed of the following PCB hazardous waste from its BMS Facilities:

- B002 PCB Oil >50 ppm - 19,049.51 kg/20.95 tons
- B004 PCB Contaminated Articles > 50 ppm < 500 ppm – 70 kg/.08 tons

- B005 PCB Article > 500 ppm – 45 kg/0.5 tons
- B006 PCB Transformers – 4,197 kg/4.62 tons
- B007 PCB contaminated soil, sludges etc. – 418,032.19 kg/450.84 tons

186.    Results of environmental sampling submitted to the NYSDEC have demonstrated past and present PCB Contamination of soil, groundwater and sediment at the BMS Facilities, and in the South Branch of Ley Creek and Headson's Creek adjacent to and downstream of the BMS Facilities.

187.    Bristol-Myers engaged in a remediation project under the Voluntary Cleanup Program (VCP Site #C734138) for the Fulton Site, which is still a part of the BMS Facilities, and which was, and still is contaminated by, among other things, PCBs, despite some remedial work performed on this site by Bristol-Myers.

188.    Documents provided by NYSDEC in response to a FOIL request indicate that this site's groundwater is still contaminated with PCBs.

189.    Bristol-Myers is liable for Contamination it has allowed to migrate beyond its property boundary into the various Ley Creek tributaries around its BMS Facilities, which records document PCBs up to at 25 parts per million remaining in some environmental media.

190.    Sediment sampling that, upon information and belief, was conducted by NYSDEC in the Couth Branch of Ley Creek and Headson's Creek near the BMS Facilities, identified Contamination, including PCBs.

191.    According to reports received from NYSDEC, both surface water and groundwater on the BMS Facilities flow toward and into the South Branch of Ley Creek and/or Headson's Creek.

192.    Upon information and belief, Bristol-Myers has conducted no remediation of PCB Contamination in the South Branch of Ley Creek and/or Headson's Creek.

193.    Upon information and belief, Bristol-Myers has instituted no engineering or other controls to prevent Contamination from migrating from the South Branch of Ley Creek and/or Headson's Creek near the BMS Facilities to the Expanded OU-2 Site.

194.    This PCB Contamination includes Aroclor 1254 and 1260, which upon information and belief, the Former GM IFG Plant is believed not to have used.

195.    Upon information and belief, Bristol-Myers has allowed Contamination to continue to migrate off of the BMS Facilities.

196.    BMS has also entered into other Consent Orders and a Brownfield Cleanup Agreement as a responsible party to conduct various remediation efforts on the BMS Facilities as a result of contamination by PCBs and other hazardous wastes.

197.    For example, Bristol-Myers executed Consent Order No. A7-0278-92-03 for State Superfund Site No. 734001 in relation to a 1.5-acre landfill on its 6000 Thompson Road facility, where the company burned and buried laboratory waste north of the Fulton Site.

198.    Bristol-Myers has also executed a Brownfield Cleanup Agreement Index No. C734138-09-11, for the Northern Campus Restoration Area, Brownfield Cleanup Program ("BCP") Site No. 734138, which represents a 23-acre contaminated portion of the main facility site, in which BMS is listed as a participant (responsible party), not a volunteer.  The documents provided by BMS to NYSDEC in connection with its BCP application identify PCBs as a contaminant of concern.  *See* https://www.dec.ny.gov/cfmx/extapps/derexternal/haz/details.cfm?pageid=3 .

199.    As a result of the above, Bristol-Myers is liable under CERCLA as the current or past owner of a facility, where hazardous substances were released, and under the Oil Spill Act because of the discharge of petroleum products into the watershed.

**Chrysler/Magna/New Process Gear/ONX1 LLC**

200.    The Chrysler Facility was owned and/or operated by Chrysler or a Chrysler subsidiary or an affiliated entity from 1959 until Chrysler's bankruptcy in 2010.

201.    During that time, the NYSDEC Spills Database shows 32 separate spills at the Facility.

202.    Further, according to the NYSDEC hazardous waste manifest database, roughly 100 tons of hazardous waste containing PCBs was generated from the Facility, along with numerous other kinds of hazardous waste.

203.    The Facility contained at least one outfall which discharged directly into Sanders Creek, a tributary of Ley Creek.

204.    In 2002, NYSDEC conducted a macroinvertebrate survey of Sanders Creek. The survey showed that PCBs, namely Aroclors 1254 and 1260, were present in crayfish taken from Sanders Creek.

205.    NYSDEC suspected that this Facility was a possible source of this PCB Contamination and required testing.

206.    A more detailed history of the corporate name changes, spills and releases, follows.

207.    Old Carco Liquidation Trust is a trust formed pursuant to a Liquidation Trust Agreement in the Chapter 11 bankruptcy of Old Carco LLC, (f/k/a Chrysler LLC), and is the successor-in-interest of Old Carco LLC, and is the trust to which claims can be made against Chrysler Corporation, which eventually became Chrysler LLC.

208.    Old Carco LLC (f/k/a Chrysler LLC) is a dissolved entity which operated the "Chrysler Facility" located at 6600 Chrysler Driver (later known as 6600 New Venture Gear Drive), East Syracuse, New York.

209.   Old Carco LLC is named in this Amended Complaint only as a "nominal defendant" pursuant to the April 23, 2010 decision of the United States Bankruptcy Court for the Southern District of New York, in order to pursue applicable insurance coverage that Old Carco LLC may have had in relation to its operation at the Chrysler Facility.

210.   In 1959, Chrysler Corporation began purchasing land, developing the property and operating at the Chrysler Facility.

211.   Chrysler Corporation later changed its name to Chrysler Motors Corporation.

212.   Chrysler Corporation transferred the Chrysler Facility on December 31, 1979 to New Process Gear Corporation ("NPGC") which owned the subject property until 1987.

213.   NPGC held title to and operated at the Chrysler Facility as a division of Chrysler Motors Corporation from 1979-1987, which then became more commonly known as the New Process Gear Facility.

214.   In 1987, Chrysler Motors Corporation, f/k/a New Process Gear Corporation, transferred the Chrysler Facility to Acustar, Inc. (a wholly owned subsidiary of Chrysler Motors Corporation).

215.   In 1990, Acustar, Inc. transferred the Chrysler Facility to New Venture Gear, Inc. ("NVGI"), which was a new joint venture between Chrysler Motors Corporation and General Motors Corporation (which was a 36% minority shareholder).

216.   On January 1, 1999, NVGI, which at some point became known as DCC 929, LLC, transferred the Chrysler Facility to New Venture Gear of New York, LLC.

217.   In 2002, after a merger with Daimler, the new Daimler Chrysler bought General Motors' entire 36% minority stake in NVGI.

218.   In 2004, New Venture Gear of New York, LLC transferred the Chrysler Facility to NVGI.

219.   Also in 2004, New Process Gear, Inc. ("NPGI") and Magna Powertrain USA, Inc. also operated at the site, which continued until about 2012.

220.   In 2004, Magna International Inc. purchased an 80% interest in some of the assets of NVGI from Daimler Chrysler, creating NPGI in which Daimler Chrysler retained the remaining 20% interest.

221.   In 2007, Magna International Inc. purchased the remaining 20% interest in NPGI from Daimler Chrysler.

222.   In 2009, NVGI's design and engineering services moved to Troy, Michigan.

223.   From 2004 to August 24, 2012, NPGI operated at the New Process Gear Facility.

224.   Between 2004 and 2012, Magna Powertrain USA, Inc. and NPGI, both wholly owned by Magna International Inc., operated at the New Process Gear facility under the following assumed names: New Process Gear; MPT Transfer Case Assembly; MPT X2T; MPT Geared & AWD Systems.

225.   NPGI was wholly owned and controlled by Magna International Inc., and lacked corporate autonomy.

226.   During operations at the Chrysler Facility from 1959 to 1979 and the New Process Gear Facility from 1979 to 2012, Chrysler Corporation (n/k/a Old Carco Liquidation Trust) Chrysler LLC (n/k/a Old Carco LLC), and other Chrysler entities, Magna, Magna International Inc. and both NPGC and NPGI, during their ownership or operations, discharged Contaminants into the tributary and ultimately into Ley Creek involved in the manufacture of automotive gear and gear housing, including but not limited to Petroleum and PCBs used in electrical services including transformers and substations, along with PCB hydraulic fluids.

45

227.    During this time period, the Chrysler Facility had numerous reported spills, including but not limited to: Spill ##8605940 (used oil to surface water unknown quantity); 9005379 (diesel truck spill); 9208676 (gasoline unknown quantity to soil); 9211399 (gasoline unknown quantity to soil); 9412146 (#2 fuel oil to soil); 9603160 (diesel unknown amount to soil); 9603347 (oakite 15 gallons to soil); 9606389 (mercury 3 pounds to soil); 9608003 (1200 gallons of lube oil to sewer); 9700843 (unidentified equipment failure spill); 9712032 (another unidentified spill); 9806403 (unidentified tank farm failure); 9807176 (tank overflow of unknown substance); 9810679 (equipment failure of unidentified substance), 9900368 (waste water and hydraulic oil spill); 9902636 (waste oil into sewer); 9906682 (1000 gallon waste oil spill); 9908428 (40 gallon spill to soil); 101108 (lube oil to soil); 102687 (20 gallons petroleum to sewer); 103886 (motor oil); 104015 (transmission fluid); 104684 (7 gallon floor cleaner); 211099 (used oil); 303470 (unknown 2 gallon spill to soil); 306290 (quenching oil to surface water); 308123 (unknown amount waste oil spill); 308506 (unknown amount waste oil spill); 404337 (unknown spill on dock); 409541 (5 gallon diesel spill); 610876 (unknown amount of cutting oil to soil); 908952 (gasoline on impervious surface); 1011638 (waste oil on impervious surface); 1305935 (15 gallon fuel dispenser pump diesel spill); and 1401116 (diesel tank spill).

228.    According to a hazardous waste manifest database received from NYSDEC, during the ownership and operation of the Chrysler Facility by the entities detailed above, numerous tons of hazardous waste containing PCBs, along with numerous other kinds of hazardous waste, including solvents and metals were disposed.  The hazardous waste manifest database lists NPGI as the generator under No. NYD002239994 of the following PCB containing waste:

- B001 PCB Oil from transformers – 19,581 kg/21.54 tons
- B002 PCB Oil >50 ppm - 8,206.77 kg/ 9.03 tons
- B003 PCB Oil >500 ppm – 4,587 kg/5.05 tons
- B004 PCB Contaminated Articles > 50 ppm < 500 ppm – 11 kg/.01 tons

- B005 PCB Article > 500 ppm – 10,293.18 kg/ 11 tons
- B006 PCB Transformers – 37,688.73 kg/41.46 tons
- B007 PCB contaminated soil, sludges etc. – 6,689.82 kg/7.36 tons

229.    In addition, Chrysler Corporation shipped hazardous waste under NY #D00239994 and

NJ#111074643.

230.    During Magna/NPGI's operation of the Chrysler Facility, the facility's outfall 001

discharged PCBs into Sanders Creek, a tributary of Ley Creek.

231.    Upon information and belief, this same outfall was also used by Chrysler Corporation

(n/k/a Old Carco Liquidation Trust) and Chrysler LLC (n/k/a Old Carco LLC), and other Chrysler

entities before Magna/NPGI's operations.

232.    On multiple occasions, Magna/NPGI violated their SPDES permit regarding discharges

from this outfall, including but not limited to instances involving discharge of PCBs.

233.    In 2008 and 2009, NYSDEC required Magna/NPGI to conduct a six-month high intensity

monitoring program for PCBs on the discharge from outfall 001.

234.    In February 2009, elevated levels of the PCB Aroclor 1260, a type of PCB product believed

not to have been used by the Former GM IFG Plant, were detected at the Magna/NPGI outfall 001,

which were then discharged into Sanders Creek, which flows directly into Ley Creek.

235.    During closure of a Magna/NPGI stormwater pond, undertaken during the relinquishment

of Magna/NPGI's SPDES permit, sampling showed several parameters exceed the 6 NYCRR Part

375 criteria for protection of groundwater.

236.    NYSDEC believed the stormwater pond was not lined, and that residual material in the

pond was a threat to groundwater.

237.    Sampling of the storm water pond showed exceedances of Total PCBs.

238.     Upon information and belief, Magna, Magna International Inc., NPGC and NPGI have not conducted any remediation of PCB Contamination they discharged into Sanders Creek and Ley Creek.

239.     ONX1 is the current owner of the Chrysler Facility at 6600 Chrysler Drive, also known as 6600 New Venture Gear Drive, which is located on Sanders Creek (which ultimately discharges into Ley Creek), where numerous spills took place, including PCB spills, and upon information and belief, the manufacture of automotive gear and gear housing occurred, and PCB materials were used in electrical services including transformers and substations, along with PCB hydraulic fluids.

240.     According to the EDR Report, ONX1 LLC experienced two spills on the property that impacted Sanders Creek and groundwater.

241.     The first spill (#1215916) on or about August 6, 2013, involved a "loss into Sander Creek, haz mat on scene" according to the spill report. The nature of the material spilled may have involved lube oil, cutting oil and/or petroleum, according to the report.

242.     The second spill was listed as a tank spill #1305696 on August 28, 2013, which required owner Robert Trafford to immediately call a spill contractor, engineers and demolition crews.

243.     The next day, on August 29, 2013, twelve underground storage tanks (Tanks 1-12) were all required to be removed.

244.     Contaminated groundwater then had to be pumped from the excavation over next few days and treated using the on-site industrial wastewater pretreatment plant.

245.     Contaminated pea stone backfill around tanks also had to be excavated and disposed of off-site, and then sidewall and bottom soil samples had to be secured.

246.     Contamination remained in the groundwater at the base of excavation, which is continuing to be pumped to the on-site waste water treatment plant for treatment and disposal.

247.    As a result of the above, the various owners and operators of the Chrysler Facility are liable under CERCLA as the current or past owner of a facility, where hazardous substances were released, and under the Oil Spill Act because of the discharge of petroleum products into the watershed.

**Solvents & Petroleum**

248.    S&P owns and operates a remediation and spill response company, and purchased the property at 1405 Brewerton Road ("S&P Facility") from Buckley Petroleum, Inc. who operated on the site beginning in about 1945, which upon information and belief caused spills of Contaminants into Ley Creek.

249.    According to the EDR Report, S&P is a Large Quantity Generator handler that generates 1,000 kg or more of hazardous waste during any calendar month; or generates more than 1 kg of acutely hazardous waste during any calendar month; or generates more than 100 kg of any residue or contaminated soil, waste or other debris resulting from the cleanup of a spill, into or on any land or water, of acutely hazardous waste during any calendar month; or generates 1 kg or less of acutely hazardous waste during any calendar month, and accumulates more than 1 kg of acutely hazardous waste at any time; or generates 100 kg or less of any residue or contaminated soil, waste or other debris resulting from the cleanup of a spill, into or on any land or water, of acutely hazardous waste during any calendar month, and accumulates more than 100 kg of that material at any time which commenced such operations in 1977.

250.    S&P is also a wholesale supplier of insecticides and other chemical and allied products under NY #D013277454 and NJ # S 120665322.

251.    The S&P Facility is both a Chemical Bulk Storage facility under CBS #7-000164 and a Petroleum Bulk Storage facility under PBS # 7-182451.

252.    The S&P Facility  was assigned a Corrective Action Prioritization code in relation to a site-wide remedial action.

253.    The S&P Facility had a spill (# 8807288) on December 5, 1988 in relation to a tank overfill.

254.    The correction action report indicates that there was migration of contaminated groundwater from the facility, which was eventually brought "under control."

255.    Based on this facility's day-to-day operations handling hazardous waste, which has impacted subsurface groundwater on the S&P Facility that has migrated from the site, likely into Ley Creek, S&P is a responsible party under CERCLA for contributing Contamination into Ley Creek.

**Thompson Corners/Metalico /Aleris**
**Former Roth Brothers Smelting Plants 1 and 2**

256.    Beginning in 1949, the Roth Brothers began operations in Plant No. 1 on Thompson Road, reclaiming non-ferrous metals and alloys through secondary smelting and refining of purchased scrap, drosses, and by-products.

257.    Roth Brothers Smelting Plant No. 2 was constructed between 1952 and 1957.

258.    Historically, facility operations by the Roth Brothers consisted of aluminum and zinc smelting, lead-tin solder operations, and copper insulation incineration. Aluminum and zinc operations were primarily conducted in Plant No. 1, although an aluminum crusher was located in Plant No.2.

259.    In 1991, lead and copper processing operations, which were conducted in Plant No. 2, ceased and the company added an aluminum smelting capacity of 25,000 tons per year by closing and remodeling the lead-tin solder operations.

260.    Thompson Corners, LLC purchased four parcels ("Thompson Properties"), which included the former Roth Brothers Smelting Plant 1 and 2 sites, from Wabash Aluminum Alloys, LLC on or about April 7, 2005.

261.    Therefore, Thompson Corners was the owner of the two former Roth Brothers Smelting plants (RCRA Site #734064) located at 6223 and 6625 Thompson Road, which is along the South Branch of Ley Creek, on which Releases of PCBs occurred, and which Releases were subject to a 1994 NYSDEC Consent Order #C7-0001-94-10 with Roth Brothers (whose successor is Aleris), which was not fully complied with.

262.    A second Consent Order was issued on September 15, 2010, Consent Order #R7-20070627-35, that also included Metalico New York as a respondent, and which upon information and belief has not been fully complied with.  *See* Ex. A at Map 2, Site F.

263.    Thompson Corners then subdivided the Thompson Properties, and sold the lots separately.

264.    In 2006, Thompson Corners sold 6225 Thompson Road (former Roth Plant 2 on Parcel 2 with a former address of 6223 Thompson Road) to Metalico Syracuse Realty Inc.

265.    In 2013, Thompson Corners sold 6223 Thompson Road (former Roth Plant 1 on Lot 1) to Hauler's Facility LLC, doing business as Syracuse Haulers Waste Removal, Inc. *See* https://wastebits.com/locator/location/syracuse-haulers-waste-removal-inc.

266.    In 2011, Thompson Corners sold 6215 Thompson Road (Lot 2) and a right-of-way leading to Ley Creek to Thompson Lawn, LLC, which in turn in 2016 transferred this land to McDewitt, LLC, both upon information and belief related entities to Thompson Corners.

267.    Thompson Lawn, LLC still owns the right-of-way parcel.

268.    Moreover, CNY Sandtrap LLC, bought a lot which was part of the Oberdorfer Site. This lot was just recently sold in January 2019 to Hauler's Facility, LLC.

269.    Behind Horton LLC bought 6229 Thompson Road (Lot 2B, see Exhibit C, Map 10872) and then also sold this property on the same day in January 2019 to Hauler's Facility, LLC.

270.    Finally, Thompson Corners, LLC sold a .93-acre part of the U.S. Hoffman Machinery site to 6181 Thompson Road LLC.

271.    Upon information and belief, 6181 Thompson Road, LLC, Thompson Corners LLC, CNY Sandtrap, LLC and Thompson NW, LLC (together "Thompson Entities") are related because the same individual, Donald J. Brang, signed an easement on behalf of all of these entities that was recorded in the Onondaga County Clerk's Office at Liber 5371 of Deeds, page 133.

272.    These Thompson Entities are responsible parties by virtue of their property ownership, for any Contamination on and migrating from the Thompson Corners Properties, including the former Roth Brothers Plants, into the Ley Creek Watershed.

273.    Metalico Realty is the owner of one of two former Roth Brothers plants located at 6225 Thompson Road ("Metalico Facility"), on which Metalico New York operates a scrap metal recycling and smelting business, which is along the South Branch of Ley Creek, into which PCB Releases from the operations occurred.

274.    These Releases were subject to a 1994 NYSDEC Consent Order #C7-0001-94-10 with Roth Brothers (whose successor is Aleris), and/or a September 15, 2010 Consent Order #R7-20070627-35 that also included Thompson Corners as a respondent, which Orders upon information and belief have not been fully complied with.  *See* Ex. B at Map 2, Site F.

275.    Metalico New York operates a secondary smelting and aluminum alloying operation at the Metalico Facility, and is a Petroleum Bulk Storage facility under ID #7-437999, which uses a variety of petroleum products in its processing operations, and stores in multiple on-Site storage tanks a variety of petroleum products including waste oil and used oil.

276.     According to the EDR Report, the Metalico Facility has been put on the "EPA Watch List" under Facility #NYD006977086, and the report further notes that migration of groundwater from the facility has occurred.

277.     Therefore, Metalico New York and Metalico Realty are responsible, as owners and operators, for Releases from the Metalico Facility into the South Branch of Ley Creek, which eventually drains into Ley Creek, and which has not been remediated in accordance with the two Consent Orders.

278.     Aleris purchased Wabash Aluminum Alloys in 2007, which bought the former Roth Brothers Plants from Phillips Metals in 1999, which merged with Roth Brothers in 1997.

279.     Aleris is the successor to Roth Brothers Smelting's liability.

280.     Aleris is therefore also responsible for the remediation of the PCBs released by Roth Brothers into the South Branch of Ley Creek.

<strong>Cooper Crouse-Hinds</strong>

281.     Crouse-Hinds has historically owned and operated two landfills in and around the Lower Ley Creek area right at the corner of the creek where significant levels of PCB Contaminants have been found on the banks of the creek, which was used to dispose of wastes from its manufacturing facility, including PCBs above 50 ppm, paint and plastic wastes and waste generated from the facility's wastewater treatment plant.

282.     In addition, according to the Monsanto Files, Crouse-Hinds purchased 14,400 pounds of Interteen PPO (PCB Aroclor 1260) for its Transformer/Capacitor in 1970.

283.     As noted above, GM is not known to have used products containing PCB Aroclor 1260, and therefore, cannot be responsible for this type of PCB Contamination, which has been documented to be present in the Ley Creek Watershed.

284.    Upon information and belief, this Contamination in and around Ley Creek was dredged and redeposited east of this facility.  *See* Exhibits "B" and "N."

**Gardner Denver/Lamson Corporation/Syracuse LePage LLC - 1 Lamson Street**

285.    Lamson Corporation (also formerly known as Lamson Company), owned and operated a manufacturing facility ("Lamson Facility") along the South Branch of Ley Creek  and Teall Brook at 1 Lamson Street from about 1921 to 2000, where, upon information and belief, manufacturing and design centrifugal blowers and exhausters that used PCB materials in hydraulic fluids, heat transfer fluids, and lubricants occurred, which upon information and belief that drained into Ley Creek.

286.    Upon information and belief, Gardner Denver became the successor to Lamson Corporation in or about 1996, and continued operations thereafter.

287.    Upon information and belief, Gardner Denver (through its division Hoffman Air Filtration Systems) is still the operator of the Lamson Facility, according to the EDR Report, and still manufactures and designs centrifugal blowers and exhausters.

288.    On or about August 15, 1986, a spill of an unknown quantity of #4 fuel oil into groundwater at the Lamson Facility was reported to NYSDEC and assigned Spill # 8603776.  This spill took over nine months to close suggesting remediation work was required.  Upon information and belief, this spill affected groundwater that flows to the South Branch of Ley Creek.

289.    Lamson Corporation had another spill #9107363 on October 10, 1991, when a water-miscible cutting and grinding fluid was spilled, and the company was required to sample under USEPA methods 8020, 8240, 8270, 413.3, DOH 310-13, TCLP Metals and for PCBs.

290.    This spill required an extensive soil sampling program to define the extent of the Contamination which occurred from late 1991 to September 1995, and which defined the

substance spilled as a synthetic lubricant caused by a machinery failure.  The fluid allegedly escaped from the building under the door and the spills was not cleaned up and closed until March 1996.

291.    Since these spills were not remediated rapidly, the Contamination likely migrated into the soil and groundwater and off-site into the Ley Creek Watershed.

292.    Syracuse Lepage LLC is the current owner of the former Lamson Site, which now has the address of 1 Lepage Place.

293.    This site may still be contributing contamination to the Ley Creek Watershed since there are no known records revealing any remediation on or off this property.

294.    Therefore, Gardner Denver and Syracuse LePage LLC are responsible parties by virtue of Contamination on and which has or is migrating from the Lamson Facility into the Ley Creek Watershed.

**Gardner Denver/U.S. Hoffman/6181 Thompson Road LLC – 6181 Thompson Road**

295.    Gardner Denver also acquired 6181 Thompson Road in 2001, a portion of the former U.S. Hoffman Machinery Corporation site, and then sold it to 6181 Thompson Road LLC in 2003, and became a tenant of this new owner.

296.    6181 Thompson Road, LLC is the current owner of 6181 Thompson Road, which drains into the South Branch of Ley Creek (formerly known as Headson's Creek), and upon information and belief, was previously also used as the United States Hoffman Machinery foundry and specialized in manufacture of garment press and laundry equipment activities using hydraulic equipment, which, upon information and belief, contained PCB oils.

297.    Donald Brang, owner of Brang Real Estate, LLC, is actively marketing this property for sale.  *See* http://brangco.com/property/6181-thompson-rd-syracuse-ny-13206/ .

298.    According to Sanborn maps, U.S. Hoffman Machinery using various names, has been present at this site since at least 1950, but its predecessor T.D. Palmer commenced operations in 1908.

299.    Upon information and belief, Gardner Denver's Hoffman Air & Filtration Systems Division continues to make compressors, vacuum & blowers, liquid ring pumps, petroleum pumps, loading arms, couplers, water jetting, and equipment at 6181 Thompson Road.

300.    Hoffman Air & Filtration Systems also still operates as a large quantity generator of hazardous waste at the site under EPA ID #NYD002246668.

301.    Therefore, Gardner Denver and 6181 Thomson Road, LLC are responsible parties by virtue of Contamination on and which has or is migrating from 6181 Thompson Road into the Ley Creek Watershed.

**Gardner Denver /Oberdorfer Foundries – 6259 Thompson Road**

302.    Oberdorfer Foundries Inc. commenced operations at 6259 Thompson Road ("Oberdorfer Site") in 1919.

303.    Northern Industrial Holdings, LLC is the current owner of 6259 Thompson Road.  This site was historically occupied by Oberdorfer Foundries Inc. (a/k/a Oberdorfer, LLC), and has continued operations at the Site since 2013.

304.    Upon information and belief, Gardener Denver, Inc., acquired Oberdorfer Foundries Inc. (a/k/a Oberdorfer, LLC), and operated Gardner Denver Oberdorfer Pumps, Inc. at the Oberdorfer Site for many years.

305.    According to the EDR Report, the Oberdorfer Site has an industrial landfill on site with known leachate discharges to surface water.

56

306.    The Oberdorfer Site also has or previously had petroleum underground and above ground storage tanks.

307.    A number of spills have occurred on this site including but not limited to a spill that occurred on October 21, 1993 identified as NYSDEC Spill # 9308786.

308.    On October 15, 2003, NYSDEC Spill # 0302932 resulted from a ruptured hydraulic line on a truck.

309.    A spill was identified on February 2, 2017, apparently associated with a transformer pole.

310.    The spill was allegedly discovered when a Phase II investigation was conducted by a potential purchaser, which apparently did not report the spill.

311.    Excavation of Contamination was required by the NYSDEC during ownership of the Oberdorfer Site by Northern Industries Holdings, LLC.

312.    Therefore, Gardner Denver and Northern Industrial Holdings, LLC are responsible parties by virtue of Contamination on and which has or is migrating from 6259 Thompson Road into the Ley Creek Watershed.

**Super Heat Treating / Jagar - 3605½  James Street**

313.    Super Heat Treating, Inc. owned and operated a site located at 3605½ James Street ("Super Heat Site") from 1953 until approximately 1998 when it was dissolved (45 years), which property was owned by Arthur and Seymour Roth (a/k/a the Roth Brothers).

314.    Jagar is the current owner of this property, which it apparently purchased from Onondaga County at a tax sale in 2005.

315.    NYSDEC Spill Records dated 1993 and 1994 for the Super Heat Site reveal a waste oil, used oil deliberate spill and abandoned drums on the site.

316.     According to the EDR Report, NYSDEC appears to have inspected the vacant building after Super Heat Treating, Inc. left the facility and observed "oil staining" "vacant building 55 gal containers spilled on outside of bldg. also inside there are haz. mat. spills black oily substance. side entrance is opened."

317.     Super Heat Treating, Inc. operated from at least 1980 as a large quantity generator generating D003 hazardous waste.

318.     In addition, this company was a large quantity generator for F010 hazardous waste, which includes quenching bath residues from oil baths from metal heat treating operations where cyanides are used in the process, and F012 quenching waste water treatment sludges from metal heat treating operations where cyanides are used in the process.

319.     Jagar, as the current owner, is therefore a responsible party for any hazardous waste or has on or is emanating from Super Heat Site, as well as any petroleum currently being discharged.

**Syracuse China**

320.     Syracuse China owned and/or operated a facility ("Syracuse China Facility") at 2801-2900 Court Street from about 1922 to 2009, where it manufactured china products and used PCBs in hydraulic fluid.

321.     According to the EDR Report, a 13-acre landfill is present at the Syracuse China Facility site, which borders the Ley Creek Dredging Site to the north and the National Grid site to the east.

322.     Wastewater treatment lagoons previously contained toxic levels of lead contamination and surface water sampling revealed the presence of lead and trace concentrations of VOCs.

323.     These lagoons were used as settling ponds for part of Syracuse China's wastewater treatment process.

324.   In addition, similar levels of lead contamination were found in several areas outside of these lagoons.

325.   The Syracuse China Facility was been used as a landfill since 1940, including use by the City of Syracuse, the Town of Salina, and the Town of Dewitt to dump wastes that were cleaned out of storm sewers, which were known to contain PCBs.

326.   A Remedial Investigation/Feasibility Study ("RI/FS") was completed on March 21, 1995, to delineate areas of concern and determine the extent of groundwater Contamination, but landfill closure did not began until May 2000 and the Remedial Action activities were not completed until 2003, when much of the materials was consolidated back onto ten acres under a landfill cap.

327.   While the landfill cap is required to be monitored, this remedy was deemed acceptable adjacent to Ley Creek Dredging Site on which GM was held to a much higher cleanup standard.

328.   At the  Ley Creek Dredging Site, NYSDEC concluded that because "people are not likely to contact contaminated soils", "measures are in place to prevent contact with the underlying contamination" and "people are not drinking the contaminated groundwater because the area is served by a public water supply that obtains its water from a different source" that a landfill consolidation remedy was acceptable.

329.   Even though the groundwater flows north toward the immediately adjacent Ley Creek Dredging Site, Ley Creek and the Expanded OU-2 Area immediately north of that, NYSDEC has imposed ecological cleanup standards for these other areas as opposed to the industrial cleanup standards it applied to the Syracuse China landfill.

330.   Plaintiffs, upon information and belief, has remediated and continues to monitor contamination that may have migrated from this landfill into Ley Creek.

331.    During operation of the Syracuse China Facility, its property was used as a municipal landfill for storm sewer waste, and a drainage ditch and landfill pond, and, upon information and belief, was used to dispose of wastes containing PCBs, lead, and VOCs that drained into Ley Creek.

332.    Upon information and belief, the dredging described above resulted in the deposition of dredge spoils upgradient along creek banks, including but not limited to the OU-2 Area.

333.    The Syracuse China Facility, known as the Syracuse China Superfund Site #734053, is listed as a Class 4 site on the NYS Registry of Inactive Hazardous Waste Disposal Sites since it was closed, but where site OM&M is required.

334.    Amparit Industries is the owner of the Syracuse China Facility.

335.    Therefore, both Syracuse China and Amparit Industries are responsible for the Contamination from the Syracuse China Facility, where PCBs and other environmental contaminants were historically used in manufacturing and disposed on-site, which upon information and belief, has contributed, and/or continues to contribute, PCBs and other Contaminants into Ley Creek.

**John Deere/ Syracuse Deere Road – 6401 Deere Road**

336.    Deere purchased Syracuse Chilled Plow Company, and directly or through Syracuse Chilled Plow Company has owned and operated a manufacturing facility at 6401 Deere Road, which is along the Ley Creek South Branch and Sanders Creek, from about 1876 to the present and has distributed parts including  plow/tractor blades at the facility using, upon information and belief, which contain PCB-containing hydraulic fluids.  *See* Exhibit "B."

337.    Syracuse Deere Road is the current owner for the former Deere facility.

338.    According to the EDR Report, the operator of John Deere Parts Distribution Center at this site (EPA ID #NYR000121574) is small quantity generator of D001 ignitable wastes and D002 corrosive hazardous waste used to clean parts.  The operator is listed as John Deere Co.

339.    The EDR Report indicates the facility started generating these type of waste beginning in 1955, before most environmental laws, and when many companies simply disposed of such waste material on-site.

340.    Based on the number of years of operation at this site and the long number of years hazardous substances have been used to clean parts, upon information and belief, Deere and Syracuse Deere Road are responsible for Hazardous Substances on or emanating from this site.

### Western Electric/Nokia

341.    Western Electric owned and operated a Distribution Housing facility at 6360 Thompson Road ("Thompson Road Facility") from about 1952 until 1983, located across Thompson Road from South Branch of Ley Creek, where it repaired and reconditioned equipment and used PCB materials in hydraulic fluids for machinery reconditioning purposes.

342.    The EDR Report revealed between the years 1982-1984 Western Electric disposed of 25,473 pounds of PCB waste from its Thompson Road Facility in East Syracuse as well as other types of hazardous waste including halogenated solvents and heavy metals.  Western Electric was listed as a large quantity generator of hazardous waste in USEPA's records.

343.    Western Electric operated for over 30 years as a distributing house that included warehouse and large-scale repair operations for a broad variety of equipment used by the Bell Telephone system.

344.    Upon information and belief, the direction of groundwater flow under this site is in the direction of the South Branch of Ley Creek.  Therefore, any PCBs or other contaminants released likely migrated into the Ley Creek Watershed.

345.    Western Electric transferred the Thompson Road Facility on December 31, 1983 to NYNEX Corporation, and as of approximately January 1, 1984, a newly formed company, AT&T Technologies, Inc., assumed the corporate charter of Western Electric.

346.    In 1995, AT&T Technologies, Inc. changed its name to Lucent Technologies, which was spun-off as an independent company in 1996. Lucent merged with Alcatel SA of France on December 1, 2006, forming Alcatel-Lucent, which was acquired by Nokia of America Corporation ("Nokia") in 2016.

347.    Upon information and belief, Nokia has assumed all liability for all of these prior owners and operators of the Thompson Road Facility.

348.    Since cable repair operations typically used PCB oils, and the EDR Report and other documents confirmed that, at least between 1982 and 1984, PCBs were used, generated and disposed of in relation to the Thompson Road Property, Nokia is liable for the off-site migration of PCBs or other types of Contamination from the Thompson Road Site.

349.    Telesector Resources has been the owner of the Thompson Road Facility since December 31, 1984, at which time its actual name was NYNEX Service Company.

350.    NYNEX Service Company filed a correction deed on January 13, 1995 indicating that Telesector was the official owner since the acquisition by Western Electric.

351.    Telesector Resources owned the Thompson Road Property and NYNEX operations were performed on the Site for many years until Verizon took over NYNEX operations; Telesector

currently operates under the name Verizon Services Group, which upon information and belief still conducts cable repair operations at the Thompson Road Facility.

352.    Since Telesector was the owner of the Thompson Road Property as of the last day of 1983, it was therefore the owner and operator of the Thompson Road Property when PCB disposal occurred until 1984, according to the EDR Report and associated filings.

353.    According to the EDR Report, Telesector was also the owner and operator of the Thompson Road Facility when several petroleum spills occurred.

354.    According to the EDR Report, one spill occurred in 1987, when NYNEX had a leaking petroleum underground storage tank and had to perform a subsurface spill remediation associated with NYSDEC Spill #189656.  Therefore, upon information and belief, this spill leached into subsurface groundwater and likely migrated off-site into the Ley Creek Watershed.

355.    Another spill occurred in 1999, when a truck broke a hose, resulting in the spill of an unknown type of oil per NYSDEC Spill # 9903406.

356.    There were eight petroleum storage tanks at the facility as of 2010, according to the New York State Petroleum Bulk Storage records, and six as of 2018.

357.    Upon information and belief, any of these tanks may have leaked during Telesector's ownership and operation of this Facility.

358.    On December 20, 2012, Verizon received a Notice of Violation ("NOV") from NYSDEC for failure to maintain spill prevention equipment and lack of labeling.  Additional NOVs were issue on June 17, 2015 and June 5, 2018.

359.    According to the EDR Report, other hazardous wastes, including halogenated solvents and mercury were also used, generated, and disposed of from the Thompson Road Facility by NYNEX and Verizon during Telesector's ownership of the Thompson Road Facility.

360.    The EDR report lists the Facility on the federal MANIFEST database for hazardous waste shipments (disposal) of benzene (D018), non-listed ignitable wastes (D001), non-listed corrosive wastes (D002), and 52 pounds of solid waste (no waste code), all of which could have been released during Telesector's 36-year ownership and operation of the Facility.

361.    Based on a 1991 NIOSH health and safety investigation when NYNEX operations were being conducted at the facility (https://www.cdc.gov/niosh/hhe/reports/pdfs/1991-0022-2118.pdf):

- This plant, formerly part of Western Electric, has been in operation since 1953.  The current workforce of approximately 100 is involved in telephone cable de-reeling, cable cutting, and end-capping.  Over 85% of the facility is now devoted to warehousing.

- Plastic end caps are used to protect the cut ends of telephone cable from moisture and physical damage.  From 1953 to approximately 1982, Western Electric (NYNEX) employees tapped end caps onto the cables.  Beginning in 1982-83, NYNEX employees began using heat-shrinkable end caps for the capping operation.

- A 1990 NYNEX report containing the results of air sampling conducted by the Telesector Resources Group on the materials used in the de-reeling and end capping operation was received by NIOSH on January 3, 1991.  This report detailed area air sampling results for a variety of organic vapors, including total hydrocarbons, cyclohexanone, ethyl acetate and ethyl acrylate.  Air samples were also collected for metals such as nickel, lead, copper, iron, and aluminum.  …All of the measurements, with the exception of TDI, were either non-detectable or below their respective occupational exposure limits.  Toluene diisocyanate was detected in two of nineteen short-term (15 minute) air samples.  The highest of these two samples measured TDI at approximately 0.1 parts per million (ppm), a level which exceeds the Occupational Safety and Health.

362.    A 2011 Phase I Report prepared by ATC Associates, Inc. for Verizon, when it was interested in selling the Facility, included only one recognized environmental condition ("REC") – poles that were on the surface of the ground for an extended period of time, which could have leach petroleum hydrocarbons into the subsurface of the Facility soils and groundwater.

363.    However, this Phase I Report was highly deficient as it did not even mention any of the Western Electric historical on-site uses, and the Western Electric facility history was not present

in the EDR Report attached to this Phase I, even though all of Thompson Road was included in the search.  If the same Western Electric history that was present in the EDR Report which Plaintiffs recently obtained, this would have revealed the PCB disposal history in relation to the Facility.

364.    The report also fails to list certain conditions as RECs, which normally would be listed as RECs, including seven nearby pole-mounted transformers, as well as four drains to an underground oil/water separator located south of the building, which in turn allegedly discharges to the Dewitt sanitary sewer.

365.    The Thompson Road Facility oil/water separator was only first installed pursuant to Permit No. 12349 on September 4, 1997, and according to Section 6.11 in the report, oil and water is first discharged into the drains and then pumped into the oil water separator.  There is no explanation as to how the oil is managed.

366.    Discharges from the Facility may have been made directly to the subsurface prior to this date or are still occurring in relation to this system since oil and water are discharging into subsurface drains.

367.    The discharge system, or lack thereof, at the Facility before 1997 and after the oil water separator was installed, is likely the source for off-site contamination migration into the Ley Creek Watershed.

368.    ATC observed incidental staining associated with vehicle maintenance, on the concrete floor throughout the vehicle maintenance area, and two hydraulic lifts (which are listed under the heading of "PCBs"), as well as staining around drums and equipment throughout the Facility building.

369.    Therefore, Western Electric, Nokia and Telesector, as owners and operators of the Thompson Road Site, are liable under CERCLA for Releases from that site into the Ley Creek Watershed.

**Honeywell/Electric Auto/Eltra/Prestolite**

370.    Electric Auto-Lite Company and Eltra Corporation were historic operators at 219 Lamson Street (now known as 2100, 2101, 2103 Coughlin Avenue and 219 Lamson Street) ("Prestolite Site"), where the company manufactured spark plugs and automotive electronics equipment from approximately 1953 until 1986.

371.    Upon information and belief, since drums of PCB oil were left abandoned on the site, this facility used PCBs in this manufacturing process.

372.    Upon information and belief, Electric Auto-Lite was acquired by Bendix Commercial Vehicle Systems LLC in 1973, which was acquired by Allied Signal Inc., which then merged into Honeywell International Inc.

373.    Upon information and belief, Eltra Corporation was also acquired by Allied Signal Inc., which merged into Honeywell International Inc.

374.    The property was operated as the Prestolite Motor and Ignition Division of Allied Corporation a wholly-owned subsidiary of Allied-Signal, Inc., pursuant to a January 16, 1986 Purchase Agreement. Prestolite was formerly a division of Bunker Ramo-Eltra Corporation,  a subsidiary of Allied Corporation, and merged with and into Allied on January 16, 1986.

375.    Upon information and belief, Allied-Signal, Inc. retained environmental liability under the January 16, 1986 Purchase & Sale Agreement with Prestolite Electric Incorporated.

376.    Therefore, Honeywell is the successor responsible party for operations at the Prestolite Site.

377.    On April 18, 1986, Prestolite Electric Incorporated purchased the Prestolite Site.

378.    On or about August 11, 1988, abandoned drums containing PCBs were reported at the Prestolite Site (NYSDEC Spill # 8804207).

379.    Upon information and belief, the likely long-term use of PCBs from 1953 to the 1988, resulted in the contamination of the Prestolite Site with PCBs.

380.    Upon information and belief, Contamination at the Prestolite Site was never properly investigated or remediated.

381.    The Prestolite Facility, which upon information and belief, used and disposed of PCBs and other environmental contaminants, drains into Teall Brook and the South Branch of Ley Creek (formerly Headson's Creek), which flows into the OU-2 portion of Ley Creek.

382.    As noted in the January 16, 1986 Purchase & Sale Agreement with Prestolite Electric Incorporated, Allied-Signal, Inc., the Seller, specifically retained liability to "carry out a cleanup of the old wastewater treatment plant…formerly used to treat wastewater from the plating operations."

383.    Prestolite Electric Incorporated ("Old Prestolite"), whose parent company was PMI Holding Corporation, filed bankruptcy in February 15, 1990.  A Bankruptcy Order for Prestolite Electric Incorporated was entered September 20, 1991.

384.    However, the Prestolite Site had previously been transferred in 1986 to The National Council for Community Development, Inc. and has since been subdivided.

385.    The Syracuse Industrial Development Agency and 800 Nottingham Road Corporation are the current owners.

386.    In addition, based on a 1963 deed conveying Electric Auto-Lite's interest to Eltra for the current Prestolite Site, United States Hoffman Machinery Corporation also appears to have

operated on this site as far back as 1922, and based on the time period and type of manufacturing operations performed likely contributed PCB waste that drained into Teall Brook and then into the South Branch of Ley Creek.

387.    The presence of Hoffman on this site is also confirmed by Sanborn maps.  Therefore, Hoffman also operated the Prestolite Site.

388.    Hoffman used the following spent non-halogenated solvents: xylene, acetone, ethyl acetate, ethyl benzene, ethyl ether, methyl isobutyl ketone, n-butyl alcohol, cyclohexanone, and methanol; all spent solvent mixtures/blends containing, before use, only the above spent non-halogenated solvents; and all spent solvent mixtures/blends containing, before use, one or more of the above non-halogenated solvents, and, a total of ten percent or more (by volume) of one or more of those solvents listed as F001, F002, F004, and F005 hazardous wastes, and still bottoms from the recovery of these spent solvents and spent solvent mixtures.

389.    Accordingly, Honeywell, Old Prestolite and Honeywell as owners and operators of the Prestolite Site, are liable under CERCLA for Releases from that site into the Ley Creek Watershed.

**Lennox Industries/Northeast Management Services, Inc./North Midler Properties LLC**

390.    Lennox Industries operated a furnace manufacturing facility at 400 N. Midler Avenue ("Lennox Property") located on Ley Creek South Branch from about 1947 to 1967, where upon information and belief it used PCBs and/or other Contaminants during the manufacturing process.

391.    Northeast Management Services, Inc. is or was the last entity to own the Lennox Property in its entirety at 400 North Midler Avenue, Syracuse, New York 13206, and as such is a CERCLA potentially responsible party.

392.    North Midler Properties LLC is the current owner of most of the lots at the 400 North Midler Avenue, Syracuse, New York 13206 Lennox Industrial Park, and as such is a CERCLA potentially responsible party.

393.    Sanborn maps of the former Lennox Property at 400 N. Midler Avenue, which reveal the historic presence of a large industrial steel fabricating complex with very large tanks, including:

- 1,000 Gallons of Gasoline
- 1,080 Gallons of Diesel
- 16,000 Gallons of Fuel
- 17,500 Gallons of Fuel
- 20,000 Gallons of Fuel

394.    Moreover, the facility buildings appear to still be present, and an NYSDEC FOIL for the facility revealed no tank closure records demonstrating the proper closure of these large tanks.

395.    In addition, there is a water pipe located along the northern boundary of the Lennox Site leading off-site in the direction of Teall Brook, which leads into the Ley Creek Watershed, and upon information and belief was and/or still is a conduit for off-site migration of contaminants from the Lennox Site into the watershed.

396.    Historic maps indicate this pipe leads into Teall Brook, which runs along the property's northern boundary line, and then leads into Ley Creek.

397.    According to the EDR Report, Northeast Management Services, Inc. took over operation of the above and underground storage tanks, at least some of which are still apparently on the property under USEPA ID # NY UST U003078217 and operates the site as a petroleum bulk storage facility called Lennox Industrial Park.

398.    Therefore, Lennox and Northeast Management Services, Inc., as owners and operators of the Lennox Property, are liable under CERCLA for Releases, and under the Oil Spill Act for discharge of petroleum, from that site into the Ley Creek Watershed.

## THE DREDGING

399.     Empire Pipeline Corporation and Burke Corporation dredged portions of Ley Creek (and possibly some of its tributaries) on behalf of the County in the 1970's until about 1980, and arranged for disposal of the Contaminants, including PCBs and other Hazardous Substances, by depositing dredge spoils and/or other materials on both sides of the Creek.

400.     C&S performed, supervised or otherwise arranged for dredging work in and around Ley Creek on behalf of Onondaga County from in the 1970's to about September 1980, and arranged for disposal of Contaminants, including PCBs and other Hazardous Substances, by depositing dredge spoils and/or other materials on both sides of the Creek.

401.     Upon information and belief, C&S became aware that Empire Pipeline Corporation had not removed contaminated excavated material in violation of County bid and contract documents, since they had not "disposed" of spoils, but rather placed unsuitable spoils back in the floodplain, in violation of an NYSDEC permit (see Exhibits "N" and "O"), along the banks of Ley Creek and had not removed contaminated excavated material that it temporarily placed on the County-owned property, which GM had to purchase and became the Ley Creek PCB Dredgings Site, and which should have been removed prior to termination of their lease period.

402.     Upon information and belief, this contaminated material was never removed by these contractors under the oversight of C & S, which arranged for the disposal of the spoils creating hazardous waste landfill areas in locations they knew were still prone to flooding.

403.     The Dredging Arranger Defendants knew or should have known that the material that was dredged from Ley Creek contained or might contain Hazardous Substances.

## DAMAGE TO PLAINTIFFS

404.    Plaintiffs have been and will continue to be damaged by incurring response costs for Environmental Response to the Contamination caused by defendants, some of which was released after GM ceased its manufacturing operations and is continuing to migrate into the Ley Creek Watershed, well in excess of plaintiffs' own equitable share of liability for such remediation resulting from the GM Debtors' historic ownership and operation.

405.    As a direct, proximate, and natural consequence of the Releases, and the failure of the defendants to promptly and adequately remediate the Contamination, plaintiffs have endured, and will need to endure in the future, Environmental Response activities.

406.    Plaintiff RACER Properties has been and will continue to be damaged by defendants' failure and/or refusal to remediate the Contamination.

407.    Plaintiffs have currently available to them a total of about $19 million for the remediation and long-term OM&M of both OU-1 and OU-2 of the GM IFG Subsite, but it is likely that remediation of these Operable Units will cost significantly more than that.

408.    Upon information and belief, the remediation of the Expanded OU-2 Site may cost as much as around $60 million to around $93 million, for which defendants are jointly and severally liable, or should be required to pay their equitable share.

## PROCEDURAL ISSUES

409.    Plaintiffs have no adequate remedy at law, and no previous application has been made for the relief sought in this action.

410.    This Court has subject matter jurisdiction over the First and Second Causes of Action of this Amended Complaint, pursuant to CERCLA §113(b) (42 U.S.C. § 9613(b)) and 28 U.S.C. § 1331.

411.   This Court has supplemental jurisdiction over the state law claims in the other Causes of Action of this Amended Complaint pursuant to 28 U.S.C. § 1367, since they arise out of a common nucleus of facts.

412.   Venue is proper in this federal District Court pursuant to CERCLA §113(b) (42 U.S.C. §9613(b)), because the Releases occurred and the Contamination is located within the Northern District of New York, and pursuant to 28 U.S.C. § 1391, because the real property which is the subject of this action is located, and the events related to the claims occurred, within the Northern District of New York.

413.   In addition, the Declaratory Judgements Act, 28 U.S.C. §2201, authorizes this Court to grant declaratory relief in this matter.

**AS AND FOR A FIRST CAUSE OF ACTION
FOR COST RECOVERY UNDER CERCLA §107,
PLAINTIFFS ALLEGE AS FOLLOWS:**

414.   Plaintiffs repeat and reallege the allegations of paragraphs "1" through "413" of this Amended Complaint, as if set forth in this paragraph at length.

415.   Defendants' Properties and the Expanded OU-2 Site are "facilities," as defined in CERCLA §101(9) (42 U.S.C. §9601(9)).

416.   The Owner and Operator Defendants are "owners" and/or "operators" as defined by CERCLA §101(20) (42 U.S.C. §9601(20)), of one or more of Defendants' Properties, either at the present time, or were such "owners" and/or "operators" at the time of disposal of Hazardous Substances at Defendants' Properties.

417.   The Dredging Arranger Defendants, and many of the Owner and Operator Defendants, are persons who arranged for disposal of hazardous substances, as described in CERCLA § 107(a)(3), at the Expanded OU-2 Site, at Defendants' Properties and/or in the Ley Creek Watershed.

418.    The Hazardous Substances are "hazardous substances" as defined by CERCLA §101(14) (42 U.S.C. §9601(14)).

419.    Pursuant to CERCLA §107(a) (42 U.S.C. §9607(a)), defendants are persons who are strictly liable and responsible for investigation, cleanup, remediation and removal of the Contamination, and plaintiffs' associated past and future response costs.

420.    Plaintiffs have incurred response costs as a result of the Contamination.

421.    All response costs incurred by plaintiffs in connection with the Contamination have been consistent with the National Contingency Plan, and are recoverable pursuant to CERCLA §107(a) (42 U.S.C. §9607(a)).

422.    Accordingly, defendants are strictly, jointly and severally liable under CERCLA §107(a), 42 U.S.C. §9607(a) for all response costs incurred by the plaintiffs, and all response costs necessary in the future, to remediate the Expanded OU-2 Site.

423.    This Court should direct defendants to pay the response costs incurred by plaintiffs, and declare that they are liable for plaintiffs' future response costs for the Expanded OU-2 Site.

### AS AND FOR A SECOND CAUSE OF ACTION
### FOR CONTRIBUTION UNDER CERCLA,
### PLAINTIFFS ALLEGE AS FOLLOWS:

424.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "423" of this Amended Complaint, as if set forth in this paragraph at length.

425.    Pursuant to CERCLA, including CERCLA §113(f)(1) (42 U.S.C. § 9613(f)(1)), CERCLA §107(a) (42 U.S.C. § 9607(a)), and/or otherwise, defendants must contribute their equitable share of the response costs incurred by plaintiffs to investigate and remediate the Contamination at the Expanded OU-2 Site.

426.    This Court should direct defendants to pay their equitable shares of response costs incurred by plaintiffs, and declare that they are liable for their equitable share of plaintiffs' future response costs for the Expanded OU-2 Site.

**AS AND FOR A THIRD CAUSE OF ACTION
FOR RESPONSE COSTS AND DAMAGES
UNDER NAVIGATION LAW §181(5),
PLAINTIFFS ALLEGE AS FOLLOWS:**

427.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "426" of this Amended Complaint, as if set forth in this paragraph at length.

428.    Upon information and belief, some of the Contaminants spilled or discharged by defendants at or from the Defendants' Properties included Petroleum.

429.    Owner and Operator Defendants that own or operate, or have owned or operated, Defendants' Properties where Petroleum was discharged and migrated into the Ley Creek Watershed, and the Dredging Arranger Defendants (together the "Discharger Defendants") had the capacity to take action to investigate and clean up the Contamination resulting from the Releases of Petroleum, or defendants discharged Petroleum into Ley Creek, but they failed to effect an immediate cleanup, proximately resulting in Contamination of the Expanded OU-2 Site.

430.    The Discharger Defendants did not have permits from the United States or New York State or any other government authority for the Releases, and the Releases of Petroleum were therefore prohibited by Navigation Law §173.

431.    Pursuant to the Oil Spill Act, including Navigation Law § 181(5), the Discharger Defendants are liable for investigation, cleanup and removal of the Contamination of the Expanded OU-2 Site, and all of the direct and indirect damages of plaintiffs, including attorneys' fees.

**AS AND FOR A FOURTH CAUSE OF ACTION
FOR CONTRIBUTION UNDER NAVIGATION LAW §181(5),
PLAINTIFFS ALLEGE AS FOLLOWS:**

432.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "431" of this Amended Complaint, as if set forth in this paragraph at length.

433.    Pursuant to the Oil Spill Act, including Navigation Law §176(8), the Discharger Defendants are liable to indemnify or make contribution to plaintiffs for their past and future costs of investigation, remediation, cleanup, and removal, and response, and are responsible for investigation, remediation, cleanup and removal of, and response to, the Contamination (to the extent the Contaminants are Petroleum) of the Expanded OU-2 Site, and declare that they are responsible for future response costs.

**AS AND FOR A FIFTH CAUSE OF
ACTION FOR NEGLIGENCE,
PLAINTIFFS ALLEGE AS FOLLOWS:**

434.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "433" of this Amended Complaint, as if set forth in this paragraph at length.

435.    Defendants owed a duty of care to plaintiffs with regard to their ownership and/or operation of Defendants' Properties and the Contamination originating from Defendants' Properties.

436.    Defendants caused the Releases and Contamination, should have promptly and adequately reported the Contamination to NYSDEC and plaintiffs, and effected an immediate investigation and cleanup.

437.    Defendants (including their officers, agents, servants, and/or employees) acted unreasonably and negligently in failing to prevent, or causing the Releases and Contamination, failing to promptly and adequately report the Contamination to NYSDEC, USEPA and plaintiffs, and/or failing to promptly and adequately investigate and remediate the Contamination, and those

acts or omissions were the direct and proximate cause of the continued existence and spread of the Contamination, and damages to plaintiffs.

438.    Defendants, by reason of their negligence, are liable for all of the damages to plaintiffs proximately caused by the Contamination, and investigation, cleanup and removal of the Contamination at the Expanded OU-2 Site.

### AS AND FOR A SIXTH CAUSE
### OF ACTION FOR PUBLIC NUISANCE,
### PLAINTIFFS ALLEGE AS FOLLOWS:

439.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "438" of this Amended Complaint, as if set forth in this paragraph at length.

440.    The Releases and resulting Contamination are a public nuisance, because they interfere with rights common to all, including groundwater and surface water.

441.    Defendants caused the Releases and Contamination, and/or having a reasonable opportunity to abate the nuisance by investigating and remediating the Contamination, failed to do so in a reasonably prompt and effective manner, and/or failed to promptly and adequately report them to NYSDEC, USEPA and plaintiffs.

442.    By causing the Releases and Contamination, and/or failing to promptly and adequately report and investigate and remediate the Contamination, defendants (including their officers, agents, servants, and/or employees), have interfered with rights common to all, including groundwater, or have assumed liability for that interference.

443.    Plaintiffs have sustained special damages from this public nuisance.

444.    Defendants, by reason of this public nuisance, are liable for all of the damages to plaintiffs proximately caused by the Contamination, and investigation, cleanup and removal of the Contamination at the Expanded OU-2 Site.

**AS AND FOR A SEVENTH CAUSE OF
ACTION FOR RESTITUTION,
PLAINTIFFS ALLEGE AS FOLLOWS:**

445.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "444" of this Amended Complaint, as if set forth in this paragraph at length.

446.    The Contamination poses a threat to the environment and/or public health.

447.    Plaintiffs' actions in responding to the Contamination, which has been maintained and allowed to persist by defendants in violation of law, were immediately necessary to satisfy the requirements of public health.

448.    It would be against equity and good conscience to permit defendants to pass the burden of cleaning up the Contamination to plaintiffs, and for defendants to have had the benefit of enjoyment of the use of their respective Defendants' Properties or their contracts, free of full responsibility for investigation, remediation, cleanup, and removal of, and response to, the Contamination at the Expanded OU-2 Site.

449.    Therefore, defendants should make restitution to plaintiffs for some or all off their expenses, costs, and damages for Environmental Response related to the Expanded OU-2 Site, to the extent not recoverable under CERCLA.

**AS AND FOR AN EIGHTH CAUSE OF
ACTION FOR CONTRIBUTION OR INDEMNIFICATION,
PLAINTIFFS ALLEGE AS FOLLOWS:**

450.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "449" of this Amended Complaint, as if set forth in this paragraph at length.

451.    Defendants, including their officers, agents, servants, employees, and/or predecessors, had a non-delegable duty to prevent, clean up or ensure against the Contamination.

452.    Some or all of the Contaminants are classified as hazardous wastes, pursuant to Environmental Conservation Law ("ECL") Article 27, and hazardous substances, pursuant to ECL Article 37.

453.    As a result of the breach of this duty by defendants, including their officers, agents, servants, employees, and/or predecessors, defendants are responsible for plaintiffs' past and future expenses and damages in investigation, remediation, cleanup, and removal of, and response to, the Contamination at the Expanded OU-2 Site, and as a result, defendants should, in equity, indemnify plaintiffs for some or all of its expenses, costs, and damages, to the extent not recoverable under CERCLA.

### AS AND FOR A NINTH CAUSE OF ACTION FOR A DECLARATORY JUDGMENT, PLAINTIFFS ALLEGE AS FOLLOWS:

454.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "453" of this Amended Complaint, as if set forth in this paragraph at length.

455.    The Declaratory Judgements Act, 28 U.S.C. §2201, authorizes this Court to grant declaratory relief in this matter.

456.    Plaintiffs and defendants have an actual controversy sufficient to allow this Court to declare their rights.

457.    As set forth above, defendants are liable for their equitable share of cleanup of the Expanded OU-2 Site.

458.    Accordingly, plaintiffs request that the Court issue a Declaratory Judgment that defendants are liable for their equitable share of the costs of investigation and remediation of the Expanded OU-2 Site.

**WHEREFORE**, plaintiffs demand judgment against defendants as follows:

a.  Declaring that defendants are jointly and severally responsible, or alternatively liable for their equitable share, of the costs associated with Environmental Response to the Contamination at the Expanded OU-2 Site, and requiring them to pay those costs to plaintiffs.

b.  Declaring that defendants are responsible for plaintiffs' future damages and Environmental Response costs and to fully investigate and remediate the Expanded OU-2 Site.

c.  Awarding plaintiffs their damages and response costs, with interest.

d.  Granting a permanent injunction ordering defendants to further investigate the Contamination at the Expanded OU-2 Site, and to completely remove and remediate all of the Contaminants and the Contamination from the Expanded OU-2 Site and the Ley Creek Watershed.

e.  Awarding plaintiffs their attorneys' fees, experts' fees and other costs and expenses.

f.  Awarding such other damages and further relief as this Court deems just, proper and equitable.

Dated: Rochester, New York
      April 30, 2019

s/Alan J. Knauf
**KNAUF SHAW LLP**
Attorneys for Plaintiffs
Alan J. Knauf, Esq.,
  Linda R. Shaw, Esq., and
  Jonathan Tantillo, Esq., of Counsel
1400 Crossroads Building
2 State Street
Rochester, New York 14614
Tel.: (585) 546-8430
lshaw@nyenvlaw.com
aknauf@nyenvlaw.com
jtantillo@nyenvlaw.com

## JURY DEMAND

Plaintiffs demand trial by jury, pursuant to F.R.C.P. Rule 38(b).

Dated: Rochester, New York
        April 30, 2019

s/Alan J. Knauf_____
**KNAUF SHAW LLP**
Attorneys for Plaintiffs
Alan J. Knauf, Esq.,
  Linda R. Shaw, Esq., and
  Jonathan Tantillo, Esq., of Counsel
1400 Crossroads Building
2 State Street
Rochester, New York 14614
Tel.: (585) 546-8430
lshaw@nyenvlaw.com
aknauf@nyenvlaw.com