UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

REVITALIZING AUTO COMMUNITIES
ENVIRONMENTAL RESPONSE TRUST and
RACER PROPERTIES LLC,

                        Plaintiffs

            -v-                                    5:18-CV-1267

NATIONAL GRID USA, et al.,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


APPEARANCES:                              OF COUNSEL:

KNAUF SHAW LLP                            ALAN J. KNAUF, ESQ.
Attorneys for plaintiffs                  LINDA R. SHAW, ESQ.
1400 Crossroads Building                  AMY K. KENDALL, ESQ.
2 State Street                            JONATHAN R. TANTILLO, ESQ.
Rochester, New York 14614                 MELISSA VALLE, ESQ.

BARCLAY DAMON LLP-ALBANY                  YVONNE E. HENNESSEY, ESQ.
Attorneys for defendants National Grid
USA and Niagara Mohawk Power
Corporation
80 State Street
Albany, New York 12207

DAY, PITNEY LAW FIRM-HARTFORD             ERICK M. SANDLER, ESQ.
Attorneys for defendants Carrier          ELIZABETH C. BARTON, ESQ.
Corporation, United Technologies
Corporation, and Carlyle Air Conditioning
Company Inc.
242 Trumbull Street
Hartford, Connecticut 06103

LONGSTREET & BERRY, LLP                   MARTHA L. BERRY, ESQ.
Attorneys for defendant Center Circles LLC
P.O. Box 249
Fayetteville, New York 13066

YOUNG, SOMMER LAW FIRM                       DEAN S. SOMMER, ESQ.
Attorneys for defendant General Electric     KRISTIN CARTER ROWE, ESQ.
Company
Executive Woods
Five Palisades Drive
Albany, New York 12205

MORGAN, LEWIS LAW FIRM                       BERNARD J. GARBUTT, III, ESQ.
Attorneys for defendant Bristol-Meyers
Squibb Company
101 Park Avenue
New York, New York 10178

MORGAN, LEWIS LAW FIRM-PHILADELPHIA          GLEN R. STUART, ESQ.
Attorneys for defendant Bristol-Meyers       ADINA D. BINGHAM, ESQ.
Squibb Company
1701 Market Street
Philadelphia, Pennsylvania 19103

SIDLEY, AUSTIN LAW FIRM-NEW YORK             JOHN JOSEPH KUSTER, ESQ.
Attorneys for defendants New Process
Gear Corporation, Magna Powertrain USA, Inc.,
and New Process Gear, Inc.
787 Seventh Avenue
New York, New York 10019

RUPP, BAASE LAW FIRM-BUFFALO                 JOHN T. KOLAGA, ESQ.
Attorneys for defendants Thompson
Corners, LLC, 6181 Thompson Road, LLC,
Thompson Lawn, LLC, and Thompson NW, LLC
424 Main Street
1600 Liberty Building
Buffalo, New York 14202

HINMAN, HOWARD LAW FIRM-BINGHAMTON           ALBERT J. MILLUS, JR., ESQ.
Attorneys for defendants Metalico Syracuse
Realty, Inc. and Metalico New York, Inc.
P.O. Box 5250
80 Exchange Street
700 Security Mutual Building
Binghamton, New York 13902

GODFREY & KAHN, S.C.                          DANIEL FLAHERTY, ESQ.
Attorneys for defendant Gardner Denver,      DANIEL NARVEY, ESQ.
Inc.
833 East Michigan Street Suite 1800
Milwaukee, Wisconsin 53202

BOWITCH, COFFEY LAW FIRM
Attorneys for defendant Gardner Denver,
Inc.
17 Elk Street
Albany, New York 12207

GARY S. BOWITCH, ESQ.

WOODS OVIATT GILMAN LLP
Attorneys for defendant ONX1 LLC
1900 Bausch & Lomb Place
Rochester, New York 14604

DONALD W. O'BRIEN, JR. ESQ.

NIXON, PEABODY LAW FIRM-ALBANY
Attorneys for defendants Onondaga Pottery
Company, Inc., Syracuse China Company,
and Libbey Glass Inc.
677 Broadway 10th Floor
Albany, New York 12207

ANDREW C. ROSE, ESQ.
PETER C. TRIMARCHI, ESQ.

KENNEY, SHELTON LAW FIRM-BUFFALO
Attorneys for defendant Amparit Industries, LLC
233 Franklin Street
Buffalo, New York 14202

LORI E. PETRONE, ESQ.

BROWN DUKE & FOGEL, P.C.
Attorneys for defendants Carrier Circle Business
Complex LLC, Syracuse Lepage LLC, and
North Midler Properties LLC
120 Madison Avenue, Suite 1620
Syracuse, New York 13202

MICHAEL A. FOGEL, ESQ.

BROWN DUKE & FOGEL, P.C.
Attorneys for defendant Carrier Circle Business
Complex LLC and Syracuse Lepage LLC
621 W. Genesee Street
Syracuse, New York 13204

PATRICK D. DONNELLY, ESQ.

WHITEMAN, OSTERMAN LAW FIRM-ALBANY
Attorneys for defendant Telesector Resources
Group, Inc.
One Commerce Plaza Suite 1900
Albany, New York 12260

PHILIP H. GITLEN, ESQ.

ALSTON, BIRD LAW FIRM-NEW YORK
Attorneys for defendant Western Electric
Company, Incorporated and Nokia of
America Corporation
90 Park Avenue
New York, New York 10016

DAVID VENDERBUSH, ESQ.

3

ALSTON, BIRD LAW FIRM
Attorneys for defendant Western Electric
Company, Incorporated and Nokia of
America Corporation
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309

MEAGHAN G. BOYD, ESQ.
GEOFFREY C. RATHGEBER, ESQ.


JONES, DAY LAW FIRM-CHICAGO
Attorneys for defendant Lennox Industries
Inc.
77 West Wacker Drive Suite 3500
Chicago, Illinois 60601

CHARLES T. WEHLAND, ESQ.


JONES, DAY LAW FIRM-NEW YORK
Attorneys for defendant Lennox Industries
Inc.
250 Vesey Street
New York, New York 10281

ALLISON L. WAKS, ESQ.


BROWN DUKE & FOGEL, P.C.
Attorneys for defendant Syracuse Deere
Road Associates, LLC
120 Madison Avenue, Suite 1620
Syracuse, New York 13202

GREGORY M. BROWN, ESQ.


LINDA E. ALARIO
Attorneys for defendant Jagar Enterprises, Inc.
203 Jasper Street
Syracuse, New York 13203

LINDA E. ALARIO, ESQ.


HARTER, SECREST LAW FIRM-ROCHESTER
Attorneys for defendants Calocerinos and
Spina, and C& S Engineers, Inc.
1600 Bausch & Lomb Place
Rochester, New York 14604

PAUL D. SYLVESTRI, ESQ.
PETER H. ABDELLA, ESQ.


TALARICO LAW FIRM
Attorneys for B&B Family Limited Partnership
6832 East Genesee Street
Fayetteville, New York 13066

JOSEPH R. TALARICO, II, ESQ.

OFFICE OF EDWARD A. O'HARA, III          EDWARD A. O'HARA, III, ESQ.
Attorneys for defendant Hauler's Facility LLC
304 South Franklin Street
300 Crown Building
Syracuse, New York 13202

ARNOLD, PORTER LAW FIRM-DC          LAUREN COLE DANIEL, ESQ.
Attorneys for defendant Honeywell
International Inc.
601 Massachusetts Avenue N.W.
Washington, DC 20001

HANGLEY ARONCHICK SEGAL PUDLIN          STEVEN T. MIANO, ESQ.
& SCHILLER                              PETER V. KEAYS, ESQ.
Attorneys for defendant Lockeed Martin   ROBERT A. WIYGUL, ESQ.
Corporation
One Logan Square 27th Floor
Philadelphia, Pennsylvania 19103

LAW OFFICE OF DOUGLAS H. ZAMELIS          DOUGLAS H. ZAMELIS, ESQ.
Attorneys for defendant Northeast
Management Services, Inc.
7629A State Highway 80
Cooperstown, New York 13326

WESTFALL LAW PLLC          MELODY D. WESTFALL, ESQ.
247 West Fayette Street, Suite 203
Syracuse, New York 13202

DAVID N. HURD
District Court Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

On October 26, 2018, plaintiffs Revitalizing Auto Communities Environmental Response Trust ("RACER") and Racer Properties LLC ("Racer Properties" and together "plaintiffs") filed a complaint, lodged against a veritable host of defendants.  It alleged that several dozen businesses in Central New York had contributed to the pollution of Ley Creek, a tributary of Onondaga Lake.

5

Plaintiffs seek recovery for their efforts to clean up the creek, as well as contribution from defendants, under §§ 107(a) and 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), for Counts I and II of the complaint, respectively.  42 U.S.C. §§ 9607(a), 9613(f).  Additionally, plaintiffs have lodged claims sounding in:  Count (III) response costs recovery under N.Y. NAV. LAW § 181(5); Count (IV) contribution under N.Y. NAV. LAW § 176(8); Count (V) common law negligence; Count (VI) common law public nuisance; Count (VII) restitution; Count (VIII) contribution or indemnification; and Count (IX) declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

On November 13, 2019, the following defendants jointly moved to dismiss plaintiffs' amended complaint—the operative pleading—in its entirety under Federal Rule of Civil Procedure ("Rule") 12(b)(6):  General Electric Company; Lockheed Martin Corp.; Lennox Industries Inc.; ONX1 LLC; 6181 Thompson Road LLC; Thompson Corners, LLC; Thompson Lawn, LLC; Thompson NW, LLC; Northeast Management Services, Inc.; Syracuse Deere Road Associates, LLC; National Grid USA; Niagara Mohawk Power Corporation; Teleselector Resources Group, Inc.; Hauler's Facility LLC; Carrier Circle Business Complex LLC; North Midler Properties LLC; Syracuse LePage LLC; Amparit Industries, LLC; B&B Family Limited Partnership; Jagar Enterprises, Inc.; Magna Powertrain USA, Inc.; New Process Gear, Inc.; Libbey Glass Inc.; Onondaga Pottery Company, Inc.; Syracuse China Company; Metalico New York, Inc.; Metalico Syracuse Realty, Inc.; C&S Engineers, Inc.; Calocerinos and Spina; Carrier Corporation; Carlyle Air Conditioning Company Inc.; United Technologies Corporation; Bristol-Myers Squibb Company; Nokia of America Corporation; and Western Electric Company, Incorporated (together, "the moving defendants").

6

On December 3, 2019, some of the moving defendants who were added late to the action submitted supplemental briefing presenting additional arguments in favor of dismissing them from this case.  Those defendants are:  B&B Family Limited Partnership; Hauler's Facility LLC; Lockheed Martin Corporation; Nokia of America Corporation; North Midler Properties LLC; Northeast Management Services, Inc.; and Northern Industrial Holdings, LLC (together "the late defendants").

That same day, defendant Honeywell International Inc. ("Honeywell") also moved to dismiss the amended complaint as against it, though it largely joined the moving and late defendants' arguments.[1]  Several more defendants are presently unrepresented and have not joined any motion, namely:  Solvents and Petroleum Service, Inc., Aleris Partners LLC, Fulton Iron & Steel Co. Inc., Burko Corporation, Empire Pipeline Corporation, United States Hoffman Machinery Corporation, Old Carco Liquidation Trust, Old Carco LLC, United States Hoffman Machinery Corporation, and Old Electric, Inc. (together "the unrepresented defendants"), not to mention additional John Does.

Additionally, by text order on March 16, 2020, plaintiffs were ordered to show cause why their claims were not mooted or unripe in light of changing circumstances after the amended complaint was filed.  Those motions having been fully briefed, they will now be considered on the basis of the parties' submissions without oral argument.

## II.     **BACKGROUND**

As any local can tell you, Onondaga Lake boasts a nearly legendary history of pollution.  *See, e.g.*, *Onondaga Lake*, NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, https://www.dec.ny.gov/lands/72771.html#Pollution (last visited April 20,

---

[1] Because there is a common thread of argument among all defendants, they will be referred to as "defendants" when making a common argument and only identified as a narrower group of defendants when making an argument unique to that group.

2020) (describing ongoing pollution control efforts for Onondaga Lake beginning in the 1970s).[2]  As a result, the lake became a natural target for cleanup efforts as the federal government began to seriously invest in environmental conservation and remediation.  *See* Dkt. 157 ("AC"), ¶ 2.  By extension, the fact that the lake is featured as a Site on the National Priority List ("NPL") should not come as much of a shock.  *Id.*

Of course, to make a project as expansive as cleaning Onondaga Lake manageable, it needed to be handled piecemeal, and thus the cleanup plan further divided the remediation site into twelve subsites.  AC ¶ 2.  One of those dozen subsites is the Syracuse Inland Fisher Guide Facility ("the plant"), which was owned by General Motors ("GM").  AC ¶ 1.  Even that subsite, however, proved too large to contend with in its entirety, and so the property surrounding the plant has been further divided into two Operable Units ("OU"), creatively named OU-1 and OU-2.  AC ¶ 2.  OU-1 includes the plant and its immediate environs. AC ¶ 3.  OU-2 covers a 9,000-foot swath of Ley Creek extending beyond the boundaries of the plant.  AC ¶ 4.

By 2009, GM had become saddled with several environmental liabilities, among them rehabilitating the plant.  Dkt. 255-3, p. 6.[3]  GM's finances were in dire straits at the time and on June 1, 2009, GM declared bankruptcy under Chapter 11 of the Bankruptcy Code. *Id.* at 5.  Nevertheless, the United States, on behalf of the Environmental Protection Agency

---

[2] The facts are primarily taken from the amended complaint and any and all documents attached to it, because for the purposes of a Rule 12(b)(6) motion, this Court must "accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff[.]"  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).  This citation is only included for the sake of providing a narrative background and will not be relied on in deciding the present motion.

[3] Pagination corresponds with CM/ECF.  Additionally, the Court notes that plaintiffs objected to any reliance on the documents attached to the moving defendants' motion to dismiss, including this one.  However, it is beyond dispute that a court may consider "documents incorporated within the complaint by reference."  *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002).  Because plaintiffs provided a hyperlink to an online version of this document in the complaint, they can hardly argue that they have not incorporated it by reference.  AC p. 8 n.3.  Although this Court acknowledges that there are attachments to this particular document not included in defendants' submitted version, plaintiffs are assured that the Court has reviewed the full version and only cites to defendants' truncated submissions for the sake of clarity.

("EPA"), several states including New York, and the Saint Regis Mohawk Tribe, continued to pursue GM in the hopes of forcing it to clean the various polluted sites for which it was responsible. *Id.* at 2, 7.

On March 29, 2011, the United States Bankruptcy Court for the Southern District of New York entered a Trust Consent Decree ("the 2011 Agreement") between GM, the EPA, the states pursing GM, and the Saint Regis Mohawk Tribe. AC ¶ 20. The purpose of that agreement was to create a trust to "conduct, manage and/or fund Environmental Actions with respect to" the properties owned by GM, "including the migration of Hazardous Substances emanating from" those properties. Dkt. 255-3, p. 15. The trust would also own and operate some of the properties, in the hope that they could be sold for productive or beneficial use. *Id.* at 15-16. The trust was ultimately named RACER. AC ¶ 22. The 2011 Agreement bound all parties involved, including their legal successors and assigns, as well as EPLET, LLC, RACER's trustee. Dkt. 255-3, pp. 11, 15.

Functionally, the 2011 Agreement set aside $22,573,341 for remediating the OU-1 portion of the property, and specifically the plant, with another $8,548,471 to remedy the OU-2 portion of the property. Dkt. 255-3, pp. 41-42. In the event that a budget dispute caused an expected budget for remediation to exceed the approved budget funding for a site, the 2011 Agreement allows RACER to petition the Bankruptcy Court to resolve that dispute. *Id.* at 32-33. If RACER files a petition, the Bankruptcy Court will assess whether the lead agency requesting the budget increase has proven by clear and convincing evidence that the increase is owed to "material information, a material event, or a material condition" that was not reasonably foreseeable at the time the lead agency first developed the remedial funding. *Id.* Should the lead agency fail to carry that burden, the requested increase would be denied. *Id.*

To ensure that the 2011 Agreement resolved the cleanup efforts for the plant moving forward, the 2011 Agreement contained several covenants not to sue.  Dkt. 255-3, pp. 59-63. According to the provisions of that agreement, the EPA and New York State promised "not to sue or assert any administrative or other civil claims or causes of action against [GM], any successor entity thereto, or [RACER]," including any CERCLA or State environmental claims against GM for the properties identified by the EPA as in need of rehabilitation.  *Id.* at 60. However, all parties involved in the agreement retain "all rights with respect to any site" other than those properties identified in the 2011 Agreement, "other than claims or causes of action for migration of Hazardous Substances emanating from" a designated property.  *Id.* at 64.

Ultimately, by virtue of the 2011 Agreement, Racer Properties took possession and ownership of the plant, and thus the entirety of OU-1.  AC ¶ 3.  Racer Properties only owns some small portion of OU-2.  AC ¶ 6.  In addition, Racer Properties owns another subsite referred to as the "Ley Creek PCB Dredgings Subsite."  AC ¶ 8.  RACER became responsible for rehabilitating these sites and has undertaken efforts to do so.  *See* AC ¶ 8.

One particular concern regarding cleaning OU-2 was polychlorinated biphenyls ("PCBs").  AC ¶ 14.  The importation and manufacture of PCBs was banned in 1979.  *Id.* Before it was banned, however, plaintiffs allege that defendants all used PCBs and discharged them into Ley Creek's watershed.  AC ¶ 16.  Plaintiffs also allege that PCBs were used in many industrial products and pieces of equipment prior to being banned, and thus it is no surprise that such a broad swath of industries would have released them into the watershed.  AC ¶ 19.

In total, plaintiffs allege four sources of the PCBs in OU-2:  (1) New York's relocating a portion of Ley Creek in 1951 before the plant was fully operational; (2) subsequent dredging of sediments by the Onondaga County Department of Drainage and Sanitation; (3) the Town

10

of Salina's landfills, which accepted waste from Cooper Crouse-Hinds and defendant Syracuse China Company; and (4) direct releases by the various industrial defendants. AC ¶ 10.

In March of 2015, the EPA and New York State's Department of Environmental Conservation ("NYSDEC") produced a Record of Decision ("the 2015 ROD") electing the remedies they wanted RACER to undertake to begin to address OU-2. Dkt. 157-7. The 2015 ROD also described three prior measures undertaken by GM, beginning in 2002. *Id.* at 12. First, GM capped a landfill at the plant to prevent contaminants from leaching into the groundwater. *Id.* at 13. Second, GM removed 26,000 tons of soils containing PCBs from the Ley Creek waterbed. *Id.* Third, GM constructed a retention pond and water treatment system to prevent contamination from the plant emanating into Ley Creek. *Id.*

On October 27, 2015, RACER entered into a consent order ("the 2015 Agreement") with NYSDEC in which it agreed to remediate OU-2 consistent with the 2015 ROD. AC ¶ 25; *see generally* Dkt. 157-3. The 2015 Agreement nevertheless allowed RACER to seek contribution, indemnification, and recovery from other potentially responsible parties ("PRPs"). AC ¶ 26; Dkt. 157-3, p. 12.

According to the amended complaint, NYSDEC was still unsatisfied with the efforts taken thus far and began to push RACER to remediate lands even further afield from OU-2. AC ¶ 27. All told, NYSDEC began pressuring RACER to address an additional 22 acres ("the expanded territory"), even though, according to plaintiffs, NYSDEC should have known that this area was at least likely to be contaminated when it first entered into the 2011 and 2015 Agreements. AC ¶ 28.

Despite this contamination being foreseeable, only one acre of the expanded territory was part of the March 2015 ROD. AC ¶ 32. Plaintiffs allege that remediating the expanded

territory would incur approximately $93.5 million in additional expense with an aggressive approach, or $60 million if they took a more sedate route.  *Id.*  To date, RACER has spent $12.4 million on cleaning and investigating OU-2 and the expanded territory, including $2.4 million sampling and investigating both areas together.  Dkt. 311-1, ¶ 6.[4]

Plaintiffs allege that NYSDEC has so far been unwilling to pursue recovery from any other PRP.  AC ¶ 36.  However, on December 12, 2019, at NYSDEC's urging, the EPA assumed lead agency status for the cleanup of OU-2.  Dkt. 298-1, p. 2.  The EPA acknowledged that it would be willing to consider pursuing other PRPs to recover the funding needed to remediate the expanded territory.  *Id.*

Nevertheless, the threat of bearing the cost of remediating the expanded territory alone "compelled" plaintiffs to file the present complaint against other PRPs.  AC ¶ 36. Plaintiffs first filed their complaint on October 26, 2018.  Dkt. 1.  That complaint contained several John Doe defendants.  *Id.*  On April 30, 2019, plaintiffs filed the amended complaint, which introduced new named defendants B&B Family Limited Partnership, Hauler's Facility LLC, Lockheed Martin Corporation, Nokia of America Corporation, North Midler Properties LLC, Northeast Management Services, Inc., Northern Industrial Holdings, LLC, and Honeywell International, Inc.  Dkt. 157.

On September 5, 2019, United States Magistrate Judge Andrew T. Baxter issued a scheduling order setting the timeline for any motions to dismiss.  Dkt. 223.  Defense motions on issues common to all defendants were due on November 13, 2019, any supplemental or additional briefs on common issues were to be filed on December 3, 2019, plaintiffs' responses were due on January 22, 2020, and defendants' replies were due on February 22,

---

[4] The Court refers to documents other than those attached to or referenced in the complaint solely for the purposes of addressing whether plaintiffs' claims can survive summary judgment on the basis of either ripeness or mootness.

2020.  *Id.*  On November 13, 2019, the moving defendants submitted their joint motion to dismiss plaintiffs' complaint.  Dkt. 255.

On December 3, 2019, the late defendants submitted their supplemental brief arguing additional reasons why the amended complaint should be dismissed.  Dkt. 294.  Similarly, Honeywell moved to dismiss the complaint and joined the moving and late defendants' motions on that same day.[5]  Dkt. 295.  On March 16, 2020, after preliminary review of the submissions, this Court ordered plaintiffs to show cause why NYSDEC's ceding lead agency status to the EPA, and the EPA's willingness to pursue remedies from other PRPs, did not render the case moot or unripe such that summary judgment against plaintiffs would be appropriate.  Dkt. 310.

## III.   **LEGAL STANDARD**

### A. **Motion to Dismiss.**

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  *Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Instead, the complaint must contain sufficient factual matter that it presents a claim to relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In assessing the plausibility of the plaintiff's complaint, "the complaint is to be construed liberally, and all reasonable inferences must be drawn in the plaintiff's favor."

---

[5] The parties dispute timeliness of Honeywell's motion to dismiss.  Because supplemental briefs on common issues were permitted by December 3, 2019, Honeywell's motion was timely filed.  Plaintiffs' opposition, however, was not.  Magistrate Judge Baxter's text order set the date for plaintiffs' reply to any supplemental briefs for January 22, 2020, and plaintiffs did not file their response until February 25, 2020.  Dkt. 305.  Honeywell objected to plaintiffs' late response, which plaintiffs defended on the basis that the docket entry for Honeywell's motion set the response date at February 25, 2020.  Contrary to plaintiffs' assumption and argument, however, the Court had no hand in setting that date.  Rather, it was Honeywell who set that date when it filed its motion.  Thus, Magistrate Judge Baxter's date remained the effective date.  Because Honeywell only joined in the arguments raised by the other defendants, however, plaintiffs' arguments against the other motions will still be considered against Honeywell to the extent that the response incorporated those arguments.

*Ginsburg*, 839 F. Supp. 2d at 540.  The complaint may be supported by "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citing *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)).

### B. Summary Judgment.

Under Rule 56(f), a court may "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute," so long as it first gives the parties "reasonable time to respond."  Fed. R. Civ. P.  56(f)(3).  A dispute concerning a material fact is not genuine unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Roberts v. Univ. of Rochester*, 573 F. App'x 29, 31 (2d Cir. 2014) (summary order) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## IV.   DISCUSSION

### A. Propriety of RACER as a plaintiff.

"The question of in whose name the action may be prosecuted is procedural, and thus governed by federal law."  *Hong Kong Deposit & Guaranty Co. Ltd. v. Hibdon*, 602 F. Supp. 1378, 1381, n.14 (S.D.N.Y. 1985) (cleaned up).  Rule 17 deals with that precise issue but notes the law of the state where the district court is located controls unless the party is either an individual not acting in a representative capacity or a corporation. FED. R. CIV. P. 17(b).

However, regardless of whether state law would allow an unincorporated association to sue, that association may still "sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws[.]"  *Id.* at 17(b)(3)(A). If, after completing the requisite analysis under Rule 17, a claim lacks a properly named

14

plaintiff, the remedy is to afford a reasonable amount of time to allow the real party in interest to ratify, join, or be substituted into the action. *Id.* at 17(a)(3).[6]

Under New York law, a trust has a different legal status depending on what type of trust it is. For example, an express trust is a simple legal vehicle by which the trust holds property administered by a trustee. *See Natixis Real Est. Capital Tr. 2007-HE2 v. Natixis Real Est. Holdings, LLC*, 50 N.Y.S.3d 13, 17 (App. Div. 1st Dep't 2017) (describing purpose and function of standard trust); *see also* N.Y. EST. POWERS & TRUSTS LAW § 7-2.1(a) (referring to standard trusts as express trusts). Express trusts thus lack the capacity to sue except to enforce the trust against the trustee, because New York's statutory body governing trusts, N.Y. EST. POWERS & TRUSTS LAW § 7-2.a(a), "vests the legal estate of an express trust in the trustees[.]" *Ronald Henry Land Tr. v. Sasmor*, 990 N.Y.S.2d 767, 768 (App. Div. 2d Dep't 2014).

There is, however, an exception to the rule that a trust's legal estate resides with the trustee; namely, the business trust.[7] A business trust is "any association operating a business under a written agreement or declaration of trust, the beneficial interest under which is divided into shares represented by certificates." *Cutler v. 65 Sec. Plan*, 831 F. Supp. 1008, 1015 (E.D.N.Y. 1993) (citing N.Y. ASSOC. LAW § 2.2). A critical feature of a business trust is that its interest is divided into shares represented by certificates. *Cutler*, 831 F. Supp. at 1015. Indeed, a business trust must be an "entity used to make profit (directly or indirectly)," rather than to effect a gift or transfer of property. *In re Gurney's Inn Corp. Liquidating Tr.*, 215

---

[6] Several, but not all, courts to consider the question have held that CERCLA preempts Rule 17 by virtue of its broad enforcement mandate. *See, e.g.*, *Town of Oyster Bay v. Occidental Chem. Corp.*, 987 F. Supp. 182, 199-200 (E.D.N.Y. 1997) (collecting cases). However, those cases all considered whether to allow defendants to use Rule 17 to avoid liability through tricks of state law, rather than ensuring that a proper named plaintiff brought the case. *Id.* Especially because Rule 17's remedy for a lack of a proper named plaintiff is only to permit the true party in interest to join, rather than requiring dismissal of the claim, it is unnecessary to take the drastic step of finding a Rule preempted in this case.

[7] It is possible that there is more than one, but no party has identified for the Court any type of trust with legal title at all, and it has not found any other exceptions in its own research.

B.R. 659, 661 n.2 (E.D.N.Y. 1997) (citing *Denmark Cheese Ass'n v. Hazard Advertising Co.*, 298 N.Y.S.2d 98, 100 (Sup. Ct. N.Y. Cty.), *modified on other grounds*, 305 N.Y.S.2d 1019 (1969)).

Plaintiffs are correct that the Rules govern in this case, but they are wrong to view them as dispositive without turning to state law.  Although Rule 17(a) allows a trustee to sue on behalf of an express trust without joining the trust itself as a party, that says nothing about whether that trust has the capacity to sue in the first place.  That antecedent question can only be answered by Rule 17(b).  In turn, that Rule rests on state law, and thus New York's treatment of trusts and their capacity to sue becomes the critical inquiry.[8]

It is immediately apparent upon consideration of the two types of trust that RACER fits neatly into neither.  It is not an instrument intended solely to transfer property, but neither does it make any form of profit.  *In re Gurney's*, 215 B.R. at 661 n.2.  It certainly does not have any share certificates to the Court's knowledge.  *Cutler*, 831 F. Supp. at 1015. Moreover, plaintiffs' reliance on RACER's requirement to indemnify its protected parties does not help the analysis, because whether RACER is required to indemnify parties under the 2011 Agreement does not factor into whether New York would permit a trust to sue in its own name.  Dkt. 255-3, pp. 12, 53.

Ultimately, given the parties' failure to even address the dispositive question of what type of trust RACER is, the best answer that they can receive is simply that RACER is not a business trust.  By extension, and given the apparent absence of any other type of trust that New York gives legal form, RACER cannot remain as a plaintiff in this or any subsequent

---

[8] In cases analyzing federal law to resolve the underlying substantive question, such as determining whether a trust can be a debtor for the purposes of bankruptcy, there is a dispute as to whether state or federal law applies in determining what form a trust takes.  *See, e.g.*, *Cutler v. 65 Sec. Plan*, 831 F. Supp. 1008, 1014 (E.D.N.Y. 1993) (collecting cases).  However, because Rule 17 requires that state law resolve the underlying question of capacity to sue, this Court will apply state law to the question of what form of trust RACER is as well.

case.  Since plaintiffs' claims will not survive defendants' present motions, EPLET, LLC must be joined and/or ratify any future action as RACER's trustee for RACER to remain as a plaintiff.

## A.  Plaintiffs' § 107 Claim (Count I).

Section 107(a) of CERCLA states that "[n]otwithstanding any other provision or rule of law, and subject only to the defenses set forth in [§ 107](b)," a responsible party "shall be liable for . . . necessary costs of response incurred by any other person consistent with the national contingency plan."  42 U.S.C. § 9607(a).  In other words, if one party cleans up a contaminated area and incurs expenses in doing so, that party can recover the costs of their cleanup from parties responsible for creating the mess in the first place.  *See id.*

Defendants have identified a number of potential problems with plaintiffs' § 107 claim, namely whether the claim:  (1) is ripe; (2) has been mooted by the EPA's change in course such that it will take control of cleaning the expanded territory and will seek recovery from other PRPs; (3) is barred by § 107's statute of limitations; and (4) seeks to recover funds for a cleanup plaintiffs were not entitled to undertake.

Ripeness comes in two variants:  constitutional and prudential.  Constitutional ripeness limits the power of a court to hear a claim, whereas prudential ripeness is a doctrine of convenience that allows courts to dismiss a claim until a more appropriate time to review it arises.  *Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003).

Constitutional ripeness enforces Article III's live case and controversy requirement by prohibiting courts from resolving disputes without a "direct and immediate dilemma."  *United States v. Johnson*, 446 F.3d 272, 278 (2d Cir. 2006).  "The mere possibility of future injury, unless it is the cause of some *present detriment*, does not constitute [the requisite] hardship" to render a dispute ripe.  *Id.* (alterations in original) (citing *Simmonds*, 326 F.3d at 360).  This

requirement is intended to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 478 (2d Cir. 1999). Ultimately, a claim is constitutionally unripe if it can only be resolved after certain contingent future events occur. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985).

By contrast, the ultimate inquiry in determining whether a case is prudentially ripe is "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003). Similar to the analysis for constitutional ripeness, "[t]he 'fitness' analysis is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 691 (2d Cir. 2013). But "[i]n assessing th[e] possibility of hardship, [the question is] whether the challenged action creates a direct and immediate dilemma for the parties." *Id.* Courts assess both varieties of ripeness on a claim-by-claim, rather than case-by-case, basis. *See, e.g.*, *Kurtz v. Verizon N.Y., Inc.*, 758 F.3d 506, 511-15 (2d Cir. 2014) (analyzing several distinct claims to determine if they are ripe).

From the constitutional perspective, plaintiffs have adequately shown that they have suffered an actual injury that is redressable under § 107 such that there is no ripeness issue. Plaintiffs have plausibly alleged that they have already incurred expenses cleaning the expanded territory, and have supported that argument sufficiently in the summary judgment context with citations to documentary evidence. Dkt. 311-1, ¶ 6. By extension, there is no future event that is strictly necessary to make this case capable of moving forward. Thus, this Court has jurisdiction to hear plaintiffs' § 107 claim.

Prudential ripeness asks a different question, however.  As for the first prong, although there is no future contingent event that is strictly necessary to resolving plaintiffs' § 107 claim, it is hard to dispute that the EPA taking an active role in enforcing the cleanup of the OU-2 expanded territory would provide a great deal of clarity to that claim.  As much as plaintiffs may protest that defendants misunderstand the point of their bringing the suit, it is easy to see why defendants are vexed.

Much of the complaint reads as if plaintiffs are asserting defenses to NYSDEC compelling it, and it alone, to clean the OU-2 expanded territory.  The complaint alleges that NYSDEC should have known that the expanded territory was contaminated.  AC ¶ 28.  It also alleges that the territory exceeds that which plaintiffs were bound to clean based on the several consent orders they entered into with NYSDEC.  AC ¶ 27.  Indeed, plaintiffs ultimately state that the purpose of their bringing this action at all is because NYSDEC told them that its intention was to pursue remediation costs for the OU-2 expanded territory exclusively from them.  AC ¶¶ 36, 38.  Especially now that the EPA has assumed control of the cleanup and has stated its intention to pursue other PRPs, it is not hard to see why defendants might struggle to understand the purpose of this litigation.  Dkt. 298-1, p. 2.

Should this claim be dismissed as prudentially unripe, it would allow all parties to wait until the EPA decides upon a proper course of action and begins to look for PRPs to direct to follow that course.  Plaintiffs' varied defenses against the EPA and NYSDEC—bartered for through the 2011 Agreement and its successors—could then be addressed.  If one or more of those defenses prove successful, plaintiffs would achieve their ultimate objective of ensuring that they do not bear the full cost of remediating the expanded territory alone.  In other words, the relationship between the parties and their obligations to each other would be clearer if the

EPA were permitted to weigh its options and proceed accordingly.  As a result, plaintiffs have made a relatively meager showing of fitness for judicial resolution.  *Walsh*, 714 F.3d at 691.

Plaintiffs' showing of hardship is not much stronger.  If the EPA were to continue pressuring plaintiffs to clean the expanded territory, plaintiffs could oppose that pressure through several mechanisms.  First, assuming that the EPA were to establish that the expanded territory is contemplated by the several previous agreements between it and RACER, and thus that RACER is obligated to clean it up, the 2011 Agreement contains a clause specifically to deal with that type of unexpected expense.  *See* Dkt. 255-3, pp. 32-33.  Because the EPA failed to include the expanded territory in any proposed budget or remedy election, it would have to prove to the Bankruptcy Court for the Southern District of New York by clear and convincing evidence that the massive additional expense of the expanded cleanup was not reasonably foreseeable.  *Id.*

Second, assuming that the expanded territory was not contemplated by any prior agreement, but the EPA were to prove that pollution emanated from the plant to the expanded territory, plaintiffs could rely on the 2011 Agreement's covenant not to sue to bar the claim outright.  *See* Dkt. 255-3, pp. 60, 64 (including covenant by EPA and New York not to sue RACER to compel cleanup of any pollution "emanating from" the plant).  Third and finally, if the expanded territory was not contemplated by any prior agreement and did not migrate from the plant, the EPA would have a tough row to hoe in proving that plaintiffs were responsible for its contamination.

In other words, even plaintiffs would almost certainly benefit from dismissing this claim.  Plaintiffs would be far better served defending themselves from the EPA's compulsion rather than incurring the massive expenses involved in cleaning the expanded territory in addition to the costs of this suit.

This is especially true now that the EPA has assumed lead agency status on this case and expressed an intent to hold other PRPs responsible, which plaintiffs have always stated was a primary goal of this claim.  AC ¶¶ 36, 38.  If the EPA continues to pursue plaintiffs as a PRP, plaintiffs would be able to levy a logically consistent defense now, and then, once their liability to remediate the expanded territory—or lack thereof—is soundly established, plaintiffs could bring a logically consistent claim to recover for their investigation of the expanded territory.  As it stands, and as will become clear below in discussing plaintiffs' § 113 claims, plaintiffs are forced to contort logic and argument in a way that undercuts their claims because they are struggling to straddle maintaining their defenses against the EPA and their attempts to recover from defendants.

Plaintiffs do not face much of a dilemma.  They point to the varied statutes of limitations as a ticking clock urging imminent resolution of this case, but that limitation period has either not yet begun, or else has already run out.  In neither case does dismissing plaintiffs' § 107 claim as unripe create prejudice.

That point will require some explanation.  For § 107 cost recovery actions, CERCLA "distinguishes between two kinds of response:  remedial actions—generally long-term or permanent containment or disposal programs—and removal efforts—typically short-term cleanup arrangements."  *Schaefer v. Town of Victor*, 457 F.3d 188, 195 (2d Cir. 2006).  For a remedial action, the statute of limitations runs out six years after the on-site remediation construction begins.  42 U.S.C. § 9613(g)(2)(B).  Conversely, a removal action's statute of limitations runs out three years after the removal project ends.  *Id.* at § 9613(g)(2)(A).

There can only be one remedial action at any given site.  *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.* ("*NYSEG II*"), 766 F.3d 212, 235 (2d Cir. 2014) ("A remedial action is supposed to be a final, once-and-for-all cleanup of a site[.]").  If a plaintiff successfully files a

recovery action before the statute of limitations runs out, that plaintiff may bring subsequent recovery actions for additional, unexpected expenses incurred in the process of a remediation action, so long as the suit is filed within three years of the end of the additional responses necessary for the cleanup. *Id.* As a result, a plaintiff is incentivized to act quickly to ascertain the responsible parties and hold them liable once a final remediation project has begun, but is not penalized for swift action by being limited from recovering subsequent expenses. *See id.*

Now that the temporal dimensions of § 107's statute of limitations have been cleared up, some attention must be paid to the spatial ones. After all, the *NYSEG II* Court limited remedial actions to one per site, so it is just as important to know where the remedial action took place, and what remediation actions were considered on-site, as it is to know when the remediation began. *See NYSEG II*, 766 F.3d at 235. CERCLA defines on-site as "the areal extent of contamination and all suitable areas in very close proximity to the contamination necessary for implementation of the response action." 40 C.F.R. § 300.5.

As for how a site's division into multiple OUs affects the statute of limitations, it is helpful to remember that "OU divisions of a site may or may not correspond to the geographic bounds" of the site. *Am. Premier Underwriters Inc. v. Gen. Elec. Co.*, 866 F. Supp. 2d 883, 895 (S.D. Ohio 2012); *see N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.* ("*NYSEG I*"), 808 F. Supp. 2d 417, 511 (N.D.N.Y. 2011) (finding "persuasive those cases in which courts have concluded that regardless of the number of [OUs] at a site, there can be only one remedial action for any given facility"), *aff'd in part, vacated in part on other grounds, and remanded by NYSEG II*, 766 F.3d 212.

However, as useful as it may be to know that subdivision of a site into multiple OUs does not by itself create multiple sites, that knowledge does precious little to answer what

does determine the scope of a site.  In attempting to answer that question, the *NYSEG I*
Court found it salient that its distinct OUs were "affected by the same source and constituent
contamination," and that they originated from the same facility and migrated naturally along a
river.  808 F. Supp. 2d at 511; *see NYSEG II*, 766 F.3d at 236 (affirming district court's
findings that statute of limitations barred all recovery actions for site in question).
Alternatively, some courts have looked to whether the site can be "reasonably or naturally
divided" based on its geographic features.  *Gen. Elec. Co.*, 866 F. Supp. 2d at 895-96.

All together, there are four possible permutations of the statute of limitations question
in this case.  First, as defendants argue, GM's three cleanup measures at the plant beginning
in 2002 and 2004 could have been remedial in nature, and the expanded territory could be
part of the same site as the plant.  Dkt. 157-7.  In that case, the statute of limitations began to
tick away in 2004 at the latest, and plaintiffs' six-year period to bring a § 107 recovery claim
for their own remediation of the expanded territory would have long passed.

Second, even if GM's earlier measures were remedial in nature, a court could find that
the expanded territory is a different site from the plant.  In that case, no construction of a
remediation action at the expanded territory has begun because plaintiffs' investigation into
the soil of the expanded territory certainly does not qualify as the construction of a remedial
measure.  Thus, the statute of limitations will not begin to run until actual construction begins.
*See* 42 U.S.C. § 9613(g)(2)(b) (providing that statute of limitations begins to run "6 years after
initiation of *physical on-site construction* of the remedial action" (emphasis added)).

Third and fourth, GM's cleanup measures at the turn of the millennium could be
considered removal actions, in which case either the expanded territory is a new site or it is
not.  In either case, there has been no prior remediation action at the expanded territory and
the limitations period has not yet begun.  *See id.*

In other words, as much as plaintiffs would make out of their already having spent money investigating the expanded territory, and as much as that injury may be recoverable now, neither point changes that plaintiffs' claims would suffer little—if at all—by waiting until the scope of the EPA's cleanup actions and plaintiffs' liability is settled.  The parties and this Court would all be much advantaged by waiting until such time as the EPA's next move has been made before resolving the issues that plaintiffs present.  Accordingly, plaintiffs' § 107 claim is not prudentially ripe, and the Court, on its own motion, grants summary judgment for all defendants.  Plaintiffs' § 107 claim will be dismissed without prejudice.  Plaintiffs may renew this claim once the EPA's plan of attack and the question of whether plaintiffs are liable to clean the expanded territory are made clear.

### B. Plaintiffs' § 113 Claims (Count II).

CERCLA's § 113 allows a PRP who has been exposed to liability to seek contribution for that liability from other PRPs.  42 U.S.C. § 9613(f).  There are two subcategories of CERCLA contribution claims:  (1) § 113(f)(1) claims; and (2) § 113(f)(3)(B) claims.  A § 113(f)(1) claim comes into play when a PRP has been sued and found liable for cleanup costs.  42 U.S.C. § 9613(f)(1).  A § 113(f)(3)(B) claim, by contrast, arises when a PRP enters into a settlement agreement with a state or the United States and seeks to receive contribution costs from other PRPs.  *Id.* at § 9613(f)(3)(B).  Given the absence of any completed litigation, the parties do not dispute that § 113(f)(3)(B) governs in this case.

A CERCLA contribution claim has a three-year statute of limitations.  *Consol. Edison Co. v. UGI Utils., Inc.*, 423 F.3d 90, 98 (2d Cir. 2005).  This three-year clock begins to run once a consent decree is approved by the relevant court.  *New York v. Solvent Chem. Co., Inc.*, 664 F.3d 22, 26 (2d Cir. 2011).  Of course, the approval of a consent decree often signals only the beginning of a CERCLA cleanup, and, as a result, savvy plaintiffs will

typically seek contribution and declaratory judgments soon after entering into the consent decree. *Id.* at 26-27.

However, a consent decree only begins the limitations period if it resolved the plaintiff's liability to the United States or a state. *See Niagara Mohawk*, 596 F.3d at 126. However, it is the act of resolving CERCLA liability that commences the statute of limitations, and there is no need for the consent decree to actually apportion the amount of liability in settling the claim. *ASARCO LLC v. Goodwin*, 756 F.3d 191, 202 (2d Cir. 2014).

Defendants argue that plaintiffs' § 113 claims are either time-barred because the applicable statute of limitations began to run with the approval of the 2011 Agreement, or else there is no predicate consent order to allow plaintiffs' § 113 claims. Plaintiffs argue that the 2011 Agreement did not completely resolve the EPA and NYSDEC's CERCLA liability, but that even though the 2015 Agreement did not render plaintiffs liable for the expanded territory either, that agreement at least falls within the applicable statute of limitations.

Plaintiffs' primary argument gives away its case. If there is no agreement that imposes liability for the expanded territory, then there is no predicate that establishes liability under CERCLA and plaintiffs' § 113 claim must be dismissed. Plaintiffs' alternative argument that if plaintiffs are liable for the expanded territory, it was the 2015 Agreement, rather than the 2011 Agreement, that imposed that liability, would allow their claims to proceed, but it is clear from the face of the complaint and its attached documents that this argument does not reflect reality.

The 2011 Agreement states in no uncertain terms that upon "the full funding of [RACER] . . . , the United States on behalf of [the EPA] and the States . . . covenant not to sue or assert any administrative or other civil claims or causes of action against [GM], *any successor entity thereto, or [RACER and its] Protected Parties* under CERCLA . . . and State

25

environmental statutes . . . ."[9]  Dkt. 255-3, p. 60 (emphasis added).  Much as plaintiffs may object to reaching an issue of contractual interpretation on a motion to dismiss, reproducing the plain language of an agreement incorporated by reference into the complaint barely even merits the word "interpretation."

To circumvent this plain language, plaintiffs make two further arguments to try to save their § 113 claim.  First, plaintiffs argue that they were not signatories to the 2011 Agreement, and thus their claim is not time-barred.  They rely for that proposition on *Cooper Crouse-Hinds, LLC v. City of Syracuse*, 2018 WL 840056 (N.D.N.Y. Feb. 12, 2018).  In that case, the district court found that because one of the two plaintiffs was not a party to the consent decree in question, that consent decree could not have resolved the question of liability as to that plaintiff.  *Id.* at *6-7.

Plaintiffs' focus on whether or not RACER and Racer Properties were parties to the 2011 Agreement misses the fundamental point of the inquiry.  It is the resolution of a PRP's liability under CERCLA, not its signing the agreement, that triggers the statute of limitations.  RACER is specifically identified as a party whose liability was resolved by the 2011 Agreement.  Dkt. 255-3, p. 60.

For its part, Racer Properties is an entity that owns the plant as a direct successor to GM according to the face of the complaint.  AC ¶¶ 3, 6.  To whatever extent plaintiffs may try to argue that this only makes Racer Properties a successor in property interest to GM, the complaint also states that it was incorporated in the first place to "hold legal title" to the plant for RACER.  AC ¶ 45.  Moreover, Racer Properties is a wholly-owned subsidiary of RACER.

---

[9] Although there is an active circuit split as to whether a conditional establishment of liability begins the limitations period for a § 113 claim, the condition of funding RACER has plainly been met in this case because RACER has been funded, as evidenced by the varied cleanup activities it has already undertaken.  *See, e.g.*, *Cooper Crouse-Hinds, LLC v. City of Syracuse*, 2018 WL 840056, at *6-7 (N.D.N.Y. Feb. 12, 2018).  There is no doubt that once a PRP has fulfilled its conditions of resolving CERCLA liability that a settlement agreement sufficiently resolves liability.  *Niagara Mohawk*, 596 F.3d at 126 (noting that because the PRP "completed the Consent Order responsibilities" it had "resolved its liability . . . for purposes of contribution").

Dkt. 157-3.  In the face of such plain unity of purpose and clarity of succession, plaintiffs cannot circumvent the statute of limitations simply by incorporating another entity.  Thus, both plaintiffs' CERCLA liabilities for the plant and its environs were fully resolved by the 2011 Agreement.

Second, plaintiffs argue that the 2011 Agreement did not resolve their liability because it only applies to the properties outlined in that agreement and areas contaminated from those properties' emanations, and does not resolve every possible CERCLA claim against them.  This argument cannot be credited.  By plaintiffs' logic, the only settlement agreements that can trigger § 113's statute of limitations are ones that absolve the PRP of all CERCLA liability across the entire world from now until the end of time.  Given the impracticality of such a rule, the Court is satisfied that if plaintiffs' liability for the expanded territory has been established, it was by the 2011 Agreement.

In any event, it can be stated to a certainty that the 2015 Agreement did not resolve plaintiffs' liability.  In *Cooper Crouse-Hinds*—the same case that plaintiffs rely on to argue that the 2011 Agreement did not resolve plaintiffs' liability—the district court found that an agreement did not establish its plaintiff's liability because that agreement contained the following clause:  "[n]othing contained in this Order shall be construed as barring, diminishing, adjudicating, or in any way affecting any of the Department's rights."  2018 WL 840056, at *5. The 2015 Agreement contained a clause that might look familiar:  "nothing contained in this Order will be construed as barring, diminishing, adjudicating, or in any way affecting any of the Department's rights or authorities . . . ."  Dkt. 157-3, p. 12.  There is no reason to second-guess the decision in *Cooper Crouse-Hinds*, and by extension the 2015 Agreement cannot serve as a predicate for plaintiffs' § 113 claims.

Therefore, if plaintiffs are correct in their argument that the expanded territory is not contemplated by any prior agreement, then there is no predicate settlement agreement for their § 113 claims and they have failed to state a claim.  Alternatively, if any agreement did establish plaintiffs' liability under CERCLA for the purposes of their seeking contribution, that agreement was plainly the 2011 Agreement, and not the 2015 Agreement.  Thus plaintiffs' § 113 claims fall well outside of the three-year statute of limitations.  In either case, plaintiffs' § 113 claims against the moving defendants and Honeywell must be dismissed without prejudice.[10]

Additionally, as to the unrepresented defendants and John Does, the Court notes that the same prudential ripeness analysis counsels in favor of dismissing plaintiffs' § 113 claims in the unrepresented defendants' favor.  Assuming that the EPA does, in fact, pursue plaintiffs as liable for the costs to clean the expanded territory, plaintiffs may find themselves subject to a new determination of liability or else a new settlement agreement as a result of that pursuit.  Should either event occur, plaintiffs would suddenly find themselves with a viable § 113 claim when at present there is none.

There is therefore little purpose in allowing the claims against the defendants for whom no motion to dismiss was made to remain when those claims, too, would benefit from the resolution of plaintiffs' external dispute with the EPA.  Thus, plaintiffs' § 113 claims against the unmoving defendants are prudentially unripe, will be dismissed as against the unrepresented defendants and the John Does without prejudice.

---

[10] Because the statute of limitations has either been exceeded for all defendants or is irrelevant, there is no need to consider the issue of whether plaintiffs' § 113 claims against the late defendants and Honeywell relate back to plaintiffs' first complaint.

### C.  State Law Claims (Counts III-VIII).

This Court still maintains supplemental jurisdiction of plaintiffs' state claims under 28 U.S.C. § 1367(a).  *See Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) ("[F]ederal courts have supplemental jurisdiction to hear state law claims that are so related to federal question claims brought in the same action as to form part of the same case or controversy under Article III of the United States Constitution." (internal quotation marks omitted)).

A district court may, however, "decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]"  28 U.S.C. § 1367(c)(3).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . —judicial economy, convenience, fairness and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

As discussed above, plaintiffs' two substantive federal claims will be dismissed.[11] Plaintiffs' state law claims may have merit.  However, once again, plaintiffs' litigative position is currently an awkward one, which will be better resolved if revisited at a later date.  In these circumstances, the balance of factors, particularly judicial economy and fairness, make it appropriate to allow plaintiffs' position to settle itself before considering their state law claims. Thus, this Court declines to exercise jurisdiction over plaintiffs' state law claims, and those claims will also be dismissed without prejudice.

### D.  Declaratory Relief (Count IX).

As defendants argued in their motion to dismiss, plaintiffs' count IX claim for declaratory relief is not an independent basis of relief, but instead relies upon plaintiffs' other

---

[11] As discussed below, the Declaratory Judgment Act does not confer jurisdiction on its own.

claims for its teeth.  Those other claims will be gone, and in the absence of any other basis to

support plaintiffs' claim for declaratory judgment, it, too, must be dismissed without prejudice.

*Lee v. Makhnevich*, 2013 WL 1234829, at *3 (S.D.N.Y. Mar. 27, 2013) (noting Declaratory

Judgment Act does not confer jurisdiction on its own); *see Chevron Corp. v. Naranjo*, 667

F.3d 232, 244 (2d Cir. 2012) (noting that Declaratory Judgment Act is "procedural only," and

"does not create an independent cause of action").

## V.    **CONCLUSION**

If this case could be reduced to one word, it would be haste.  Plaintiffs[12] were all too

eager to conduct expansive—and expensive—testing of the expanded territory.  Had they

waited and offered resistance to the EPA's pressure, they might have found that there was no

need for them to bear that cost at all.  Plaintiffs again charged headlong into bringing this suit,

no matter how difficult that prospect made juggling their conflicting interests in preventing

themselves from being held liable for the expanded territory and recovering their

expenditures.

Given plaintiffs' repeated tendency to rush, it is not much of a surprise that the result

would be discord.  Only by pausing and resetting can this case be returned to some

semblance of proper harmony.  It may be that the EPA will continue to pressure plaintiffs

alone to clean the expanded territory.  In that case they may defend that pressure and, once

they have resolved their liability to remediate that territory one way or the other, bring their

federal and/or state claims and determine whether it was ever timely brought at that point.

Indeed, that reset could revive both of plaintiffs' CERCLA claims, because if plaintiffs are

found liable for the expanded territory, that finding could potentially serve as a predicate for

them to bring a renewed § 113 claim as well.  If, however, the EPA brings a claim against a

---

[12] Including Eplet, LLC as RACER's trustee.

number of PRPs, plaintiffs may file cross-claims against their co-defendants at that point while continuing to assert their defenses against the EPA.

In any case, plaintiffs would be better served by waiting until such time as the EPA decides on its course and until plaintiffs see their opposition to that course, if any, through to its completion.  Thus, until that time comes, plaintiffs' claims are not ripe and must be dismissed.

Therefore, it is

ORDERED THAT

The amended complaint is dismissed without prejudice.

The Clerk of Court is directed to enter judgment accordingly and close the case.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  May 12, 2020
          Utica, New York.