UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK

_____

EPLET, LLC, not individually but solely in its
representative capacity as Administrative Trustee of
Revitalizing Auto Communities Response Trust, and
RACER PROPERTIES LLC,

                    Plaintiffs,

       vs.

NATIONAL GRID USA, NIAGARA MOHAWK POWER
CORPORATION, CARRIER CORPORATION, UNITED
TECHNOLOGIES CORPORATION, CARLYLE AIR
CONDITIONING COMPANY, INC., GENERAL ELECTRIC
COMPANY, BRISTOL-MYERS SQUIBB COMPANY, NEW
PROCESS GEAR CORPORATION, NEW PROCESS GEAR,
INC., MAGNA POWERTRAIN USA, INC., OLD CARCO LLC,
OLD CARCO LIQUIDATION TRUST, SOLVENTS AND
PETROLEUM SERVICE, INC., THOMPSON CORNERS LLC,
METALICO SYRACUSE REALTY, INC., METALICO NEW
YORK, INC., ALERIS PARTNERS LLC, COOPER
CROUSE-HINDS, LLC, GARDNER DENVER, INC.,
HONEYWELL INTERNATIONAL INC., OLD ELECTRIC
INCORPORATED, ONX1 LLC, LOCKHEED MARTIN
CORPORATION, ONONDAGA POTTERY COMPANY, INC.,
AMPARIT INDUSTRIES, LLC, 6181 THOMPSON ROAD, LLC,
CARRIER CIRCLE BUSINESS COMPLEX LLC, TELESECTOR
RESOURCES GROUP, INC., WESTERN ELECTRIC COMPANY,
INCORPORATED, NOKIA OF AMERICA CORPORATION,
FULTON IRON & STEEL CO. INC., SYRACUSE LEPAGE LLC,
LENNOX INDUSTRIES INC., SYRACUSE DEERE ROAD
ASSOCIATES, LLC, JAGAR ENTERPRISES, INC., BURKO
CORPORATION, EMPIRE PIPELINE CORPORATION,
CALOCERINOS AND SPINA, C & S ENGINEERS, INC., B&B
FAMILY LIMITED PARTNERSHIP, NORTHERN INDUSTRIAL
HOLDING, LLC, UNITED STATES HOFFMAN MACHINERY
CORPORATION, THOMPSON NW, LLC, THOMPSON LAWN,
LLC, HAULER'S FACILITY LLC, NORTHEAST MANAGEMENT
SERVICES, INC., and NORTH MIDLER PROPERTIES LLC,

                    Defendants.

_____

**SECOND AMENDED COMPLAINT**

Case No. 5:18-cv-01267-DNH-ATB

**TRIAL BY JURY DEMANDED**

EPLET, LLC ("EPLET"), not individually but solely in its representative capacity as Administrative Trustee for Revitalizing Auto Communities Response Trust ("RACER Trust"), and RACER Properties LLC ("RACER Properties") (collectively, "Plaintiffs") allege as follows:

## INTRODUCTION

1. Plaintiffs have incurred, and continue to incur, millions of dollars in costs for response ("Environmental Response") to environmental contamination ("Contamination") in the general vicinity of Ley Creek, a tributary of Onondaga Lake in Onondaga County, New York. As relevant here, Plaintiffs have been—and are presently—responding to contamination in locations denoted herein, and described in more detail below, as "Operable Unit 2" ("OU-2") and the "Expanded Territory." *See* Exhibit "S" (maps of OU-2 and Expanded Territory). Plaintiffs seek to recover these costs, an order declaring Defendants' liability for both past and future response costs within OU-2 and the Expanded Territory, and related relief as described further herein.

2. Defendants are each liable under federal and state law for Plaintiffs' response costs in OU-2 and the Expanded Territory. Certain Defendants own or operate—or at one time owned or operated—industrial facilities that contaminate, or at one time contaminated, the Ley Creek Watershed with hazardous substances (including but not limited to polychlorinated biphenyls, or "PCBs") and other contaminants (including petroleum). Other Defendants arranged for disposal into OU-2 and the Expanded Territory of hazardous substances and other contaminants (including petroleum).

3. RACER Trust, whose trustee EPLET is a Plaintiff in this Second Amended Complaint in its representative capacity, is an environmental response trust formed and funded pursuant to a 2011 federal consent decree ("2011 Agreement"), *see* Exhibit "T," to respond to contamination at dozens of properties nationwide that were formerly owned by General Motors Corporation

("GM"), which properties do not include OU-2 or the Expanded Territory. No Defendant is a party to the 2011 Agreement.

4.       Neither Plaintiff EPLET nor Plaintiff RACER Properties LLC—an entity created by RACER Trust to hold legal title to certain properties (not including OU-2 or the Expanded Territory)—succeeded to GM's environmental liability. One purpose of RACER Trust, however, is to perform environmental response actions to address environmental contamination at former GM Properties (again, not including OU-2 or the Expanded Territory) as well as areas contaminated by "migration of Hazardous Substances emanating [there]from." Like anyone else that incurs costs responding to contamination for which others are partially or wholly liable, RACER Trust is entitled to recover its response costs from any party liable for that contamination.

5.       Plaintiffs maintain that, to the extent contamination originating from former GM property is (or was) present in the Expanded Territory and certain parts of OU-2, it arrived there by means other than "migration of Hazardous Substances emanating from" former GM Property; and that, consequently, Plaintiffs are not responsible under the 2011 Agreement or RACER Trust's own governing documents for responding to that contamination. But, even if RACER Trust were so responsible, Plaintiffs would remain eligible to recover response costs from Defendants.

6.       RACER Trust has entered into two administrative consent orders ("ACOs")—the first, in 2015, with the New York State Department of Environmental Conservation ("NYSDEC"); and the second, in 2021, with the United States Environmental Protection Agency ("EPA")—by which RACER Trust agreed to conduct certain environmental response actions within OU-2 and, in the case of the 2021 ACO, the Expanded Territory. But neither ACO, nor any administrative or judicial settlement of any kind, has resolved any Plaintiff's liability for response costs within the Expanded Territory.

3

7.     Under pressure from NYSDEC—and, later, EPA—Plaintiffs have, despite the absence of agreement, order, or law so requiring, incurred costs responding to Contamination in the Expanded Territory, which response costs they now seek to recover from Defendants (in addition to the response costs they have incurred within OU-2).

8.     Cleanup of the Contamination in OU-2 and, especially, the Expanded Territory, is far from complete. Indeed, the environmental remedy ("dig and haul") that NYSDEC and EPA jointly selected in a 2015 Record of Decision ("ROD")—and incorporated into its 2015 ACO with RACER Trust—is projected conservatively to exceed $90 million in future remediation costs (in addition to the $13.8 million in environmental response costs that RACER Trust already has incurred responding to Contamination in OU-2 and the Expanded Territory, including cleanup in a small portion of the latter). RACER Trust is not adequately funded to perform all the future remediation, nor is it required to by any law, order, or agreement.

9.     At the time of this Second Amended Complaint (October 2021), RACER Trust continues to do preparatory work associated with response activities at OU-2 and the Expanded Territory to move the ball forward for whomever ultimately will remediate those locations (and for whoever will pay the necessary costs) under the direction of EPA. Meanwhile, by virtue of costs they have already incurred, Plaintiffs presently have ripe causes of action under federal and state law to recover their costs from Defendants and declare Defendants' liability for future costs.

## PARTIES

### A.  Plaintiffs

10.     Plaintiff EPLET is the Administrative Trustee of RACER Trust. RACER Trust is an independent environmental response trust formed under the laws of the State of New York, with a principal place of business at 1505 Woodward Avenue, Suite 200, Detroit, Michigan 48226.

4

EPLET, which is a signatory to the Trust Consent Decree prior to establishment of RACER Trust, is a Delaware limited liability company doing business in the State of New York. EPLET has the same principal place of business as RACER Trust. Pursuant to *RACER Trust v. Nat'l Grid USA*, 10 F.4th 87 (2d Cir. 2021), EPLET, not individually but solely in its representative capacity as Administrative Trustee of RACER Trust, is substituted as Plaintiff for RACER Trust in this Second Amended Complaint.

11.     Plaintiff RACER Properties is a Delaware limited liability company doing business in the State of New York, established to hold legal title to certain properties discussed herein. RACER Trust is the sole member of RACER Properties and shares its principal place of business with RACER Properties.

### B. Defendants

12.     General references to "Defendants" refer to all Defendants identified in paragraphs "13" to "58," *infra*. "Owner and Operator Defendants" are the Defendants identified in paragraphs "13" to "54," *infra*. "Arranger Defendants" are the Defendants identified in paragraphs "55" to "58," *infra*.

13.     Defendant National Grid USA (f/k/a Niagara Mohawk Power Corporation) ("National Grid") is a Delaware corporation doing business in the State of New York, with its local offices located at 300 Erie Blvd West, Syracuse, New York 13202.

14.     Defendant Niagara Mohawk Power Corporation is a business corporation organized under the laws of the State of New York, with offices located at 300 Erie Blvd West, Syracuse, New York 13202.  Defendants National Grid USA and Niagara Mohawk Power Corporation are collectively referred to in this Second Amended Complaint as "National Grid."

15.     Defendant Carrier Corporation ("Carrier") is a Delaware corporation doing business in the

5

State of New York, with its principal offices located at 6304 Carrier Parkway, East Syracuse, New York 13057, which is owned by Defendant United Technologies Corporation.

16.    Defendant United Technologies Corporation ("UTC") is a Delaware corporation doing business in the State of New York, with its principal offices located at 10 Farm Springs Road, Farmington, Connecticut 06032.

17.    Defendant General Electric Company ("GE") is a business corporation organized under the laws of the State of New York, with its principal offices located at 41 Farnsworth Street, Boston, Massachusetts 02210.

18.    Defendant B&B Family Limited Partnership ("B&B") is a partnership with an address of P.O. Box 420, Solvay Road, Jamesville, New York 13078.

19.    Defendant Lockheed Martin Corporation ("Lockheed") is a Maryland corporation doing business in the State of New York, with principal offices located at 6801 Rockledge Dr., Bethesda, Maryland, 20817.

20.    Defendant Carlyle Air Conditioning Company Inc. ("Carlyle"), a subsidiary of Carrier and owned by UTC, is a business corporation organized under the laws of the State of New York, with its principal offices at 6304 Carrier Parkway, East Syracuse, New York 13057.

21.    Defendant Carrier Circle Business Complex LLC ("CCBC") is a limited liability company organized under the laws of the State of New York, with a designated service address of 535 East Countyline Road, Suite 15, Lakewood, New Jersey 08701.

22.    Defendant Bristol-Myers Squibb Company ("Bristol-Myers") is a Delaware corporation doing business in the State of New York, with principal offices located at 430 East 29th Street, 14th Floor, New York, New York 10016.

23.    Defendant Fulton Iron & Steel Co. Inc. ("Fulton Iron") was a business corporation

6

organized under the laws of the State of New York, with a designated service address of 415 South First Street, Fulton, New York 13069, which is currently inactive through dissolution as of September 3, 1992.

24.     Defendant Old CARCO LLC (f/k/a Chrysler LLC) ("Old CARCO") is a dissolved Delaware limited liability company formerly doing business in the State of New York, with principal offices formerly located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. Old CARCO LLC is named as a nominal Defendant to pursue applicable insurance coverage that it may have had in relation to its operations located at or about at 6600 Chrysler Drive, renamed 6600 New Venture Gear Drive, in the Town of DeWitt, New York (tax lot no. 027.-02-11.1), known herein as the "Chrysler Facility."

25.     Defendant Old CARCO Liquidation Trust ("Old CARCO Trust") is a bankruptcy trust whose trustee is RJM I, LLC, which has an address of 251 Little Falls Drive, Wilmington, Delaware 19808. Old CARCO Trust was formed pursuant to a Liquidation Trust Agreement in the Chapter 11 bankruptcy of Defendant Old CARCO LLC; is the successor-in-interest of Old CARCO LLC; and is the trust to which claims can be made against Old CARCO LLC.

26.     Defendant Magna Powertrain USA, Inc. ("Magna") is a Delaware corporation doing business in the State of New York, with offices at 1870 Technology Drive Troy, Michigan 48083.

27.     Defendant New Process Gear Corporation ("NPGC") (formerly known as the Management Club of New Process Gear, Division of Chrysler Corporation, which was last owned by Magna Powertrain USA, Inc.) is an inactive Delaware corporation which did business in the State of New York, with offices located at 6600 Chrysler Drive, renamed 6600 New Venture Gear Drive, East Syracuse, New York 13057 (the "Chrysler Facility").

28.     Defendant New Process Gear, Inc. ("NPGI") is a business corporation organized under the

7

laws of the State of New York, with principal offices located at 6600 New Venture Gear Drive, East Syracuse, New York, 13057.

29.     Defendant ONX1 LLC ("ONX1") is a Delaware limited liability company doing business in the State of New York, with a designated service address of 127 W. Fairbanks Avenue #410, Winter Park, Florida 32789.

30.     Defendant Solvents and Petroleum Service, Inc. ("S&P") is a business corporation organized under the laws of the State of New York, with its principal offices located at 1405 Brewerton Road, Syracuse, New York 13208.

31.     Defendant Thompson Corners, LLC ("Thompson Corners") is a limited liability company organized under the laws of the State of New York, with offices at 6225 Thompson Road, Syracuse, New York 13206.

32.     Defendant Thompson NW, LLC ("Thompson NW") is a limited liability company organized under the laws of the State of New York, with a designated service address of 7050 Cedarbay Road, Fayetteville, New York 13066.

33.     Defendant 6181 Thompson Road, LLC is a limited liability company organized under the laws of the State of New York, with a designated service address of 7050 Cedarbay Road, Fayetteville, New York 13066.

34.     Defendant Thompson Lawn, LLC ("Thompson Lawn") is a limited liability company organized under the laws of the State of New York, with a designated service address of 7050 Cedarbay Road, Fayetteville, New York 13066.

35.     Defendant Metalico Syracuse Realty, Inc. ("Metalico Realty") is a business corporation organized under the laws of the State of New York, with offices at 6225 Thompson Road, Syracuse, New York 13206.

36. Defendant Metalico New York, Inc. (f/k/a Metalico Syracuse, Inc.) ("Metalico New York") is a business corporation organized under the laws of the State of New York, with principal offices located at 135 Dermody Street, Cranford, New Jersey 07016.

37. Defendant Hauler's Facility LLC ("Hauler's Facility") is a limited liability company organized under the laws of the State of New York, with a designated service address of 6223 Thompson Road, Suite 1000, Syracuse, New York 13206.

38. Defendant Aleris Partners LLC ("Aleris") is a limited liability company organized under the laws of the State of New York, with a designated service address of P.O. Box 46, 124 Grove Avenue, Cedarhurst, New York 11516.

39. Defendant Gardner Denver, Inc. ("Gardner Denver") is a Delaware corporation doing business in the State of New York, with principal offices located at 222 East Erie Street, Suite 500, Milwaukee, Wisconsin 53202, and is the successor to Lamson Corporation, Hoffman Air & Filtration Systems, and Oberdorfer Pumps.

40. Defendant United States Hoffman Machinery Corporation ("U.S. Hoffman") is a Delaware corporation doing business in the State of New York, with a principal place of business at 6181 Thompson Road, Syracuse, New York, and which upon information and belief is or formerly may have been known as or may have merged with Hoffman Air Filtration Licensco Inc., Hoffman Air Filtration Systems and/or Hoffman Air & Filtration, and all of which have been acquired and/or are operated by Gardner Denver, Inc.

41. Defendant Syracuse Lepage LLC ("Syracuse Lepage") is a limited liability corporation organized under the laws of the State of New York, with an office address at 1 Lepage Place, Syracuse, New York 13206.

42. Defendant Northern Industrial Holdings, LLC ("Northern Industrial Holdings") is a

Delaware corporation with a service of process address at Capitol Services, Inc., 1675 South State Street, Suite B, Dover, Delaware, 19901. Northern Industrial Holdings owns real property at 6259 Thompson Road, Syracuse, New York 13206.

43. Defendant Jagar Enterprises, Inc. ("Jagar") is a business corporation organized under the laws of the State of New York, with principal offices at 203 Jasper Street, Syracuse, New York 13203.

44. Defendant Onondaga Pottery Company, Inc. ("Onondaga Pottery") is a business corporation organized under the laws of the State of New York, formerly known as Syracuse China Corporation, with principal offices located at 300 Madison Avenue, Toledo, Ohio 43604.

45. Defendant Amparit Industries, LLC ("Amparit") is a limited liability company organized under the laws of the State of New York, with a designated service address of 2435 State Route 5, Utica, New York 13502.

46. Defendant Syracuse Deere Road Associates, LLC ("Syracuse Deere Road") is a Delaware limited liability company doing business in the State of New York, with a designated service address of 80 State Street, Albany, New York 12207.

47. Defendant Western Electric Company, Incorporated ("Western Electric") is a Delaware company doing business in the State of New York, with principal offices located at 600 Mountain Ave, Room 63-334, Murray Hill, New Jersey 07974.

48. Defendant Nokia of America Corporation ("Nokia") is a Delaware corporation doing business in the State of New York, with principal offices located at 600 Mountain Ave, Murray Hill, New Jersey 07974.

49. Defendant Telesector Resources Group, Inc. ("Telesector") is a Delaware corporation doing business in the State of New York, with principal offices located at 140 West Street, 20th

Floor, New York, New York 10007.

50. Defendant Honeywell International Inc. ("Honeywell") is a Delaware corporation doing business in the State of New York, with principal offices located at 115 Tabor Road, Morris Plains, New Jersey, 07960.

51. Defendant Old Electric Inc. ("Old Electric") is a Delaware corporation doing or formerly doing business in the State of New York, formerly known as Prestolite Electric, Incorporated, with principal offices located or formerly located at Four SeaGate, Toledo, Ohio 43601.

52. Defendant Lennox Industries Inc. (formerly known as The Lennox Furnace Company) ("Lennox") is a Delaware corporation doing business in the State of New York, with principal offices located at 2140 Lake Park Blvd., Richardson, Texas 75080.

53. Defendant Northeast Management Services, Inc. ("Northeast Management Services") is a business corporation organized under the laws of the State of New York, with a principal place of business at 400 North Midler Avenue, Syracuse, New York 13206.

54. Defendant North Midler Properties LLC ("North Midler Properties") is a limited liability company organized under the laws of the State New York, with a principal place of business at 400 North Midler Avenue, Syracuse, New York 13206.

55. Defendant Burko Corporation ("Burko") was a business corporation organized under the laws of the State of New York that dissolved on December 29, 1982, which maintained offices at 145 Orchard Drive East, North Syracuse, New York 13212.

56. Defendant Empire Pipeline Corporation ("Empire") was a business corporation organized under the laws of the State of New York, now dissolved, which maintained offices at 300 Hiawatha Blvd, East Syracuse, New York 13208.

57. Defendant Calocerinos and Spina ("C&S") was a general partnership organized under the

11

laws of the State of New York, which maintained offices at 2100 East Genesee Street, Syracuse, New York.

58.    Defendant C & S Engineers, Inc. ("C&S Engineers") is a business corporation organized under the laws of the State of New York, with principal offices located at 499 Col. Eileen Collins Blvd, Syracuse, New York 13212, and upon information and belief is the successor to C&S.

## GENERAL BACKGROUND

### A. Locations at Issue

59.    Onondaga Lake is an approximately five-square mile lake that abuts the City of Syracuse in Onondaga County, New York. For more than a century, numerous industrial facilities released or discharged hazardous substances and other contaminants into the lake, its tributaries, and uplands within the lake's 285-square mile watershed (depicted in Exhibit "A").

60.    The ROD states that "Industrialization of the area began soon after the completion of the Erie Canal in 1857 and the development of railroads in eastern Syracuse.  Several industries have been located near Ley Creek and its branches since the late 19th and early 20th centuries. The industrial nature of this area, as well as the infrastructure and other development, influenced this site and contributed to its current condition." Exhibit "G," at 2.

61.    In 1994, EPA designated a substantial portion of the Onondaga Lake Watershed as the Onondaga Lake National Priority List ("NPL") Site.

62.    To facilitate coordination of various environmental investigatory and remedial activities within the Onondaga Lake NPL Site, EPA and NYSDEC divided the Site into twelve geographically distinct Subsites.

63.    The General Motors-Inland Fisher Guide ("GM-IFG") Subsite of the Onondaga Lake NPL Site lies in the Town of Salina in Onondaga County, within the 30-square mile watershed of Ley

12

Creek, a tributary of Onondaga Lake.

64.    As it traverses the GM-IFG Subsite, Ley Creek flows roughly east to west. Tributaries of this stretch of Ley Creek include Headson's Brook and Headson's Creek, Teall Brook and Teall Creek, Sanders Creek, the South Branch of Ley Creek, and the North Branch of Ley Creek. Upon information and belief, contaminants released or discharged into these and other tributaries of this stretch of Ley Creek traveled to and are present in OU-2 and the Expanded Territory.

65.    In approximately 1951, before the Former GM-IFG Plant was fully constructed or operational (*see* Exhibit "Q" showing 1951 Townline Road construction drawings, and Exhibit "R" showing the Former GM-IFG Plant not yet constructed), the New York State Thruway Authority built the New York State Thruway and a new Townline Road bridge over the Thruway. As part of this project, the Thruway Authority and those acting under its direction relocated a portion of the original Ley Creek channel within what is now OU-2 from north of its current location to its current location (*see* Exhibit "Q" showing the relocation of the North Branch of Ley Creek).

66.    EPA and NYSDEC have designated two Operable Units ("OUs") within the GM-IFG Subsite. These OUs are geographically distinct, and neither overlaps with the Expanded Territory described in paragraph "70," *infra*. Exhibit "S" depict OU-1, OU-2, and the Expanded Territory, as those terms are used in this Second Amended Complaint. *See also* Exhibits "B," "D."

67.    OU-1 comprises the distinct tract of real property, south of Ley Creek, on which GM formerly operated the GM-IFG Plant. *See* Exhibit B. That tract abuts and is located to the west of Townline Road.

68.    From 2011 to 2020, RACER Properties held legal title to the property comprising OU-1. In 2020, RACER Properties conveyed that property to SIP Syracuse, LLC by quitclaim deed

(Exhibit "W"). The sale does not truncate RACER Trust's obligation to complete environmental actions in the vicinity of the property. Indeed, RACER Properties retained an easement for the purpose of "completing any Environmental Actions." Easement Agreement (Exhibit "X") § 1.1.

69.    OU-2 comprises approximately 9,200 linear feet of Ley Creek channel sediments, surface water, and adjacent floodplain soils/sediments upstream of the eastern edge of the Route 11 Bridge and downstream of the western edge of the Townline Road Bridge; a 10-acre wetland ("National Grid Wetland") on property owned by National Grid ("National Grid Property") that  lies directly west of OU-1; soil in an approximately 1.8-acre area ("Factory Avenue Area") lying directly between OU-1's northern property boundary and Factory Avenue; soil in an area located along the northern shoulder of Factory Avenue in the vicinity of LeMoyne Avenue; and the National Grid/Teall Avenue Substation access road ("NG Access Road"), as shown on Exhibit B. OU-2 does not extend to any groundwater.

70.    The Expanded Territory includes a majority of the area north of Ley Creek lying between the creek and the New York State Thruway from Townline Road to LeMoyne Avenue; an area south of Ley Creek from approximately the Town of Salina Highway Department Garage at 601 Factory Avenue to State Route 11 (a.k.a. Brewerton Road) between Ley Creek and Cambridge Avenue, Brown Avenue, and Factory Avenue; and the backyards of 19 residential properties on Brookline Road ("Brookline Road Properties") immediately north of the top of the northern bank of Ley Creek, all located in the Town of Salina and shown on Exhibit "B."

71.    OU-1, OU-2, and the Expanded Territory are each separate and distinct "facilities," as defined by 42 U.S.C. § 9601(9).

72.    The Ley Creek PCB Dredgings Subsite of the Onondaga Lake NPL Site is located on the south side of Ley Creek, to the northwest of OU-1 of the GM-IFG Subsite. *See* Exhibit "B."

14

73.    RACER Properties holds legal title to the property comprising the Ley Creek PCB Dredgings Subsite. Other than any potential de minimis geographical overlap between the Ley Creek PCB Dredgings Subsite and OU-2, RACER Properties has never held legal title to any real property within OU-2, and neither EPLET nor RACER Trust has ever held legal title to any real property within OU-2. None of EPLET, RACER Trust, and RACER Properties has ever held legal title to any real property within the Expanded Territory.

74.    The Lower Ley Creek Subsite of the Onondaga Lake NPL Site is located directly west and downstream of the GM-IFG Subsite. The Lower Ley Creek Subsite includes the stretch of Ley Creek from the western edge of the Route 11 Bridge to the creek mouth at Onondaga Lake.

### B. Activities of Owner and Operator Defendants

75.    As used in this Second Amended Complaint, the term "hazardous substance" is defined as in CERCLA § 101(14) (42 U.S.C. § 9601(14)) and further includes "hazardous substances" and "hazardous waste" defined in New York Environmental Conservation Law ("ECL") and its implementing regulations; the term "release" is defined as in CERCLA § 101(22) (42 U.S.C. § 9601(22)) and further includes "releases" defined in the ECL and its implementing regulations; the term "discharge" is defined as in New York Navigation Law § 172(8); the term "petroleum" is defined as in New York Navigation Law § 172(15); and the term "contaminant" includes all hazardous substances, petroleum, and any other waste or emission that contributes to pollution, including but not limited to "pollutant[s] or contaminant[s]" as defined in CERCLA § 101(33) (42 U.S.C. § 9601(33)).

76.    Exhibit "N" is a map of industrial sites in the Ley Creek Watershed. Upon information and belief, hazardous substances and other contaminants once present on each of these industrial sites, and other sites discussed herein, are now present in OU-2 and the Expanded Territory.

15

77. PCBs are the most prevalent contaminant of concern identified in OU-2 and the Expanded Territory.

78. PCBs were domestically manufactured in commercial quantities from 1930 until 1979, at which time their manufacture and importation were generally banned by the Toxic Substances Control Act of 1976 ("TSCA"). EPA continued to permit importation of PCBs after 1979 under TSCA's exemption provisions.

79. PCBs were used in a wide variety of products and materials, including: (i) transformers, transformer bushings, and capacitors; (ii) electrical equipment including cables, voltage regulators, switches, breakers, vacuum pumps, re-closers, bushings, and electromagnets; (iii) oil used in motors and hydraulic systems; (iv) old electrical devices or appliances containing PCB capacitors; (v) fluorescent light ballasts; (vi) cable insulation; (vii) thermal insulation material including fiberglass, felt, foam, and cork; (viii) adhesives and tapes; (ix) paint; (x) caulking compounds; (xi) plastics; (xii) carbonless copy paper; (xiii) floor finish; (xiv) heat transfer systems; and (xv) investment casting wax.

80. Upon information and belief, each Owner and Operator Defendant either now or at one time released or discharged, or caused to be released or discharged, PCBs and/or other or contaminants (including petroleum, some of which contained PCBs) into the Ley Creek Watershed, which PCBs and contaminants are present in OU-2; or else now owns or at one time owned real property from which these PCBs and/or other contaminants were released or discharged.

81. Upon information and belief, each Owner and Operator Defendant either now or at one time released or discharged, or caused to be released or discharged, PCBs and/or other contaminants (including petroleum, some of which contained PCBs) into the Ley Creek

16

Watershed, which PCBs and contaminants are present in the Expanded Territory; or else now owns or at one time owned real property from which these PCBs and/or other contaminants were released or discharged.

### *National Grid Facility: National Grid*

82.    National Grid owns large amounts of property in the Ley Creek Watershed.

83.    National Grid has been identified as a Potentially Responsible Party ("PRP") for the Lower Ley Creek Subsite.

84.    National Grid has operated, since approximately the 1920s, a large electrical substation containing at least 12 transformers on the National Grid Property, known as either the Teall Avenue or 800 Factory Avenue Transformer or Substation facility ("National Grid Facility"), located at about or at 800 Factory Avenue, in the Town of Salina, New York (tax lot no. 022.-05-18.0).

85.    Upon information and belief, at least some of these transformers contained PCBs.

86.    Between 1935 and 1977, Monsanto Company (and its predecessor Monsanto Chemical Company) produced all or nearly all PCBs used by U.S. industry.

87.    According to records obtained by EPA from Monsanto Company ("Monsanto Files"), National Grid purchased approximately 18,000 pounds of Therminol FR-1 Heat Transfer Fluid (PCB Aroclor 1242) in 1970 alone. According to NYSDEC's website, National Grid has had at least five spills on the National Grid Property between 1995 and 2018, after GM had ceased operations at the Former GM-IFG Plant:

    a.    1995 Spill #9503252 (100 gallons of transformer oil into soil);

    b.    2006 Spill #0601915 (3 gallons of transformer oil into soil);

    c.    2014 Spill #1403464 (100 gallons of dielectric fluid onto soil which spill is not closed);

d. 2015 Spill #1503529 (20 pounds of hydraulic oil onto soil from vehicular failure); and

e. 2018 Spill #1802404 (10 gallons of transformer oil).

88. Following the 2014 Spill, National Grid sampled the oil in the transformers and indicated that the oil contained up to 19 parts per million (ppm) of PCB Aroclor 1260 and up to 8.1 ppm of PCB Aroclor 1242. NYSDEC noted residual oil present on the ground under all 12 transformers.

89. Many industrial facilities in the Ley Creek Watershed, including many of Defendants' Facilities, have on-site large transformers that are owned by National Grid or other Defendants.

90. Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the National Grid Facility or National Grid Property—for which Defendant National Grid is liable—are present in OU-2 and the Expanded Territory.

### *Carrier Facility: Carrier/UTC*

91. Carrier, along with UTC, owns and operates a 175-acre manufacturing facility ("Carrier Facility") located in the Town of Dewitt, New York, at or about at 6304 Carrier Parkway (tax lot no. 032.-02-01.1), Carrier Parkway (tax lot no. 032.-02-01.3); 6463 Thompson Road (tax lot no. 032.-01-04.1), and 6463 Thompson Road (tax lot no. 032.-01-07.0), that is designated as the UTC-Carrier New York State Superfund Site #734043.

92. NYSDEC's database for this State Superfund Site states that Carrier acquired the Carrier Facility "in the 1950s" and that Carrier's "facility produced a variety of products associated with heating, ventilation, and air conditioning."

93. That database identifies both Carrier and UTC as owners of the Carrier Facility at the time of disposal of hazardous wastes, including PCBs and volatile organic compounds (VOCs), and thus both UTC and Carrier were each an owner during the period of releases or discharges of contaminants.

94.    An October 2020 Interim Corrective Measure Work Plan for this State Superfund Site states that "Carrier currently operates the site as a research and laboratory facility."

95.    The NYSDEC database states that surface runoff is conveyed to Sanders Creek through established outfalls in the facility's stormwater collection system or as direct, non-point runoff. The database further states:

> Sanders Creek:  Investigations revealed PCBs throughout Sanders Creek and its floodplains above the Ecological SCO of 1 ppm at various depths.  In some areas concentrations of PCBs exceeded 50 ppm. A&R Building/Former Pond Area:  The Former Pond area had soil detections of SVOCs and PCBs at levels above Protection of Ecological Resources but below the SCO of Industrial Use.  The A&R building area had no soil detections above the Industrial Use SCO.  Former TR-1 Building:  A soil sample at the soil-groundwater interface near Substation I was found to contain Total PCBs at a concentration of 26.4 mg/kg. Debris Pile:  PCBs were found in concentrations greater than 50 ppm in the Debris Pile during the initial investigations. On-Site SVI:  VOCs were detected in buildings TR-4, TR-6, TR-18, and TR-18s.  Other occupied building[s] are currently being investigated for VOCs. Off-Site SVI:  There is no reason to believe there are any site related VOCs North and South of the site.  The potential for soil vapor intrusion to occur east of Kinne Street will be evaluated once the sub-slab and indoor air data has been evaluated at Building TR-20 and the potential for soil vapor intrusion to occur west of the site will be addressed under the landfill area, AOC G.  Landfill Area, AOC G:  Area is still under investigation. Early investigations revealed impacts from Metals, PCBs, SVOCs, and VOCs. TR-3 / SWTP:  Findings indicated chlorinated VOCs, PCBs, and oil-related impacts to subsurface soils and groundwater in the area, including the area between the wall and Sanders Creek.  Surface water:  PCBs were detected in the TR-18 and Thompson Rd Storm Lines at concentrations up to 67.8 ppm.  PCBs were found in roof runoff in concentrations ranging from 2 ppm to 30,000 ppm.  Groundwater:  Investigations have revealed VOC and PCB impacts in groundwater at several various locations throughout the site.

96.    As late as 1995, after operations at the Former GM-IFG Plant had ceased, Carrier was still releasing PCBs into Sanders Creek, as documented in a 1995 PCB Oil NYSDEC Spill Report #9505910.

97.    Industrial releases or discharges from the Carrier Facility pursuant to State Pollutant Discharge Elimination System ("SPDES") permit #NY000-1163 added PCBs and halogenated solvent contamination to the Ley Creek Watershed.  *See* Exhibit "N", Upper Ley Creek Map 2,

Site E.

98.    According to hazardous waste manifest database records received from NYSDEC, during their ownership and operation of the Carrier Facility, Carrier and/or UTC disposed of thousands of tons of hazardous substances containing PCBs, along with numerous other kinds of hazardous substances, including solvents and metals. The hazardous waste manifest database lists Carrier as the generator under No. NYD001317072 for the following PCB containing waste:

- B001 PCB Oil from transformers – 1,225,194.3 kg/1,347.71 tons
- B002 PCB Oil >50 ppm - 102,365.27 kg/112.60 kg/ tons
- B003 PCB Oil >500 ppm – 38,736,19 kg/42.61 tons
- B004 PCB Contaminated Articles > 50 ppm < 500 ppm –14,188.27 kg/15.61 tons
- B005 PCB Article > 500 ppm – 6,506.00 kg/7.16 tons
- B006 PCB Transformers – 276,219.74 kg/ 303.84 tons
- B007 PCB contaminated soil, sludges etc. – 3,663,395.2 kg/1,359.73 tons

99.    UTC acquired Carrier in 1979. UTC owned Carrier and was an operator of the Carrier Facility at the time of Carrier's 1995 PCB spill and during releases or discharges into Sanders Creek. UTC is named as a responsible party in NYSDEC's on-line Superfund Site listing for this spill. *See* Exhibit "N" at Map 2, Site E.

100.    In 2006, Carrier, as a "wholly owned subsidiary of [UTC]," executed a RCRA Order on Consent Index Number: CO 7-20051118-4, also enforceable under the New York State Superfund Law, ECL Article 27 Title 13, requiring corrective action to remediate PCBs in Sanders Creek, among other measures, because PCBs were bypassing its waste treatment plant and entering Sanders Creek beyond Outfalls 10 and 11.

101.    A September 2018 letter from NYSDEC in relation to the Carrier Facility requesting emerging contaminants sampling was addressed only to UTC, not to Carrier, indicating that UTC had taken over the day-to-day management of the facility's hazardous substance issues.

102.    Pursuant to an Interim Corrective Measure Work Plan, Carrier, under supervision of

20

NYSDEC, has proposed to remediate PCB and VOC contamination released or discharged from the Carrier Facility by excavation and off-site disposal of contaminated soil and sediment from the Sanders Creek corridor to approximately three feet below surface grade for approximately one mile, beginning adjacent to the Carrier Facility, and continuing westward downstream to the confluence with the South Branch of Ley Creek.

103.    That cleanup is scheduled for 2022, and while on June 9, 2021, Plaintiffs requested that Carrier give them access to Sanders Creek, including in the area of the outfalls from the Carrier Facility, prior to the work so that Plaintiffs' consultants could sample the contamination, Carrier refused to grant that access.

104.    Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the Carrier Facility—for which Defendants Carrier and UTC are liable—are present in OU-2 and the Expanded Territory.

### *Carrier Facility/TR-1, Court Street Facility, and Syracuse East Facility: GE/B&B/Lockheed*

105.    GE is a former owner and operator of the TR-1 Plant at the Carrier Facility, at which it manufactured turbines and engines from approximately 1940 to 1946, during which time, upon information and belief, contaminants were released into the Ley Creek Watershed.

106.    GE or its corporate affiliates, including GE Aerospace, owned and/or operated a facility about or at 6417, 6439 and 6545 Deere Road, in the Town of Dewitt, New York (tax lot nos. 023.-06-03.0; 023.-06-02.0; 023.-06-01.0), known as the General Electric-Former Court Street Plant #5 ("Court Street Facility"), consisting of  Buildings 5 and 5A, located along Sanders Creek to the north, and the South Branch of Ley Creek to the south (*see* Exhibits "B" and "N"), where they manufactured radar and sonar equipment for the U.S. Government between about 1956 and 1991.

107.    Numerous transformers at the Court Street Facility contained PCBs, and the outfalls at the

plant discharged into Sanders Creek.

108.   Monsanto records indicate GE purchased approximately 25,190 pounds of Aroclor 1254 and Aroclor 1260 PCB products that were delivered to Dewitt and Syracuse between 1970 and 1975; however, the Monsanto sales records do not identify the specific GE site address that received these products.

109.   There were multiple releases of PCBs and other contaminants (including hydraulic oils containing PCBs, petroleum, and chlorinated solvents) at the Court Street Facility, including spills reported in 1987, 1991, 1992, 1997 and 2006, and these contaminants are present in OU-2 and the Expanded Territory.

110.   According to the NYSDEC Superfund Database listing for the Court Street Facility, "[s]pills of solvents from underground solvent storage tanks and an aboveground solvent dispensing pad resulted in the disposal of hazardous waste at the site," including two spills reported in 1997 (Nos. 9707687 and 9708460) that resulted in the discharge of transformer oil.

111.   The Court Street Facility is listed as a Class 4 State Superfund site #734070 on the New York State Registry of Inactive Hazardous Waste Disposal Sites, where remedial systems are in place and Operation, Maintenance, and Monitoring ("OM&M") is required.

112.   Upon information and belief, GE assigned the leases for buildings at the Court Street Facility to Martin Marietta Corporation ("MMC") in 1993, when MMC purchased the assets that comprised GE's Aerospace business, and occupied the Court Street Facility.

113.   MMC is a partial indemnitor of GE for certain liability associated with the TR-1 Plant and Court Street Plant #5.

114.   MMC merged with Lockheed Corporation to form Defendant Lockheed.

115.   Upon information and belief, Lockheed has assumed GE's liability for releases and

22

discharges of contaminants at the Carrier Facility and the Court Street Facility.

116.    Defendant Lockheed agreed to perform various remedial measures at the Court Street Facility, and entered into a Consent Order on June 11, 1996 with NYSDEC, obligating Lockheed to perform more remedial work, and monitor and maintain the plant, but has failed to adequately remediate contaminants released at that location.

117.    MMC and Defendant Lockheed were in control of the Court Street Facility through a permanent easement, during a time period when releases of PCBs occurred, and failed to adequately control or remediate those releases.

118.    In 1997, dewatering operations during transformer pad excavation activities discharged into Sanders Creek, and also a bright green unidentified substance was observed in that creek.

119.    Upon information and belief, B&B is the current owner of 6439 and 6545 Deere Road, comprising a portion of the Court Street Facility.

120.    GE operated a third facility located at or about at 5990 East Molloy Road, in the Town of Dewitt, New York (tax lot no. 022.-05-03.6), known as the GE Apparatus Service or Syracuse East facility (EPA Registry ID## 110019187128 and 110011542697 and NYD010763290) ("Syracuse East Facility"), adjacent to the North Branch of Ley Creek, beginning in 1986, and owned the Syracuse East Facility from 1994 until 2018. This facility is now an abandoned building, which still has GE's name on the door.

121.    According to EPA's Enforcement and Compliance History Database, the Syracuse East Facility was a Commercial and Industrial Machinery and Equipment (except Automotive and Electronic) Repair and Maintenance facility.

122.    Upon information and belief, PCBs and other contaminants (including petroleum) were released or discharged during GE's operation of the Syracuse East Facility.

23

123. According to an Electronic Data Research ("EDR") Report and other records obtained by Plaintiffs, the Syracuse East Facility generated a variety of hazardous wastes, including PCB wastes generated between 1989 and 1993.

124. Upon information and belief, hazardous substances and other contaminants (including petroleum) were and are found in the approximate location of the pre-1950s Ley Creek channel directly downgradient from the Syracuse East Facility, that at least partially resulted from releases or discharges from that facility.

125. Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the TR-1 Plant at the Carrier Facility, the Court Street Plant, and the Syracuse East facility—for which Defendants GE, B&B, and Lockheed are liable—are present in OU-2 and the Expanded Territory.

### *Carlyle Facility: Carlyle/UTC/CCBC*

126. Carlyle, a subsidiary of Carrier, has owned and operated, along with UTC and Carrier, a manufacturing facility ("Carlyle Facility") located at or about at 6500 New Venture Gear Drive (formerly 6500 Chrysler Drive), in the Town of Dewitt, New York (tax lot no. 027.-02-11.1) since 1960. This facility abuts Sanders Creek.

127. According to the EPA FINDS database under EPA #110019426691, during Carlyle's ownership of the Carlyle Facility, it manufactured air-conditioning and warm-air-heating equipment and commercial and industrial refrigeration equipment.

128. According to hazardous waste manifest database records received from NYSDEC, during the ownership and operation of the Carlyle Site by UTC, Carrier and/or Carlyle, Carlyle disposed of hazardous substances containing PCBs, along with numerous other kinds of hazardous substances, including solvents and metals, as well as petroleum. Records list Carlyle as the

24

generator under No. NYD000688796 for the following PCB containing waste:

- B001 PCB Oil from transformers –21,608 kg /23.77 tons
- B002 PCB Oil >50 ppm - 625.5 kg/0.69 tons
- B003 PCB Oil >500 ppm – 445 kg/.49 tons
- B004 PCB Contaminated Articles > 50 ppm < 500 ppm – 134 kg/0.15 tons
- B005 PCB Article > 500 ppm – 45 kg/0.05 tons
- B006 PCB Transformers – 36,316 kg/39.95 tons
- B007 PCB contaminated soil, sludges etc. – 623.77 kg/0.69 tons

129. The Carlyle Facility had a number of documented spills.

130. In 1987, a spill designated as Spill #8703556 required remediation of contaminated soil under buried tanks was required and involved an "oily substance."

131. A PCB spill occurred on the Carlyle Facility in 1988, according to Spill Report #8804337. *See* Exhibits "B" and "N," Upper Ley Creek Map 2, Sites 2 and E.

132. According to EDR database information on the Carlyle Facility, UTC and Carlyle are jointly named as a large quantity generator for a number of different types of hazardous waste for many years, and Inspector F. Freiherr, LP, conducted a TSCA PCB inspection (198808223136 2) at the facility in 1988.

133. The Carlyle Facility has required vapor mitigation to address vapor contamination (Site No. 734068) because of groundwater contamination.

134. CCBC is the current owner of the Carlyle Facility.

135. Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the Carlyle Facility—for which Defendants Carlyle, UTC, and CCBC are liable—are present in OU-2 and the Expanded Territory.

### *BMS Facilities: Bristol-Myers/Fulton Iron*

136. Bristol-Myers has owned and operated, from 1943 to the present, a laboratory facility, located at or about at 3551 Burnet Avenue, in the Town of Dewitt, New York (tax lot nos. 012.-

01-02.1; 010.-02-01.0; 010.-03-02.1), and then purchased parcels and assembled a large manufacturing facility at or about at 6000 Thompson Road, in the Town of Dewitt, New York (tax lot nos. 012.-01-060; 23.-06-04.0; 012.-01-05.0; 012.-01-01.0), along the South Branch of Ley Creek, part of which was formerly the Fulton Iron facility ("Fulton Iron Facility") located at or about at 3800 Burnet Avenue, in the in the Town of Dewitt. Collectively, the properties owned by Bristol-Myers in the Town of Dewitt, including but not limited to the Fulton Iron facility, are referred to herein as the "BMS Facilities." *See* Exhibit B at Map 2, Site H.

137. The South Branch of Ley Creek and Headson's Creek transect and surround the BMS Facilities.

138. The Fulton Iron Facility, located on Burnet Avenue (tax lot nos. 010.-03-03.1; 010.-05-01.1; 011.01-02.0), which is part of the BMS Facilities, was operated by Fulton Iron operated as a metal scrapyard from about 1959 until 1993.

139. At the Fulton Iron Facility, scrap items including automobiles and appliances were drained of fluids, such as motor oil, gasoline, and hydraulic oils containing PCBs, and then the metal was cut or shredded and pressed to desired sizes to sell as scrap.

140. In the course of its scrap operations, Fulton Iron released and discharged contaminants including PCBs at its facility, which was listed as New York State Superfund Site #734056.

141. Extensive remediation was conducted in 1996 in seven areas of the Fulton Iron Facility with soil PCB concentrations between 25 and 50 ppm and in five areas with soil PCB concentrations greater than 50 ppm, including Aroclors 1242, 1248, 1254, and 1260, although after excavation, residue contamination as high as 33 ppm of PCBs was left in the ground.

142. Bristol-Myers has released or discharged storm and/or waste process water containing contaminants, upon information and belief containing PCBs and petroleum, into the South Branch

of Ley Creek via SPDES Permit #NY0233251, and has continued to have spills as part of its ongoing industrial operations at its BMS Facilities, including but not limited to: a 1986 spill of diesel fuel (Spill #8604666) in groundwater; another petroleum spill in 1987 (Spill #8607721); a spill of an "unknown substance" from equipment failure (1988 Spill #8802080); and a 1988 spill of kerosene into groundwater (Spill #8802588); all of which are documented on NYSDEC's website.

143.    Bristol Myers pleaded guilty to violations of the Clean Water Act in 1992 for discharging waste to public sewers in violation of its industrial user permit, and for discharging methylisobutylketone (MIBK), acetone, and condensate into the waters of the United States.

144.    Based on Freedom of Information Law ("FOIL") records received from NYSDEC and EPA, Bristol-Myers purchased, used, and disposed of PCBs at the BMS Facilities.

145.    According to the Monsanto Files, Bristol-Myers purchased 48,000 and 12,000 pounds of Therminol FR-1 (Heat Transfer Fluid) containing PCBs Aroclor 1242 in 1970 and 1971, respectively.

146.    Under Bristol-Myers' hazardous waste generator number NYD002230902, Bristol-Myers has disposed of the following PCB hazardous waste from its BMS Facilities:

- B002 PCB Oil >50 ppm - 19,049.51 kg/20.95 tons
- B004 PCB Contaminated Articles > 50 ppm < 500 ppm – 70 kg/.08 tons
- B005 PCB Article > 500 ppm – 45 kg/0.5 tons
- B006 PCB Transformers – 4,197 kg/4.62 tons
- B007 PCB contaminated soil, sludges etc. – 418,032.19 kg/450.84 tons

147.    Results of environmental sampling submitted to the NYSDEC have demonstrated past and present PCB contamination of soil, groundwater, and sediment at the BMS Facilities, and in the South Branch of Ley Creek and Headson's Creek adjacent to and downstream of the BMS Facilities.

148.    Bristol-Myers engaged in a remediation project under the Voluntary Cleanup Program (VCP Site #C734138) for the Fulton Site, which is still a part of the BMS Facilities, and which was, and still is, contaminated by, among other things, PCBs.

149.    Documents provided by NYSDEC in response to a FOIL request indicate that groundwater at and around the BMS Facilities remains contaminated with PCBs. Records also document PCBs up to at 25 ppm remaining in some environmental media around the BMS facilities.

150.    Sediment sampling that, upon information and belief, was conducted by NYSDEC in the South Branch of Ley Creek and Headson's Creek near the BMS Facilities, identified contamination including PCBs.

151.    According to NYSDEC, both surface water and groundwater on the BMS Facilities flow toward and into the South Branch of Ley Creek and/or Headson's Creek.

152.    Upon information and belief, Bristol-Myers has conducted no remediation of PCB contamination in the South Branch of Ley Creek and/or Headson's Creek.

153.    Upon information and belief, Bristol-Myers has instituted no engineering or other controls to prevent contamination from traveling from the South Branch of Ley Creek and/or Headson's Creek near the BMS Facilities to OU-2 and the Expanded Territory.

154.    This PCB contamination includes Aroclor 1254 and Aroclor 1260, which, upon information and belief, were not used in significant quantities at the Former GM-IFG Plant.

155.    Upon information and belief, Bristol-Myers has allowed contaminants to continue to be released or discharge from the BMS Facilities.

156.    Bristol-Myers has entered into Consent Orders and a Brownfield Cleanup Agreement as a responsible party to conduct various remediation efforts on the BMS Facilities as a result of contamination by PCBs and other hazardous wastes.

157.    For example, Bristol-Myers executed Consent Order No. A7-0278-92-03 for New York State Superfund Site No. 734001 in relation to a 1.5-acre landfill on its 6000 Thompson Road facility, where the company burned and buried laboratory waste north of the Fulton Iron Facility.

158.    Bristol-Myers has executed a Brownfield Cleanup Agreement Index No. C734138-09-11, for the Northern Campus Restoration Area, Brownfield Cleanup Program ("BCP") Site No. 734138, which represents a 23-acre contaminated portion of the main facility site at 6000 Thompson Road, in which Bristol-Myers is listed as a participant (responsible party), not a volunteer.  The documents provided by Bristol-Myers to NYSDEC in connection with its BCP application identify PCBs as a contaminant of concern.

159.    Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the BMS Facilities—for which Defendants Bristol-Myers and Fulton Iron are liable—are present in OU-2 and the Expanded Territory.

### *Chrysler Facility: Old CARCO/Old CARCO Trust/Magna/NPGC/NPGI/ONX1*

160.    The Chrysler Facility was owned and/or operated by Chrysler Corporation, its successors, and/or its subsidiary or affiliated entities from 1959 to 2010.

161.    NPGC owned the Chrysler Facility from about 1979 to 1987 and operated it as a division of Chrysler Motors Corporation. During this period, the Chrysler Facility became known as the New Process Gear facility.

162.    In 1987, Chrysler Motors Corporation transferred the Chrysler Facility to Acustar, Inc., a wholly owned subsidiary of Chrysler Motors Corporation.

163.    In 1990, Acustar, Inc. transferred the Chrysler Facility to New Venture Gear, Inc. ("NVGI"), which was a new joint venture between Chrysler Motors Corporation and General Motors Corporation (which was a 36% minority shareholder).

164. On January 1, 1999, NVGI, which at some point became known as DCC 929, LLC, transferred the Chrysler Facility to New Venture Gear of New York, LLC.

165. In 2002, after a merger with Daimler, the new Daimler Chrysler bought General Motors' entire 36% minority stake in NVGI.

166. In 2004, New Venture Gear of New York, LLC transferred the Chrysler Facility to NVGI.

167. Also in 2004, NPGI and Magna also operated at the site, which continued until about 2012.

168. In 2004, Magna International Inc. purchased an 80% interest in some of the assets of NVGI from Daimler Chrysler, creating NPGI, in which Daimler Chrysler retained the remaining 20% interest.

169. In 2007, Magna International Inc. purchased the remaining 20% interest in NPGI from Daimler Chrysler.

170. In 2009, NVGI's design and engineering services moved to Troy, Michigan.

171. Between 2004 and August 24, 2012, NPGI operated the New Process Gear Facility.

172. Between 2004 and 2012, Magna and NPGI, both wholly owned by Magna International Inc., operated at the New Process Gear facility under the following assumed names: New Process Gear; MPT Transfer Case Assembly; MPT X2T; MPT Geared & AWD Systems.

173. NPGI was wholly owned and controlled by Magna International Inc. and, upon information and belief, lacked corporate autonomy.

174. ONX1 is the current owner of the Chrysler Facility, and upon information and belief, in 2015 transferred a portion of the Chrysler Facility to JDC DeWitt, L.L.C.

175. The Chrysler Facility contained at least one outfall which released or discharged directly into Sanders Creek.

176. Process flow diagrams indicate that, by at least 1974, Chrysler used a heat exchange system

30

to support manufacturing operations, and the heat exchanger cooling water discharged to Sanders Creek via stormwater retention ponds and outfall 001.

177. The Chrysler Facility site layout includes an electrical substation directly adjacent to the lower stormwater retention pond that also discharged to Sanders Creek via outfall 001.

178. During operations at the Chrysler Facility from 1959 to 1979 and the New Process Gear Facility from 1979 to 2012, Chrysler Corporation, Chrysler LLC, other Chrysler entities, Magna, Magna International Inc., NPGC, and NPGI, during their ownership or operations, released or discharged into Sanders Creek contaminants including PCBs and petroleum involved in the manufacture of automotive gear and gear housing, including contaminants that were used in electrical services including transformers and substations, along with PCB hydraulic fluids.

179. The Chrysler Facility also was used for the machining and casting of aluminum, cast iron, and steel, and die and investment casting, which are operations that have historically been associated with PCB use.

180. The Chrysler Facility had numerous reported spills, including but not limited to: Spill ##8605940 (used oil to surface water unknown quantity); 9005379 (diesel truck spill); 9208676 (gasoline unknown quantity to soil); 9211399 (gasoline unknown quantity to soil); 9412146 (#2 fuel oil to soil); 9603160 (diesel unknown amount to soil); 9603347 (oakite 15 gallons to soil); 9606389 (mercury 3 pounds to soil); 9608003 (1200 gallons of lube oil to sewer); 9700843 (unidentified equipment failure spill); 9712032 (another unidentified spill); 9806403 (unidentified tank farm failure); 9807176 (tank overflow of unknown substance); 9810679 (equipment failure of unidentified substance), 9900368 (wastewater and hydraulic oil spill); 9902636 (waste oil into sewer); 9906682 (1000 gallon waste oil spill); 9908428 (40 gallon spill to soil); 101108 (lube oil to soil); 102687 (20 gallons petroleum to sewer); 103886 (motor oil); 104015 (transmission fluid);

104684 (7 gallon floor cleaner); 211099 (used oil); 303470 (unknown 2 gallon spill to soil); 306290 (quenching oil to surface water); 308123 (unknown amount waste oil spill); 308506 (unknown amount waste oil spill); 404337 (unknown spill on dock); 409541 (5 gallon diesel spill); 610876 (unknown amount of cutting oil to soil); 908952 (gasoline on impervious surface); 1011638 (waste oil on impervious surface); 1305935 (15 gallon fuel dispenser pump diesel spill); and 1401116 (diesel tank spill). The NYSDEC Spills Database shows about 32 separate spills at the Chrysler Facility.

181.    According to the NYSDEC hazardous waste manifest database, the Chrysler Facility generated roughly 100 tons of hazardous waste containing PCBs, along with numerous other kinds of hazardous waste, including at least 63 tons originating from transformers and/or capacitors.

182.    In 2002, NYSDEC conducted a macroinvertebrate survey of Sanders Creek. The survey showed that PCBs, namely Aroclors 1254 and 1260, were present in crayfish taken from Sanders Creek. NYSDEC suspected the Chrysler Facility was a source of this PCB contamination.

183.    According to a hazardous waste manifest database received from NYSDEC, during the ownership and operation of the Chrysler Facility by the entities detailed above, numerous tons of hazardous waste containing PCBs, along with numerous other kinds of hazardous waste, including solvents and metals were disposed.  The hazardous waste manifest database lists NPGI as the generator under No. NYD002239994 of the following PCB containing waste:

- B001 PCB Oil from transformers – 19,581 kg/21.54 tons
- B002 PCB Oil >50 ppm - 8,206.77 kg/9.03 tons
- B003 PCB Oil >500 ppm – 4,587 kg/5.05 tons
- B004 PCB Contaminated Articles > 50 ppm < 500 ppm – 11 kg/.01 tons
- B005 PCB Article > 500 ppm – 10,293.18 kg/ 11 tons
- B006 PCB Transformers – 37,688.73 kg/41.46 tons
- B007 PCB contaminated soil, sludges etc. – 6,689.82 kg/7.36 tons

184.    During Magna/NPGI's operation of the Chrysler Facility, the facility's outfall 001 released

32

or discharged PCBs into Sanders Creek.

185. Upon information and belief, this same outfall was also used by Chrysler Corporation, Chrysler LLC, and other related entities before Magna/NPGI's operations.

186. On multiple occasions, Magna/NPGI violated their SPDES permit regarding releases or discharges from outfall 001, including but not limited to instances involving release or discharge of PCBs.

187. In 2008 and 2009, NYSDEC required Magna/NPGI to conduct a six-month high intensity monitoring program for PCBs on the release or discharge from outfall 001.

188. In February 2009, elevated levels of Aroclor 1260, a type of PCB product believed not to have been used in any significant quantity at the Former GM IFG Plant, were detected at the Magna/NPGI outfall 001, which contaminants were then released or discharged into Sanders Creek.

189. During closure of a Magna/NPGI stormwater pond, undertaken during the relinquishment of Magna/NPGI's SPDES permit, sampling showed several parameters—including Total PCBs— exceeding the State's criteria for protection of groundwater 6 NYCRR Part 375.

190. NYSDEC believed the stormwater pond was not lined, and that residual material in the pond was a threat to contaminate groundwater.

191. Upon information and belief, Magna, Magna International Inc., NPGC and NPGI have not conducted any remediation of PCB contamination released or discharged into the Ley Creek Watershed.

192. According to the EDR Report, ONX1 experienced two spills at the Chrysler Facility that impacted Sanders Creek and groundwater.

193. ONX1's first reported spill (#1215916) occurred on or about August 6, 2013, and involved

33

a "loss into Sander[s] Creek, haz mat on scene" according to the spill report. The nature of the material spilled may have involved lube oil, cutting oil and/or petroleum, according to the report.

194. ONX1's second reported spill was listed as a tank spill #1305696 on August 28, 2013. It required owner Robert Trafford to immediately call a spill contractor, engineers, and demolition crews.

195. The day after ONX1's second reported spill, twelve underground storage tanks (Tanks 1-12) were all required to be removed. Contaminated groundwater then had to be pumped from the excavation over next few days and treated using the on-site industrial wastewater pretreatment plant. Contaminated pea stone backfill around tanks also had to be excavated and disposed of off-site, and then sidewall and bottom soil samples had to be secured. Contamination remained in the groundwater at the base of excavation, which is continuing to be pumped to the on-site wastewater treatment plant for treatment and disposal.

196. Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the Chrysler Facility—for which Defendants Old CARCO, Old CARCO Trust, Magna, NPGC, NPGI, and ONX1 are liable—are present in OU-2 and the Expanded Territory.

### *S&P Facility: S&P*

197. S&P owns and operates a remediation and spill response company.

198. S&P purchased the property located at or about at 1401 and 1405 Brewerton Road, in the Town of Salina, New York (tax lot nos. 073.-01-05.0; 073.-01-60.0) ("S&P Facility") from Buckley Petroleum, Inc., which operated a gas station on the site beginning in about 1945, and which operation upon information and belief caused spills of contaminants into Ley Creek and the Ley Creek Watershed.

199.    S&P's Hazardous Waste Permit, issued by NYSDEC in 2012, covers storage of hazardous solvent waste (waste codes in F and D categories) received from customers that perform activities known to be associated with PCBs, such as semi-conductor manufacturing, dry cleaning, auto repair, painting, printing and metal machining, and fabrication.

200.    According to the EDR Report, S&P is a large quantity hazardous waste generator.

201.    S&P is a wholesale supplier of insecticides and other chemical and allied products under NY #D013277454 and NJ #S120665322.

202.    The S&P Facility is both a Chemical Bulk Storage facility under CBS #7-000164 and a Petroleum Bulk Storage facility under PBS #7-182451.

203.    The S&P Facility was assigned a Corrective Action Prioritization Code in relation to a site-wide remedial action.

204.    The S&P Facility had a spill (#8807288) on December 5, 1988, in relation to a tank overfill. The Corrective Action Report indicates that there was migration of contaminated groundwater from the facility into the Ley Creek Watershed, which contamination was reportedly eventually brought "under control."

205.    Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the S&P Facility—for which Defendant S&P is liable—are present in OU-2 and the Expanded Territory.

*Former Roth Brothers Smelting Facilities: Thompson Corners/*
*Thompson NW/6181 Thompson Road LLC/Thompson Lawn/*
*Metalico Realty/Metalico New York/Hauler's Facility/Aleris*

206.    Two former smelting plants ("Former Roth Brothers Smelting Facilities") were operated by Roth Brothers Smelting Corp. ("Roth Brothers") from about 1949 to 1997, and were located at or about at 6215, 6223 and 6625 Thompson Road, in the Town of Dewitt, New York (tax lot nos.

033.-03-09.1, 033.-04-13.1,033.-04-15.1), which is along the South Branch of Ley Creek.

207.   Beginning in 1949, Roth Brothers began operations in their Smelting Plant No. 1, reclaiming non-ferrous metals and alloys through secondary smelting and refining of purchased scrap, drosses, and by-products.

208.   Roth Brothers Smelting Plant No. 2 was constructed between 1952 and 1957.

209.   Historically, facility operations by the Roth Brothers consisted of aluminum and zinc smelting, lead-tin solder operations, and copper insulation incineration, which resulted in releases and discharges of contaminants including PCBs. Aluminum and zinc operations were primarily conducted in Plant No. 1, although an aluminum crusher was located in Plant No. 2.

210.   In 1991, lead and copper processing operations, which were conducted in Plant No. 2, ceased and the company added aluminum smelting capacity of 25,000 tons per year by closing and remodeling the lead-tin solder operations.

211.   PCBs were detected in onsite storm sewer outfalls from the facility discharging into the South Branch of Ley Creek in exceedance of the SPDES permit limit (1 ppb) between 1986 and 1988, and were detected above the maximum daily limit for PCB Aroclors 1242 and 1248 (concentrations up to 12 ppb) between 1991 and 1994.

212.   In 1994, Roth Brothers entered into Consent Order #C7-0001-94-10 with NYSDEC to carry out a Corrective Measures Implementation Plan to address contaminants at the Former Roth Brothers Smelting Facilities, but that Order was not fully complied with.

213.   In 1997, Roth merged with Philip Environmental, and the operation continued until 1999.

214.   In 1999, the Former Roth Brothers Smelting Facilities were purchased by Wabash Aluminum Alloys, LLC, which was purchased by Aleris in 2007.

215.   Aleris is the successor to Roth Brothers' liability.

216.    On January 28, 2003, Wabash Aluminum Alloys, LLC received a notice of violation for unreported petroleum spills.

217.    Thompson Corners purchased four parcels, including the former Roth Brothers Smelting Facilities, from Wabash Aluminum Alloys, LLC on or about April 7, 2005. Thompson Corners eventually subdivided those parcels and sold the lots separately.

218.    On September 15, 2010, a second Consent Order was entered into with NYSDEC for the Former Roth Brothers Smelting Facilities, Consent Order #R7-20070627-35, which included Thompson Corners and Metalico New York as respondents, and which upon information and belief has not been fully complied with. *See* Exhibit "N" at Map 2, Site F.

219.    In 2006, Thompson Corners sold 6225 Thompson Road (former Roth Plant 2 on Parcel 2 with a former address of 6223 Thompson Road) to Metalico Syracuse Realty Inc.

220.    In 2013, Thompson Corners sold 6223 Thompson Road (former Roth Plant 1 on Lot 1) to Hauler's Facility, doing business as Syracuse Haulers Waste Removal, Inc. *See* https://wastebits.com/locator/location/syracuse-haulers-waste-removal-inc.

221.    In 2011, Thompson Corners sold 6215 Thompson Road (Lot 2) and a right-of-way leading to Ley Creek to Thompson Lawn, which still owns the right of way. Thompson Lawn in turn in 2016 transferred the land to McDewitt, LLC. Upon information and belief, both Thompson Lawn and McDewitt are related to Thompson Corners.

222.    CNY Sandtrap LLC bought a lot which was part of the Oberdorfer Facility described further below and sold that lot in January 2019 to Hauler's Facility.

223.    Behind Horton LLC bought 6229 Thompson Road and then also sold this property on the same day in January 2019 to Hauler's Facility.

224.    Thompson Corners sold to 6181 Thompson Road LLC a .93-acre portion of the Hoffman

Facility described further below.

225.   Upon information and belief, 6181 Thompson Road, LLC, Thompson Corners LLC, CNY Sandtrap, LLC and Thompson NW, LLC are all related because the same individual, Donald J. Brang, signed an easement on behalf of all these entities that was recorded in the Onondaga County Clerk's Office at Liber 5371 of Deeds, page 133.

226.   Metalico Realty is the owner of one of two former Roth Brothers Smelting Facilities located at 6225 Thompson Road ("Metalico Facility"), on which Metalico New York operates a scrap metal recycling and smelting business, and which is located along the South Branch of Ley Creek, into which PCB releases from operations occurred.  *See* Exhibit N at Map 2, Site F.

227.   Metalico New York operates a secondary smelting and aluminum alloying operation at the Metalico Facility, and is a Petroleum Bulk Storage facility under ID #7-437999, which uses a variety of petroleum products in its processing operations, and stores in multiple on-site storage tanks a variety of petroleum products including waste oil and used oil, and upon information and belief, discharged and released petroleum, PCBs, and other contaminants into the South Branch of Ley Creek.

228.   According to the EDR Report, the Metalico Facility is on the "EPA Watch List" under Facility #NYD006977086, and migration of groundwater from the facility has occurred.

229.   Certain soils in the vicinity of Plant 2 were contaminated by lead (up to 40,000 ppm total lead), cadmium, and PCBs at up to 250 ppm.

230.   During a June 2018 monitoring event, the NYSDEC Class GA groundwater standard for PCBs (0.09 µg/L) was exceeded at MW-8R (35.0 µg/L).

231.   Also in 2018, Barton & Loguidice noted that the increased PCB concentrations observed during storm effluent monitoring were likely from scrap yard effluent and soil/debris collected in

the scrap metal yard at the Former Roth Brothers Smelting Facilities.

232.    Further, discharges of PCBs from the facilities into the South Branch of Ley Creek are ongoing.

233.    Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the properties and facilities discussed in paragraphs "206" through "232" above—for which Defendants Thompson Corners, Thompson NW, 6181 Thompson Road LLC, Thompson Lawn, Metalico Realty, Metalico New York, Hauler's Facility, and Aleris are liable—are present in OU-2 and the Expanded Territory.

### *Hoffman Facility: 6181 Thompson Road LLC/Gardner Denver/U.S. Hoffman*

234.    Gardner Denver acquired the property located at or about at 6181 Thompson Road, in the Town of Dewitt (tax lot no. 033.-04-17.1) ("Hoffman Facility")—a portion of the former U.S. Hoffman site—in 2001, sold it to 6181 Thompson Road LLC in 2003, and became a tenant of this new owner.

235.    6181 Thompson Road, LLC is the current owner of the Hoffman Facility.

236.    Upon information and belief, the Hoffman Facility released or discharged contaminants into the South Branch of Ley Creek.

237.    Upon information and belief, the Hoffman Facility was previously used as the United States Hoffman Machinery foundry and specialized in manufacture of garment press and laundry equipment activities using hydraulic equipment, which, upon information and belief, contained PCBs and petroleum.

238.    Donald Brang, owner of Brang Real Estate, LLC, is actively marketing this property for sale. *See* http://brangco.com/property/6181-thompson-rd-syracuse-ny-13206/.

239.    According to Sanborn maps, U.S. Hoffman, under various names, has been present at this

site since at least 1950, but its predecessor T.D. Palmer commenced operations there in 1908.

240.    Upon information and belief, Gardner Denver's Hoffman Air & Filtration Systems Division continues to make compressors, vacuums, blowers, liquid ring pumps, petroleum pumps, loading arms, couplers, water jetting, and equipment at the Hoffman Facility.

241.    Hoffman Air & Filtration Systems also still operates as a large quantity generator of hazardous waste at the site under EPA ID #NYD002246668.

242.    The NYSDEC Hazardous Waste Manifest database for this facility notes the generation of hazardous wastes with the following waste codes: D001, D002, D003, D006 (cadmium), D008 (lead), D009 (mercury), F001, F002, F003, F005, U002 (2-propanone), U080 (methane), U151 (mercury), U226 (ethane), as well as 2,957 kg of B003 (petroleum oil or other liquid containing 500 ppm or greater PCBs) in August 1997.

243.    On September 8, 1998, a transformer at the Hoffman Facility was knocked down by a storm (Spill No. 9806995), which upon information and belief resulted in a release of PCBs.

244.    On August 22, 2000, the facility had a spill (No. 0006131) of "transformer oil" in the soil, which upon information and belief contained PCBs.

245.    In December 2015, an above-ground storage tank at the Hoffman Facility ruptured, and approximately 40 gallons of diesel fuel were released to the surrounding soils. Subsequent sampling of the affected soil revealed that PCB Aroclors 1248 and 1254 were present in the soil at concentrations of 996 micrograms per kilogram (µg/kg) (0.996 ppm) and 398 µg/kg (0.398 ppm), respectively, and total PCBs were detected at a concentration of 1,390 µg/kg (1.39 ppm).

246.    Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the Hoffman Facility—for which Defendants 6181 Thompson Road, Gardner Denver, and U.S. Hoffman are liable—are present in OU-2 and the

40

Expanded Territory.

### *Lamson Facility: Gardner Denver/Syracuse LePage*

247.    Lamson Corporation, f/n/a Lamson Company ("Lamson") owned and operated a manufacturing facility ("Lamson Facility") near the South Branch of Ley Creek and Teall Brook at 1 Lamson Street (now know as 1 Lepage Place), in the Town of Dewitt, New York (tax lot no. 033.-07-01.0) from about 1921 to 2000.

248.    Upon information and belief, the Lamson Facility manufactured and designed centrifugal blowers and exhausters that used PCB materials in hydraulic fluids, heat transfer fluids, and lubricants, which upon information and belief were released or discharged into the South Branch of Ley Creek and Teall Brook.

249.    Upon information and belief, Gardner Denver became the successor to Lamson Corporation in or about 1996, and continued operations at the Lamson Facility thereafter.

250.    According to the EDR Report, Gardner Denver (through its division Hoffman Air Filtration Systems) is still the operator of the Lamson Facility, and still manufactures and designs centrifugal blowers and exhausters.

251.    Transformers, as well as a brass foundry, oil tanks, plating and lacquering operations, and a structural steel fabricating shop are or were located at the Lamson Facility.

252.    Upon information and belief, PCBs may have been used at the Lamson Facility as part of these operations between at least 1951 and 1990, and may have been released into the South Branch of Ley Creek and Teall Brook.

253.    On or about August 15, 1986, a spill of an unknown quantity of #4 fuel oil into groundwater at the Lamson Facility was reported to NYSDEC and assigned Spill #8603776.  This spill took over nine months to close, suggesting that remediation work was required.  Upon information and

41

belief, this spill affected groundwater that flows to the South Branch of Ley Creek.

254.    Lamson Corporation had another spill #9107363 on October 8, 1991, when a water-miscible cutting and grinding fluid was spilled, and the company was required to sample under EPA methods 8020, 8240, 8270, 413.3, DOH 310-13, TCLP Metals and for PCBs. This October 1991 spill required an extensive soil sampling program to define the extent of the contamination which occurred from late 1991 to September 1995. The substance spilled was determined to be a synthetic lubricant caused by a machinery failure. The fluid allegedly escaped from the building under the door, and the spill was not cleaned up and closed until March 1996.

255.    Because the August 1986 and October 1991 spills were not remediated rapidly, the contamination likely migrated into the soil and groundwater and off-site into the Ley Creek Watershed.

256.    On December 5, 2002, a spill of 100 gallons of hydraulic oil, which may have contained PCBs, to site soil was reported to NYSDEC.

257.    Syracuse Lepage is the current owner of the Lamson Facility.

258.    Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the Lamson Facility—for which Defendants Gardner Denver and Syracuse LePage are liable—are present in OU-2 and the Expanded Territory.

### *Oberdorfer Facility: Gardner Denver/Northern Industrial Holdings/Hauler's Facility*

259.    Northern Industrial Holdings and Hauler's Facility are the current owners of a four-acre site located at or about at 6200 and 6259 Thompson Road, in the Town of Dewitt, New York (tax lot nos. 033.-04-10.1; 033.-04-10.2) ("Oberdorfer Facility"), at which Oberdorfer Foundries Inc. (a/k/a Oberdorfer, LLC) commenced operations in 1919.

260.    Upon information and belief, Gardner Denver, Inc., acquired Oberdorfer Foundries Inc.

and operated Gardner Denver Oberdorfer Pumps, Inc. at the Oberdorfer Facility for many years.

261. From 1921 until 2013, Oberdorfer operated a foundry that cast brass, bronze, aluminum, and magnesium components of engine assemblies, and manufactured small centrifugal pumps.

262. Foundry operations included sand molding, core making, metal melting and pouring, cleaning, and machining, through which the foundry operator disposed of spent core sands, molding sands, contaminated sand, refractory linings, bentonite and binder clay, metal oxides, metal scraps including metal fines, and baghouse dust. Foundry operations also included the use of transformers.

263. In connection with the foundry, a portion of the Oberdorfer Facility was used for two unlined landfills since 1945, with known leachate releases or discharges to surface water, and the materials dumped there have been the typical non-ferrous foundry sand and refractory wastes, as well as various chemical binders (phenolic resins, such as phenol-formaldehyde, phenol-isocyanate, phenol-urea and sodium-solicate).

264. According to investigations by NYSDEC, there was and still may be a potential for contaminants to reach the South Branch of Ley Creek due to possible leaching of substances from the Oberdorfer Facility.

265. The Oberdorfer Facility possessed a General Permit (WMGR019) - Beneficial Use of Waste Foundry Sand, amended in 2009 and 2014, for foundry sand to be used on-site as fill. The permit allowed for PCB constituents to be present in the sand.

266. The Oberdorfer Facility possesses or possessed SPDES permits, since at least 1972, permitting it to discharge into the Ley Creek Watershed.

267. The Oberdorfer Facility has or previously had underground and above ground storage tanks for petroleum.

43

268.    Prior to sometime between 1977 and 1981, when use of PCBs would have been most prevalent, Oberdorfer discharged all process wastewater and cooling water produced during site operations into the South Branch of Ley Creek, via outfalls 001, 003, and 004.

269.    Even after these process discharges, water discharging from the Oberdorfer Facility still contained concentrations of individual PCB Aroclors when Oberdorfer sampled the effluent in 1993, indicating that PCBs were still being discharged from the Oberdorfer Facility to the South Branch of Ley Creek.

270.    During a January 1993 annual facility inspection, the NYSDEC inspector noticed an "unpermitted industrial discharge" at the southern end of the facility and noted his concern that this discharge water potentially included leachate from the on-site landfills.  Subsequent testing of an effluent sample detected PCB Aroclor 1248 at a concentration of 0.27 micrograms per liter ($\mu$g/L).

271.    A number of spills have occurred on the Oberdorfer Facility, including but not limited to a spill that occurred on October 21, 1993, identified as NYSDEC Spill #9308786.

272.    On October 15, 2003, NYSDEC Spill #0302932 at the Oberdorfer Facility resulted from a ruptured hydraulic line on a truck.

273.    A spill at the Oberdorfer Facility occurred on February 2, 2017, apparently associated with a transformer pole. The spill was allegedly discovered when a Phase II investigation was conducted by a potential purchaser, which apparently did not report the spill.

274.    During Northern Industrial Holdings' ownership of the Oberdorfer Facility, excavation of contamination was required by NYSDEC.

275.    Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the Oberdorfer Facility—for which Defendants Gardner

44

Denver, Northern Industrial Holdings and Hauler's Facility are liable—are present in OU-2 and the Expanded Territory.

### *Super Heat Facility: Jagar*

276.    Super Heat Treating, Inc. ("Super Heat Treating") owned and operated a site located at 3605½ James Street, in the Town of Dewitt, New York (tax lot no. 033.-07-03.1) ("Super Heat Facility") from about 1953 until approximately 1998, when the company was dissolved.

277.    The Super Heat Facility had been previously owned by Arthur and Seymour Roth (a/k/a the Roth Brothers).

278.    Operations conducted at this facility included vacuum heat treating and brazing, atmosphere heat treating, tool and die hardening, metallurgical lab and testing facilities, and production facilities for carburizing, hardening, normalizing, stress relieving, and cold treating, and also hydraulic systems, which typically used PCBs.

279.    NYSDEC Spill Records dated 1993 and 1994 for the Super Heat Facility reveal waste oil, a deliberate used oil spill and abandoned drums on the site.

280.    According to the EDR Report, NYSDEC inspected the vacant building after Super Heat Treating left the facility and observed "oil staining" "vacant building 55 gal containers spilled on outside of bldg. also inside there are haz. mat. spills black oily substance. side entrance is opened."

281.    Super Heat Treating operated from at least 1980 as a large quantity generator generating hazardous waste, including ignitable and reactive waste.

282.    In addition, Super Heat Treating was a large quantity generator for F010 hazardous waste, which includes quenching bath residues from oil baths from metal heat treating operations where cyanides are used in the process, and F012 quenching wastewater treatment sludges from metal heat treating operations where cyanides are used in the process.

283.    Wastewater was discharged into an on-site septic tank and not into the sanitary sewer system until 1988, when the company finally connected to the Onondaga County sanitary sewer system, so it may have leached PCBs or other contaminants into Headson's Creek, which is only approximately 0.15 mile to the southeast.

284.    Jagar is the current owner of the Super Heat Facility, which it apparently purchased from Onondaga County at a tax sale in 2005.

285.    Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the Super Heat Facility—for which Defendant Jagar is liable—are present in OU-2 and the Expanded Territory.

### *Syracuse China Facility: Onondaga Pottery/Amparit*

286.    Onondaga Pottery and, beginning in about 1995, Syracuse China Company owned and/or operated a facility located at or about at 2801, 3003 and 3063 Court Street, in the Town of Salina, New York (067.-01-11.1; 067.-01-08.1; 067.-01-09.2; 067.-01-09.3; and 067.-01-14.1) ("Syracuse China Facility") that borders the Ley Creek PCB Dredgings Subsite to the north and the National Grid Property to the east.

287.    From about 1922 to 2009, Onondaga Pottery and then Syracuse China Company manufactured china products at this site, and in their operations used PCBs in hydraulic fluid and had PCB-containing transformers.

288.    The Syracuse China Facility, known as the Syracuse China State Superfund Site #734053, is listed as a Class 4 site on the NYS Registry of Inactive Hazardous Waste Disposal Sites where site OM&M is required.

289.    Amparit Industries is the current owner of the Syracuse China Facility, and upon information and belief Syracuse Property Partners LLC owns a portion of the Facility.

46

290. When Amparit took title to the Syracuse China Facility in March 2011, it had not performed a Phase I Environmental Site Assessment within one year.

291. Wastewater treatment lagoons used as settling ponds for Syracuse China's wastewater treatment process previously contained toxic levels of lead contamination, and surface water sampling revealed the presence of lead and trace concentrations of volatile organic compounds. Similar levels of lead contamination were found in several areas outside of these lagoons.

292. Wastewater from the facility was discharged through outfalls into Ley Creek.

293. Transformers used at the Syracuse China Facility were disposed of in 1989, with 7,190 kilograms (kg) (15,850 pounds [lbs]) of PCB transformer waste (B006 waste ), 630 gallons of PCB oil (B001 waste ), and 1,010 kg (2,226 lbs) of other PCB-containing equipment (B005 waste ). Another 68 kg (150 lbs) of B005 waste was disposed of in 1995.

294. From approximately 1940 to 1994, Onondaga Pottery used a 13-acre landfill on the northern portion of the Syracuse China Facility on Factory Avenue to dispose of wastes from the plant, including fired clay, gypsum molds, broken china, cement, and construction debris.

295. That landfill was also used by the City of Syracuse, the Town of Salina, and the Town of Dewitt to dump wastes that were cleaned out of storm sewers and from road fill, which were known to typically contain PCBs.

296. A Remedial Investigation/Feasibility Study ("RI/FS") was completed at the Syracuse China Facility on March 21, 1995, to delineate areas of concern and determine the extent of groundwater contamination. Landfill closure did not begin until May 2000 and remedial actions were not completed until 2003, when much of the material was consolidated back onto ten acres under a landfill cap.

297. Even though the groundwater flows from the Syracuse China Facility north toward the

47

immediately adjacent Ley Creek PCB Dredgings Subsite, Ley Creek, OU-2, and the Expanded Territory, NYSDEC has imposed ecological cleanup standards for these other areas as opposed to the industrial cleanup standards it applied to the Syracuse China Facility.

298.    Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the Syracuse China Facility—for which Defendants Syracuse China and Amparit are liable—are present in OU-2 and the Expanded Territory.

### *Deere Facility: Syracuse Deere Road*

299.    Syracuse Deere Road is the current owner of the former Deere & Company manufacturing facility located at or about at 6401 Deere Road, in the Town of Dewitt, New York (tax lot no. 023.-05-08.1) ("Deere Facility"), situated along the South Branch of Ley Creek and Sanders Creek.

300.    Deere & Company purchased Syracuse Chilled Plow Company, and directly or through Syracuse Chilled Plow Company owned and operated the Deere Facility from about 1876 to the present and distributed parts including plow/tractor blades at the facility using, upon information and belief, hazardous substances including PCB-containing hydraulic fluids.  *See* Exhibit "N."

301.    According to the EDR Report, the operator of John Deere Parts Distribution Center at this site (EPA ID #NYR000121574) is a small quantity generator of D001 ignitable wastes and D002 corrosive hazardous waste used to clean parts.  The operator is listed as John Deere Co.

302.    The EDR Report indicates the Deere Facility started generating these types of waste beginning in 1955, at a time when many companies simply disposed of such waste material on-site.

303.    Based on the number of years of operation at this site and the long number of years hazardous substances have been used to clean parts, upon information and belief, hazardous substances and other contaminants (including petroleum) have been released or discharged into

48

the Ley Creek Watershed from the Deere Facility.

304.    Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the Deere Facility—for which Defendant Syracuse Deere Road is liable—are present in OU-2 and the Expanded Territory.

### *Western Electric Facility: Western Electric/Nokia/Telesector*

305.    Western Electric owned and operated a facility located at or about at 6360 Thompson Road, in the Town of Dewitt, New York (tax lot no. 032.-02-03.0) ("Western Electric Facility") from about 1952 until 1983, located across Thompson Road from the South Branch of Ley Creek.

306.    Western Electric operated the Western Electric Facility for over 30 years as a distributing house that included warehouse and large-scale repair operations for a broad variety of equipment (including telephone sets, teletypewriters, switchboards and other office and electronic equipment) used by the Bell Telephone system.

307.    Western Electric repaired and reconditioned equipment and used PCB materials in hydraulic fluids for machinery reconditioning purposes at the Western Electric Facility.

308.    Switches and capacitors in electronic equipment are known to be associated with PCB use, while PCBs, particularly Aroclors 1254 and 1260, are associated with various components of electrical cables, including insulation, foam rubber, rubber, adhesive tape, and plastics.

309.    Activities linked to PCBs during Western Electric's operation of the Site (1951 to 1983) include telephone cable de-reeling, cable cutting, and end-capping, reconditioning telephone equipment using hydraulic machinery, and the use of PCB-containing transformers.

310.    The EDR Report revealed that between the years 1982–1984 Western Electric disposed of 25,473 pounds of PCB waste from its Western Electric Facility as well as other types of hazardous waste including halogenated solvents and heavy metals. Western Electric was listed as a large

49

quantity generator of hazardous waste in EPA's records.

311.    In addition, from 1991 to 1993, subsequent site owners disposed of additional quantities of PCB waste from the facility as described below.

312.    Large amounts of PCB contaminated hazardous wastes with waste code B007 (adjusted from B009 which is not a valid code) were disposed of five times from 1982 to 1983. Since the average weight of the five disposals was 2,091 kg (4,610 lbs), this waste could have included cables with PCB components, soil, sludges, and clothing based on the B007 code.

313.    Additional volumes of PCB-containing equipment were generated from the site that was assigned waste code B005 in 1983 (1,948 kg [4,295 lbs]) and 1993 (75 kg [165 lbs]). B005 waste is defined as PCB articles or equipment, excluding transformers and small capacitors, with greater than 500 parts ppm PCBs. A PCB article includes electric motors, circuit breakers, reclosers, voltage regulators, switches (including sectionalizers and motor starters), electromagnets, cable, hydraulic machines, pumps, pipes, or any other manufactured item with a surface that has been in direct contact with PCBs pursuant to 6 NYCRR § 371.4 (e).

314.    PCB transformer waste from the site was disposed of in 1984 (1,221 kg [2,692 lbs]) and in 1991 (340 kg [750 lbs]) using waste code B006. B006 PCB transformer waste includes transformer dielectric fluid, also known as askarel, which commonly contained PCBs (either Aroclor 1254 or Aroclor 1260) combined with trichlorobenzene.

315.    Cable repair operations during the period 1982–1984 typically used PCB oils.

316.    Upon information and belief, the direction of groundwater flow under the Western Electric Facility is in the direction of the South Branch of Ley Creek.

317.    PCBs or other hazardous substances or contaminants released or discharged from the Western Electric Facility likely migrated into the Ley Creek Watershed.

50

318.    Western Electric transferred the Western Electric Facility on December 31, 1983, to Telesector, whose name at the time was NYNEX Service Company ("NYNEX"). NYNEX filed a correction deed on January 13, 1995, indicating that Telesector had been the official owner since the acquisition from Western Electric.

319.    As of approximately January 1, 1984, a newly formed company, AT&T Technologies, Inc., assumed the corporate charter of Western Electric.

320.    Similar operations continued after ownership transferred in 1984.  PCBs continued to be used in existing equipment and was continued to be used at this site since there is proof that PCB waste was generated onsite after the ban, including 415 kg (915 lbs) from 1991 to 1993 as described above.

321.    In 1995, AT&T Technologies, Inc. changed its name to Lucent Technologies, which was spun-off as an independent company in 1996. Lucent merged with Alcatel SA of France on December 1, 2006, forming Alcatel-Lucent, which was acquired by Nokia of America Corporation ("Nokia") in 2016.

322.    Upon information and belief, Nokia has assumed all relevant liability for all these prior owners and operators of the Western Electric Facility.

323.    Telesector Resources owned the Western Electric Facility, and NYNEX operations were performed on-site, for many years until Verizon took over NYNEX operations. Telesector currently operates under the name Verizon Services Group ("Verizon"), which upon information and belief still conducts cable repair operations at the Western Electric Facility.

324.    Since Telesector was the owner of the Western Electric Facility as of the last day of 1983, it was the owner and operator of the facility at a time when, according to the EDF Report and associated filings, PCB disposal from the facility occurred.

51

325.    According to the EDR Report, Telesector was also the owner and operator of the Western Electric Facility when several petroleum spills occurred.

326.    According to the EDR Report, one spill at the Western Electric Facility occurred in 1987, when NYNEX had a leaking petroleum underground storage tank and had to perform a subsurface spill remediation associated with NYSDEC Spill #189656. Upon information and belief, this spill leached into subsurface groundwater and likely migrated off-site into the Ley Creek Watershed.

327.    Another spill at the Western Electric Facility occurred in 1999, when a truck broke a hose, resulting in the spill of an unknown type of oil per NYSDEC Spill #9903406.

328.    There were eight petroleum storage tanks at the Western Electric Facility as of 2010, according to the New York State Petroleum Bulk Storage records, and six as of 2018. Upon information and belief, any of these tanks may have leaked during Telesector's ownership and operation of this facility.

329.    On December 20, 2012, Verizon received a Notice of Violation ("NOV") from NYSDEC for failure to maintain spill prevention equipment and lack of labeling. Additional NOVs were issued to Verizon on June 17, 2015, and June 5, 2018.

330.    According to the EDR Report, other hazardous wastes, including halogenated solvents and mercury, were also used, generated, and disposed of from the Western Electric Facility by NYNEX and Verizon during Telesector's ownership of the Western Electric Facility.

331.    The EDR report lists the Western Electric Facility on the federal MANIFEST database for hazardous waste shipments (disposal) of benzene (D018), non-listed ignitable wastes (D001), non-listed corrosive wastes (D002), and 52 pounds of solid waste (no waste code), all of which could have been released or discharged during Telesector's 36-year ownership and operation of the Facility.

332.    Based on a 1991 NIOSH health and safety investigation when NYNEX operations were being conducted at the Western Electric Facility (https://www.cdc.gov/niosh/hhe/reports/pdfs/1991-0022-2118.pdf):

- This plant, formerly part of Western Electric, has been in operation since 1953.  The current workforce of approximately 100 is involved in telephone cable de-reeling, cable cutting, and end-capping.  Over 85% of the facility is now devoted to warehousing.

- Plastic end caps are used to protect the cut ends of telephone cable from moisture and physical damage.  From 1953 to approximately 1982, Western Electric (NYNEX) employees tapped end caps onto the cables.  Beginning in 1982-83, NYNEX employees began using heat-shrinkable end caps for the capping operation.

- A 1990 NYNEX report containing the results of air sampling conducted by the Telesector Resources Group on the materials used in the de-reeling and end capping operation was received by NIOSH on January 3, 1991.  This report detailed area air sampling results for a variety of organic vapors, including total hydrocarbons, cyclohexanone, ethyl acetate and ethyl acrylate.  Air samples were also collected for metals such as nickel, lead, copper, iron, and aluminum.  …All of the measurements, with the exception of TDI, were either non-detectable or below their respective occupational exposure limits.  Toluene diisocyanate was detected in two of nineteen short-term (15 minute) air samples.  The highest of these two samples measured TDI at approximately 0.1 parts per million (ppm), a level which exceeds the Occupational Safety and Health.

333.     A 2011 Phase I Report prepared by ATC Associates, Inc. ("ATC") for Verizon, when it was interested in selling the Western Electric Facility, included only one recognized environmental condition ("REC") – poles that were on the surface of the ground for an extended period of time, which could have leached petroleum hydrocarbons into the subsurface of the facility soils and groundwater.

334.    The 2011 Phase I Report was not comprehensive, as it did not mention any of the Western Electric historical on-site uses, and the history of its operations was not present in the EDR Report attached to this Phase I Report.  If the same Western Electric history that was present in the EDR Report which Plaintiffs recently obtained had been present in the 2011 Phase I Report, the Phase I Report would have revealed the PCB disposal history in relation to the facility.

53

335.    The 2011 Phase I Report also fails to list certain conditions as RECs, which normally would be listed as RECs, including seven nearby pole-mounted transformers, as well as four drains to an underground oil/water separator located south of the building, which in turn allegedly releases or discharges to the sanitary sewer of the Town of Dewitt.

336.    The Western Electric Facility oil/water separator was only first installed pursuant to Permit No. 12349 on September 4, 1997, and according to Section 6.11 in the report, oil and water is first released or discharged into the drains and then pumped into the oil water separator.  There is no explanation in the permit as to how the oil is managed.

337.    Discharges from the Western Electric Facility may have been made directly to the subsurface prior to September 4, 1997, and/or are still occurring in relation to this system since oil and water are releasing or discharging into subsurface drains.

338.    The release or discharge system, or lack thereof, at the Western Electric Facility before 1997, and after the oil water separator was installed, is likely the source for off-site contamination released or discharged into the Ley Creek Watershed through the nearby South Branch of Ley Creek.

339.    ATC observed incidental staining associated with vehicle maintenance, on the concrete floor throughout the vehicle maintenance area, and two hydraulic lifts (which are listed under the heading of "PCBs"), as well as staining around drums and equipment throughout the Western Electric Facility building.

340.    Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the Western Electric Facility—for which Defendants Western Electric, Nokia, and Telesector are liable—are present in OU-2 and the Expanded Territory.

### *Prestolite Facility: Honeywell/Old Electric/U.S. Hoffman/North Midler Properties*

341.    Electric Auto-Lite Company and Eltra Corporation were historic operators of a facility ("Prestolite Facility") located at or about at 219 Lamson Street (now known as 2100, 2101 and 2103 Coughlin Avenue), in the City of Syracuse, New York (tax lot nos. 023.-08-31.1 and 023.-08-31.2), where each manufactured spark plugs and automotive electronics equipment, fractional horsepower motors and traction motors, small generators, small electric appliances (specifically clocks and can openers), electric windshield wipers, and large motors for use in golf carts from approximately 1953 until 1986.

342.    Upon information and belief, Electric Auto-Lite was acquired by Bendix Commercial Vehicle Systems LLC in 1973, which was acquired by Allied Signal Inc., which then merged into Honeywell.

343.    Upon information and belief, Eltra Corporation was acquired by Allied Signal Inc., which merged into Honeywell.

344.    The Prestolite Facility was operated as the Prestolite Motor and Ignition Division of Allied Corporation, a wholly owned subsidiary of Allied-Signal Inc., pursuant to a January 16, 1986 Purchase Agreement. Prestolite was formerly a division of Bunker Ramo-Eltra Corporation, a subsidiary of Allied Corporation, and merged with and into Allied on January 16, 1986.

345.    Upon information and belief, Allied-Signal Inc. retained environmental liability under the January 16, 1986, Purchase & Sale Agreement with Prestolite Electric Incorporated.

346.    Upon information and belief, Honeywell has assumed all relevant liability for all these prior owners and operators of the Prestolite Facility.

347.    On April 18, 1986, Prestolite Electric Incorporated purchased the Prestolite Facility.

348.    On or about August 11, 1988, abandoned drums containing PCBs were reported at the

Prestolite Facility (NYSDEC Spill #8804207).

349. Upon information and belief, the likely long-term use of PCBs from 1953 to the 1988, resulted in the contamination of the Prestolite Facility with PCBs and petroleum.

350. Upon information and belief, contamination at the Prestolite Facility was never properly investigated or remediated.

351. Upon information and belief, the Prestolite Facility released and discharged PCBs and other contaminants (including petroleum) into Teall Brook and the South Branch of Ley Creek.

352. As noted in the January 16, 1986, Purchase & Sale Agreement with Prestolite Electric Incorporated, Allied-Signal, Inc., the Seller, specifically retained liability to "carry out a cleanup of the old wastewater treatment plant…formerly used to treat wastewater from the plating operations."

353. In 2001, an unidentified individual at the Prestolite Facility reported to NYSDEC that, for approximately a week, an "iradescent [sic] green" liquid was pooled near the loading dock at the site.

354. Prestolite Electric Incorporated, n/k/a Old Electric, whose parent company was PMI Holding Corporation, filed bankruptcy on February 15, 1990. A Bankruptcy Order for Prestolite Electric Incorporated was entered September 20, 1991.

355. The Prestolite Facility was transferred in 1986 to The National Council for Community Development, Inc. and has since been subdivided.

356. North Midler Properties LLC is the current owner of the Prestolite Facility.

357. A 1963 deed conveying Electric Auto-Lite's interest to Eltra for the current Prestolite Facility indicates that U.S. Hoffman operated on this site as far back as 1922, and based on the time period and type of manufacturing operations performed likely contributed PCB waste that

drained into Teall Brook and then into the South Branch of Ley Creek.

358. The presence of Hoffman on the Prestolite Facility is also confirmed by Sanborn maps. Therefore, Hoffman also operated the Prestolite Facility.

359. Hoffman used the following spent non-halogenated solvents: xylene, acetone, ethyl acetate, ethyl benzene, ethyl ether, methyl isobutyl ketone, n-butyl alcohol, cyclohexanone, and methanol; all spent solvent mixtures/blends containing, before use, only the above spent non-halogenated solvents; and all spent solvent mixtures/blends containing, before use, one or more of the above non-halogenated solvents, and, a total of ten percent or more (by volume) of one or more of those solvents listed as F001, F002, F004, and F005 hazardous wastes, and still bottoms from the recovery of these spent solvents and spent solvent mixtures.

360. Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the Prestolite Facility—for which Defendants Honeywell, Old Electric, U.S. Hoffman and North Midler Properties are liable—are present in OU-2 and the Expanded Territory.

### *Lennox Facility: Lennox/Northeast Management Services/North Midler Properties*

361. Lennox operated a furnace manufacturing facility ("Lennox Facility") located at or about at 356, 380 382, 386, and 400 North Midler Avenue, in the Town of Dewitt and City of Syracuse, New York (tax lot nos. 031.-11-14.3; 031.-11-14.5; 031.-11-14.1; 031.-11-14.2; 023.-07-23.0; 031.-11-14.1; 023.-07-22.0; 023.-07-21.1; 023.-07-20.0; 023.-07-19.0), on the South Branch of Ley Creek, from about the early 1900s to 1967, and where foundry operations also took place on the site in the 1950s.

362. The metalworking processes conducted by Lennox used hydraulic fluids, which are typically associated with PCB Aroclors 1232–1260 (Aroclors 1232, 1242, 1248, 1254, 1260), and

cutting oils, which were typically associated with PCB Aroclor 1254.

363.    Upon information and belief, Lennox used PCBs and/or other hazardous substances as part of its manufacturing process at the Lennox Facility.

364.    Northeast Management Services was the last entity to own the Lennox Facility in its entirety and is still an owner of a portion of the Lennox Facility at 380 Midler Avenue North Rear.

365.    North Midler Properties is the current owner of most of the lots of the Lennox Industrial Park at 400 North Midler Avenue.

366.    Sanborn maps of the Lennox Facility reveal the historic presence of a large industrial steel fabricating complex, including buildings that appear to be still present, with very large petroleum tanks, including:

- 1,000 Gallons of Gasoline
- 1,080 Gallons of Diesel
- 16,000 Gallons of Fuel
- 17,500 Gallons of Fuel
- 20,000 Gallons of Fuel

367.    According to the EDR Report, Northeast Management Services assumed operation of the above underground storage tanks, at least some of which are still apparently on the Lennox Facility, under EPA ID #NY UST U003078217. Northeast Management Services operates the site as a petroleum bulk storage facility called Lennox Industrial Park.

368.    An NYSDEC FOIL request for the Lennox Facility revealed no tank closure records demonstrating the proper closure of these large tanks.

369.    On May 7, 1990, hundreds of gallons of petroleum accumulated on surface water were reported on or near the site, while on May 16, 1991, a private citizen reported three 55-gallon drums and three 30-gallon drums containing petroleum products as abandoned at the site.

370.    Transformers that likely contained PCBs were present on the site from at least 1953.

371.   There is a water pipe located along the northern boundary of the Lennox Facility leading off-site in the direction of Teall Brook, and upon information and belief was and/or still is a conduit for off-site migration of contaminants.

372.   Historic maps indicate this water pipe on the Lennox Facility leads into Teall Brook, which runs along the property's northern boundary line, and upon information and belief was and/or still is a conduit for off-site migration of contaminants from the Lennox Facility into the Ley Creek Watershed.

373.   Upon information and belief, hazardous substances and other contaminants (including petroleum) released or discharged from the Lennox Facility—for which Defendants Lennox, Northeast Management Services, and North Midler Properties are liable—are present in OU-2 and the Expanded Territory.

### C. Activities of Arranger Defendants

374.   In the period up to and including 1969, the Ley Creek Watershed experienced several flooding events, including a major flooding event in 1969.

375.   Following the 1969 flooding event, Onondaga County, with the cooperation of the Town of Salina, undertook a flood-control project that significantly widened and realigned Ley Creek. This project began in approximately 1970 and continued to the mid-1980s.

376.   Prior to the flood-control project, the width of Ley Creek in the vicinity of the GM-IFG Subsite was approximately 24 feet. The project widened Ley Creek to approximately 80 feet. *See* Exhibit "M," showing the widened Creek in the mid-1970s overlaid on top of a 2017 Ley Creek aerial.

377.   During this multi-year flood control project, contractors for Onondaga County, including Arranger Defendants, excavated the creek bed and, to prevent future flooding, placed dredged

spoils permanently on both banks of Ley Creek and adjacent lands, from approximately Townline Road west to approximately Route 11, including on lands that comprise OU-2 and the Expanded Territory. Dredged spoils were placed on these lands between about 1970 and 1975, and then again in the early 1980s. *See* Exhibits "G," "H," "I," "M," "O" and "P".

378.    Lands receiving dredged spoil included at least lands owned by Onondaga County, New York State, National Grid, S&P, and Plaza East LLC, and possibly additional private land. *See* Exhibits "B," "F," "M," "O" and "P."

379.    Upon information and belief, the dredged spoils placed during the flood-control project contained hazardous substances and other contaminants (including petroleum) that had been released or discharged into the Ley Creek Watershed from facilities owned or operated by Defendants, as detailed above.

380.    The Town of Salina operated two Landfills adjacent to Ley Creek, known as the Town of Salina Landfill and the Mattydale Landfill or Dump. Some of the Owner and Operator Defendants released or discharged, or caused to be released or discharged, hazardous substances and/or other contaminants (including petroleum) into one or both Landfills. Upon information and belief, neither Landfill has been properly remediated.

381.    The flood-control work cut through the Town of Salina Landfill in the Lower Ley Creek, which land was owned by Plaza East LLC.

382.    Upon information and belief, numerous Defendants had discharged or released, or caused to be discharged or released, hazardous substances and/or other contaminants (including petroleum) into the Town of Salina Landfill prior to the flood-control work. The flood-control work caused some of these hazardous substances and/or other contaminants (including petroleum) to be placed permanently on lands within OU-2 and the Expanded Territory.

60

383.    Empire and Burko dredged portions of Ley Creek (and possibly some of its tributaries) on behalf of Onondaga County in the 1970s until about 1980.

384.    Empire and Burko arranged for the disposal of dredged PCBs, other hazardous substances, and other contaminants (including petroleum) by depositing dredge spoils and/or other materials on both sides of Ley Creek, including in OU-2 and the Expanded Territory.

385.    C&S performed, supervised, or otherwise arranged for dredging work in and around Ley Creek on behalf of Onondaga County from the 1970s until about September 1980.

386.    Upon information and belief, C&S Engineers is the successor to C&S, and is responsible for its liabilities.

387.    C&S arranged for the disposal of dredged PCBs, other hazardous substances, and other contaminants (including petroleum) by depositing dredge spoils and/or other materials on both sides of Ley Creek.

388.    Upon information and belief, C&S was aware that Empire had not removed contaminated excavated material in violation of Onondaga County bid and contract documents, since Empire had not "disposed" of spoils, but rather placed unsuitable spoils back in the floodplain, in violation of an NYSDEC permit (*see* Exhibits "N" and "O"), along the banks of Ley Creek and had not removed contaminated excavated material that was temporarily placed on County-owned property, including the property that became the Ley Creek PCB Dredgings Subsite, and which should have been removed prior to termination of the applicable period.

389.    Upon information and belief, the contaminated dredged material was never removed by C&S or contractors under its oversight, which arranged for the disposal of the spoils creating hazardous waste landfill areas in locations known to be prone to flooding.

390.    The Arranger Defendants knew or should have known that the material that was dredged

from Ley Creek contained or might contain PCBs, other hazardous substances, and other contaminants (including petroleum).

391.    Upon information and belief, hazardous substances and other contaminants (including petroleum) for which Arranger Defendants are liable are present in OU-2 and the Expanded Territory.

### D. The Former GM-IFG Plant

392.    GM owned and operated the Former GM-IFG Plant at One General Motors Circle (also known as 1000 Townline Road), Salina, New York, from approximately the mid-1950s until 1993. *See* Exhibit "R" (showing plant only starting to be constructed in 1951).

393.    Remediation and Liability Management Company, Inc. ("REALM") and Environmental Corporate Remediation Company, Inc. ("ENCORE") were GM's wholly owned subsidiaries. Certain activities conducted in whole or in part by REALM and/or ENCORE are, for ease of reading, referred to herein as activities conducted by GM.

394.    GM manufactured automotive parts at the Former GM-IFG Plant and used hydraulic oils.

395.    GM discharged process wastewater and stormwater into Ley Creek from the Former GM-IFG Plant, which contained the specific PCB Aroclors 1242 and 1248, as a result of GM's use of hydraulic oils.  *See* Exhibits "H" and "I," including the 1999 Consent Order Index No. D7-0008-97-06, between NYSDEC and REALM at ¶4 ("1999 REALM Consent Order").

396.    PCB Aroclors, including PCB Aroclors different than those used at the Former GM-IFG Plant, were released or discharged into the Ley Creek Watershed from facilities owned or operated by Defendants (as described above) prior to, during, and after the Onondaga County flood-control project described above. *See* Exhibits "H" and "J," including the 1988 OBG Report and 1985 Oil & PCB Sampling and Analyses of Portions of Ley Creek Report prepared by EDI Engineering &

62

Science for GM ("1985 EDI Report"); Exhibit "K," 1997 GM Consent Order ¶¶ 4-5; Exhibit "M"

(showing the areas of the actual creek widening from a 1970s aerial map overlaid on a 2017 aerial

map depicting the approximate current creek dimensions, which has returned to its prior width of

approximately 24 feet).

397.    PCBs were originally detected in 1983 in smallmouth bass (Micropterus dolomieu) from

Onondaga Lake (Sloan, Ronald J., 1985; personal communication).  The mean concentration was

0.625 ppm total PCB, and the maximum was 1.36 ppm. *See* Exhibit "J." The 1985 EDI Report

indicates that the PCB compounds detected in the fish were "Aroclors 1254, 1260, and 1016," that

the "source of these PCB's is unknown," and that "Aroclors 1242 and 1248 are present in effluent

from the Fisher Guide plant on Ley Creek."

398.    Upon information and belief, NYSDEC was provided with a copy of the 1985 EDI Report.

399.    As early as this first 1985 environmental investigation report, prepared in relation to the

PCB contamination in Onondaga Lake and Ley Creek, NYSDEC was notified of the following:

> Ley Creek drains an area of about 30 square miles (77 km$^2$) and is tributary to
> Onondaga Lake. Onondaga Lake is part of the Oswego River System, which is
> tributary to Lake Ontario…. In general, the Ley Creek drainage basin, except for
> the northeast portion, can be described as a highly urbanized area. Portions of the
> towns and cities of Syracuse, North Syracuse, East Syracuse, Cicero, Clay, Dewitt,
> Manlius, and Salina are in the Ley Creek watershed.  Many industries and
> commercial establishments are in the watershed. The larger industries include
> General Motors Corporation, Bristol Laboratories, Carrier Corporation, Syracuse
> China Corporation, Chrysler, and General Electric. These large factories and their
> parking lots cover significant portions of the watershed.  In addition, 14 miles of
> expressway, 8 interchanges, a service facility for the New York State Thruway, the
> Hancock Field of the U.S. Air Force, and Syracuse International Airport are located
> in Ley Creek's watershed. Streets, shopping areas, parking lots, and buildings cover
> other parts of this watershed. Industrial effluents and urban storm runoff discharge
> into Ley Creek. The northeast part of the watershed is relatively undeveloped.  The
> Ley Creek watershed area was and still is highly industrial.

400.    On August 12, 1985, GM entered into a Consent Order with NYSDEC to perform a

Remedial Investigation in certain areas of Ley Creek.  *See* Exhibit "I" at ¶ 8 and at 48 of 135 of

63

the attached ROD and Exhibit "J."

401.    On April 24, 1987, GM's consultant, O'Brien & Gere Engineers, Inc. ("OBG"), implemented a Hydrogeologic Investigation of Ley Creek, which identified PCBs up to 466 ppm in soil and groundwater within an approximately 1,300-foot portion of the Creek (OBG-1 through OBG-7C). *Id*.

402.    On November 27, 1987, NYSDEC in cooperation with EPA, designated the Ley Creek PCB Dredgings Subsite—an area bounded by Factory Avenue to the south, Ley Creek to the north, Townline Road to the East, and 4,300 feet downstream to the west (also known as New York State Superfund Site No. 734044). *See* Exhibits "E," depicting the Ley Creek PCB Dredgings Site, and "I," 1999 REALM Consent Order ¶ 6-7 and Exhibit B to that Consent Order showing a map of the Ley Creek PCB Dredgings Subsite.

403.    Despite data in both the 1985 EDI Report and 1988 OBG Report, which included sampling NYSDEC requested to be performed on both sides of Ley Creek (north and south), *see* Exhibit "H" and Exhibit "J," GM's REALM subsidiary was only deemed ultimately responsible for further investigating and, eventually, remediating certain areas on the south side of the creek. *See* Exhibits "B," "E," "G" and "H-J."

404.    On May 21, 1991, GM and NYSDEC entered into a Consent Order Index No. A7-0239-90-07 to perform an RI/FS to complete the characterization of the areal and vertical extent of contamination of the Ley Creek PCB Dredgings Site and to evaluate alternatives for remediation. *See* Exhibit "I" at ¶ 10-11.

405.    Six years later, on January 23, 1997, NYSDEC approved the RI/FS submitted by GM/REALM, and prepared a Proposed Record of Decision, which recommended removal and off-Site disposal of the dredge spoils equal to or greater than 50 ppm (which is the federal threshold

64

level for PCBs pursuant to the Toxic Substances Control Act, or "TSCA"), and covering of the remaining volumes of material with PCB concentrations exceeding more than 1 ppm at the surface and 10 ppm in the subsurface soils. *See* Exhibit "I" at pp.¶12-13.

406. On a July 15, 1999, REALM entered into a 1999 Consent Order with NYSDEC to prepare a Remedial Design for the Ley Creek PCB Dredgings Site.

407. Between 1999 and 2001, GM/REALM completed remediation of the Ley Creek PCB Dredgings Subsite. EPA concurred with NYSDEC's 1997 Record of Decision for the Ley Creek PCB Dredgings Subsite in 1998, and GM performed that work, with the approval and oversight of both agencies, in 1999-2000.

408. EPA and NYSDEC have concluded that, as a result of the work, the potential for direct contact exposure to on-site PCBs has been eliminated and the Ley Creek PCB Dredgings Subsite is no longer considered a significant threat to human health and the environment. In 2006, EPA conducted a five-year review of the Ley Creek PCB Dredgings Subsite to determine if the performed remedial activities remained protective of human health and the environment. While the review determined that the remedy continued to be protective of human health and the environment and no additional cleanup work was needed, the review also recommended the implementation of a deed restriction precluding activities on the Ley Creek PCB Dredgings Subsite that could potentially expose contaminated materials, and to ensure that the integrity of the cover is maintained.

409. Pursuant to the March 1997 Ley Creek PCB Dredgings Subsite Record of Decision (attached to and incorporated into the 1999 REALM Consent Order in Exhibit "I"), even though GM had performed some investigation of the groundwater under the dredging soils and surface water and sediments in Ley Creek in the area west of Townline Road and east of the Route 11

bridge (*i.e.* in and around the Ley Creek PCB Dredgings Site), NYSDEC deferred evaluation of the groundwater under the dredging soils and surface water and sediments in Ley Creek in the area west of Townline Road and east of the Route 11 bridge (*i.e.,* in and around the Ley Creek PCB Dredgings Site, designated as "Deferred Media"), later referring to this area as "Operable Unit 2," until the Remedial Investigation of the Former GM IFG Plant (OU-1) was performed.

410.    NYSDEC and GM entered into an Administrative Order on Consent (Index #D-7-0001-97-06) ("1997 GM Consent Order"), which became effective on September 25, 1997, for New York State Superfund Site No. 734057, requiring GM to conduct an RI/FS for the site of the Former GM-IFG Plant and Deferred Media and to implement certain Interim Remedial Measures ("IRMs") within OU-1. *See* Exhibit "K." An IRM is NYSDEC's nomenclature for what CERCLA refers to as a "removal action" (as opposed to a "remedial action"). Soil, sediment, surface water, and biota samples were obtained for chemical analysis as part of the RI.

411.    Part XVII.E of the 1997 GM Consent Order makes clear that it did not resolve GM's environmental liability.

412.    GM implemented three significant IRMs (removal actions) from 2002 to 2004, to prevent further migration of PCBs to Ley Creek from the Former GM IFG Plant, which had been closed since 1993. These IRMs were limited to OU-1, and they did not permanently address contamination within OU-1.

- Former Landfill IRM:  An industrial landfill at the Former GM IFG Plant that contains chromium- and PCB-contaminated material was capped to prevent contaminants from leaching into the groundwater.  In addition, hot spots associated with the landfill were excavated.

- Former Drainage Swale IRM:  This second action involved the removal of highly contaminated soil from a former discharge swale.  This swale was used in the 1950s and 1960s as a conduit for the discharge of liquid process waste to Ley Creek. The swale was subsequently filled in, but the contaminated soil remained until the performance of this action.  Over 26,000 tons of soils containing PCBs were removed from this area of the

Former GM IFG Plant property.

- SPDES Treatment System IRM:  The third action involved the construction of a retention pond and associated water treatment system.  This pond collects all water that accumulates on the Former GM IFG Plant property in any of the storm sewers or abandoned process sewers.  The pond water is then sent through the treatment plant in order to meet permitted discharge limits, prior to discharge to Ley Creek.  The purpose of this response action was to stop the intermittent discharge of PCBs and other contaminants that occur during storm events.

413.    Despite the IRMs, and the fact that no operations at the Former GM IFG Plant have occurred in the 25 years since 1993 that could have added new PCB contamination to Ley Creek (as all outfalls are now treated through the OU-1 SPDES Treatment System), nonetheless PCB-contaminated stormwater originating offsite enters the Plant's stormwater system from off-site sources—including, upon information and belief, facilities owned or operated by certain Defendants—that is treated by the on-site SPDES Treatment System.

### E. 2011 Agreement and Creation of RACER Trust

414.    In 2009, GM filed for Chapter 11 bankruptcy. At some point during the bankruptcy proceeding, GM changed its corporate name to Motors Liquidation Company ("MLC").

415.    For purposes of this Second Amended Complaint, the "GM Debtors" (or "Debtors") comprise GM, MLC, REALM, and ENCORE.

416.    Effective March 29, 2011, the U.S. District Court for the Southern District of New York entered as a consent decree the 2011 Agreement, which was a settlement among the GM Debtors, EPA, NYSDEC, and regulatory agencies of other States, the St. Regis Mohawk Tribe, and EPLET, not individually but solely in its representative capacity as administrative trustee for the environmental response trust (RACER Trust) whose creation the 2011 Agreement provided for. The 2011 Agreement is attached hereto as Exhibit "T."

417.    Plaintiff EPLET, and GM Debtors, executed the 2011 Agreement "without the admission

of liability or any adjudication on any issue of fact or law." Exhibit "T" (2011 Agreement) at 6.

418. The parties to the 2011 Agreement executed a separate agreement, known as the Trust Agreement (attached as Exhibit "U") that provided for establishment of an environmental response trust, which later became known as RACER Trust, pursuant to section 1.468B-1 of the Treasury Regulations promulgated under the Internal Revenue Code, and defined as a qualified settlement fund pursuant to section 468B of the Internal Revenue Code and its implementing regulations.

419. The United States is the sole beneficiary of RACER Trust.

420. Among RACER Trust's purposes are: "to conduct, manage and/or fund Environmental Actions with respect to [a discrete list of] Properties [formerly owned by GM] or migration of Hazardous Substances emanating from certain of the Properties"; and "to try to sell or transfer certain of the Properties with the objective that they be put to productive or beneficial use." Exhibit "U" (Trust Agreement) § 2.3.

421. The property comprising the Former GM-IFG Plant (i.e., OU-1) is one of the Properties referenced in the Trust Agreement. Exhibit "U" (Trust Agreement, Exhibit A). Neither OU-2 nor the Expanded Territory is among the Properties referenced in the Trust Agreement.

422. Plaintiffs did not assume environmental liabilities of GM by virtue of the 2011 Agreement or the Trust Agreement, or any subsequent arrangement with any party.

423. The 2011 Agreement settled GM's environmental liabilities only for "matters addressed" therein. Exhibit "T" (2011 Agreement) ¶ 105; Exhibit "U" (Trust Agreement) § 4.11. Those matters include "all costs … relating to or in connection with the Properties"—among them OU-1, but not OU-2 or the Expanded Territory—"including releases of Hazardous Substances from any portion of the Properties, and all areas affected by migration of such substances emanating from the Properties." Exhibit "T" (2011 Agreement) ¶ 105. The "matters addressed" by the 2011

68

Agreement expressly and specifically "do not include," Exhibit "T" (2011 Agreement) ¶ 105, any costs "with respect to any site that is not a Property, other than claims or causes of action for migration of Hazardous Substances emanating from a Property," Exhibit "T" (2011 Agreement) ¶ 100(vii).

424.    The 2011 Agreement funded RACER Trust's environmental activities on both the property comprising the Former GM-IFG Plant (i.e., OU-1) and certain "property extending from the facility property boundaries to the Route 11 Bridge." Exhibit "T" (2011 Agreement) ¶ 63. The signatories to the 2011 Agreement thus anticipated that hazardous substances had emanated from OU-1 and migrated somewhere downstream or downgradient. The 2011 Agreement did not define precisely where hazardous substances emanating from OU-1 (or any other location in the Ley Creek Watershed, including properties owned or operated by Defendants) had migrated downstream or downgradient.

425.    The 2011 Agreement recognized the potential environmental liability of the GM Debtors not only "with respect to the Properties and surrounding areas where Hazardous Substances have migrated, [or] are continuing to migrate," but also with respect to areas where those substances "otherwise have or will come to be located." Exhibit "T" (2011 Agreement) at 3. The 2011 Agreement did not, however, resolve anyone's liability for the costs of responding to contamination that originated from OU-1 but came to be located elsewhere by means other than migration—e.g., the relocation of Ley Creek in the 1950s pursuant to the New York Thruway Authority project, and/or the placement of dredged spoil on the north and south side of Ley Creek in the 1970s and 1980s under the direction of Onondaga County. The 2011 Agreement did not make RACER Trust responsible for responding to such contamination.

426.    The 2011 Agreement allocated $31,121,812 for RACER Trust to perform environmental

69

response activities related to the Former GM-IFG Plant. Exhibit "T" (2011 Agreement, Attachment A at 2).

427.    While the 2011 Agreement allocates a single, undifferentiated pot of funding for all these activities, it also recites "$22,573,341 for remediation within the IFG Syracuse facility property boundaries,"—i.e., OU-1—"and $8,548,471 for the property extending from the facility property boundaries to the Route 11 Bridge." Exhibit "T" (2011 Agreement) ¶ 63. Thus, the signatories to the 2011 Agreement anticipated that only $8.5 million would be necessary to fully remediate the off-site areas for which it made RACER Trust responsible.  By September 2018, funds were depleted to $19.2 million, *see* Exhibit "L."

428.    The signatories to the 2011 Agreement—in particular, EPA and NYSDEC—were aware at the time of its execution that areas of OU-2 and the Expanded Territory were contaminated. Various consent orders, reports, data and other evidence all in NYSDEC's possession at the time of the 2011 Agreement (*see* Exhibit "H") indicated contamination on lands north of Ley Creek (including within the Expanded Territory); that dredged spoils from the creek bed had been placed there (*see* Exhibits "G," "K," and "M"); that the original Ley Creek had been substantially relocated; and that any contamination present in the then-existing creek bed, banks, and floodplains was left in place and covered with fill (*see* Exhibit "Q"), all during time periods when the use and release or discharge of hazardous substances throughout the Ley Creek Watershed was known to be prevalent. It was reasonably foreseeable that hazardous substances originating from the Former GM-IFG Plant would be present in OU-2 and the Expanded Territory for reasons other than emanation from the plant and then migration to those locations.

429.    The 2011 Agreement explicitly "reserve[s] all claims … and causes of action either judicial or administrative, past, present, or future, in law and equity, which" Plaintiff EPLET and RACER

70

Trust "may have against all other persons or entities, firms, corporations, entities, or predecessors of [GM Debtors] for any matter arising at or relating in any manner to the Properties and/or claims addressed" in the agreement. Exhibit "T" (2011 Agreement) ¶ 98.

### F. 2015 Administrative Consent Order

430.    In March 2015, NYSDEC and EPA issued the ROD selecting a remedy for OU-2, namely excavation and off-site disposal. Exhibit "C." Two maps attached to the ROD Decision Summary depict OU-2, as defined in this Second Amended Complaint, with the exception that the maps erroneously depict OU-2 to also include the Ley Creek PCB Dredgings Subsite, but the text of the ROD clarifies that OU-2 "does not include the Ley Creek PCB Dredgings Subsite."

431.    In 2015, RACER Trust executed an ACO ("2015 ACO") with NYSDEC—which was, at that time, the lead agency overseeing environmental response activities within OU-2—that directs RACER Trust to perform remedial design ("RD") and remedial action ("RA") activities within OU-2. The 2015 ACO provides that OU-2's "boundaries … are defined in the [ROD]," Exhibit "C" (2015 ACO) ¶ 5, and states that, "[a]s described in the ROD," OU-2 comprises "approximately 9,200 linear feet of Ley Creek including the adjacent floodplains between Townline Road and the upstream plane of the Route 11 Bridge," Exhibit "C" (2015 ACO) ¶ 5. Exhibit A to the 2015 ACO, titled "Map(s) of Site," reproduces one of the ROD maps that depicts OU-2's "site location." These maps are consistent with the definition of OU-2 set forth in this Second Amended Complaint, with the exception noted above regarding the Ley Creek PCB Dredgings Subsite.

432.    The 2015 ACO did not constitute or support a "finding of liability, fault, wrongdoing, or violation of any law" by RACER Trust or GM, Exhibit "C" (2015 ACO) ¶ 9 & pt. VII.B. In particular, the Trust did not admit that hazardous substances emanating from the Former GM-IFG Plant had migrated to any specific part of OU-2.

71

433.    The 2011 Agreement provides that RACER Trust may execute a consent order with the lead agency overseeing environmental actions. Exhibit "T" (2011 Agreement) ¶ 101; Exhibit "U" (Trust Agreement) § 2.7.2. The 2015 ACO preserved RACER Trust's rights "to seek and obtain contribution … and/or any other form of recovery … from other potentially responsible parties … as may be provided by law, including but not limited to rights provided under CERCLA." Exhibit "C" (2015 ACO) pt. VII.B.

434.    As part of the RD prescribed in the 2015 ACO, RACER Trust conducted Pre-Remedial Design Investigation ("PDI") sampling of "the adjacent floodplains" that revealed contamination across a significantly greater geographic scope than the 2015 ACO site map reflected. NYSDEC then requested that RACER Trust, as part of the continuing PDI, sample soils on the north side of Ley Creek, far downstream from the Former GM-IFG Plant, within the Expanded Territory. RACER Trust maintained that response actions in the Expanded Territory were unnecessary to implement the 2015 ACO—i.e., RACER Trust maintained that response activities within the Expanded Territory are not a matter addressed by the 2015 ACO. Without conceding that it was necessary to implement the 2015 ACO, RACER Trust conducted sampling in the Expanded Territory. That sampling effort is now virtually complete.

435.    One sampling location not marked on the 2015 ACO site map, but which NYSDEC requested that RACER Trust sample, was the residential Brookline Road neighborhood, situated atop a gentle slope rising from Ley Creek's north bank. Sampling in that neighborhood revealed heavily contaminated backyards, posing an acute public health problem. NYSDEC requested that RACER Trust to conduct RA at those residences promptly to resolve the problem. As before, RACER Trust maintained that the 2015 ACO did not require this environmental response. Without conceding that it was necessary to implement the 2015 ACO, RACER Trust performed RA at

Brookline Road. The Trust remediated 19 residential backyards up to the top of the creek bank.

436. Pursuant to the 2015 ACO, RACER Trust completed certain RD and RA within OU-2, at the National Grid Wetland, and in several portions of the Factory Avenue Area.

### G. 2021 Administrative Consent Order

437. In 2019, at NYSDEC's request, EPA became the Lead Agency coordinating environmental activities for OU-2. NYSDEC remains Lead Agency for OU-1.

438. EPA then requested that RACER Trust perform a Focused Feasibility Study ("FFS") to explore alternatives to the remedy that the ROD prescribes for OU-2. RACER Trust has submitted the FFS to EPA for review.

439. In 2021, RACER Trust executed a new ACO with EPA limited to RD activities in OU-2 and the Expanded Territory. Exhibit "Y." These terms are defined there in the same manner as in this Second Amended Complaint.

440. For purposes of resolving liability, the "matters addressed" in the 2021 ACO include only activities within OU-2 and specifically exclude activities within the Expanded Territory, the latter of which, RACER Trust continues to maintain, the 2011 Agreement does not require RACER Trust to address. Exhibit "Y" (2021 ACO) ¶¶ 58 & 72.

441. RACER Trust's entry into the 2021 ACO does not constitute any admission or finding of liability, fault, or wrongdoing; and specifically does not constitute any admission or finding as to where hazardous materials emanating from the property comprising the Former GM-IFG Plant have migrated. Exhibit "Y" (2021 ACO) ¶ 5.

442. In accordance with the 2021 ACO, RACER Trust is not performing a final RD until EPA decides, in conjunction with NYSDEC, whether—and, if so, in what manner—to amend the ROD.

### H. Plaintiffs' Costs Incurred

443.    Plaintiffs incurred response costs for environmental response within OU-2 before the Original Complaint in this action was filed; between the date of the Original Complaint and the date of the First Amended Complaint; and from the date of the First Amended Complaint until September 30, 2021, and these costs are continuing to be incurred. Mullen Declaration (Exhibit "V"). Defendants are liable for these response costs.

444.    Plaintiffs incurred response costs for environmental response within the Expanded Territory before the Original Complaint in this action was filed; between the date of the Original Complaint and the date of the First Amended Complaint; and from the date of the First Amended Complaint until September 30, 2021, and these costs are continuing to be incurred. Mullen Declaration (Exhibit "V"). Defendants are liable for these response costs.

445.    If the remedy selected in the ROD (excavation and off-site disposal) were applied to known and suspected Contamination within OU-2 and the Expanded Territory, a conservative estimate of the future cost of such remediation (including all as-yet-uncompleted activities) is $93.5 million, if the 1-ppm ecological protection remediation goal in the ROD remains operative.

### DAMAGE TO PLAINTIFFS

446.    Plaintiffs have been and will continue to be damaged by incurring costs for Environmental Response to Contamination at OU-2 and the Expanded Territory, some of which was released after GM ceased its manufacturing operations and is continuing to migrate into the Ley Creek Watershed, well in excess of Plaintiffs' own equitable share of responsibility for such Environmental Response due to the 2011 Agreement and the ACOs.

447.    As a direct, proximate, and natural consequence of the releases and discharges described above, and the failure of the Defendants promptly and adequately to remediate Contamination,

74

Plaintiffs have undertaken, and will need to undertake in the future, Environmental Response activities.

448.    Plaintiffs have been and will continue to be damaged by Defendants' failure and/or refusal to remediate the Contamination.

449.    Plaintiffs have currently available to them a total of about $17.5 million for the remediation and long-term OM&M of both OU-1 and OU-2 of the GM IFG Subsite, but it is likely that remediation of these Operable Units will cost significantly more than that.

450.    Upon information and belief, the remediation of OU-2 and the Expanded Territory may cost as much as $93.5 million, for which Defendants are jointly and severally liable, or for which they should be required to pay their equitable share.

### JURISDICTIONAL AND PROCEDURAL ISSUES

451.    Plaintiffs have no adequate remedy at law, and no previous application has been made for the relief sought in this action.

452.    Jurisdiction is vested by 28 U.S.C. § 1331 over the First, Second and Tenth Causes of Action, *infra*, which arise under the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 ff.; and over the Ninth Cause of Action, *infra*, which arises under CERCLA and/or the federal Declaratory Judgment Act, 28 U.S.C § 2201(a).

453.    Jurisdiction is vested by 28 U.S.C. § 1367(a) over the Third through Eighth Causes of Action, *infra*, which arise under the statutory and common law of the State of New York, and which share with the federal claims a common nucleus of facts.

454.    Venue is proper in this federal District Court under 28 U.S.C. § 1391(b)(1) and (2), and under 42 U.S.C. §9613(b), because relevant events (including releases of hazardous substances)

75

occurred within this District, the contamination and tracts of real property that are the subject of this action are located within this District, and several Defendants reside in this District.

455. The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes declaratory relief in this matter. CERCLA, 42 U.S.C. § 9613(g)(2), requires entry of a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action(s) to recover further response costs or damages.

**AS AND FOR A FIRST CAUSE OF ACTION**
**FOR COST RECOVERY UNDER CERCLA,**
**PLAINTIFFS ALLEGE AS FOLLOWS:**

456. Plaintiffs repeat and reallege the allegations of paragraphs "1" through "455" of this Second Amended Complaint, as if set forth in this paragraph at length.

457. Hazardous substances located at OU-2 and the Expanded Territory ("Hazardous Substances") are "hazardous substances" as defined by CERCLA § 101(14) (42 U.S.C. § 9601(14)).

458. Each of the "Facilities" defined above in paragraphs "82" through "373" ("Defendants' Facilities"), OU-2, and the Expanded Territory are distinct "facilities," as defined in CERCLA § 101(9) (42 U.S.C. § 9601(9)).

459. Owner and Operator Defendants are "owners" and/or "operators" as defined by CERCLA § 101(20) (42 U.S.C. § 9601(20)), of one or more of Defendants' Facilities, either at the present time, or were such "owners" and/or "operators" at the time of disposal of Hazardous Substances at Defendants' Facilities, which Hazardous Substances are (or were, at the time RACER Trust commenced Environmental Response actions at OU-2 and/or the Expanded Territory) present in OU-2 and/or the Expanded Territory.

460. Arranger Defendants, and many of the Owner and Operator Defendants, are persons who

arranged for disposal of Hazardous Substances, as described in CERCLA § 107(a)(3) (42 U.S.C. § 9607(a)(3)), at OU-2 and the Expanded Territory, at Defendants' Facilities and/or in the Ley Creek Watershed.

461. Pursuant to CERCLA § 107(a) (42 U.S.C. § 9607(a)), Defendants are persons who are strictly liable and responsible for investigation, cleanup, remediation and removal of the contamination, and Plaintiffs' associated past and future response costs.

462. Plaintiffs have incurred response costs at OU-2 as a result of the Contamination.

463. Plaintiffs have incurred response costs at the Expanded Territory as a result of the Contamination.

464. All response costs incurred by Plaintiffs in connection with the Contamination have been consistent with the National Contingency Plan and are recoverable pursuant to CERCLA § 107(a) (42 U.S.C. § 9607(a)).

465. Defendants are strictly, jointly and severally liable under CERCLA § 107(a) (42 U.S.C. § 9607(a)) for all response costs incurred by the Plaintiffs, and all response costs necessary in the future, to investigate and remediate OU-2 and the Expanded Territory.

466. This Court should direct Defendants to pay the response costs incurred by Plaintiffs at OU-2 and the Expanded Territory, and declare, as required by CERCLA § 113(g)(2) (42 U.S.C § 9613(g)(2)), Defendants' liability for Plaintiffs' future response costs at OU-2 and the Expanded Territory.

**AS AND FOR A SECOND CAUSE OF ACTION
FOR CONTRIBUTION UNDER CERCLA,
PLAINTIFFS ALLEGE AS FOLLOWS:**

467. Plaintiffs repeat and reallege the allegations of paragraphs "1" through "466" of this Second Amended Complaint, as if set forth in this paragraph at length.

77

468.    The Hazardous Substances are "hazardous substances" as defined by CERCLA § 101(14) (42 U.S.C. § 9601(14)).

469.    Pursuant to CERCLA, including CERCLA § 113(f) (42 U.S.C. § 9613(f)), CERCLA § 107(a) (42 U.S.C. § 9607(a)), and/or otherwise, Defendants must contribute their equitable share of response costs incurred by Plaintiffs to investigate and remediate the Contamination at OU-2 and the Expanded Territory.

470.    If the 2015 ACO is a settlement of Plaintiffs' liability for response costs at OU-2 and/or the Expanded Territory, as defined in CERCLA § 113(f)(2) (42 U.S.C. § 9613(f)(2)), CERCLA entitles Plaintiffs to claims for contribution.

471.    This Court should direct Defendants to pay their equitable shares of response costs incurred by Plaintiffs, and declare Defendants' liability for their equitable share of Plaintiffs' future response costs at OU-2 and the Expanded Territory.

**AS AND FOR A THIRD CAUSE OF ACTION
FOR RESPONSE COSTS AND DAMAGES
UNDER NAVIGATION LAW §181(5),
PLAINTIFFS ALLEGE AS FOLLOWS:**

472.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "471" of this Second Amended Complaint, as if set forth in this paragraph at length.

473.    Some of the contaminants spilled or discharged by Defendants at or from the Defendants' Facilities, and some of the Contamination at OU-2 and the Expanded Territory, include petroleum (including but not limited to PCB-containing hydraulic and transformer oil) (together "Petroleum").

474.    Owner and Operator Defendants that own or operate, or have owned or operated, Defendants' Facilities where Petroleum was discharged and migrated into the Ley Creek Watershed, and along with the Arranger Defendants (together with the Owner and Operator

Defendants, the "Discharger Defendants") had the capacity to take action to investigate and clean up the Contamination resulting from the discharges of Petroleum, or Defendants discharged Petroleum into Ley Creek, but they failed to effect an immediate cleanup, resulting in Contamination of OU-2 and the Expanded Territory with Petroleum ("Petroleum Contamination").

475.    The Discharger Defendants did not have permits from the United States or New York State or any other government authority for these discharges of Petroleum, which were therefore prohibited by Navigation Law § 173.

476.    Pursuant to the Oil Spill Act, including Navigation Law § 181(5), the Discharger Defendants are liable for investigation, cleanup and removal of the Petroleum Contamination at OU-2 and the Expanded Territory, and all of the direct and indirect damages of Plaintiffs, including attorneys' fees.

**AS AND FOR A FOURTH CAUSE OF ACTION
FOR CONTRIBUTION UNDER NAVIGATION LAW §176(8),
PLAINTIFFS ALLEGE AS FOLLOWS:**

477.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "476" of this Second Amended Complaint, as if set forth in this paragraph at length.

478.    Plaintiffs have incurred costs for Environmental Response to Petroleum Contamination, including investigation, remediation, cleanup and/or removal, at OU-2 and/or Expanded Territory, in excess of their fair share (to the extent they have a fair share).

479.    Pursuant to the Oil Spill Act, including Navigation Law § 176(8), the Discharger Defendants are liable to indemnify or make contribution to Plaintiffs for their past and future costs of investigation, remediation, cleanup, removal and response, and are responsible for investigation, remediation, cleanup and removal of, and response to, the Petroleum Contamination (to the extent the contaminants are Petroleum, including but not limited to PCB-containing hydraulic and

transformer oil) at OU-2 and the Expanded Territory, and declare that they are responsible for future response costs.

**AS AND FOR A FIFTH CAUSE OF
ACTION FOR NEGLIGENCE,
PLAINTIFFS ALLEGE AS FOLLOWS:**

480.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "479" of this Second Amended Complaint, as if set forth in this paragraph at length.

481.    Defendants owed a duty of care to Plaintiffs with regard to their ownership and/or operation of Defendants' Facilities and the Contamination originating from Defendants' Facilities.

482.    Defendants proximately caused releases and discharges of Hazardous Substances and Petroleum and the Contamination, and should have promptly and adequately reported releases and discharges to NYSDEC, EPA and Plaintiffs, and effected an immediate investigation and cleanup.

483.    Defendants (including their officers, agents, servants, and/or employees) acted unreasonably and negligently in failing to prevent, or causing the releases, discharges and Contamination, failing to promptly and adequately report, investigate and remediate the Contamination, and those acts or omissions were the direct and proximate cause of the continued existence and spread of the Contamination, and damages to Plaintiffs.

484.    Defendants, by reason of their negligence, are liable for all of the damages to Plaintiffs proximately caused by the Contamination, and investigation, cleanup and removal of the Contamination at OU-2 and the Expanded Territory.

**AS AND FOR A SIXTH CAUSE
OF ACTION FOR PUBLIC NUISANCE,
PLAINTIFFS ALLEGE AS FOLLOWS:**

485.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "484" of this Second Amended Complaint, as if set forth in this paragraph at length.

486.    The releases and discharges described above, and the resulting Contamination are a public nuisance, because they interfere with rights common to all, including groundwater and surface water.

487.    Defendants caused releases, discharges and Contamination, and/or had a reasonable opportunity to abate the nuisance by investigating and remediating the Contamination, failed to do so in a reasonably prompt and effective manner, and/or failed to promptly and adequately report releases, discharges and Contamination to NYSDEC, EPA and Plaintiffs.

488.    By causing the releases, discharges and Contamination, and/or failing to promptly and adequately report, investigate and remediate the releases, discharges and Contamination, Defendants (including their officers, agents, servants, and/or employees), have interfered with rights common to all, including groundwater, and/or have assumed liability for that interference.

489.    Plaintiffs have sustained special damages from this public nuisance.

490.    Defendants, by reason of this public nuisance, are liable for all of the damages to Plaintiffs proximately caused by the Contamination, and investigation, cleanup and removal of the Contamination at OU-2 and the Expanded Territory.

**AS AND FOR A SEVENTH CAUSE OF
ACTION FOR RESTITUTION,
PLAINTIFFS ALLEGE AS FOLLOWS:**

491.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "490" of this Second Amended Complaint, as if set forth in this paragraph at length.

492.    The Contamination poses a threat to the environment and/or public health.

493.    Plaintiffs' actions in responding to the Contamination, which has been maintained and allowed to persist by Defendants in violation of law, were immediately necessary to satisfy the requirements of public health.

81

494.    It would be against equity and good conscience to permit Defendants to pass the burden of cleaning up the Contamination to Plaintiffs, and for Defendants to have had the benefit of enjoyment of the use of their respective facilities or their businesses, free of full responsibility for investigation, remediation, cleanup, and removal of, and response to, the Contamination at OU-2 and the Expanded Territory.

495.    Therefore, Defendants should make restitution to Plaintiffs for some or all off their expenses, costs, and damages for Environmental Response related to OU-2 and the Expanded Territory, to the extent not recoverable under CERCLA.

**AS AND FOR AN EIGHTH CAUSE OF
ACTION FOR CONTRIBUTION OR INDEMNIFICATION,
PLAINTIFFS ALLEGE AS FOLLOWS:**

496.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "495" of this Second Amended Complaint, as if set forth in this paragraph at length.

497.    Defendants, including their officers, agents, servants, employees, and/or predecessors, had a non-delegable duty to prevent, clean up or ensure against the Contamination.

498.    Some or all of the contaminants are classified as hazardous wastes, pursuant to ECL Article 27, and hazardous substances, pursuant to ECL Article 37.

499.    While Plaintiffs were obligated to undertake Environmental Response to the Contamination, including investigation, remediation, cleanup and/or removal, at OU-2, and NYSDEC has claimed that Plaintiffs were similarly obligated with respect to the Expanded Territory, Plaintiffs have expended in excess of their fair share (to the extent they have a fair share) of response costs for OU-2 and/or the Expanded Territory.

500.    As a result of the breach of this duty by Defendants, including their officers, agents, servants, employees, and/or predecessors, Defendants are responsible for Plaintiffs' past and future

expenses and damages in investigation, remediation, cleanup, and removal of, and response to, the Contamination at OU-2 and the Expanded Territory, and as a result, Defendants should, in equity, indemnify Plaintiffs for some or all of their expenses, costs, and damages, to the extent not recoverable under CERCLA.

**AS AND FOR A NINTH CAUSE OF
ACTION FOR A DECLARATORY JUDGMENT,
PLAINTIFFS ALLEGE AS FOLLOWS:**

501. Plaintiffs repeat and reallege the allegations of paragraphs "1" through "500" of this Second Amended Complaint, as if set forth in this paragraph at length.

502. The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to grant declaratory relief in this matter.

503. CERCLA § 113(g)(2) (42 U.S.C. § 9613(g)(2)) requires entry of a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further responses costs or damages, in any action brought under CERCLA § 107 (42 U.S.C. § 9607).

504. Plaintiffs and Defendants have an actual controversy sufficient to allow this Court to declare their rights.

505. As set forth above, Defendants are jointly and severally liable—or, alternatively, liable for their equitable share—for the costs of Environmental Response actions at OU-2 and the Expanded Territory.

506. Plaintiffs request that the Court issue a Declaratory Judgment that Defendants are jointly and severally liable—or, alternatively, liable for their equitable share—for the costs of Environmental Response at OU-2 and the Expanded Territory.

**AS AND FOR A TENTH CAUSE OF ACTION
FOR CONTRIBUTION UNDER CERCLA,
PLAINTIFFS ALLEGE AS FOLLOWS:**

507. Plaintiffs repeat and reallege the allegations of paragraphs "1" through "506" of this Second Amended Complaint, as if set forth in this paragraph at length.

508. The Hazardous Substances are "hazardous substances" as defined by CERCLA § 101(14) (42 U.S.C. § 9601(14)).

509. Pursuant to CERCLA, including CERCLA § 113(f) (42 U.S.C. § 9613(f)), CERCLA § 107(a) (42 U.S.C. § 9607(a)), and/or otherwise, Defendants must contribute their equitable share of response costs incurred by Plaintiffs to investigate and remediate the Contamination at OU-2 and the Expanded Territory.

510. If the 2021 ACO is a settlement of Plaintiffs' liability for response costs at OU-2 and/or the Expanded Territory, as defined in CERCLA § 113(f)(2) (42 U.S.C. § 9613(f)(2)), CERCLA entitles Plaintiffs to claims for contribution.

511. This Court should direct Defendants to pay their equitable shares of response costs incurred by Plaintiffs at OU-2 and the Expanded Territory, and also declare Defendants' liability for their equitable share of Plaintiffs' future response costs at OU-2 and the Expanded Territory.

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

a. Declaring that Defendants are jointly and severally responsible, or alternatively liable for their equitable share, of the costs associated with Environmental Response to the Contamination at OU-2 and the Expanded Territory, and requiring them to pay those costs to Plaintiffs.

b. Declaring that Defendants are responsible for Plaintiffs' future damages and Environmental Response costs and to fully investigate and remediate OU-2 and the

Expanded Territory.

c. Awarding Plaintiffs their damages and response costs, with interest.

d. Granting a permanent injunction ordering Defendants to further investigate the Contamination at OU-2 and the Expanded Territory, and to completely remove and remediate all of the Hazardous Substances, Petroleum and the Contamination from OU-2, the Expanded Territory and the Ley Creek Watershed.

e. Awarding Plaintiffs their attorneys' fees, experts' fees and other costs and expenses.

f. Awarding such other damages and further relief as this Court deems just, proper and equitable.

Dated: Rochester, New York
October 13, 2021

_____

**KNAUF SHAW LLP**
Attorneys for Plaintiffs
Alan J. Knauf, Esq.,
Linda R. Shaw, Esq.,
Amy K. Kendall, Esq.,
Melissa M. Valle, Esq., and
Jonathan Tantillo, Esq., of Counsel
1400 Crossroads Building
2 State Street
Rochester, New York 14614
Tel.: (585) 546-8430
aknauf@nyenvlaw.com
lshaw@nyenvlaw.com
akendall@nyenvlaw.com
mvalle@nyenvlaw.com
jtantillo@nyenvlaw.com


_____

**DONAHUE, GOLDBERG &
   LITTLETON**
Attorney for Plaintiffs
Matthew Littleton, Esq.
1008 Pennsylvania Avenue SE
Washington, DC 20003
Tel: (202) 683-6895
matt@donahuegoldberg.com

**JURY DEMAND**

Plaintiffs demand trial by jury, pursuant to F.R.C.P. Rule 38(b).

Dated: Rochester, New York
October 13, 2021

_____

**KNAUF SHAW LLP**
Attorneys for Plaintiffs
Alan J. Knauf, Esq.,
Linda R. Shaw, Esq.,
Amy K. Kendall, Esq.,
Melissa M. Valle, Esq., and
Jonathan Tantillo, Esq., of Counsel
1400 Crossroads Building
2 State Street
Rochester, New York 14614
Tel.: (585) 546-8430
lshaw@nyenvlaw.com
aknauf@nyenvlaw.com
akendall@nyenvlaw.com
mvalle@nyenvlaw.com
jtantillo@nyenvlaw.com

_____

**DONAHUE, GOLDBERG &**
   **LITTLETON**
Attorney for Plaintiffs
Matthew Littleton, Esq.
1008 Pennsylvania Avenue SE
Washington, DC 20003
Tel: (202) 683-6895
matt@donahuegoldberg.com

86