UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
RACER PROPERTIES LLC and EPLET,
LLC, not individually but solely in its
representative capacity as
Administrative Trustee of Revitalizing
Auto Communities Environmental
Response Trust,

                                    Plaintiffs,

        -v-                                    5:18-CV-1267

NATIONAL GRID USA, et al.,

                                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                          OF COUNSEL:

KNAUF SHAW LLP                        ALAN J. KNAUF, ESQ.
Attorneys for Plaintiffs              LINDA R. SHAW, ESQ.
1400 Crossroads Building              AMY K. KENDALL, ESQ.
2 State Street                        JONATHAN R. TANTILLO, ESQ.
Rochester, New York 14614             MELISSA VALLE, ESQ.

PRETI FLAHERTY  BELIVEAU              JEFFREY D. TALBERT, ESQ.
    & PACHIOS, LLP                    DAVID B. VAN SLYKE, ESQ.
Attorneys for Plaintiff Racer         LAURA A. RIDEOUT, ESQ.
    Properties LLC
P.O. Box 9546
One City Center
Portland, Maine 04112

BARCLAY DAMON LLP-ALBANY              YVONNE E. HENNESSEY, ESQ.
Attorneys for Defendants National
    Grid USA and Niagara Mohawk
    Power Corporation
80 State Street
Albany, New York 12207

DAY, PITNEY LAW FIRM-HARTFORD
Attorneys for Defendants Carrier
    Corporation, United Technologies
    Corporation, and Carlyle Air
    Conditioning Company Inc.
242 Trumbull Street
Hartford, Connecticut 06103

ERICK M. SANDLER, ESQ.
ELIZABETH C. BARTON, ESQ.

YOUNG, SOMMER LAW FIRM
Attorneys for Defendant General
    Electric Company
Executive Woods Five Palisades Drive
Albany, New York 12205

DEAN S. SOMMER, ESQ.
KRISTIN CARTER
    ROWE, ESQ.

MORGAN, LEWIS LAW FIRM-NY
Attorneys for Defendant Bristol-Meyers
    Squibb Company
101 Park Avenue
New York, New York 10178

BERNARD J.
    GARBUTT, III, ESQ.

MORGAN, LEWIS LAW FIRM
Attorneys for Defendant Bristol-Meyers
    Squibb Company
1701 Market Street
Philadelphia, Pennsylvania 19103

GLEN R. STUART, ESQ.
ADINA D. BINGHAM, ESQ.

RUPP, BAASE LAW FIRM-BUFFALO
Attorneys for Defendants Thompson
    Corners, LLC, 6181 Thompson
    Road, LLC, Thompson Lawn, LLC,
    and Thompson NW, LLC
424 Main Street, 1600 Liberty Building
Buffalo, New York 14202

JOHN T. KOLAGA, ESQ.

HINMAN, HOWARD LAW FIRM                ALBERT J. MILLUS, Jr., ESQ.
Attorneys for Defendants Metalico
    Syracuse Realty, Inc. and Metalico
    New York, Inc.
P.O. Box 5250
80 Exchange Street
700 Security Mutual Building
Binghamton, New York 13902

GODFREY & KAHN, S.C.                   DANIEL FLAHERTY, ESQ.
Attorneys for Defendant Gardner        DANIEL NARVEY, ESQ.
    Denver, Inc.
833 East Michigan Street Suite 1800
Milwaukee, Wisconsin 53202

GARY S. BOWITCH                        GARY S. BOWITCH, ESQ.
Attorneys for Defendant Gardner
    Denver, Inc.
13 Willow Street
Castleton, New York 12033

WOODS OVIATT GILMAN LLP                DONALD W.
Attorneys for Defendant ONX1 LLC           O'BRIEN, Jr. ESQ.
1900 Bausch & Lomb Place
Rochester, New York 14604

NIXON, PEABODY LAW FIRM-ALBANY         ANDREW C. ROSE, ESQ.
Attorneys for Defendant Onondaga       DANA P. STANTON, ESQ.
    Pottery Company, Inc.
677 Broadway 10th Floor
Albany, New York 12207

KENNEY, SHELTON LAW FIRM               LORI E. PETRONE, ESQ.
Attorneys for Defendant Amparit
    Industries, LLC
233 Franklin Street
Buffalo, New York 14202

FOGEL & BROWN, P.C.
Attorneys for Defendants Carrier Circle
    Business Complex LLC,
    Syracuse Lepage LLC, and
    North Midler Properties LLC
120 Madison Street
Syracuse, New York 13202

MICHAEL A. FOGEL, ESQ.
PATRICK D. DONNELLY, ESQ.

WHITEMAN, OSTERMAN LAW FIRM
Attorneys for Defendant Telesector
    Resources Group, Inc.
One Commerce Plaza Suite 1900
Albany, New York 12210

PHILIP H. GITLEN, ESQ.

ALSTON, BIRD LAW FIRM-NY
Attorneys for Defendant Western
    Electric Company, Incorporated and
    Nokia of America Corporation
90 Park Avenue
New York, New York 10016

DAVID VENDERBUSH, ESQ.

ALSTON, BIRD LAW FIRM-ATLANTA
Attorneys for Defendant Western
    Electric Company, Incorporated and
    Nokia of America Corporation
1201 West Peachtree Street
Atlanta, Georgia 30309

MEAGHAN G. BOYD, ESQ.

JONES, DAY LAW FIRM-CHICAGO
Attorneys for Defendant Lennox
    Industries Inc.
77 West Wacker Drive Suite 3500
Chicago, Illinois 60601

CHARLES T. WEHLAND, ESQ.

JONES, DAY LAW FIRM-NEW YORK
Attorneys for Defendant Lennox
    Industries Inc.
250 Vesey Street
New York, New York 10281

ALLISON L. WAKS, ESQ.

BROWN DUKE & FOGEL, P.C.                    GREGORY M. BROWN, ESQ.
Attorneys for Defendants Syracuse Deere
    Road Associates, LLC and Hauler's
    Facility LLC
120 Madison Avenue Suite 1620
Syracuse, New York 13202


LINDA E. ALARIO                            LINDA E. ALARIO, ESQ.
Attorneys for Defendant Jagar
    Enterprises, Inc.
203 Jasper Street
Syracuse, New York 13203


HARTER, SECREST LAW FIRM                   PAUL D. SYLVESTRI, ESQ.
Attorneys for Defendants Calocerinos       PETER H. ABDELLA, ESQ.
    and Spina and C&S
    Engineers, Inc.
1600 Bausch & Lomb Place
Rochester, New York 14604


TALARICO LAW FIRM                          JOSEPH R. TALARICO II, ESQ.
Attorneys for Defendant B&B Family
    Limited Partnership
6832 East Genesee Street
Fayetteville, New York 13066


GEOFFREY J. MICHAEL                        GEOFFREY J. MICHAEL, ESQ.
Attorneys for Defendant Honeywell
    International Inc.
6407 Eleventh Street
Alexandria, Virginia 22307


ARNOLD, PORTER LAW FIRM-DC                 LAUREN COLE DANIEL, ESQ.
Attorneys for Defendant Honeywell
    International Inc.
601 Massachusetts Avenue Northwest
Washington, District of Colombia 20001

HANGLEY ARONCHICK SEGAL
   PUDLIN & SCHILLER
Attorneys for Defendant Lockheed
   Martin Corporation
One Logan Square Twenty-Seventh Floor
Philadelphia, Pennsylvania 19103

STEVEN T. MIANO, ESQ.
PETER V. KEAYS, ESQ.
ROBERT A. WIYGUL, ESQ.

THE LAW OFFICE OF DOUGLAS H.
   ZAMELIS
Attorneys for Defendant Northeast
   Management Services, Inc.
7629A State Highway 80
Cooperstown, New York 13326

DOUGLAS H. ZAMELIS, ESQ.

WESTFALL LAW PLLC
Attorneys for Defendant Northern
   Industrial Holdings, LLC
247 W. Fayette Street, Suite 203
Syracuse, New York 13202

MELODY D. WESTFALL, ESQ.

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

On October 26, 2018, plaintiffs Racer Properties LLC ("Racer Properties") and EPLET, LLC ("EPLET" and with Racer Properties "plaintiffs") on behalf of Revitalizing Auto Communities Environmental Response Trust ("RACER") filed a complaint in this District. At its core, plaintiffs' complaint sought money damages to recover the expenses they accrued cleaning pollution caused by dozens of defendant companies (together "defendants") over dozens of years at Onondaga Lake near Syracuse, New York.

That complaint has since been amended twice, but at present plaintiffs assert ten claims for relief against defendants: (1) cost recovery under 42 U.S.C. § 9607(a) ("§ 107") of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); (2) contribution under 42 U.S.C. § 9613(f) ("§ 113") of CERCLA; (3) response costs and damages under § 181(5) of the New York Navigation Law; (4) contribution under § 176(8) of the New York Navigation Law; (5) negligence under New York common law; (6) public nuisance under the New York common law; (7) restitution under the New York common law; (8) contribution or indemnification under New York common law; (9) declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201; and (10) a second claim for contribution under § 113 based on events taking place after the first amended complaint had been filed.

On February 16, 2022, defendants moved to dismiss the Second Amended Complaint.  That motion, having been fully briefed, will now be decided on the submissions and without oral argument.

7

## II. __BACKGROUND__[1]

Onondaga Lake has long been infamous for its pollution. *Revitalizing Auto Cmtys. Ennv't Response Tr. v. Nat'l Grid USA* ("*RACER I*"), 2020 WL 2404770, at *2 (N.D.N.Y. May 12, 2020). As a result, it comes as little surprise that in 1993 the lake and its immediate environs were added to the National Priorities List of potential CERCLA sites to kickstart a cleanup. *Revitalizing Auto Cmtys. Ennv't Response Tr. v. Nat'l Grid USA* ("*Racer II*"), 10 F.4th 87, 93 (2d Cir. 2021).

But explaining *how* Onondaga Lake came to be so polluted requires taking a step back. Beginning in the mid-1950s, automotive manufacturer General Motors ("GM") built car parts out of the Syracuse Inland Fisher Guide Plant (the "IFG Plant"). Dkt. 334 ("SAC") ¶¶ 392, 394. Building those parts required hydraulic oils containing substances called polychlorinated biphenyls ("PCBs"), which are apparently particularly destructive to the environment. SAC ¶¶ 394-96.

In the course of disposing of its waste, the IFG Plant caused PCBs to enter the watershed of Ley Creek. SAC ¶¶ 394-96. Ley Creek, in turn, is one of

---

[1] The facts are taken from the Second Amended Complaint, as well as any documents attached to it or incorporated by reference. However, because many relevant facts have already been discussed at some length in prior decisions, the parties' familiarity will largely be assumed for brevity's sake. Recent developments unique to the Second Amended Complaint and factual allegations relevant to the present motion practice will nevertheless be discussed.

Onondaga Lake's tributaries.  SAC ¶ 1.  It is also one of the most significant sources of its pollution.  *See id.*

The IFG Plant was situated well upstream—that is, to the east—of Onondaga Lake.  *See* Dkt. 334-19, p. 4.  In fact, its property abuts Townline Road, where Ley Creek begins.  *Id.*  From the IFG Plant, Ley Creek travels under the LeMoyne Avenue Bridge, before flowing past the Route 11 Bridge furthest to the west.  *See* SAC ¶ 64; Dkt. 334-19, p. 4.  Of course, though plaintiffs acknowledge that the IFG Plant caused PCBs to enter the Ley Creek watershed, SAC ¶ 395, they also attribute that pollution to defendants, *see id.*, *passim*.

As a result, the State of New York began to put pressure on GM to clean up after itself some time around 1985.  *See* SAC ¶¶ 399-400.  Ultimately, the New York State Department of Environmental Conservation ("NYSDEC") and GM entered into a consent decree that year to investigate and then redress the pollution at the IFG Plant.  *Id.* ¶ 400.

That consent decree proved to be the first of many.  *See* SAC ¶¶ 405-10.  Working in concert with New York, GM slowly began to work towards cleaning up the pollution at and resulting from the IFG Plant.  *RACER II*, 10 F.4th at 94.  Eventually, and perhaps due to the strain of trying to remediate the area, GM shut down the IFG Plant in 1993, around the same

time Onondaga Lake was added to the National Priorities List.
SAC ¶¶ 397-404; *see RACER II*, 10 F.4th at 93-94.

On June 1, 2009, GM declared bankruptcy. *RACER I*, 2020 WL 2404770, at *2. But of course, GM's lack of funding did not make the environmental consequences of its long-term business practices disappear. *See id.* Instead, the Saint Regis Mohawk Tribe joined New York and pursued GM in bankruptcy court, hoping to find a solution to ensure that the Onondaga Lake cleanup continued apace. *Id.*

The Environmental Protection Agency for the United States of America (the "EPA") was also after GM at the same time, and filed a Proof of Claim alleging nationwide pollution against it on November 30, 2009. Dkt. 346-2, p. 2. A second proof of claim followed on March 1, 2011. Dkt. 346-3, p. 3.

On March 29, 2011, the EPA, New York, and the Saint Regis Mohawk Tribe (together the "Governments") entered into yet another consent decree with GM (the "2011 Agreement"). *RACER I*, 2020 WL 2404770, at *3. Functionally, the 2011 Agreement set aside about $31 million to remediate the area polluted by the IFG Plant. *Id.* RACER was created to carry on GM's work on that project, EPLET was formed to operate as RACER's trustee, and Racer Properties holds the title to the IFG Plant. *Id.* at *3, 7. Because trusts cannot take legal action on their own, EPLET signed the 2011 Agreement on RACER's behalf. *RACER II*, 10 F.4th at 94.

Thus, plaintiffs found themselves charged with finishing at least a portion of GM's work remediating the pollution caused by the IFG Plant. From a purely geographical perspective, there are (at least) two ways to look at the area entrusted to plaintiffs to remediate.

First, there is the functional definition, which divides the IFG Plant into two distinct operational units ("OUs"). Second, the EPA and NYSDEC defined the entire Onondaga Lake cleanup project as consisting of twelve distinct "subsites." SAC ¶ 62. As is relevant here, in a Proof of Claim filed in 2009, the EPA explained that five subsites bear at least some relation to the properties plaintiffs are charged to remediate. Dkt. 346-2, p. 67.[2]

To make those abstract descriptions a little more concrete, start with the two OUs plaintiffs point to, creatively named OU-1 and OU-2. *RACER II*, 10 F.4th at 94. Of the $31 million initially set aside for RACER's remediation project, $22.57 million was earmarked for OU-1, which, according to plaintiffs, consists of the real property of the IFG Plant. *Id.*; SAC ¶ 67. The remaining $8.55 million was set aside for OU-2. *RACER II*, 10 F.4th at 94.

OU-2's relationship to the IFG Plant is somewhat more complicated. According to plaintiffs, OU-2 consists of about "9,200 linear feet of Ley Creek channel sediments, surface water, and adjacent floodplain soils/sediments

---

[2] Pagination Corresponds with CM/ECF. As will be discussed in greater detail below, the EPA's Proofs of Claim can be considered for the present motion practice because they are incorporated by reference into the 2011 Agreement.

upstream of the eastern edge of the Route 11 Bridge and downstream of the western edge of the Townline Road Bridge," as well as several acres of nearby wetlands.  SAC ¶ 69.  In other words, OU-2 consists of Ley Creek's bed from Townline Road in the east to the Route 11 Bridge to the west.  *See id.*

Alternatively, the areas targeted for remediation can be thought of using the EPA's subsite scheme.  Though the overlap between plaintiffs' OUs and the EPA's subsites can be a little murky, plaintiffs have helpfully explained where the two methods of description line up.  As a result, three of the five subsites the EPA claims as related to the IFG Plant need a bit of explanation. To begin, Subsite 2 consists of "certain areas alongside Ley Creek . . . including the [eighty-five] acres on which GM operated the IFG [Plant]."  Dkt. 346-2, p. 68.  In other words, there is no apparent practical difference between OU-1 and Subsite 2.  Dkt. 357, p. 31 n.12.

Subsite 4 "includes approximately [eighteen] acres of banks alongside Ley Creek," especially where Onondaga County placed PCB-contaminated dredging in the 1970s and 1980s.  Dkt. 346-2, p. 69; SAC ¶ 425.  For its part, Subsite 5 "includes certain downstream banks of Ley Creek." Dkt. 346-2, p. 70.  Plaintiffs acknowledge that Subsite 5 makes up OU-2. Dkts. 334-19, p. 4; 357 p. 31, n.12.

According to the Proofs of Claim, PCBs are present at each of those three subsites because of GM, and specifically the IFG Plant.  Dkt. 346-2, pp. 68-70.

However, in their complaint, plaintiffs allege that the contamination anywhere other than OU-1 was caused either by: (1) New York's own project which relocated Ley Creek in 1951; or (2) Onondaga County's placing dredged soil on the north and south banks of Ley Creek in the 1970s and 1980s. SAC ¶ 425. According to plaintiffs, the Governments were aware at the time the 2011 Agreement was signed that OU-2 and the expanded territory were contaminated not because of migration or emanation, but from these external forces. *Id.* ¶ 428.

Regardless of how the two areas came to be contaminated, RACER went about its work in short order. In 2013, RACER completed a remedial investigation and feasibility study for OU-2. *RACER II*, 10 F.4th at 94. In 2015, the EPA and NYSDEC "issued a Record of Decision describing the remediation activities they wished RACER to undertake with respect to OU-2." *Id.*

However, the relatively smooth cleanup would soon hit its first snag. At some point after 2015, NYSDEC directed RACER to take soil samples for some properties that plaintiffs claim were beyond the bounds of OU-2. *RACER II*, 10 F.4th at 94-95. Plaintiffs have taken to calling these lands the "expanded territory." *Id.*

The so-called "expanded territory" consists of land on the north and south banks of Ley Creek running from along the IFG Plant in the east to the

easternmost edge of the Route 11 bridge in the west.  Dkt. 334-19, p. 4.
When the results of RACER's sampling came back, they apparently indicated
that the expanded territory was contaminated as well.  *RACER II*, 10 F.4th
at 95.

According to plaintiffs, RACER was not obligated under the 2011
Agreement to redress contamination at either OU-2 or the expanded
territory.  SAC ¶ 5.  But plaintiffs *do* claim that defendants are responsible
for contaminating both areas, and plaintiffs seek to hold defendants liable for
the costs incurred in the cleanup.  *Id.* ¶ 2.

To that end, RACER and Racer Properties filed a complaint in this
District on October 26, 2018.  Dkt. 1.  All defendants then moved to dismiss
plaintiffs' complaint, most on November 13, 2019, while others moved
through supplemental briefing on December 3, 2019.  Dkts. 255; 294.  On
May 12, 2020, those motions were granted.  Dkt. 312.  In addition, RACER
was removed as plaintiff and EPLET ordered substituted in for any further
proceedings, because a trust cannot bring a lawsuit under New York law.  *Id.*

On August 18, 2021, the Court of Appeals for the Second Circuit reversed
the dismissal, remanding jurisdiction to this Court to determine in the first
instance the merits of defendants' arguments for dismissal other than the
concerns regarding ripeness that resulted in the first decision.  Dkt. 321.  On
November 17, 2021, plaintiffs filed the SAC.  Dkt. 334.

In the meantime, on September 29, 2021, EPLET entered into another consent decree with the EPA (the "2021 Agreement").  Dkt. 334-25, p. 29; SAC ¶ 439.  The 2021 Agreement explicitly covers RACER's activities in OU-2, but explicitly does not cover RACER's activities in the expanded territory.  Dkt. 334-25, ¶ 2.  That said, for its part, the EPA does not acknowledge any difference between OU-2 and the expanded territory, and instead argues that the former embraces the latter.  *Id.*

On February 16, 2022, defendants filed a second motion to dismiss. Dkt. 346.  Plaintiffs have responded, and defendants replied.  Dkts. 357; 363. This decision now follows.[3]

## III. **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That factual matter may be drawn from "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

---

[3] Plaintiffs have requested oral argument.  Dkt. 358.  Because oral argument would be neither necessary nor useful, that request must be denied.

Importantly, "the complaint is to be construed liberally, and all reasonable inferences must be drawn in the plaintiff's favor." *Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).  If the complaint and its additional materials—when viewed through that pro-plaintiff lens—are not enough to raise the plaintiff's right to relief above the speculative level, the complaint must be dismissed.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## IV. <u>DISCUSSION</u>

Defendants' arguments in favor of dismissal come under three general categories: (1) CERCLA claims; (2) state law claims; and (3) declaratory relief.  However, plaintiffs' complaint relies entirely on its CERCLA claims to maintain jurisdiction.  Thus, if those claims fail, the question becomes whether to keep jurisdiction over plaintiffs' complaint at all.  If those claims survive, each category will be considered in turn.

### A. <u>CERCLA</u>

Plaintiffs bring three total claims under CERCLA: (1) a § 107 cost recovery claim; (2) a § 113 contribution claim based on the 2015 Record of Decision; and (3) a § 113 contribution claim based on the 2021 Agreement.

Section 107(a) of CERCLA provides that "[n]otwithstanding any other provision or rule of law, and subject only to the defenses set forth in [§ 107](b)," a party responsible for pollution "shall be liable for . . . necessary

costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a).  In other words, if one party cleans up a contaminated area and incurs expenses in doing so, that party can recover the costs of their cleanup from other responsible entities.  *See id.*

By contrast, CERCLA's § 113 allows a potentially responsible party ("PRP") who has been exposed to liability to seek contribution for that liability from other PRPs.  42 U.S.C. § 9613(f).  There are two subcategories of CERCLA contribution claims:  (1) § 113(f)(1) claims; and (2) § 113(f)(3)(B) claims.  A § 113(f)(1) claim comes into play when a PRP has been sued and found liable for cleanup costs.  42 U.S.C. § 9613(f)(1).  A § 113(f)(3)(B) claim, by contrast, arises when a PRP enters into a settlement agreement with a state or the United States and seeks to receive contribution from other PRPs for costs incurred as a result of that settlement.  *Id.* at § 9613(f)(3)(B).  Given the absence of any completed litigation, the parties do not dispute that if plaintiffs successfully state a § 113 claim, § 113(f)(3)(B) best fits the facts of this case.

A § 113(f)(3)(B) contribution claim has a three-year statute of limitations. *Consol. Edison Co. v. UGI Utils., Inc.*, 423 F.3d 90, 98 (2d Cir. 2005).  That clock begins to tick once a consent decree is approved by the relevant court. *New York v. Solvent Chem. Co., Inc.*, 664 F.3d 22, 26 (2d Cir. 2011).  Of course, the approval of a consent decree often signals only the beginning of a

CERCLA cleanup, and, as a result, savvy plaintiffs will typically seek contribution and declaratory judgments soon after entering into the consent decree. *Id.* at 26-27.

That being said, a consent decree only begins the limitations period if it resolved the plaintiff's liability to the United States or a state. *See Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc*, 596 F.3d 112, 126 (2d Cir. 2010). In other words, it is not the execution of the consent decree in the abstract, but rather the act of resolving the plaintiff's CERCLA liability that triggers a § 113 claim and begins the limitations period's countdown. *ASARCO LLC v. Goodwin*, 756 F.3d 191, 202 (2d Cir. 2014).

Now, because § 107 and § 113 claims offer decidedly different relief, the obvious question that follows is why they are being considered together. The answer is that when a plaintiff meets the requirements to bring a § 113(f)(3)(B) claim, it loses the ability to alternatively proceed under § 107. *RACER II*, 10 F.4th at 103. By extension, if plaintiffs had a viable § 113 claim for any harm that they allege now, § 107 would not afford them a remedy. *See id.* And if that § 113 claim is time-barred, plaintiffs are simply out of luck.

According to defendants, that is precisely where plaintiffs find themselves now. After all, defendants argue that the 2011 Agreement resolved all of plaintiffs' CERCLA liability concerning OU-2 and the expanded territory. In

18

that case, plaintiffs' CERCLA claims are time-barred, one and all.  Needless to say, plaintiffs see things differently.

Though the dispute may appear straightforward at first blush, that single disagreement is actually properly expressed as three.  That is because there are three different agreements at play: (1) the 2011 Agreement; (2) the 2015 Record of Decision; and (3) the 2021 Agreement.  Each agreement's capacity to establish plaintiffs' liability for OU-2 and the expanded territory must be assessed in turn.

However, as an initial matter, it is worth taking a moment to explain why OU-2 and the expanded territory's liability can be assessed collectively.  Much ink is spilled in the complaint arguing how OU-2 came to be contaminated and why the unique circumstances of that contamination make it different from OU-1.  Yet the nature of the expanded territory's contamination gets much shorter shrift.  Nowhere in the complaint do plaintiffs allege that similar unique circumstances merit a similar break in the analysis between OU-2 and the expanded territory.  *See generally*, SAC, *passim*.

Nor do plaintiffs' opposition papers argue that the analysis should be any different for the expanded territory than it was for OU-2.  Put together, with the obvious exception of the 2021 Agreement, which explicitly does not cover

the expanded territory, there is no indication in the record that the two regions should be treated differently.  Dkt. 334-25, ¶ 2.

Thus, plaintiffs' failure to point to any meaningful analytical difference between the two areas amounts to a concession that they should be treated the same.  *See, e.g.*, *Napoli v. Nat'l Surety Corp.*, 2022 WL 1943776, at *6 (S.D.N.Y. May 19, 2022) (collecting cases for proposition that failure to address arguments in responsive briefing amounts to concession of those arguments).  Especially because the expanded territory consists of land adjacent to the banks of Ley Creek (or OU-2), the two areas will be treated identically for the purposes of the present motion practice.

### 1. **The 2011 Agreement**

Now that that preliminary matter is settled, the analysis begins with the 2011 Agreement.  To that end, "contracts with the government are governed by federal common law[.]" *Falls Riverway Realty, Inc. v. City of Niagara Falls, N.Y.*, 754 F.2d 49, 55 n.4 (2d Cir. 1985) (citing *Priebe & Sons v. United States*, 332 U.S. 407 (1947)).  But while that may seem like useful guidance on paper, in a practical sense courts are "severely limited" from creating or expanding legal principles unique to federal jurisprudence. *In re Gaston & Snow*, 243 F.3d 599, 606 (2d Cir. 2001).

Thus, in the typical case courts can only create federal common law where the operation of state law would "significantly conflict" with "uniquely federal

interests." *Empire Healthchoice Assur., Inc. v. McVeigh*, 396 F.3d 136, 140 (2d Cir. 2005) (cleaned up).

Instead, courts tend to look closely at state law before developing novel federal solutions to a question of contract interpretation. *See Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 316 (2d Cir. 2006) ("[I]n developing federal common law in an area, [a court] may look to state law[.]" (cleaned up)).  Fortunately enough, "[w]hen it comes to general rules of contract interpretation, there is little difference between federal common law and New York law[.]" *Barnes v. Am. Int'l Life Assurance Co.*, 681 F. Supp. 2d 513, 520 (S.D.N.Y. 2010). Accordingly, in the absence of any indication from either party that some unique federal concern should cause a divergence in this case, New York law will be used for guidance.  *McVeigh*, 396 F.3d at 140.

"Under New York law the initial interpretation of a contract is a matter of law for the court to decide." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) (internal citations and quotation marks omitted).  That also leaves to courts the antecedent question of whether the terms of a contract are ambiguous.  *Id.*  If the contract's terms are clear and unambiguous, a court may dismiss a claim rooted in contractual interpretation at the Rule 12(b)(6) stage.  *See, e.g.*, *Advanced Mktg. Grp., Inc. v. Bus. Payment Sys., LLC*, 300 F. App'x 48, 49

(2d Cir. 2008) (summary order).  But an ambiguity creates a question of fact as to the proper interpretation and precludes dismissal before discovery. *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007).

Ambiguous language is language which is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of customs, practices, usages[,] and terminology as generally understood in the particular trade or business." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992).  The obvious corollary is that "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations, or where one party's view strains the contract language beyond its reasonable and ordinary meaning." *Crowley*, 512 F. Supp. 2d at 152 (citing *Seiden Assocs.*, 959 F.2d at 428).

Wrapping all that law together, if the 2011 Agreement unambiguously resolved plaintiffs' liability as to OU-2 and the expanded territory, then plaintiffs' § 113 claims relating to those areas must be dismissed as time-barred and their § 107 claims must be dismissed as foreclosed by their now-defunct § 113 claims.  But if the 2011 Agreement is ambiguous, or else if the 2011 Agreement unambiguously does *not* embrace plaintiffs' liability for OU-2, then the analysis must proceed to the 2015 Record of Decision and the

2021 Agreement to determine whether either of those unambiguously allows for a § 113 claim.[4]

To get to the bottom of the parties' dispute, it is worth noting from the jump that consent decrees often include a "matters addressed" section specifically to determine what that consent decree covers.  *United States v. Se. Pa. Transp. Auth.*, 235 F.3d 817, 823 (3d Cir. 2000).  Functionally, these sections exist to "foreclose future arguments over the scope" of the consent decree's determination of liability.  *Id.*

As a result, courts routinely use the "matters addressed" sections of § 113 consent decrees to set the bounds of contribution protection and, thus, the scope of available contribution claims under § 113(f)(3)(B).  *See, e.g.*, *New York v. Town of Clarkstown*, 95 F. Supp. 3d 660, 676-77 (S.D.N.Y. 2015).

As it turns out, the 2011 Agreement contains just such a "matters addressed" section.  *See* Dkt. 334-20 ("2011 Agreement"), ¶ 105.  That section covers:

> all costs of Environmental Actions incurred or to be incurred by the [Governments] or any other person or entity relating to or in connection with the Properties, including releases of Hazardous Substances from any portion of the Properties, and all areas affected by migration of such substances emanating from the Properties; provided, however, that the "matters addressed" in this Settlement Agreement do not include (i) any matters reserved in Paragraph 100 of this Settlement Agreement; or

---

[4] Plaintiffs nevertheless argue that even if the 2011 Agreement resolved their liability for OU-2 and the expanded territory, the 2015 Record of Decision and/or the 2021 Agreement reset the statute of limitations.  That argument will be addressed below.

> (ii) any claims for past costs asserted by [PRPs] who are not
> parties to this Settlement Agreement.

*Id.*

Though the 2011 Agreement's matters addressed section provides a useful starting point to construing that document, there are two obvious references that need clarification.  First is the definition of a Property.  A Property is any of the 89 pieces of real estate identified in Attachment A to the 2011 Agreement.  2011 Agreement, ¶ 20.  The IFG Plant is listed among those properties.  *Id.* at 96.

The second issue to be resolved are the "matters reserved in Paragraph 100" of the 2011 Agreement.  2011 Agreement, ¶ 105.  Paragraph 100 contains the Governments' reservation of rights.  *Id.* ¶ 100.  As may be expected, that paragraph limits the Governments' covenants not to sue in the 2011 Agreement by noting that they "do not apply to any matters other than those expressly specified therein."  *Id.*

In addition, the Governments specifically reserved a number of additional rights against plaintiffs, including: (1) any action to enforce the Governments' rights under the 2011 Agreement; (2) any unsecured claim concerning the portion of Ley Creek to the west (or downstream) of the Route 11 Bridge; and (3) "all rights with respect to any site that is not a Property, other than claims or causes of action for migration of Hazardous Substances emanating from a Property[.]"  2011 Agreement, ¶ 100.

Of course, because the reservation of rights itself references the 2011 Agreement's covenants not to sue, the scope of the former cannot be resolved without delving into the latter.  To that end, through the 2011 Agreement, the Governments covenanted "not to sue or assert any administrative or other civil claims or causes of action against . . . the Environmental Response Trust and the Environmental Response Trust Protected Parties under CERCLA, RCRA, and State environmental statutes, as well as any other environmental liabilities asserted in the Government Proofs of Claim."  2011 Agreement, ¶ 94.

As the reference to *yet another* different piece of language should make plain, we have still yet to hit the bottom of the rabbit hole in terms of the provisions at play in sorting out what the 2011 Agreement actually covered. Instead, resolving what all was included in the covenant not to sue means turning to the Proofs of Claim.[5]

But the Proofs of Claim are not explicitly part of the 2011 Agreement.  Nor are they attached to the complaint.  Consequently, it first must be

---

[5] Despite the covenants not to sue's explicit reference to the Proofs of Claim, plaintiffs incredibly argue that the Proofs of Claim were only included in the preamble to clarify the general scope of the IFG Plant's pollution and have no bearing on the scope of the 2011 Agreement's coverage.  Plaintiffs are demonstrably wrong.  Although the 2011 Agreement certainly does reference the Proofs of Claim in its preamble as plaintiffs suggest, their argument that defendants mislead the Court by suggesting that that reference does anything to set the bounds of liability established by the 2011 Agreement is powerfully misguided.  Dkt. 357, p. 31 n.11.  The Proofs of Claim are explicitly referenced—twice—as setting the bounds of the Governments' covenants not to sue. 2011 Agreement, ¶¶ 94-95.  That reference goes a long way past mere preamble.  Accordingly, plaintiffs' argument must be disregarded.

determined whether that extraneous document can be considered in deciding a Rule 12(b)(6) motion.  As it happens, plaintiffs argue that because the Proofs of Claim are extraneous to the 2011 Agreement, they cannot be considered unless the contract is first deemed ambiguous.  Plaintiffs are mistaken.

"While a consent decree is a judicial pronouncement, it is principally an agreement between the parties and as such should be construed like a contract."  *Crumpton v. Bridgeport Educ. Ass'n*, 993 F.2d 1023, 1028 (2d Cir. 1993).  Thus, like a contract, a consent decree's scope "must be discerned within its four corners," and a court cannot expand or reduce the agreement actually set down in writing.  *Id.* (internal citations and quotation marks omitted).  However, documents that are incorporated by reference into a contract "become an intrinsic part" of the contract itself.  *Id.*

"A contract may incorporate another document by reference by describing it in such clear and unambiguous terms that its identity can be ascertained beyond reasonable doubt."  *Padaguan v. Carnival Corp.*, 709 F. App'x 713, 715 (2d Cir. 2017) (summary order) (citing *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 47 (2d Cir. 1993)).  In addition, the parties to the agreement must have "had knowledge of and assented to the incorporated terms."  *Local Union 97, Int'l Brotherhood of*

26

*Elec. Workers, AFL-CIO v. NRG Energy, Inc.*, 561 F. Supp. 3d 322, 330 (N.D.N.Y. 2021).

The Proofs of Claim plainly meet the requirements of incorporation by reference.  Regarding the first element, the 2011 Agreement expressly identified them by their document numbers.  2011 Agreement, p. 10.  Thus, there can be no reasonable doubt as to what the 2011 Agreement means when it refers to the Proofs of Claim.  *Padaguan*, 709 F. App'x at 715.

As to the second element, because EPLET signed the 2011 Agreement, plaintiffs as a whole can be ascribed both knowledge of and assent to the terms of the Proofs of Claim.  *NRG Energy*, 561 F. Supp. 3d at 330.  Both requirements of incorporation are thus met, and the Proofs of Claim may be considered as an intrinsic part of the 2011 Agreement.  *Crumpton*, 993 F.2d at 1028.

That brings the analysis—at last—to the Proofs of Claim.[6]  Just as a reminder, the Proofs of Claim establish the bounds of the Governments' covenants not to sue, which in turn interact with the Governments'

---

[6] Although both Proofs of Claim are incorporated, only the November 30, 2009 Proof of Claim sets out any geographic description of the area at issue.  *Compare* Dkt. 346-2, pp. 4-106 (November 30, 2009 Proof of Claim describing areas subject to GM's contamination), *with* Dkt. 346-3, pp. 2-3 (March 1, 2011 Proof of Claim containing no such geographic information).  Though the Proofs of Claim will be referred to together to keep the analysis in line with the covenant not to sue's language, all citations will thus be to the November 30, 2009 Proof of Claim.

reservations of rights, which, finally, impose a limit on the matters addressed by the 2011 Agreement.

To that end, functionally the Proofs of Claim allege contamination against GM for certain Subsites of the Onondaga Lake Superfund Site.  Dkt. 346-2, pp. 67-72.  In particular, the Proofs of Claim established that GM was responsible for contaminating OU-1.  *See id.* at 68 (attributing pollution at Subsite 2 to GM); Dkt. 357, p. 31, n.12 (plaintiffs acknowledging that Subsite 2 is OU-1).  But the Proofs of Claim also set out that "GM disposed or arranged for the disposal of PCBs" at Subsite 4 which "contributed to the contamination of Subsite 5."  Dkt. 346-2, pp. 69-70.  Critically, plaintiffs acknowledge that Subsite 5 and OU-2 are the same.  Dkt. 357, p. 31 n.12.

In other words, the Proofs of Claim state that OU-2 was contaminated, albeit indirectly, by GM.  Dkts. 346-2, pp. 69-70; 357 p. 31 n.12.  And once again, in the 2011 Agreement, the Governments consented not to sue based on the Proofs of Claim.  2011 Agreement, ¶ 94.  On the contrary, "the Government Proofs of Claim [were] deemed satisfied in full in accordance with the terms of [the 2011 Agreement.]"  *Id.* ¶ 95.

By extension, it seems plain that plaintiffs' liability for the contamination in OU-2—and by further extension the expanded territory—was "expressly specified" by the covenants not to sue and sits outside of the Governments' reservation of rights.  2011 Agreement, ¶ 100.  In that light, plaintiffs' efforts

to dispel defendants' argument that the 2011 Agreement unambiguously covers plaintiffs' liability for OU-2 and the expanded territory have a steep hill to climb.

Yet plaintiffs resist this straightforward reading of the 2011 Agreement. To their minds, the Governments reserved "all rights with respect to any site that is not a Property, other than claims or causes of action for migration of Hazardous Substances emanating from a Property[.]" 2011 Agreement, ¶ 100(vii).  Similarly, plaintiffs note that the covenants not to sue lead off with the prefatory clause "[w]ith respect to the Properties (including releases of Hazardous Substances from any portion of the Properties and all areas affected by migration of such substances emanating from the Properties[.]"  *Id.* ¶¶ 94-95.  Plaintiffs urge that the 2011 Agreement must therefore be read to *only* cover the Properties themselves and the areas contaminated by migration from the Properties.

And because the complaint alleges that OU-2 and the expanded territory were contaminated by "means other than migration"—particularly the relocation of Ley Creek in 1951 as well as moving dredged soil in the 1970s and 1980s—plaintiffs argue that the 2011 Agreement did not resolve their liability.  SAC ¶ 425.

In the abstract, plaintiffs' reading of the 2011 Agreement is theoretically possible.  So unless no "reasonably intelligent person who has examined the

context of the entire integrated agreement" could objectively adopt one party

or the other's interpretation, the 2011 Agreement is ambiguous and

defendants' motion must be denied. *Seiden Assocs.*, 959 F.2d at 428.

Looking at the agreement as a whole, though, no reasonable person could

plausibly adopt plaintiffs' reading. The unique posture of a § 113(f)(3)(B)

claim makes that analysis somewhat complicated, but when the logic is

followed step-by-step the result is clear.

After all, a § 113(f)(3)(B) claim is born when a party's liability under

CERCLA is established. *Goodwin*, 756 F.3d at 202. As a result, for plaintiffs'

theory of the 2011 Agreement to hold water, there would have to have been

some possibility that they could have been held liable under CERCLA for

contamination at OU-2 and/or the expanded territory notwithstanding the

2011 Agreement's terms.

No reasonable reading of the 2011 Agreement would leave that possibility

open. Remember, in the 2011 Agreement, the Governments: (1) covenanted

not to sue for any liability asserted in the Proofs of Claim; (2) deemed the

Proofs of Claim satisfied; (3) acknowledged in the Proofs of Claim that OU-2

was contaminated by the same dredging project that plaintiffs rely on in their

complaint to *avoid* the 2011 Agreement establishing their liability;

(4) included broad language in the "matters addressed" section reaching all

costs "relating to or in connection with the Properties, including releases of

Hazardous Substances from any portion of the Properties, and all areas affected by migration of such substances emanating from the Properties"; (5) specifically reserved the ability to sue based on claims for pollution downstream from the Route 11 bridge; and (6) set aside $8,548,471 to remediate OU-2.  2011 Agreement, ¶¶ 63, 94-95, 100(ii), 105; Dkt. 346-2, pp. 69-70.

Putting all of those together, the contract makes it painfully clear that the Government knew full well that OU-2 and the expanded territory were contaminated when the 2011 Agreement was signed, set aside money for plaintiffs to remediate it, and deemed its claims regarding that territory satisfied.

A reasonable person simply cannot read those portions of the 2011 Agreement and the incorporated Proofs of Claim and come away with the understanding that the Governments could still sue plaintiffs under CERCLA for OU-2 or the expanded territory.  At the least, a reading that would leave plaintiffs subject to claims that the Governments have explicitly forsworn as extinguished would run powerfully contrary to any reasonable party's expectation.  *See, e.g.*, *Everlast World's Boxing Headquarters Corp. v. Trident Brands Inc.*, 2020 WL 917058, at *8 (S.D.N.Y. Feb. 26, 2020) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable[,] or contrary to the reasonable expectations of the parties."

(cleaned up) (citing *Greenwich Cap. Fin. Prods., Inc. v. Negrin*,

903 N.Y.S.2d 346, 348 (N.Y. App. Div. 1st Dep't 2010)).

Plaintiffs' arguments to the contrary fail to persuade.  First, plaintiffs try

to cabin the language in the "matters addressed" section to the Property, or

the IFG Plant itself.  But once again, by its own plain terms, that section

unambiguously extends well beyond the IFG Plant to all costs "*relating to or

in connection with* the Properties."  2011 Agreement, ¶ 105 (emphasis added).

Plaintiffs nevertheless object that that language could be read incredibly

broadly, and is wanting for a limiting principle.  *See Maracich v. Spears*,

570 U.S. 48, 60 (2013).

From plaintiffs' point of view, that limiting principle should come back to

the migration and emanation language in the matters addressed paragraph.

*See* 2011 Agreement, ¶ 105.  But interpreting the 2011 Agreement in this

way requires the reader to completely ignore the plain text of the consent

decree.

The 2011 Agreement frames the "relating to or in connection with"

language as *including* emanation, migration, or release from the IFG Plant.

*See id.*  And as defendants correctly point out, "including" is either

"illustrative or enlarging."  *New York v. Dep't of Justice*, 951 F.3d 84, 102

(2d Cir. 2020).  In neither case would it be limiting, and thus plaintiffs'

reading would require the word "including" to be read out of the contract.[7]
*Spinelli v. Nat'l Football League*, 903 F.3d 185, 200 (2d Cir. 2018) (noting
that interpretation must give "effect and meaning to every term of a contract
and strive to harmonize all of its terms" (cleaned up)).

Such a narrow construction of the matters addressed paragraph would
also fly in the face of the typical breadth afforded to the clauses "relating to"
and "in connection with."  *See, e.g.*, *Coregis Ins. Co. v. Am. Health Found.,
Inc.*, 241 F.3d 123, 128-29 (2d Cir. 2001) (noting that "in relation to" is
equivalent to "in connection with" and both are broader in scope than the
term "arising out of").

Instead, the only faithful reading of the matters addressed section is one
that embraces the broad, inclusive language that the parties chose.  Given
the 2011 Agreement and the Proofs of Claims's specific reference to and

---

[7] Once again, plaintiffs take a perplexing argumentative tack in trying to avoid this conclusion.
According to plaintiffs, allowing for costs to relate to or arise in connection with the IFG Plant by
means other than migration or emanation means reducing the emanation and migration language to
surplusage.  Nonsense.  Examples have value because they make the abstract concrete.  That
purpose is not taken from them simply because they do not form an exhaustive list.  On the contrary,
reading a contract to make all inclusive lists exclusive leaves the word "including" with nothing to
add to the contract.  Plaintiffs' argument must be rejected.  *See City of Providence v. Barr*,
954 F.3d 23, 46 (1st Cir. 2020) ("The canon against surplusage is not a straitjacket.  It should not,
therefore, be employed inflexibly to rule out every interpretation of a [text] that treats certain
language as illustrative or clarifying.").  Of course, the canon of surplusage only comes into play in
the statutory analysis context when there is an ambiguity to discern.  *See N.Y. Times Co. v.
Newspaper & Mail Deliverers'—Publishers' Pension Fund*, 303 F. Supp. 3d 236, 258 n.10
(S.D.N.Y. 2018).  But the same is not true of contractual interpretation.  *See, e.g., T.M. Real Est.
Holdings, LLC v. Stop & Shop Supermarket Co. LLC*, 543 F. App'x 41, 42 (summary order) (applying
preference against surplusage in construing contract at motion to dismiss stage despite finding no
ambiguity).

inclusion of OU-2, including OU-2's contamination among that broad category is the obvious outcome.

Similar logic forecloses plaintiffs' argument that the prefatory clause in the covenants not to sue similarly limits the covenants not to sue by tying them to only the Properties.  In the abstract, it is theoretically possible that the introductory language "[w]ith respect to the Properties" could be read to limit the scope of those covenants in the manner plaintiffs suggest. 2011 Agreement, ¶¶ 94-95.

But adopting that line of reasoning would make the covenants' explicit references to the Proofs of Claim meaningless.  If the Proofs of Claim were *only* satisfied to the extent that they mentioned contamination in the form of natural migration of PCBs, then the covenants not to sue's language of "[w]ith respect to the Properties (including releases of Hazardous Substances from any portion of the Properties and all areas affected by migration of such substances emanating from the Properties)" would cover all the contamination dealt with by the 2011 Agreement on its own with no need of further clarification by reference to the Proofs of Claim. 2011 Agreement, ¶ 94.

That reduction of the 2011 Agreement's text to mere surplusage cannot be how that document was intended to be read.  *Spinelli*, 903 F.3d at 200 (noting that contracts should not be read to make language meaningless).  Instead,

there is only one way to harmonize the inclusion of the Proofs of Claim and this prefatory language.  That is to read that preface as acknowledging the existence of other sites—which are not Properties—but that nevertheless were polluted by GM and were, perhaps, mentioned in the Proofs of Claim. The preface thus limits the scope of contribution protection to *these* Properties, even if the Proofs of Claim might sweep broader and reach sites not among the listed Properties.

In any case, plaintiffs' narrow reading of the matters addressed by the 2011 Agreement is simply too much at odds with the rest of the text.  For one thing, the reservation of rights itself explicitly allows that GM may yet be held liable for areas beyond OU-2 and the expanded territory. 2011 Agreement, ¶ 100(ii).  But there is no such explicit reservation of liability for those areas themselves.

Both OU-2 and the expanded territory stop right at the eastern edge of the Route 11 Bridge.  Dkt. 334-19, p. 4.  And the 2011 Agreement expressly leaves open liability for "the entire portion of Ley Creek which is downstream from [or westward of] the Route 11 Bridge[.]"  2011 Agreement, ¶ 100(ii).  The inevitable implication is that the area *east* of the Route 11 Bridge is subject to the consent decree and thus not subject to any reservation of rights.

Yet plaintiffs demur.  According to them, any references to the Route 11 Bridge in the 2011 Agreement should be disregarded entirely.  Otherwise,

"any property between the longitudinal points of Townline Road and the Route 11 Bridge would be covered by the 2011 Agreement, even if the property were located in Canada or Pennsylvania."  Dkt. 357, p. 30.

But once again, plaintiffs' reading would require the language preserving liability west of the Route 11 bridge to be discarded entirely as surplusage. Fortunately, there is a way to read the contract that prevents plaintiffs' absurd result while remaining faithful to the plain language of the contract. *See Spinelli*, 903 F.3d at 200.

The only reasonable way to read the contract to achieve both ends is to use the Proofs of Claim to limit the geographical bounds of the area covered by the 2011 Agreement.  That way, the 2011 Agreement covers a defined area upstream from the Route 11 Bridge without allowing northward and southward expansion ad infinitum.  At the same time, the language in the reservation of rights maintaining the Governments' rights to sue downstream of the Route 11 Bridge suddenly achieves a useful clarifying purpose.

In that light, the Route 11 Bridge becomes a dividing line between what is covered by the 2011 Agreement and what is not, subject to further restrictions to the north and south imported from the Proofs of Claim.  Since that is precisely the area that plaintiffs have worked to clean up and that precipitated this lawsuit, that reading is plainly the only reasonable

interpretation of the 2011 Agreement's language.  *See* Dkt. 334-19, p. 4 (depicting OU-2 and expanded territory as east of Route 11 Bridge).

That reading also plainly mirrors the Governments' practical understanding of the scope of the 2011 Agreement.  The Governments have specifically directed plaintiffs to continue to work to remediate these areas. *RACER II*, 10 F.4th at 94-95.  The Governments also specifically diverted $8,548,471 for plaintiffs to use on "the property extending from the facility property boundaries to the Route 11 Bridge."  2011 Agreement, ¶ 63.

And nothing about the addition of the expanded territory strikes the Governments as unusual.  *See* Dkt. 334-25, ¶ 2 (EPA noting that "post-ROD expansion of a Superfund site's geographic area [in this case into the expanded territory] is not uncommon").  As a result, the Governments have repeatedly manifested an intention contrary to plaintiffs' interpretation of the 2011 Agreement.[8]  The contract should be read so as to honor those expectations.  *See Everlast*, 2020 WL 917058, at *8 (noting that contracts must be read to adhere to reasonable expectations of parties).

---

[8] From a practical standpoint, even if the 2011 Agreement were deemed ambiguous and plaintiffs' CERCLA claims were allowed to survive the present motion practice, it is unclear how any discovery could benefit them for precisely this reason.  The Governments' actions have repeatedly evinced an understanding that plaintiffs are expected to remediate OU-2 and the expanded territory. Any resulting evidence into the Governments' intent would only make that position more explicit, undermining plaintiffs' position still further.

All told, there is no reasonable basis to read the 2011 Agreement as plaintiffs suggest. Although it is certainly true that the rights reserved are explicitly carved out of the matters addressed section, there is no reading of the 2011 Agreement that would trigger the reservation of rights in this case. No portion of OU-2 is situated west of the Route 11 Bridge. 2011 Agreement, ¶ 100(ii). And though the Governments retained "all rights with respect to any site that is not a Property," they also covenanted not to sue for any liability asserted in the Proofs of Claim, which expressly include OU-2. *Id.* ¶ 100(vii).

Accordingly, the 2011 Agreement unambiguously resolved plaintiffs' liability concerning OU-2.[9] *Cf., e.g.*, *Negrin*, 903 N.Y.S. 2d at 348 (rejecting contractual interpretation that depends on "formalistic literalism" in defiance of common sense and deprives other clauses of meaning). Since plaintiffs have failed to explain in the complaint or otherwise why the expanded territory should be treated any differently, plaintiffs' liability for that region

---

[9] In reaching this conclusion, the Court recognizes that the matters addressed and reservation of rights sections of the 2011 Agreement use language that is not quite perfectly congruent. The matters addressed section covers any costs "related to and in connection with" the Properties, while the reservation of rights covers "any site that is not a Property." 2011 Agreement, ¶¶ 100(vii), 105. In other words, each paragraph is written broadly enough to conceivably create some overlap. But the drafters' artlessness does not necessarily create an ambiguity. *In re Trusteeship Created by JER CRE CDO 2005-1, Ltd.*, 2013 WL 6916912, at *1 (S.D.N.Y. Dec. 31, 2013) ("[T]he mere fact that [a contract] may be complex or imperfect does not render [it] ambiguous"). The Governments unambiguously contemplated that their claims concerning OU-2 would be extinguished by the 2011 Agreement for all the reasons discussed. That is enough, and plaintiffs' reliance on an unduly literal reading of the contract does not disturb the analysis. *See RCJV Holdings, Inc. v. Collado Ryerson, S.A. de C.V.*, 18 F. Supp. 3d 534, 545 (S.D.N.Y. 2014) (noting that "contract interpretation is an exercise in 'common sense' rather than 'formalistic literalism'").

was also established by the same document.  Putting those two conclusions together, the 2011 Agreement triggered § 113 claims for those areas all the way back in 2011.  Those claims are now untimely.

### 2. **Subsequent Agreements**

Perhaps sensing that this outcome was possible, plaintiffs argue that even if the 2011 Agreement determined its CERCLA liability and gave rise to a § 113 claim, it does not necessarily follow that its CERCLA claims are defunct.  As their next line of defense, plaintiffs argue thatthe 2015 Record of Decision and the 2021 Agreement alternatively resolved their CERCLA liability for OU-2 and the expanded territory.  As a result, the statute of limitations should have restarted with either agreement, and in either case their claims would be timely.

That argument fails.  From the outset, as far as the expanded territory is concerned, neither the 2015 Record of Decision nor the 2021 Agreement could possibly have established plaintiffs' liability.  The 2021 Agreement says as much outright.  Dkt. 334-25, ¶¶ 58, 72 (2021 Agreement explicitly excluding expanded territory from covenants not to sue and matters addressed).

As for the 2015 Record of Decision, this Court previously determined that that document did not resolve plaintiffs' liability as required to trigger a § 113 claim.  *RACER I*, 2020 WL 2404770, at *12 ("[I]t can be stated to a certainty that the 2015 [Record of Decision] did not resolve plaintiffs'

liability."). That conclusion was not rejected on appeal. *RACER II*, 10 F.4th at 104 (acknowledging district court's reasoning concerning potential that § 113 claim is time-barred and remanding for clarity of basis for dismissal). Accordingly, the analysis concerning the 2015 Record of Decision is reincorporated here and forecloses any determination of liability as to the expanded territory from any contract other than the 2011 Agreement. *RACER I*, 2020 WL 2404770, at *12

Whether the 2021 Agreement resolved plaintiffs' liability for OU-2 presents a closer question, but the result is the same. Remember, a § 113 claim comes into being once an entity "has resolved its liability to the United States or a state for some or all of a response action." *Niagara Mohawk*, 596 F.3d at 124. In this case, the 2021 Agreement could not have resolved plaintiffs' CERCLA liability for OU-2 because plaintiffs *had* no CERCLA liability for that area after the 2011 Agreement deemed that liability satisfied. *Cf. Goodwin*, 756 F.3d at 202 (noting that "resolution occurs when a [PRP] is released from CERCLA liability").

In more traditional contractual terms, plaintiffs were given no consideration in the 2021 Agreement because their purported benefit—a release from CERCLA liability for the contamination in OU-2—was already theirs by virtue of the 2011 Agreement. *See Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, --- F. Supp. 3d ----, 2022 WL 63165, at *10

40

(S.D.N.Y. Jan. 6, 2022) (noting that under New York law, consideration is essential to enforceable contract).

An empty promise cannot give rise to a § 113 claim.  Otherwise, § 113's statute of limitations would be meaningless.  The EPA is not going anywhere. It would be a simple enough matter for any party with a once-valid but now-expired contribution claim to go to the EPA, ask for a new consent decree covering the same subject matter, and brandish their new claim to gather funds from other PRPs.

That regime would run counter to CERCLA's objectives of expediting cleanups by incentivizing § 113 plaintiffs to promptly secure contribution from other PRPs to get remediation projects done as quickly as possible.  *See Goodwin*, 756 F.3d at 202 ("[T]he principal purpose of limitations periods in [CERCLA cases is] 'ensuring that the responsible parties get to the bargaining—and clean-up—table sooner rather than later.'" (cleaned up) (citing *RSR Corp. v. Comm. Metals Co.*, 496 F.3d 552, 558 (2d Cir. 2007)). Plaintiffs' arguments relying on the 2015 Record of Decision and the 2021 Agreement must therefore be rejected.

### 3. *Atlantic Research*

Finally, plaintiffs argue that the Supreme Court in *United States v. Atlantic Research Corp.*, 551 U.S. 128, 139 n.6 (2007), left open the possibility that in certain circumstances §§ 107 and 113 claims may coexist.  As a result,

plaintiffs believe that they still have § 107 claims available to them despite their failure to take advantage of their § 113 claims.

To plaintiffs' point, in *Atlantic Research*, the Supreme Court noted that in some circumstances, a PRP "may sustain expenses pursuant to a consent decree." 551 U.S. at 139 n.6. In a case of that sort, the PRP does not incur the costs voluntarily, but neither is it reimbursing the costs of another party. *Id.* Thus, the Supreme Court raised the specter of a possibility that a § 107 claim may remain viable even if a plaintiff had a § 113 claim at its disposal. *See id.*

According to plaintiffs, the hypothetical spun out by the Supreme Court matches the facts of this case perfectly. Thus, this Court should take the extraordinary step of holding for the first time that plaintiffs may recover under § 107 notwithstanding their failure to capitalize on their § 113 claim.

Defendants, predictably, disagree. To their point, plaintiffs have not pointed to a single case since *Atlantic Research* that actually permitted alternative claims under §§ 107 and 113. Most damning of all, the Second Circuit in this very case held that these two forms of CERCLA claim were mutually exclusive. *See RACER II*, 10 F. 4th at 103. That holding is binding and warrants dismissal on its own.

In any case, even given free rein to make new law, plaintiffs do not present a compelling case to carve out unique CERCLA liability to redeem

their claims.  RACER is a special-purpose trust created specifically as a result of the 2011 Agreement to grapple with GM's contamination of Onondaga Lake.  Similarly, plaintiffs were powerfully shaped by—and referenced heavily in—the 2011 Agreement, a consent decree under the auspices of CERCLA's authority.

In other words, plaintiffs were born in CERCLA's shadow, and molded by its mandates.  Their one job was to navigate CERCLA to ensure that the IFG Plant was properly cleaned up.  They, of all entities, should have known better than to let viable § 113 claims rot on the vine.  They certainly do not deserve a jury-rigged escape valve now.

Accordingly, the 2011 Agreement established plaintiffs' CERCLA liability as to OU-2 and the expanded territory.  As a consequence, plaintiffs were obligated to bring a claim for contribution within three years.  But plaintiffs did not file their complaint until seven years later, in 2018.  Dkt. 1.  Plaintiffs thus cannot bring a § 107 claim for either area, and their § 113 claims are time-barred.  Plaintiffs' other last-ditch efforts to escape this fate are without merit, and must be rejected.  In sum, plaintiffs' CERCLA claims must be dismissed with prejudice.

## B. Remaining Claims

At this point, it is worth noting that plaintiffs rely on supplemental jurisdiction under 28 U.S.C. § 1367 to keep their state law claims in this

District.  However, a federal court has § 1331 jurisdiction over a state law

claim if the state law claim grapples with a federal issue that is:

"(1) necessarily raised[;] (2) actually disputed[;] (3) substantial[;] and

(4) capable of resolution in federal court without disrupting the federal-state

balance approved by congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013).

As a result, state law claims that deal with a party's compliance with a

CERCLA consent decree which may preempt certain state law tort claims

sometimes gives rise to federal question jurisdiction. *See Bartlett v.

Honeywell Int'l Inc.*, 737 F. App'x 543, 546 (2d Cir. 2018) (summary order).

But that is not the case here.  The parties do not dispute plaintiffs'

compliance with—or the reach of—any consent decree.  Critically, both

parties also agree that plaintiffs may not recover under state law for any

costs stemming from a cleanup of hazardous materials covered by CERCLA.

In other words, the parties agree how CERCLA preemption works in a legal

sense, but they dispute the extent to which CERCLA preemption comes into

play on the facts alleged in the complaint.

In the absence of an actual dispute—let alone a substantial one—there is

no federal legal question to give rise to § 1331 jurisdiction. *See, e.g.*, *New

Mexico ex rel. Balderas v. Monsanto Co.*, 454 F. Supp. 3d 1132, 1154-55

(D.N.M. 2020) (finding no federal question jurisdiction based on CERCLA

preemption because potential preemption would not result in complete foreclosure of state law claims).

As a result, plaintiffs' remaining claims abide in federal court based only on supplemental jurisdiction.[10]  As was previously explained, a district court may "decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]"  28 U.S.C. § 1367(c)(3).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . –judicial economy, convenience, fairness and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

This case did not warrant an exception to that usual rule before, and it does not now.  *See RACER I*, 2020 WL 2404770, at *13.  Plaintiffs' claims under New York's Navigation Law are far better left to the care of New York state courts.  And in any case, discovery has not yet begun.  Therefore, there is no cause to maintain jurisdiction over plaintiffs' state law claims.  They must be dismissed without prejudice.

---

[10] Once again, the Declaratory Judgment Act does not by itself confer subject matter jurisdiction. *Correspondent Servs. Corp. v. First Equities Corp. of Fla.*, 442 F.3d 767, 769 (2d Cir. 2006).

## V. **CONCLUSION**

From the very start, plaintiffs' decision-making in this case has been troubling.  Plaintiffs were created for the sole purpose of guiding the IFG Plant through remediation under CERCLA.  And of course, CERCLA's purpose is to swiftly determine liability so that funds can be gathered to ensure that pollution is cleaned up.

Yet plaintiffs abandoned one of CERCLA's most valuable tools—a contribution claim that was available to them from the very beginning—for long years while they toiled alone.  Plaintiffs cannot be rewarded for this perplexing failure.  Especially not when the language of the 2011 Agreement so plainly signaled to them that a § 113 claim was available.  Plaintiffs' CERCLA claims must be dismissed.[11]

Therefore, it is

ORDERED that

---

[11] Certain defendants never appeared in this action.  As a result, plaintiffs have requested entry of default against each of them.  *See* Dkts. 366-371.  Two points about this must be addressed.  First, presumably plaintiffs moved for entry of default as a prelude to moving for default judgment.  That effort would have been in vain.  For default judgment to be proper, the allegations in the complaint and any other available evidence must suffice to establish a defendant's liability as a matter of law.  *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).  For the reasons explained above, though, plaintiffs' complaint actually serves the opposite end: it obviates any possibility of liability for any claim within this Court's jurisdiction.  Second, in the usual case, a court cannot dismiss a complaint *sua sponte*.  However, if a plaintiff was given a meaningful opportunity to be heard on grounds for dismissal, the complaint may be dismissed even for claims against defendants who have not moved.  *See Alki Partners, L.P. v. Vatas Holding GMHB*, 769 F. Supp. 2d 478, 499 (S.D.N.Y. 2011) (noting that dismissal of claims under Rule 12(b)(6) rubric is permissible even in absence of motion so long as plaintiff was given opportunity to respond and dismissing complaint as to non-moving defendant).  The defects the moving defendants pointed to go to the heart of plaintiffs' CERCLA claims, and plaintiffs failed to persuade the Court that those defects were not fatal.  Accordingly, the complaint must be dismissed in its entirety.

1. Defendants' motion to dismiss plaintiffs' Second Amended Complaint is GRANTED;

2. Plaintiffs' claims under the Comprehensive Environmental Response, Compensation, and Liability Act coming under counts: (I) for cost recovery under § 107; (II) for contribution under § 113; (IX) for declaratory relief under the Federal Declaratory Judgment Act; and (X) for contribution under § 113 are DISMISSED with prejudice; and

3. Plaintiffs' state law claims under Counts: (III) response costs and damages under § 181(5) of the New York Navigation Law; (IV) contribution under § 176(8) of the New York Navigation Law; (V) negligence under New York common law; (VI) public nuisance under the New York common law; (VII) restitution under the New York common law;  and (VIII) contribution or indemnification under New York common law are DISMISSED without prejudice; and

4. The Clerk of Court is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.


Dated:  July 8, 2022
        Utica, New York.

David N. Hurd
U.S. District Judge