MANDATE

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 5th day of February, two thousand twenty-four.

Before:      Guido Calabresi,
             Gerard E. Lynch,
             Beth Robinson,
                  *Circuit Judges.*

_____

Revitalizing Auto Communities Environmental Response Trust, Racer Properties LLC, Eplet, LLC, not individually but solely in its representative capacity as Administrative Trustee of Revitalizing Auto Communities Response Trust

**JUDGMENT**

Docket No. 22-1589

Plaintiffs - Appellants,

v.

National Grid USA, Niagara Mohawk Power Corporation, Carrier Corporation, United Technologies Corporation, Carlyle Air Conditioning Company, Inc., General Electric Company, FKA General Electric Corporation, BristolMeyers Squibb Company, Magna Powertrain USA, Inc., Solvents and Petroleum Service, Inc., Thompson Corners, LLC, Metalico Syracuse Realty, Inc., Metalico New York, Inc., Gardner Denver, Inc., ONX1 LLC, Onondaga Pottery Company, Inc., Amparit Industries, LLC, 6181 Thompson Road, LLC, Carrier Circle Business Complex LLC, Telesector Resources Group, Inc, Western Electric Company, Incorporated, Syracuse Lepage LLC, Lennox Industries Inc., Syracuse Deere Road Associates, LLC, Jagar Enterprises, Inc., Calocerinos and Spina, C & S Engineers, Inc., B&B Family Limited Partnership, Hauler's Facility LLC, 6223 Thompson Road Suite 1000 Syracuse, NY 13206, Honeywell International Inc., 80 State Street Albany, NY 122072543, Lockheed Martin Corporation, 6801 Rockledge Drive Bethesda, MD 20817, New Process Gear, Inc., 6600 New Venture Gear Drive East Syracuse, NY 13507, Nokia of America

MANDATE ISSUED ON 02/26/2024

Corporation, 600 Mountain Avenue Murray Hill, NJ 07974, North Midler Properties LLC, 6041 Sewickley Drive Jamesville, NY 13078, Northeast Management Services, Inc., c/o Florine Basile, Jr., President P.O. Box 1238 Cicero, NY 13039, Northern Industrial Holdings, LLC, 1675 South State Street Suite B Dover, DE 19901, Thompson Lawn, LLC, 7050 Cedarbay Road Fayetteville, NY 13066, Thompson NW, LLC, 7050 Cedarbay Road Fayetteville, NY 13066, Center Circles LLC, Chrysler Group LLC, Aleris Partners LLC, Cooper Crouse-Hinds, LLC, Prestolite Electric Incorporated, AKA New Prestolite, FKA PEI 1991 Acquisition, Inc., Fulton Iron & Steel Co. Inc., Deere & Company, Old Carco Liquidation Trust, By Its Trustee RJM I, LLC 251 Little Falls Drive Wilmington, DE 19808, Old Carco LLC, 555 Chrysler Drive Auburn Hills, MI 48236, FKA Chrysler LLC, United States Hoffman Machinery Corporation, 105 Fourth Avenue New York, NY 10003,

        Defendants - Appellees,

Libbey Glass Inc., Burko Corporation, Empire Pipeline Corporation, Old Electric, Inc., FKA Old Prestolite, FKA Prestolite Electric Incorporated, New Process Gear Corporation, Syracuse China Company, John Does,

        Defendants.

_____

      The appeal in the above captioned case from a judgment of the United States District Court for the Northern District of New York was argued on the district court's record and the parties' briefs.

      IT IS HEREBY ORDERED, ADJUDGED and DECREED that the district court's judgment dismissing the Second Amended Complaint is VACATED and the case is REMANDED for further proceedings consistent with the Court's opinion.

                For the Court:
                Catherine O'Hagan Wolfe,
                Clerk of Court

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

22-1589-cv
*Revitalizing Auto Communities Environmental Response Trust v. National Grid USA*

# In the
# United States Court of Appeals
## For the Second Circuit

———————————————

August Term, 2022

(Argued: February 23, 2023    Decided: February 5, 2024)

No. 22-1589-cv

——————

REVITALIZING AUTO COMMUNITIES ENVIRONMENTAL RESPONSE TRUST, RACER PROPERTIES LLC, EPLET, LLC, NOT INDIVIDUALLY BUT SOLELY IN ITS REPRESENTATIVE CAPACITY AS ADMINISTRATIVE TRUSTEE OF REVITALIZING AUTO COMMUNITIES RESPONSE TRUST,

*Plaintiffs-Appellants,*

v.

NATIONAL GRID USA, NIAGARA MOHAWK POWER CORPORATION, CARRIER CORPORATION, UNITED TECHNOLOGIES CORPORATION, CARLYLE AIR CONDITIONING COMPANY, INC., GENERAL ELECTRIC COMPANY, FKA GENERAL ELECTRIC CORPORATION, BRISTOLMEYERS SQUIBB COMPANY, MAGNA POWERTRAIN USA, INC., SOLVENTS AND PETROLEUM SERVICE, INC., THOMPSON CORNERS, LLC, METALICO SYRACUSE REALTY, INC., METALICO NEW YORK, INC., GARDNER DENVER, INC., ONX1 LLC, ONONDAGA POTTERY COMPANY, INC., AMPARIT INDUSTRIES, LLC, 6181 THOMPSON ROAD, LLC, CARRIER CIRCLE BUSINESS COMPLEX LLC, TELESECTOR RESOURCES GROUP, INC, WESTERN ELECTRIC COMPANY, INCORPORATED, SYRACUSE LEPAGE LLC, LENNOX INDUSTRIES INC., SYRACUSE DEERE ROAD ASSOCIATES, LLC, JAGAR ENTERPRISES, INC., CALOCERINOS AND SPINA, C & S ENGINEERS, INC., B&B FAMILY LIMITED PARTNERSHIP, HAULER'S FACILITY LLC, 6223 THOMPSON ROAD SUITE 1000 SYRACUSE, NY 13206, HONEYWELL INTERNATIONAL INC., 80 STATE STREET ALBANY, NY 122072543, LOCKHEED MARTIN CORPORATION, 6801 ROCKLEDGE DRIVE BETHESDA, MD 20817, NEW PROCESS GEAR, INC., 6600 NEW VENTURE GEAR DRIVE EAST SYRACUSE, NY

13507, NOKIA OF AMERICA CORPORATION, 600 MOUNTAIN AVENUE MURRAY HILL, NJ 07974, NORTH MIDLER PROPERTIES LLC, 6041 SEWICKLEY DRIVE JAMESVILLE, NY 13078, NORTHEAST MANAGEMENT SERVICES, INC., C/O FLORINE BASILE, JR., PRESIDENT P.O. BOX 1238 CICERO, NY 13039, NORTHERN INDUSTRIAL HOLDINGS, LLC, 1675 SOUTH STATE STREET SUITE B DOVER, DE 19901, THOMPSON LAWN, LLC, 7050 CEDARBAY ROAD FAYETTEVILLE, NY 13066, THOMPSON NW, LLC, 7050 CEDARBAY ROAD FAYETTEVILLE, NY 13066, CENTER CIRCLES LLC, CHRYSLER GROUP LLC, ALERIS PARTNERS LLC, COOPER CROUSE-HINDS, LLC, PRESTOLITE ELECTRIC INCORPORATED, AKA NEW PRESTOLITE, FKA PEI 1991 ACQUISITION, INC., FULTON IRON & STEEL CO. INC., DEERE & COMPANY, OLD CARCO LIQUIDATION TRUST, BY ITS TRUSTEE RJM I, LLC 251 LITTLE FALLS DRIVE WILMINGTON, DE 19808, OLD CARCO LLC, 555 CHRYSLER DRIVE AUBURN HILLS, MI 48236, FKA CHRYSLER LLC, UNITED STATES HOFFMAN MACHINERY CORPORATION, 105 FOURTH AVENUE NEW YORK, NY 10003,

*Defendants-Appellees*,

LIBBEY GLASS INC., BURKO CORPORATION, EMPIRE PIPELINE CORPORATION, OLD ELECTRIC, INC., FKA OLD PRESTOLITE, FKA PRESTOLITE ELECTRIC INCORPORATED, NEW PROCESS GEAR CORPORATION, SYRACUSE CHINA COMPANY, JOHN DOES,

*Defendants.*

---

Before: CALABRESI, LYNCH, and ROBINSON, *Circuit Judges*.

  Plaintiffs-Appellants Revitalizing Auto Communities Environmental Response Trust, RACER Properties LLC, and Eplet, LLC (the administrative trustee of the Revitalizing Auto Communities Response Trust) (collectively, "RACER") were created to fund and continue General Motors' ("GM") environmental remediation activities at former GM properties nationwide following GM's 2009 bankruptcy. RACER filed this suit in the Northern District of New York seeking cost recovery or contribution from dozens of Defendants under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, for the costs of environmental cleanup in and abutting a stretch of Ley Creek near the GM-IFG Plant, located near Syracuse. The district court (Hurd, *J.*) dismissed RACER's Second

2

Amended Complaint on the ground that RACER's CERCLA liability with respect to the area in question was resolved by a 2011 consent decree. As a result, RACER was foreclosed from predicating its claims on CERCLA § 107 (42 U.S.C. § 9607(a)), and its claims under CERCLA § 113 (42 U.S.C. § 9613(f)(3)(B)) were barred by the applicable three-year statute of limitations.

We conclude that the 2011 consent decree did not definitively resolve RACER's liability as to the entire area in dispute; it only resolved RACER's liability as to the site of the IFG Plant and pollutants that emanated and migrated from that site. Whether and to what extent the response costs for which RACER seeks recovery arise from pollution that migrated or emanated from the Plant site is a factual question that we cannot resolve based on the pleadings alone. Thus, the district court erred in dismissing RACER's claims. We deny RACER's request that we reassign, and accordingly, VACATE the district court's judgment dismissing the case and REMAND for further proceedings consistent with this opinion.

<div style="margin-left:40%">

JEFFREY D. TALBERT (Laura E. Jensen, *on the brief*), Preti, Flaherty, Beliveau & Pachios, LLP, Portland, ME, *for Plaintiffs-Appellants*.

Alan J. Knauf, Linda R. Shaw, Amy K. Kendall, Jonathan R. Tantillo, Knauf Shaw LLP, Rochester, NY, *for Plaintiffs-Appellants*.

ROBERT A. WIYGUL (Steven T. Miano, Peter V. Keays, *on the brief*), Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, *for Defendant-Appellee Lockheed Martin Corporation*.

Dean S. Sommer, Kristin Carter Rowe, Young/Sommer LLC, Albany, NY, *for Defendant-Appellee General Electric Company*.

</div>

Douglas H. Zamelis, The Law Office of Douglas H. Zamelis, Cooperstown, NY, *for Defendant-Appellee Northeast Management Services, Inc.*

Gregory M. Brown, Fogel & Brown, P.C., Syracuse, NY, *for Defendants-Appellees Syracuse Deere Road Associates, LLC and Hauler's Facility LLC.*

Yvonne E. Hennessey, Barclay Damon LLP, Albany, NY, *for Defendants-Appellees National Grid USA and Niagara Mohawk Power Corporation.*

Philip H. Gitlen, Whiteman Osterman & Hanna LLP, Albany, NY, *for Defendant-Appellee Verizon New York Inc. as successor to Telesector Resources Group, Inc.*

Geoffrey Michael, Lauren C. Daniel, Arnold & Porter Kaye Scholer LLP, Washington, DC, *for Defendant-Appellee Honeywell International Inc.*

Michael A. Fogel, Fogel & Brown, P.C., Syracuse, NY, *for Defendants-Appellees Carrier Circle Business Complex LLC, North Midler Properties, LLC, and Syracuse LePage LLC.*

Patrick D. Donnelly, McGivney, Kluger Clark & Intoccia, P.C., Syracuse, NY, *for Defendants-Appellees Carrier Circle Business Complex LLC, North Midler Properties, LLC, Syracuse LePage LLC,*

4

*Syracuse Deere Road Associates, LLC, Hauler's Facility LLC.*

Lori E. Petrone, Kenney Shelton Liptak Nowak, LLP, Buffalo, NY, *for Defendant-Appellee Amparit Industries, LLC.*

Joseph R. Talarico, II, Talarico Law Firm, Fayetteville, NY, *for Defendant-Appellee B&B Family Limited Partnership.*

Linda E. Alario, Syracuse, NY, *for Defendant-Appellee Jagar Enterprises, Inc.*

John J. Kuster, Sidney Austin LLP, New York, NY, *for Defendants-Appellees Magna Powertrain USA, Inc., and New Process Gear, Inc.*

Andrew C. Rose, Nixon Peabody LLP, Albany, NY, *for Defendant-Appellee Onondaga Pottery Company, Inc.*

Albert J. Millus, Jr., Hinman, Howard & Kattell, LLP, Binghamton, NY, *for Defendants-Appellees Metalico New York, Inc. and Metalico Syracuse Realty, Inc.*

Paul D. Sylvestri, Harter Secrest & Emery LLP, Rochester NY, *for Defendants-Appellees C&S Engineers, Inc. and Calocerinos and Spina.*

Elizabeth C. Barton, Erick M. Sandler, Day Pitney LLP, Hartford, CT, *for Defendants-Appellees Carrier Corporation, Carlyle Air Conditioning Company Inc., and Raytheon Technologies Corporation f/k/a United Technologies Corporation.*

5

Glen R. Stuart, Adina D. Bingham, Morgan, Lewis & Bockius LLP, Philadelphia, PA, and Bernard J. Garbutt, III, Morgan, Lewis & Bockius LLP, New York, NY, *for Defendant-Appellee Bristol-Meyers Squibb Company*.

Meaghan G. Boyd, Alston & Bird LLP, Atlanta, GA, and David Venderbush, Alston & Bird LLP, New York, NY, *for Defendants-Appellees Nokia of America Corporation and Western Electric Company, Incorporated*.

Daniel T. Flaherty, Daniel C.W. Narvey, Godfrey & Kahn, S.C., Milwaukee, WI, *for Defendant-Appellee Gardner Denver, Inc.*

John T. Kolaga, Rupp Pfalzgraf LLC, Buffalo, NY, *for Defendants-Appellees 6181 Thompson Road LLC, Thompson Corners, LLC, Thompson Lawn, LLC, and Thompson NW, LLC*.

Melody D. Westfall, Westfall Law PLLC, Syracuse, NY, *for Defendant-Appellee Northern Industrial Holdings, LLC*.

Donald W. O'Brien, Jr., Woods Oviatt Gilman LLP, Rochester, NY, *for Defendant-Appellee ONX1 LLC*.

Charles T. Wehland, Jones Day, Chicago, IL, *for Defendant-Appellee Lennox Industries*.

6

ROBINSON, *Circuit Judge*:

Between the 1950s and 1993, General Motors Company (now General Motors) ("GM") operated the Inland Fisher Guide plant ("IFG Plant" or "the Plant") in the Onondaga Lake region near Syracuse, New York. The Plant was the site of car manufacturing work that caused chemical pollutants, including polychlorinated biphenyls ("PCBs"), to enter the nearby Ley Creek, a tributary of Onondaga Lake.

Beginning in the 1980s—before Onondaga Lake was designated a Superfund Site[1] by the United States Environmental Protection Agency (EPA) in 1994—GM entered into a series of consent decrees with the EPA and the New York State Department of Environmental Conservation (NYSDEC) to help clean up pollution caused by the IFG Plant. These studies and initial remediation efforts were ongoing when GM declared bankruptcy in 2009.

In the wake of GM's bankruptcy, Plaintiffs-Appellants Revitalizing Auto Communities Environmental Response Trust, RACER Properties LLC, and Eplet,

---

[1] Under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), the EPA designates National Priority List Sites (commonly called "Superfund Sites") to receive funding from the Hazardous Substance Superfund to remediate environmental contamination. *See* 26 U.S.C. § 9507 (creating the Superfund); 42 U.S.C. § 9611 (setting out purposes of Superfund); *see also* United States Environmental Protection Agency, *Superfund: CERCLA Overview*, https://www.epa.gov/superfund/superfund-cercla-overview (last updated Oct. 30, 2023) [https://perma.cc/3G7B-HM7C].

LLC (the administrative trustee of the Revitalizing Auto Communities Response Trust) (collectively, "RACER") were created to fund and continue GM's environmental remediation activities at former GM properties nationwide. Beginning in 2011, the year it was formed, RACER began remediation efforts and continued environmental response study investigations at the former IFG Plant site and in the nearby Ley Creek.

In this suit, initially filed in 2018, RACER seeks cost recovery or contribution from dozens of Defendants[2] under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), Pub. L. No. 96-510, 94 Stat. 2767 (1980), Pub. L. No. 99-499, 100 Stat. 1613 (1986), codified together at 42 U.S.C. § 9601 *et seq.*, for the costs of environmental cleanup in and abutting a stretch of Ley Creek near the former Plant.[3] In particular, RACER

---

[2] The opposition brief on appeal was filed on behalf of thirty-five Defendants-Appellees. *See generally* Appellees' Brief. Defendants-Appellees Solvents and Petroleum Service, Inc.; Center Circles LLC; Chrysler Group LLC; Cooper Crouse-Hinds, LLC; Prestolite Electric Incorporated, FKA New Prestolite, FKA PEI 1991 Acquisition, Inc.; Deere & Company; Aleris Partners LLC; Fulton Iron & Steel Co. Inc.; Old Carco Liquidation Trust, by its Trustee RJM I, LLC, Old Carco, LLC, FKA Chrysler, LLC; and United States Hoffman Machinery Corporation, did not file an appellate brief.

[3] This is the second time this case has been before us. The United States District Court for the Northern District of New York (Hurd, *J.*) previously dismissed RACER's complaint, concluding its claims were not yet ripe. *Revitalizing Auto Communities Environmental Response Trust v. National Grid USA*, No. 5:18-CV-1267, 2020 WL 2404770, at *14 (N.D.N.Y. May 12, 2020) (*RACER I*). In 2021, this Court vacated that decision and remanded, concluding that the claims were, in fact, prudentially ripe. *Revitalizing Auto Communities Environmental Response Trust v. National Grid USA*, 10 F.4th 87, 105 (2d Cir. 2021) (*RACER II*).

invokes CERCLA § 107(a) (42 U.S.C. § 9607(a)), which authorizes suits for recovery of response costs incurred, and § 113(f)(3)(B) (42 U.S.C. § 9613(f)(3)(B)), which authorizes a party that has resolved its liability pursuant to a settlement agreement with a state or the United States to seek contribution from other potentially responsible parties for costs incurred pursuant to that settlement. RACER alleges that Defendants conducted manufacturing or other activities that contributed to contamination of the portion of the Ley Creek area for which RACER seeks contribution or cost recovery.

In 2022, the district court dismissed RACER's Second Amended Complaint (the "Complaint"), concluding that RACER's only viable claim under CERCLA was time-barred, and declining to exercise supplemental jurisdiction over the remaining state law claims. *See Racer Properties LLC v. National Grid USA*, 610 F. Supp. 3d 451, 474 (N.D.N.Y. 2022) (*RACER III*). In particular, the district court concluded that RACER's CERCLA liability with respect to the area in question was resolved by the 2011 consent decree that created RACER and imposed on it certain obligations and protections (the "2011 Settlement Agreement"). *Id.* at 467–70. As a result, RACER was foreclosed from predicating its contribution

9

claims on § 107, and its claims under § 113 were barred by the three-year statute

of limitations applicable to § 113 claims. *Id*. at 472. RACER timely appealed.

The pivotal issue before us is whether the 2011 Settlement Agreement did,

in fact, resolve RACER's liability as to the area in question. Although this

question is primarily a legal one—it's a matter of contract interpretation—

understanding the issues requires a deep dive into the facts. We ultimately

conclude that the 2011 Settlement Agreement did not definitively resolve

RACER's liability as to the entire area in dispute; it only resolved its liability as to

the site of the IFG Plant and pollutants that migrated or emanated from that site.

Whether and to what extent the response costs for which GM seeks recovery

arise from pollution that migrated or emanated from the Plant site, as opposed to

pollution that arrived in the disputed area through other means, requires factual

determinations that we cannot make in the context of this motion to dismiss.

Thus, for the reasons explained more fully below, we agree with RACER

that the district court erred in ruling on the basis of the pleadings that RACER's

only viable CERCLA claim is time-barred. Accordingly, we VACATE the district

10

court's judgment dismissing the case and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

**I.     Facts[4]**

To illuminate the competing arguments and the context of the 2011 Settlement Agreement, we first describe the history of pollution and the geography of the area at issue, then summarize several key agreements and claims that collectively provide context.

### A.  The Pollution

At the IFG Plant, GM made auto parts by metal die casting and injection molding.  These manufacturing processes used PCB-containing hydraulic oils,

---

[4] Because we are at the motion to dismiss stage, we treat all factual allegations in RACER's complaint as true and draw all reasonable inferences from those allegations in RACER's favor. *See, e.g., Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).  We also consider documents attached to or incorporated by reference to the complaint as part of RACER's allegations.  *See, e.g., Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998).  Accordingly, this account of the facts draws from allegations on the face of RACER's complaint as well as the exhibits attached thereto, including a 1997 Administrative Consent Order between GM and NYSDEC; the 2011 Settlement Agreement and 2011 Trust Agreement creating RACER; a 2015 Record of Decision between RACER, NYSDEC, and the EPA; and a 2021 Record of Decision between RACER and the EPA. In addition, we rely on—where noted—information in a 2009 Proof of Claim filed by the United States in the GM bankruptcy proceeding.  RACER argues the district court erred in considering this document in deciding the motion to dismiss.  Because this specific Proof of Claim was expressly identified in and incorporated into the 2011 Settlement Agreement that was attached to the Complaint, as explained below, we conclude that the document can properly be considered.  *See* Discussion, Section I, below.

which leaked from the machines and onto the factory floor. Moving through the floor drains, these oils—plus other processing wastes—made their way into a drainage swale that eventually drained into the nearby Ley Creek.

PCBs were "domestically manufactured in commercial quantities from 1930 until 1979," at which time they were for the most part banned under the Toxic Substances Control Act. App'x 30. "PCBs were used in a wide variety of products and materials," from electrical equipment to oil used in motors and hydraulic systems to thermal insulation material to carbonless copy paper. *Id.* According to the EPA, PCBs "do not readily break down once in the environment" and therefore "can remain for long periods cycling between air, water and soil." United States Environmental Protection Agency, *Learn About Polychlorinated Biphenyls*, https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls (last updated Apr. 12, 2023) [https://perma.cc/7PGH-XSHC]. PCBs can cause a "variety of adverse health effects," including potential carcinogenic effects in humans. *Id.*

RACER alleges that GM was not alone in contributing to pollution in the Ley Creek watershed. It alleges that the defendants it dubs "Owner and Operator Defendants" also released or discharged "contaminants (including petroleum, some of which contained PCBs) into the Ley Creek Watershed."

12

App'x 19, 30.  RACER further alleges that between around 1970 and continuing through the mid-1980s, the defendants it calls the "Arranger Defendants" placed dredged spoils on both banks of Ley Creek and adjacent lands as part of a project to widen the creek and prevent flooding.  *Id.* at 19, 73–74.  RACER alleges that these dredged spoils included PCBs and other hazardous substances discharged or released by numerous Defendants, including Defendants who had discharged or released the hazardous substances into a landfill implicated in the dredging project.

### B.  The Geography

In 1994, when the EPA designated portions of the Onondaga Lake Watershed as the Onondaga Lake National Priority List ("NPL" or "Superfund") Site, to facilitate environmental remediation activities, the EPA and the NYSDEC divided the Onondaga Lake Superfund Site into subsites.

The contaminated areas of Ley Creek at issue here are generally located within what the EPA designated as the General Motors-Inland Fisher Guide subsite ("GM-IFG Subsite") of the Onondaga Lake Superfund Site.  The GM-IFG Subsite lies within the 30-square mile Ley Creek watershed, in the Town of Salina, New York.  The GM-IFG Subsite generally consists of the former IFG

Plant, a portion of Ley Creek, and surrounding commercial and residential parcels.

Ley Creek flows east to west through the Subsite, beginning at the Townline Road bridge on the site's eastern edge.  From there, it flows past the IFG Plant's northern property boundary.  Continuing its downstream course, the creek lies between the New York State Thruway to the north, and Factory Avenue to the south.  It then flows through a developed area with smaller residential and commercial parcels.  Ley Creek eventually reaches the Route 11 bridge, at the far western edge of the Subsite.  After flowing under the Route 11 Bridge, Ley Creek continues west until it eventually reaches Onondaga Lake.

Within the GM-IFG Subsite, the EPA and NYSDEC further identified two distinct Operable Units: "OU-1" and "OU-2."  OU-1 is the distinct tract of land that the IFG Plant sat on, on the eastern portion of the GM-IFG Subsite.  It abuts the western edge of Townline Road, and sits just to the south of Ley Creek.

OU-2, on the other hand, defies such tidy description.  It comprises "approximately 9,200 linear feet of Ley Creek channel sediments, surface water, and adjacent floodplain soils/sediments upstream of the eastern edge of the Route 11 Bridge and downstream of the western edge of the Townline Road Bridge."  App'x 28.  It also includes a 10-acre wetland (the "National Grid

14

Wetland"), soil within the "Factory Avenue Area" between OU-1's Northern property boundary and Factory Avenue, soil along the northern shoulder of Factory Avenue, and the National Grid/Teall Avenue Substation access road. *Id.*



*App'x 414. This map, created by RACER, provides a satellite overview of the land in question. The former IFG Plant, described as "OU-1," is outlined in dark blue. Ley Creek and the National Grid Wetland, and several small patches included within "OU-2" are highlighted in orange. The Ley Creek Dredgings Subsite, discussed below in note 5, is in aqua. Finally, the land that RACER describes as the "Expanded Territory" (discussed below) is in magenta. Defendants reject the characterization of the magenta area as a distinct "Expanded Territory."*

The parties do not dispute that the 2011 Settlement Agreement established RACER's liability for cleanup costs within the area described as OU-1— that is, the former IFG Plant, and RACER does not seek recovery for costs incurred with respect to cleanup in that area. RACER's CERCLA claims against Defendants relate to OU-2 and what it calls the Expanded Territory. The parties differ in

15

their views about the contours of OU-2 (in particular, whether it includes the so-called "Expanded Territory") and whether RACER's liability for cleanup in that area was resolved in the 2011 Settlement Agreement. A number of administrative and judicial consent orders and claims through the years shed further light on the controversy.

### C. The Orders and Claims

Various administrative consent orders over the years created remediation obligations on the part of GM, and later RACER, in and around the GM-IFG Subsite, including OU-1, OU-2, and the so-called "Expanded Territory." In addition, the court-approved 2011 Settlement Agreement assigned to RACER liability for certain cleanup costs.

Whether that 2011 Settlement Agreement resolved RACER's liability throughout all of OU-2 and the Expanded Territory is the pivotal issue in this case. Administrative and court orders in 1997, 2011, 2015, and 2021, combined with a 2009 Proof of Claim, collectively tell the story of GM's and then RACER's obligations with respect to pollution and remediation in the stretch of Ley Creek at issue in this case. Each document except the 2009 Proof of Claim was attached to the Complaint. *See* note 4, above. We hit the highlights below.

16

i. <u>September 1997 Administrative Consent Order</u>

In September 1997, NYSDEC, as lead agency for the Onondaga Lake site, and GM entered into an administrative consent order in which GM agreed to conduct a Remedial Investigation/Feasibility Study ("RI/FS") of the IFG Plant and the stretch of Ley Creek between Townline Road and the Route 11 Bridge—a precursor to the areas that would later be designated OU-1 and OU-2, respectively. *See* App'x 316–61 (Order on Consent Index # D-7-0001-97-06) (the "1997 Consent Order").

The RI/FS called for by the 1997 Consent Order was a response to documented contamination in ground water in the area described in that order. In addition, the RI/FS included a portion of GM's investigation report involving the separate Ley Creek PCB Dredgings Subsite insofar as it related to evaluation of "ground water underlying the dredgings, and the surface water and sediments in Ley Creek" (identified as the "Deferred Media").[5] *Id.* at 323–24. In

---

[5] Not to be confused with the stretch of Ley Creek at issue in this case is the Ley Creek PCB Dredgings Subsite, located nearby. The Ley Creek PCB Dredgings Subsite is "bounded by Factory Avenue to the south, Ley Creek to the north, Townline Road to the East, and 4,300 feet downstream to the west." App'x 78. The Subsite was initially designated by NYSDEC, in cooperation with the EPA, in 1987. Following years of remediation by GM, in 2006, EPA and NYSDEC concluded the Subsite was "no longer considered a significant threat to human health and the environment" and no further cleanup was needed, though they recommended a deed restriction to preclude activities on the Subsite that could potentially expose contaminated materials. *Id.* at 79.

17

a March 1997 Record of Decision, NYSDEC had deferred this component of GM's

response obligations regarding the Ley Creek PCB Dredgings Subsite to the

RI/FS required by the 1997 Consent Order. *Id.*

Accordingly, the 1997 Consent Order defined its "Site" of interest as the

former IFG Plant and Deferred Media in the area "from Townline Road to the

Route 11 bridge." *Id.* The Site is illustrated in the below exhibit to the 1997

Consent Order.



*App'x 363; see also App'x 324 (incorporating Exhibit D as map of the Site that is the subject of the 1997 Administrative Consent Order). The cross-hatched section makes up the Site of that Order. On the right side of the image, the boundaries of the former IFG Plant can be seen (captioned "GM Facility"). Following the cross-hatching to the left on the image shows the stretch of Ley Creek between Townline Road and the Route 11 bridge that makes up the rest of the Site.*

Pursuant to the 1997 Consent Order, GM was tasked with submitting a

preliminary RI/FS report describing "the nature and extent of contamination at

18

the Site." *Id.* at 330.  The Order also outlined the next steps following the preliminary RI/FS report, including supplemental studies and investigations, and the proposal of interim remedial measures.

By the 1997 Consent Order's express terms, GM's consent to and compliance with the order did not constitute "an admission of liability or an admission … of law or fact or the applicability of any law to the conditions at the Site, the Dredgings Site or the Onondaga Lake NPL Site." *Id.* at 329.  In fact, Exhibit E to the 1997 Consent Order outlined the scope of work required by the Order and provided that "upstream sample locations will need to be collected in order to assist in evaluating impacts from the GM site relative to other potential contaminant sources upstream."  D. Ct. Dkt. No. 334-11 at 57.

Similarly, the 1997 Consent Order expressly reserved NYSDEC's right to bring claims against GM in the future with respect to the Site, "including, but not limited to, claims to require [GM] to undertake further response actions, and claims to seek reimbursement of response costs and/or natural resource damages pursuant to Section 107 of CERCLA."  App'x 349–50.

From 2002 to 2004, in accordance with the 1997 Consent Order, GM implemented three removal actions limited to the former IFG Plant—by then designated OU-1—to "prevent further migration of PCBs to Ley Creek"; but

19

these did "not permanently address contamination within OU-1." *Id.* at 80. The RI/FS for OU-1 was still ongoing in 2015, and in 2020, in connection with its sale of the former IFG Plant property, RACER kept an easement for the purpose of "completing any Environmental Actions." *Id.* at 28 (internal quotation marks omitted). The RI/FS for OU-2 continued through 2015, when it was completed with the issuance of a March 2015 Record of Decision for OU-2, discussed more fully below.

In the meantime, in 2009, GM declared bankruptcy, sparking the creation of the RACER trust to carry on GM's environmental remediation work—including the ongoing RI/FS work in OU-1 and OU-2. For that part of the story, we turn first to the proofs of claim filed in response to GM's bankruptcy.

        ii.    2009 Proofs of Claim

After GM declared bankruptcy in 2009, the EPA and state environmental agencies, including NYSDEC, needed to ensure that GM's promised remediation work would continue. Accordingly, the United States, a dozen states, and the St. Regis Mohawk Tribe filed proofs of claim against GM in the bankruptcy action. The United States filed Proof of Claim Number 64064, which asserted claims against GM for response costs incurred under CERCLA related to contamination at numerous GM sites around the country, including the Onondaga Lake

20

Superfund Site.  Claim 64064 specifically asserted that GM was liable to the EPA and the Department of the Interior for "future response actions, response costs, and natural resource damages and assessment costs incurred and to be incurred under CERCLA" for several subsites of the Onondaga Lake Superfund Site. App'x 812.

Claim 64064 divided the Onondaga Lake Superfund Site into five subsites that GM was allegedly responsible for remediating.  Subsites 2 and 5 are most relevant here, as they generally correlate with what have respectively been described as operating units OU-1 and OU-2 of the GM-IFG Subsite.[6]  Subsite 2 comprises "certain areas alongside Ley Creek, which discharges into Onondaga Lake, including the 85 acres on which GM operated the IFG Facility."  *Id.* at 808. In other words, Subsite 2 is essentially what the EPA also describes as OU-1: the tract of land where the IFG Plant sat.

---

[6] Subsites 1 and 3 are related to but located outside of the GM-IFG subsite.  Subsite 1, the "Lake Bottom Subsite," is the bottom of Onondaga Lake, where industrial processing and municipal wastewater plants have historically and routinely discharged their wastes.  Ley Creek is one such contributing source—the IFG Plant disposed of its hazardous wastewater in the Creek. Subsite 3, the "Salina Landfill Subsite," is a 55-acre former municipal landfill in the Town of Salina that operated from 1964 to 1974.  GM disposed of hazardous substances (such as paint sludge, thinner, boiler ash, and PCBs) at this off-site landfill.  Subsite 4 correlates to the PCB Dredgings Subsite, described in note 5, above.

Subsite 5, meanwhile, "includes certain downstream banks of Ley Creek." *Id.* at 810. Claim 64064 describes Subsite 5 in relation to Subsite 4 (the PCB Dredgings Subsite): "Subsite 4, which is upstream of Subsite 5, historically contributed to the contamination of Subsite 5. . . . The hazardous substances disposed of by GM at Subsite 4 and detected at Subsite 5 include PCBs." *Id.*

Broad language in Claim 64064 reserved the EPA's right to amend its Proof of Claim "to assert additional liabilities, including but not limited to liabilities for additional costs for the matters discussed herein." *Id.* at 849.

### iii. 2011 Agreements

In 2011, the bankruptcy court entered a consent decree reflecting GM's agreement with the EPA, NYSDEC, other state environmental regulatory agencies, and the St. Regis Mohawk Tribe to settle its environmental liabilities nationwide and establish a trust to carry on GM's remediation work. The consent decree adopted the 2011 Settlement Agreement, which, in turn, included and attached a Trust Agreement (the "2011 Trust Agreement"). As noted above, the 2011 Trust Agreement established what became known as the RACER Trust to carry on GM's remediation work in numerous former plant sites around the country.

As relevant to this case, the 2011 Settlement Agreement recites that GM has environmental liabilities "at certain of the properties set forth and defined in Attachment A," which are defined as the "Properties."  App'x 422, 430.  In the recitals, the 2011 Settlement Agreement recognizes that many of the Properties "have been and/or will be the subject of environmental response activities and other work."  *Id.* at 422; *see also id.* at 519 (2011 Trust Agreement) (similar preamble).  It further notes GM is a "potentially responsible or liable part[y] with respect to the Properties and surrounding areas where Hazardous Substances have migrated, are continuing to migrate, or otherwise have or will come to be located."  *Id.* at 423.

The Properties, listed in Attachment A to the 2011 Settlement Agreement, include the "GM-IFG Syracuse" site.[7]  *Id.* at 510.  An attachment to the 2011 Trust Agreement includes a metes-and-bounds description of the GM-IFG Syracuse site.  *See id.* at 586–88.  RACER asserts that the property described is coextensive with OU-1—the site of the IFG Plant itself—and Defendants do not appear to dispute that.

---

[7] The Ley Creek PCB Dredgings Site, discussed in note 5 above, is another related Property listed in Attachment A, and corresponds both to Subsite 4 in the 2009 Proof of Claim and the description given in the 1997 Consent Order.  The GM-IFG Syracuse Property is the focus of the parties' arguments in this appeal.

The general mechanics of the combined agreements are as follows: RACER agreed to take title to 89 GM properties across 14 states, perform environmental response activities at the properties, and later sell them for productive use. The 2011 Settlement Agreement created a trust fund to allow RACER to "conduct, manage and/or fund Environmental Actions with respect to certain of the Properties, including the migration of Hazardous Substances emanating from certain of the Properties." *Id.* at 431. GM was to fund the trust with a payment "in the amount of no less than $641,434,945." *Id.* at 435. In exchange, the EPA, state governments, and the St. Regis Tribe (collectively the "Governments") covenanted "not to sue or assert any administrative or other civil claims or causes of action" against GM or RACER for environmental liabilities associated with the Properties as defined in the agreement. *Id.* at 475–76.

The funding allocation reflected in the 2011 Settlement Agreement funds a minimum estimate property funding account and a reserve property funding account for each Property listed in Attachment A, as well as long-term funding accounts to preserve funding for "operation, monitoring, and maintenance activities required as Environmental Action[s]" for certain of the Properties. *Id.* at 430. The GM-IFG Property is allocated $31,121,812, including about $18

24

million in minimum estimated property funding, $3 million in reserve property funding, and $10 million for long-term operation, monitoring, and maintenance funding. *Id.* at 510. A separate paragraph of the 2011 Settlement Agreement breaks down the approximately $31 million allocation another way, providing about $22.5 million "for remediation within the IFG Syracuse facility property boundaries," in other words, OU-1, and about $8.5 million "for the property extending from the facility property boundaries to the Route 11 Bridge." *Id.* at 457–58.

> The Governments' covenants not to sue are framed as follows:
>
> With respect to the Properties (including release of Hazardous Substances from any portion of the Properties and all areas affected by migration of such substances emanating from the Properties), and except as specifically provided in Section VIII (Reservation of Rights and Regulatory Authority), upon the Effective Date and [GM's] transfer of the Properties and full funding of the [trust accounts], the [Governments] covenant not to sue or assert any administrative or other civil claims or causes of action against [GM], any successor entity thereto, or [RACER] under CERCLA, RCRA, and State environmental statutes, as well as any other environmental liabilities asserted in the Government Proofs of Claim.

*Id.* at 475–76. In addition, the Agreement provides:

> With respect to the Properties, except as specifically provided in Section VIII (Reservation of Rights and Regulatory Authority), the Government Proofs of Claim shall be deemed satisfied in full in accordance with the terms of this Settlement Agreement, [and the Governments] shall not be entitled to file any further claims under

CERCLA, RCRA, or State environmental statutes, as well as any other environmental liabilities asserted in the Government Proofs of Claim.

*Id.* at 476. The "Government Proofs of Claim" are defined as the United States, state, and St. Regis Tribe proofs of claim, collectively. *Id.* at 425. The 2011 Settlement Agreement expressly references United States Proof of Claim 64064, as well as a duplicate federal government claim.

Section VIII of the 2011 Settlement Agreement ("Reservation of Rights and Regulatory Authority"), states that "[t]he covenants not to sue . . . do not apply to any matters other than those expressly specified therein." *Id.* at 479. The 2011 Settlement Agreement specifically reserves rights with respect to certain geographic areas. Relevant here, subsection (ii) of Paragraph 100 specifically reserves rights with respect to:

> any general unsecured claim with respect to the release of Hazardous Substances into Lower Ley Creek, the Lake Bottom Subsite, or the Salina Landfill Subsite, which are part of the Onondaga Lake Superfund Site in Onondaga County, New York or the Old Ley Creek Channel in Onondaga County, New York. "Lower Ley Creek" for purposes of this Settlement Agreement shall mean the entire portion of Ley Creek which is downstream from the Route 11 Bridge.

*Id.*

Additionally, and significantly, subsection vii of that reservation of rights paragraph reserves "all rights with respect to any site that is not a Property,

26

other than claims or causes of action for migration of Hazardous Substances emanating from a Property." *Id.* at 480.

In addition, the 2011 Settlement Agreement provides contribution protection, stating the agreement "constitutes a judicially-approved settlement for purposes of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2)," and that GM and RACER "are entitled to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA . . . or as may be otherwise provided by law, for 'matters addressed' in this Settlement Agreement." *Id.* at 483. The Agreement defines "matters addressed" as:

> all costs of Environmental Actions incurred or to be incurred by the U.S. EPA, the States, or the Tribe or any other person or entity relating to or in connection with the Properties, including releases of Hazardous Substances from any portion of the Properties, and all areas affected by migration of such substances emanating from the Properties; provided, however, that the "matters addressed" in this Settlement Agreement do not include (i) any matters reserved in Paragraph 100 of this Settlement Agreement; or (ii) any claims for past costs asserted by potentially responsible parties who are not parties to this Settlement Agreement.

*Id.* at 483–84.

The 2011 Trust Agreement likewise provides,

> To the extent provided in the Settlement Agreement, the Environmental Response Trust Protected Parties are deemed to have resolved their civil liability to the Governments *arising from or relating to* the Properties under CERCLA, RCRA, and State environmental statutes, as well as any environmental liabilities asserted in the

27

Governments' proofs of claim, and have protection from contribution actions or claims as provided by Sections 113(f)(2) of CERCLA, 42 U.S.C § 9613(f)(2) or similar state law for matters addressed in the Settlement Agreement.

*Id.* at 544 (emphasis added).

Finally, the 2011 Settlement Agreement outlines RACER's outstanding obligations concerning GM's continuing environmental remediation and monitoring activities. It terminates GM's obligations to perform work under any outstanding agreement or order and allows the lead agency to substitute RACER for GM in any outstanding consent decree, administrative order, or other settlement agreement "so long as the amended or substituted decrees or orders are not inconsistent with the terms of, and funding provided under, this Settlement Agreement and the Trust Agreement." *Id.* at 474. With respect to the IFG Plant specifically, it identifies the 1997 Administrative Consent Order and a July 15, 1999, administrative consent order (the "1999 Consent Decree") and states that RACER "shall be substituted [for GM] as respondent to such Orders and [RACER] shall comply with such Orders" to the extent doing so is consistent with the Settlement Agreement and Trust Agreement. *Id.* at 474–75.[8]

---

[8] The 1999 Consent Decree focused on developing an inactive hazardous waste disposal site remedial program for the Ley Creek PCB Dredgings Site. *See* App'x 248–284 (Order on Consent Index # D7-0008-97-06).

28

iv.     2015 Record of Decision and Consent Order

After the 2011 Settlement Agreement was in place, RACER began taking over GM's remediation efforts at the GM-IFG Site, including finishing the remedial investigation/feasibility study for OU-2 in 2013.  In March 2015, the EPA and NYSDEC—the lead agency at the time—issued a record of decision ("ROD"), which defined the scope of work and selected a remedy for OU-2 of the GM-IFG Subsite.  The ROD details NYSDEC and the EPA's findings concerning contamination in OU-2 and sets out the remediation plan agreed to by the agencies and RACER.

The ROD explains that the subsite consisting of the former GM-IFG plant consists of two operable units:

> OU1, which addresses the former plant and groundwater on, and emanating from, the former plant, and OU2 (which is the subject of this ROD), which includes "other media" not addressed under OU1 . . . . includ[ing] Ley Creek channel sediments, surface water and floodplain soils/sediments in the reach from Townline Road to the Route 11 Bridge, and the National Grid Wetland, Factory Avenue Area and Factory Avenue/LeMoyne Avenue Intersection Area.

App'x 150.  The ROD earlier notes that the relevant stretch of Ley Creek consists of "approximately 9,200 linear feet . . . including the adjacent floodplains between Townline Road and the Route 11 Bridge."  *Id.* at 149.  The 2015 ROD

29

then selects a remedy for OU-2, which primarily involves excavating the PCB-laden contaminated soils and sediments in the area.

Later in 2015, NYSDEC and RACER executed an administrative consent order under which RACER would perform remedial action within OU-2 as outlined in the ROD. The preamble to this agreement reiterates the definitions of OU-1 and OU-2 from the 2015 ROD, stating:

> The [GM-IFG] Site consists of the former plant, located south of Ley Creek on Townline Road and approximately 9,200 linear feet of Ley Creek including the adjacent floodplains between Townline Road and the upstream plane of the Route 11 Bridge . . . . OU1 addresses the former plant and groundwater on, and relating to the former plant, and OU2 addresses other media not addressed under OU1.

*Id.* at 109. The preamble further states that the goals of the 2015 Consent Order are to develop and implement a remedial program for OU-2.

While the 2015 ROD set the remediation work to be completed in OU-2, RACER maintained in the Complaint that in entering into the 2015 Consent Order, it "did not admit that hazardous substances emanating from the Former GM-IFG Plant had migrated to any specific part of OU-2." *Id.* at 85.

v.    2021 Administrative Consent Order

As part of the 2015 ROD work program, NYSDEC directed RACER to sample the soils in areas that RACER contends are beyond OU-2. That sampling revealed that areas in the floodplain that RACER contends are beyond the scope

30

of the 2015 Consent Order, including residential backyards, were also contaminated with PCBs.  The area in question is what RACER describes as "the Expanded Territory."  RACER remediated nineteen contaminated residential backyards while maintaining that it was not required to do so under the 2015 Consent Order.

As RACER's work continued, the EPA took over as the lead agency handling cleanup of OU-2.  In 2021, RACER and the EPA executed another administrative consent order (the "2021 Consent Order") which obligated RACER to design the site remediation for an area that included OU-2 and an "Expanded Territory," as those terms were specially defined for purposes of that 2021 Consent Order.  App'x 656–57.  For purposes of the 2021 Consent Order alone, the EPA agreed to separately define these areas, but the EPA did "not acknowledge the distinction between OU-2 and the Expanded Territory."  *Id.* at 654.  The parties further agreed the terminology of OU-2 and the "Expanded Territory" as used in the 2021 Consent Order would have no precedential value

in any requests for additional RACER funding to be allocated toward response activities at OU-2, the Expanded Territory, or the site more broadly.[9]

In the 2021 Consent Order, the Expanded Territory is defined as:

(i) the majority of the area north of Ley Creek lying between Ley Creek and the New York State Thruway from Townline Road to LeMoyne Avenue; (ii) the area south of Ley Creek from approximately the Town of Salina Highway Department Garage at 601 Factory Avenue to State Route 11 . . . between the Creek and Cambridge Avenue, Brown Avenue and Factory Avenue; and (iii) the back yards of 19 residential properties on Brookline Road immediately north of the top of the northern bank of Ley Creek.

*Id.* at 656.  OU-2 is defined as:

the portion of the GM-IFG Subsite that includes the following: approximately 9,200 linear feet of Ley Creek channel sediments, surface water, and adjacent floodplain soils/sediments upstream of the eastern edge of the Route 11 Bridge and downstream of the western edge of the Townline Road bridge; a 10-acre wetland located on the northern portion of the National Grid property that is directly west of the GM-IFG Facility ("National Grid Wetland"); soil in the approximately 1.8-acre area located directly between the GM-IFG Facility's northern property boundary and Factory Avenue ("Factory Avenue Area"); soil in the area located along the northern shoulder of Factory Avenue in the vicinity of LeMoyne Avenue; and National Grid/Teall Avenue Substation access road ("NG Access Road").

---

[9] Because the 2021 Consent Order distinguishes between OU-2 and the Expanded Territory, and because RACER's Complaint makes this distinction, we use the same terminology for purposes of this appeal.  As reflected in our analysis below, the distinction, or lack thereof, between OU-2 and the Expanded Territory is immaterial to our conclusion that the district court erred in dismissing RACER's claims.  We express no opinion as to whether the Expanded Territory is distinct from OU-2 for any purpose.

*Id.* at 657.

RACER, for its part, alleges in the Complaint that its agreement to the 2021 Consent Order "does not constitute any admission or finding as to where hazardous materials emanating from the property comprising the Former GM-IFG Plant have migrated." *Id.* at 87. By the same token, a reservation of rights section provides that nothing in the 2021 Consent Order will limit the power and authority of the EPA to take action to "protect public health, welfare, or the environment," or to prevent or abate release of hazardous substances from OU-2 or the Expanded Territory "to the extent such actions are not inconsistent with the Trust Consent Decree." *Id.* at 671. Moreover, the EPA may seek legal or equitable relief to enforce the terms of the 2021 Consent Order or to require RACER to "perform additional activities pursuant to CERCLA or any other applicable law." *Id.* at 671–72.

This is the last of the orders we describe for the purpose of setting the stage.

## II. District Court Decision

In the Complaint, RACER brought several claims under CERCLA, as well as various state law claims. It sought a declaration that Defendants are jointly and severally responsible, or alternatively liable for their equitable share, of the

33

costs associated with the past and future investigation and remediation costs in OU-2 and the Expanded Territory.

Defendants filed a motion to dismiss RACER's CERCLA claims on the basis that the 2011 Settlement Agreement established RACER's liability for cleanup costs throughout the entire area in question, and any claim for contribution pursuant to CERCLA § 113(f)(3)(b)—the only potential claim available—was untimely. In the Defendants' view, the 2011 Agreement "plainly covers" the Upper Ley Creek where OU-2 and the "so-called expanded territory" are located. Appellees' Br. at 6.

RACER disagreed. RACER argued, among other things, that the 2011 Agreement applies only to defined Properties and hazardous substances that emanated from those defined properties. Any claims for recovery of cleanup costs that do not relate to a Property, as defined in that 2011 Settlement Agreement, or to hazardous substances that migrated from a Property, are not subject to a time-barred claim under CERCLA § 113, and are properly the subject of a timely claim under § 107. RACER contended that the 2011 Agreement did not establish its liability as to contamination in OU-2 and the Expanded Territory because OU-2 and the Expanded Territory were not part of a defined "Property," and RACER alleges that the contamination in OU-2 and the Expanded Territory

34

"arrived there by means other than 'migration of Hazardous Substances emanating from' former GM Property." App'x 17. In RACER's view, because the 2011 Settlement Agreement did not resolve its liability as to the response costs in OU-2 and the Expanded Territory, it may pursue a claim for recovery of those costs under § 107 of CERCLA.

RACER offers two theories as to how OU-2 and the Expanded Territory became contaminated by means other than migration from the Plant site (OU-1). The first is that Ley Creek was substantially relocated as part of the New York State Thruway Authority project in the mid-twentieth century. Construction of the Thruway in the 1950s involved relocating the stream channel, which, RACER alleges, spread the contaminated sediments in the then-existing creek bed around to nearby areas.

The second theory is that, as part of Onondaga County's effort to improve storm water drainage, Ley Creek was dredged in the 1970s and 1980s. At different times since, Ley Creek was restructured and dredged for flood control, which was necessary because of the highly impervious nature of this industrialized watershed. The reach of Ley Creek from Townline Road to the Route 11 Bridge was most recently dredged in 1983. Some of that dredged material was spread along the banks of Ley Creek, included in OU-2 and the

Expanded Territory. RACER alleges that the "2011 Agreement did not make RACER Trust responsible for responding to such contamination" from either source. *Id.* at 83.

The district court agreed with Defendants that the 2011 Agreement included OU-2 and the Expanded Territory within its covenant not to sue, and that RACER's § 113 claim was time-barred in light of the three-year statute of limitations applicable to claims under that provision. *RACER III*, 610 F. Supp. 3d at 462, 470. In so ruling, the district court interpreted the interlocking provisions of the 2011 Agreements and relied in part on the broad scope of the federal government's 2009 Proofs of Claim referenced in the 2011 Settlement Agreement. *See id.* at 466–70. The district court held that the "Proofs of Claim establish the bounds of the Governments' covenants not to sue, which in turn interact with the Governments' reservations of rights, which, finally, impose a limit on the matters addressed by the 2011 Agreement." *Id.* at 466. The court reasoned the 2009 Proofs of Claim could be considered in the context of Defendants' motion to dismiss because they were incorporated by reference into the 2011 Agreement, which was attached to RACER's complaint. *Id.* at 465.

Finally, the court held RACER could not in the alternative pursue a claim under § 107, and thus dismissed both CERCLA claims with prejudice. *Id.* at 471–

36

72. It dismissed pendant state-law claims for lack of supplemental jurisdiction. *Id.* at 473. RACER timely appealed.

## DISCUSSION

On appeal, RACER raises three issues. First, it argues that we must vacate the district court's judgment dismissing its Complaint because the court failed to convert the defendant's motion to dismiss into one for summary judgment when it considered evidence extraneous to the pleadings—in particular, the 2009 Proofs of Claim. Next, RACER argues that even with the Proofs of Claim in the mix, its CERCLA claims survive dismissal on the merits. Finally, RACER requests we reassign this case to another judge in the event of a remand. We address each issue in turn.

## I.   RACER's Procedural Challenge

RACER argues that this Court could resolve this appeal in its favor based solely on "the procedural mechanisms by which this matter was decided"—that is, granting the Defendants' motion to dismiss while relying on matters extraneous to the Complaint without converting the motion to one for summary judgment. Appellants' Br. at 56. According to RACER, the district court erred when it considered three documents attached to Defendants' motion to dismiss: Exhibits A and B (containing the federal 2009 Proofs of Claim), Exhibit C

37

(containing an Affirmation of attorney Kristin Carter Rowe in Support of Defendant's Motion to Dismiss) ("Rowe Affidavit"), and a separate complaint by RACER in Michigan against DTE Pontiac North (the "Michigan Complaint"). RACER argues that the court could not properly consider these documents in the context of a dismissal motion, and even if the district court did not consider the attached exhibits, it erred by failing to expressly exclude them.

We disagree. In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). Moreover, even if a document is not expressly incorporated by reference, the court may still consider it if the complaint "relies heavily upon its terms and effect," rendering the document "integral to the complaint." *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002)).

Pursuant to Fed. R. Civ. P. 12(d), a district court must convert a motion to dismiss into one for summary judgment if the court goes beyond these permissible sources and considers material outside of the pleadings. *See Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000). This conversion-to-summary-

38

judgment requirement is "strictly enforced whenever a district court considers extra-pleading material in ruling on a motion to dismiss." *Chambers*, 282 F.3d at 154 (internal quotation marks omitted).

The corollary to this point is that the mere attachment of a document to a motion to dismiss does not alone establish that conversion is required. *See Amaker v. Weiner*, 179 F.3d 48, 50–51 (2d. Cir. 1999) (attaching an attorney's affidavit as an exhibit to a motion to dismiss did not require conversion). Rather, conversion is required when "there is reason to believe that the extrinsic evidence *actually affected* the district court's decision." *Id.* at 51 (emphasis added).

Finally, we have recognized that, "generally, the harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered," and so where a plaintiff has "actual notice" of information in the defendant's papers and has "relied upon these documents in framing the complaint[,] the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Chambers*, 282 F.3d at 153 (internal quotation marks omitted).

Applying these principles, we conclude the district court committed no reversible procedural error. There can be no doubt that the district court considered Exhibit A to the Motion to Dismiss (containing one of the 2009 Proofs

39

of Claim, specifically Claim 64064), in ruling on the motion to dismiss. *See RACER III*, 610 F. Supp. 3d at 465–66; *see also* Appellants' Br. at 24 (noting the district court cited the Proof of Claim thirteen times). But that was not error because Claim 64064 is incorporated into an attachment to the Complaint. *See DiFolco*, 622 F.3d at 111.

In particular, the Complaint attaches and relies heavily on the terms and effect of the 2011 Settlement Agreement. The 2011 Settlement Agreement, in turn, expressly acknowledges that the EPA filed Claim 64064 in the bankruptcy court, setting forth "claims or causes of action for future work with respect to the Properties, and . . . claims for past costs for the Properties." App'x 424. The 2011 Settlement Agreement specifically identifies Claim 64064 as part of the collective "Government Proofs of Claim." *Id.* at 424–25. And a crucial section of the 2011 Agreement containing the covenants not to sue provides, in relevant part:

> With respect to the Properties . . . the United States on behalf of [the EPA] and the States and Tribe covenant not to sue or assert any administrative or other civil claims or causes of actions against [GM] . . . or [RACER] under CERCLA, RCRA, and State environmental statutes, as well as any other environmental liabilities asserted in the *Government Proofs of Claim*.

*Id.* at 475–76 (emphasis added). This last sentence, in particular, effectively incorporates the Government Proofs of Claim, defined by the 2011 Settlement Agreement to include Claim 64064, into an essential provision in the Settlement

40

Agreement. Because the claims are incorporated into—that is, they are considered part of—a document that is in turn incorporated into—that is, is part of—RACER's complaint, they are essentially incorporated into RACER's complaint.

We reject RACER's argument that Exhibit A is not sufficiently identified to treat it as incorporated into the 2011 Settlement Agreement. The Settlement Agreement lists the precise claim number and filer (the United States) as Exhibit A; there is no colorable dispute regarding the authenticity of the document. And the 2011 Settlement Agreement's invocation of the Proof of Claim submitted as Exhibit A did not, as RACER suggests, amount to a "mere mention." Appellants' Br. at 20. Rather, the claims in Exhibit A were specifically incorporated by reference into the covenant not to sue—a critical provision in that Settlement Agreement.

Moreover, this Court has previously noted that the harm to a plaintiff in considering extraneous material is due to "lack of notice" of the information provided in the defendant's papers. *Chambers*, 282 F.3d at 153. But the 2009 Proof of Claim was part and parcel of a document, the 2011 Settlement Agreement, that was integral to RACER's formation, liabilities, and protections.

41

RACER's arguments regarding Defendants' Exhibit B (which contains forms that reference other Government Proofs of Claim but do not provide the actual claims) and Exhibit C (containing the Rowe Affidavit and the Michigan Complaint) also fail, but for a different reason. We have no reason to believe that the court relied on either exhibit in deciding the motion to dismiss; the decision only quotes from Exhibit A—Claim 64064—and contains no reference to or mention of the Rowe Affidavit or the Michigan Complaint. Thus, we have no reason to believe that either attachment "*actually affected*" the court's decision. *Amaker*, 179 F.3d at 51 (emphasis added).

Although we conclude that the district court did not err in considering the United States' 2009 Proof of Claim, that document has little bearing on our analysis of the merits of the case for the following reasons.

## II.     The Merits

Our determination that the district court erred in dismissing RACER's claims on the pleadings flows from three conclusions: First, RACER is time-barred from seeking contribution for costs incurred with respect to liabilities RACER resolved in the 2011 Settlement Agreement, and *only* with respect to those liabilities. So to the extent that the 2011 Settlement Agreement resolved

RACER's liability as to OU-2 and the Expanded Territory, RACER's claims are time-barred. To the extent that it did not, they are not.

Second, the 2011 Settlement Agreement resolved RACER's liability only with respect to Properties, as defined in that Agreement, and causes of action for migration of Hazardous Substances emanating from Properties. To the extent that OU-2 and the Expanded Territory are within a Property, as defined in the 2011 Settlement Agreement, or have been contaminated through the migration of hazardous substances emanating from a defined Property, the 2011 Settlement Agreement resolved RACER's liability with respect to cleanup costs in those areas. To the extent OU-2 and the Expanded Territory do not lie within a defined Property, and have not been contaminated through migration from a defined Property, the 2011 Settlement Agreement did not resolve RACER's liability with respect to those areas.

Third, neither OU-2 nor the Expanded Territory lie within a defined Property in the 2011 Settlement Agreement, and we cannot determine at the pleading stage whether and to what extent the costs RACER seeks to recover arise from the migration of Hazardous Substances emanating from OU-1.

The first of these points requires discussion of the legal framework under CERCLA. The second flows from an analysis of the 2011 Settlement Agreement.

43

And the third requires a close read of the 2011 Settlement Agreement and

RACER's allegations as they relate specifically to contamination from the IFG

Plant.  In our analysis below, we review without deference the district court's

grant of a Rule 12(b)(6) motion to dismiss, accepting all factual allegations as true

and drawing all reasonable inferences in favor of the plaintiff—here, RACER.

*See, e.g., Sierra Club v. Con-Strux, LLC*, 911 F.3d 85, 88 (2d Cir. 2018).

### A.  Cost-Recovery and Contribution under CERCLA

CERCLA was enacted in 1980 to respond to the environmental and health

risks caused by the release of hazardous substances into the environment.  *See*

*Burlington Northern and Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009).

CERCLA was designed to "assur[e] that those responsible for any damage,

environmental harm, or injury from chemical poisons bear the costs of their

actions."  *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120

(2d Cir. 2010) (alteration in original) (quoting S. Rep. No. 96-848, at 13 (1980)).

Under CERCLA, the EPA is directed to compile a prioritized list of contaminated

sites (commonly known as Superfund Sites), which the EPA can either clean

itself or compel responsible parties to clean.  *See Atlantic Richfield Co. v. Christian*,

140 S. Ct. 1335, 1346 (2020) (citing 42 U.S.C. §§ 9604, 9605, 9606, 9615).  CERCLA

was designed in this way to "promote the 'timely cleanup of hazardous waste

44

sites' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington Northern*, 556 U.S. at 602 (quoting *Consolidated Edison Co. of New York, Inc. v. UGI Utilities, Inc.*, 423 F.3d 90, 94 (2d Cir. 2005)).

Under CERCLA, responsible parties are strictly liable for the costs of the cleanup. 42 U.S.C. § 9607(a). CERCLA offers a "reprieve" to these responsible parties by allowing them to "seek reimbursement of their cleanup costs from . . . potentially responsible parties ('PRP's)." *Niagara Mohawk*, 596 F.3d at 120 (citing 42 U.S.C. § 9607(a)). There are generally three types of CERCLA claims a responsible party may bring to seek contribution: under § 107, § 113(f)(3)(B), and § 113(f)(1). *See id.* at 120–21. Only the first two are potentially relevant here.

Section 107 "authorizes the United States, a state, or 'any other person' to seek reimbursement for all removal or remedial costs associated with . . . hazardous materials on the property" if those actions are consistent with the "federal government's roadmap for responding to the release of hazardous substances." *Id.* (quoting 42 U.S.C. § 9607(a)(4)). "Any person" "includes a PRP that voluntarily cleans the site." *Id.* at 121. A person suing under § 107 may seek repayment of the cleanup costs from "any person" who "at the time of disposal of any hazardous substance owned or operated any facility at which such

45

hazardous substances were disposed of," "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances," or "accepted any hazardous substances for transport to disposal or treatment facilities." 42 U.S.C. § 9607(a)(2)–(4). "Section 107 allows for complete cost recovery under a joint and several liability scheme; one PRP can potentially be accountable for the entire amount expended to remove or remediate hazardous materials." *Niagara Mohawk*, 596 F.3d at 121.

When CERCLA was first enacted in 1980, § 107 was the only available remedy, leaving some question as to whether PRPs who were themselves liable for some of the cleanup costs could use § 107 to seek *contribution* from other PRPs, rather than seeking full cost recovery. *Id.* "Congress finally provided the express language necessary to authorize a contribution right under CERCLA with the Superfund Amendments and Reauthorization Act of 1986, adding § 113 to the statutory scheme." *Id.*

Section 113(f)(3)(B) accordingly enables a party that has settled its CERCLA liability with the government, including in an "administrative or judicially approved settlement," to seek contribution from others not party to

46

such a settlement.  42 U.S.C. § 9613(f)(3)(B).[10]  Section 113 claims must be brought within three years of the settlement resolving the responsible party's CERCLA liability.  *Id.* § 9613(g)(3).  The clock starts ticking once the relevant court approves a consent decree.  *See New York v. Solvent Chem. Co., Inc.*, 664 F.3d 22, 26 (2d Cir. 2011).

Sections 107 and 113 are generally understood to be "clearly distinct" remedies, *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 163 n.3 (2004), available to parties in "different procedural circumstances," *United States v. Atlantic Research Corp.*, 551 U.S. 128, 139 (2007).  In *Niagara Mohawk*, this Court held that a responsible party (the Niagara Mohawk Power Company) that had incurred costs to investigate and remediate a former power plant site pursuant to an administrative settlement with NYSDEC could bring a § 113(f)(3)(B) claim because the settlement released the party from liability under CERCLA.  596 F.3d at 125–26.  Because its claim for reimbursement based on the settlement fit "squarely within the more specific requirements of § 113(f)(3)(B)," Niagara Mohawk could not also proceed under § 107—allowing them to do so "would in

---

[10] Under § 113(f)(1), a PRP who has been sued under § 106 or § 107 may sue for contribution during or following that action.  42 U.S.C. § 9613(f)(1); *see also Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 122 (2d Cir. 2010).  RACER's liability was established through settlement rather than litigation, so this subsection of § 113 has no potential applicability here.

47

effect nullify the [] amendment [to CERCLA] and abrogate the requirements Congress placed on contribution claims under § 113." *Id.* at 127–28.

The parties generally agree that § 113 and § 107 claims are mutually exclusive in this context,[11] and RACER acknowledges that "where a plaintiff's claim fits squarely within the more specific requirements of § 113, the plaintiff cannot choose instead to proceed under § 107." Appellants' Br. at 36 (quoting *RACER II*, 10 F.4th at 103).

---

[11] In *Atlantic Research*, the Supreme Court left open the possibility that in certain circumstances, § 107 and § 113 claims may not be mutually exclusive:

> We do not suggest that §§ 107(a)(4)(B) and 113(f) have no overlap at all. For instance, we recognize that a PRP may sustain expenses pursuant to a consent decree following a suit under § 106 or § 107(a). In such a case, the PRP does not incur costs voluntarily but does not reimburse the costs of another party. We do not decide whether these compelled costs of response are recoverable under § 113(f), § 107(a), or both. For our purposes, it suffices to demonstrate that costs incurred voluntarily are recoverable only by way of § 107(a)(4)(B), and costs of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f).

*United States v. Atlantic Research Corp.*, 551 U.S. 128, 139 n.6 (2007) (internal citations omitted). The federal Courts of Appeal have yet to identify a situation in which a PRP can seek reimbursement under both §§ 107(a) and 113. *See Cranbury Brick Yard, LLC v. United States*, 943 F.3d 701, 705 (3d Cir. 2019) (collecting cases).

RACER argued below—and briefly on appeal, *see* Appellant's Br. at 36 n.7—that as a trust tasked with carrying on GM's environmental remediation work, its situation resembles the hypothetical posited by the *Atlantic Research* footnote, making a § 107 claim available alongside its § 113 claim. We disagree. To the extent that RACER seeks contribution for costs incurred pursuant to the CERCLA liability established in the 2011 Settlement Agreement, those costs are recoverable only under § 113(f).

48

Moreover, Defendants argue, and RACER does not dispute, that the 2011 Agreement constitutes a judicially approved settlement of RACER's CERCLA liability for purposes of § 113. We agree. *See, e.g.*, *ASARCO LLC v. Goodwin*, 756 F.3d 191, 201–02 (2d Cir. 2014) (settlement); *Niagara Mohawk*, 596 F.3d at 125–27 (administrative consent decree).

Because the 2011 Settlement Agreement is a court-approved settlement that resolved RACER's CERCLA liability, any claim for contribution for costs associated with RACER's liability under the 2011 Settlement Agreement could be brought only pursuant to § 113(f)(3)(B). Section 107(a) remains available for recovery of costs for which RACER's CERCLA liability was not established by the 2011 Settlement Agreement, and § 113 could potentially apply to a contribution claim by RACER with respect to costs for which RACER became liable under CERCLA pursuant to a settlement or adjudication after the 2011 Settlement Agreement.

Put into the context of RACER's claims here, to the extent RACER settled its liability under CERCLA for cleanup in OU-2 or the Expanded Territory under the 2011 Agreement, its only available route to seek reimbursement was via § 113(f)(3)(B)—and due to the three-year statute of limitations, it lost its chance. However, to the extent the 2011 Agreement did *not* resolve RACER's liability

49

under CERCLA for cleanup in part or all of OU-2 and the Expanded Territory, it may seek reimbursement for those costs under § 107(a), or potentially under § 113 if it is later held liable under CERCLA pursuant to a settlement or judgment for cleanup in those areas.

In short, the sole issue before us is whether—or to what extent—the 2011 Settlement Agreement settled RACER's liability under CERCLA for cleanup in OU-2 and the Expanded Territory.  Accordingly, we turn to the 2011 Settlement Agreement.

## B.  The Limits of the 2011 Settlement Agreement

The parties agree that principles of contract interpretation should guide our reading of the 2011 Settlement Agreement, which is a consent decree.  *See Doe v. Pataki*, 481 F.3d 69, 75 (2d Cir. 2007).  We look to state law for guidance on contract interpretation principles, and here, apply New York law.  *See, e.g., Schurr*

50

*v. Austin Galleries of Illinois, Inc.*, 719 F.2d 571, 575 (2d Cir. 1983) (applying New York law).[12]

Under New York law, contracts are "construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). The best evidence of the parties' intent is their writing, so we interpret an unambiguous contract "according to the plain meaning of its terms." *Id.* In interpreting a contract, it "should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases." *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007). Additionally, we must avoid "adopting an interpretation that would render any individual provision superfluous." *Scholastic, Inc. v. Harris*, 259 F.3d 73, 83 (2d Cir. 2001) (quoting *Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan*, 7 F.3d 1091, 1094–95 (2d Cir. 1993)).

A contract is unambiguous if its language has "a definite and precise meaning," providing "no reasonable basis for a difference of opinion." *Greenfield*, 98 N.Y.2d at 569 (internal quotation marks omitted). If a contract is ambiguous, extrinsic evidence of the parties' intent may be considered, *see id.*,

---

[12] The parties agree that general contract interpretation principles apply but did not brief the issue of which state's contract law should guide our review of the 2011 Settlement Agreement. The district court applied New York law. *See RACER III*, 610 F. Supp. 3d at 463. In the absence of any contrary argument or authority from the parties, we do the same.

51

making the meaning of the ambiguous contract "a question of fact for the factfinder," and precluding dismissal on the pleadings, *see, e.g.*, *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009).

The district court held that the 2011 Settlement Agreement unambiguously settled RACER's CERCLA liabilities as to OU-2, in large part because it "covenanted not to sue for any liability asserted in the Proofs of Claim, which expressly include OU-2." *RACER III*, 610 F. Supp. 3d at 470. We review both the district court's determination of whether the contract is ambiguous and its interpretation of the terms of an unambiguous contract without deference. *See Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010).

On appeal, RACER renews its argument that the covenants not to sue in the 2011 Settlement Agreement resolve only its environmental liabilities for the 89 Properties set forth in Attachment A, as well as migration emanating from those defined properties. In RACER's view, the Agreement does not purport to reach, and in fact expressly excludes, liabilities other than that. During oral argument, RACER put it more bluntly, arguing that the district court "was so focused on trying to figure out what was included in the Agreement that it didn't focus on what was explicitly excluded." Transcript of Oral Argument at 2, *Racer*

52

*Properties LLC, et al. v. National Grid USA, et al.*, No. 22-1589-cv (2d Cir. Feb. 23, 2023).

Defendants disagree, arguing that because the covenant not to sue in the 2011 Agreement included the "other environmental liabilities asserted in the Government Proofs of Claim," the 2011 Agreement resolved RACER's CERCLA liability with respect to each of the environmental liabilities asserted in Claim 64064—not just those related to the GM-IFG Property or some other defined property. Appellees' Br. at 29–30.

We agree with the district court that the 2011 Settlement Agreement is unambiguous. But our read of that Agreement diverges from the district court's and aligns with RACER's. We conclude that the 2011 Settlement Agreement unambiguously resolved RACER's CERCLA liability only with respect to "Properties," as defined in that Agreement, "including releases of Hazardous Substances from any portion of the Properties, and all areas affected by migration of such substances emanating from the Properties." App'x 483–84. Our view is compelled by the unambiguous terms of the 2011 Settlement Agreement, including the critical terms establishing the scope of RACER's protection from future suit, and it is consistent with the purpose and structure of the Agreement. And to give the Government Proofs of Claim the weight that

53

Defendants assign would require us to ignore the plain language of the Agreement, including the context in which it references those claims.

i.    Unambiguous Terms

The 2011 Settlement Agreement expressly and unambiguously revolves around RACER's liabilities relating to violations of environmental laws with respect to the Properties specifically defined in that Agreement.

The preamble sets the stage, establishing that the Agreement resolves RACER's liability *with respect to defined properties*. Explaining the reasons for the Agreement, it first says, "Whereas, [GM has] environmental liabilities *at certain of the properties set forth and defined in Attachment A (the 'Properties')* and many of *those Properties* have been and/or will be the subject of environmental response activities and other work." App'x 422 (emphases added). It acknowledges the claims by the Governments "*with respect to the Properties* and surrounding areas where Hazardous Substances have migrated, are continuing to migrate, or otherwise have or will come to be located." *Id.* at 423 (emphasis added). And it

54

references the "Properties"—capital P—in a half-dozen other paragraphs describing the potential liabilities to be addressed in the Agreement.[13]

After providing for the transfer of the Properties to RACER and establishing funding for their cleanup, the 2011 Settlement Agreement resolves RACER's liabilities through provisions reflecting covenants not to sue, satisfaction of claims, and protections against contribution, combined with an express reservation of rights, all of which emphasize that the release of RACER's liability is limited to the specific defined Properties and areas affected by migration of substances emanating from those Properties.

Specifically, and critically, the covenant not to sue provision in the 2011 Settlement Agreement states:

> *With respect to the Properties* (including release of Hazardous Substances from any portion of the Properties and all areas affected by migration of such substances emanating from the Properties), and except as specifically provided in Section VIII (Reservation of Rights and Regulatory Authority), upon the Effective Date and [GM's] transfer of the Properties and full funding of the [trust accounts], the United States on behalf of [the] EPA and the States and Tribe covenant not to sue or assert any administrative or other civil claims or causes of action against [GM], any successor entity thereto, or [RACER] under CERCLA, RCRA, and State environmental statutes, as well as

---

[13] For clarity, when we refer to "Property" or "Properties" with a capital "P," we likewise mean the specific properties listed in Exhibit A to the 2011 Settlement Agreement.

any other environmental liabilities asserted in the Government Proofs
of Claim.

*Id.* at 475–76 (emphasis added).

Likewise, the satisfaction of claims provision states,

*With respect to the Properties*, except as specifically provided in Section
VIII (Reservation of Rights and Regulatory Authority), the
Government Proofs of Claim shall be deemed satisfied in full in
accordance with this Settlement Agreement.

*Id.* at 476 (emphasis added).

The contribution protection provision in the 2011 Agreement is similarly

limited to claims relating to the defined Properties and migration from those

Properties. The provision states that the Agreement "constitutes a judicially-

approved settlement for purposes of Section 113(f)(2) of CERCLA," and that

RACER is entitled to protection from contribution actions under CERCLA "for

'matters addressed'" in the Agreement. *Id.* at 483.

"Matters addressed" are defined as "all costs of Environmental Actions

incurred or to be incurred by the U.S. EPA, the States, or the Tribe or any other

person or entity *relating to or in connection with the Properties*, including releases of

Hazardous Substances from any portion of the Properties, and all areas affected

by migration of such substances emanating from the Properties," but do not

include, among other exceptions, "any matters reserved in [the Reservation of

56

Rights and Regulatory Authority provision] of this Settlement Agreement." *Id.*

at 483–84 (emphasis added).

The Reservation of Rights and Regulatory Authority section, which limits

the scope of all of the above provisions, provides that the covenants not to sue do

not apply, and the United States, the States, and the Tribe specifically reserve all

rights with respect to "*any site that is not a Property*, other than claims or causes of

action for migration of Hazardous Substances emanating from a Property." *Id.* at

479–80 (emphasis added). The clear language of the Reservation of Rights

provision puts to rest any potential doubt as to whether the 2011 Settlement

Agreement resolves liabilities other than those attached to specific Properties or

contamination emanating from those Properties.

Together, these provisions clearly establish that the 2011 Settlement

Agreement, which addresses RACER's liabilities across the country with respect

to dozens of sites, resolves RACER's liability only with respect to liability for

cleanup at each of the 89 Properties listed in Exhibit A, including migration of

hazardous substances emanating from those defined Properties.

ii.    Structure and Purpose of the 2011 Settlement Agreement

This conclusion, driven by the plain language of the 2011 Settlement

Agreement, fully jibes with the history, purpose, and structure of that

Agreement. As explained above, through the 2011 Settlement Agreement and accompanying 2011 Trust Agreement, the bankruptcy court addressed GM's nationwide environmental obligations by transferring title to 89 former GM Properties to RACER and requiring RACER to remediate the Properties and later sell them for productive use. The scope of RACER's obligations is tied to the Properties it is charged with remediating.

We know precisely what those Properties are because they are listed in Attachment A of the Agreement. Moreover, we know the precise boundaries of each Property because the metes and bounds are attached to the Trust Agreement, which is itself an exhibit to the 2011 Settlement Agreement.

Pollution is not always cabined to property boundaries, so the Agreement also provides that RACER will take on remediation work both *within* the Properties and outside of them, to the extent hazardous substances "migrat[ed]" or "emanat[ed]" *from* the Properties. App'x 432.

This struck a balance: it ensured RACER would remediate the areas that GM had polluted, but limited RACER's exposure by tying its obligations to the former GM Properties transferred to RACER, as well as the migration of pollutants from those sites. This helps ensure that the funds provided to RACER will cover all the promised remediation and that other potentially responsible

58

parties do not avoid contribution based on the mere fact of GM's bankruptcy and the creation of RACER.

### iii. The 2009 Proofs of Claim

We reject Defendants' argument, and the district court's conclusion, that the reference to the "Government Proofs of Claim" in the covenants not to sue significantly expanded the scope of the 2011 Settlement Agreement. *See RACER III*, 610 F. Supp. 3d at 466–70. Specifically, the district court concluded that because the covenants not to sue incorporated "any other environmental liabilities asserted in the Government Proofs of Claim," *id.* at 464 (internal quotation marks omitted), the Settlement Agreement resolved RACER's liability not only for Properties and hazardous substances migrating from them, but for any claims asserted in the Government Proofs of Claim, *see id.* at 466–70.

We disagree. This view disregards the critical qualifying language in the covenant not to sue and satisfaction of claims provisions that makes them applicable only "[w]ith respect *to the Properties* (including releases of Hazardous Substances from any portion of the Properties and all areas affected by migration of such substances emanating from the Properties)," and expressly conditions their reach on the limitations in the Reservation of Rights provision. App'x 475–76 (emphasis added). And it fails to grapple with the Governments' reservation

59

of rights with respect to "any site that is not *a Property*," other than claims for migration of hazardous substances from a Property.  *Id.* at 480 (emphasis added).

It also ignores the limitations in the contribution protection provision limiting its reach to the "matters addressed" in the Settlement Agreement, which is defined as the costs incurred "relating to or in connection with *the Properties*, including releases of Hazardous Substances from any portion of the Properties, and all areas affected by migration of such substances emanating from the Properties," and does not include "any matters reserved in [the Reservation of Rights provision]."  *Id.* at 483–84 (emphasis added).

We reject Defendants' argument that the "relating to or in connection with" language is broader than the language in the covenants not to sue, such that the "matters addressed" by the Settlement could include remediation within OU-2 even if it does not lie within a defined Property because it "relate[s] to" or is "in connection with" the remediation within OU-1 (the IFG Plant site). Appellants' Br. at 26–28.  The phrase cannot bear that much weight; even if we could plausibly read the provision regarding protection from contribution as having a broader scope than its related provisions, it would still be limited by the Reservation of Rights provision.

60

In short, the reference within the covenant not to sue for "any other environmental liabilities asserted in the Government Proofs of Claim" is subject to the same limitations as the rest of the covenant not to sue; it does not, in derogation of the limitation on the covenant not to sue paragraph and the Reservation of Rights clause, override those limitations and incorporate by reference every single environmental claim asserted nationwide in the Government Proofs of Claim. App'x 476.

Moreover, Defendants' read of the reference to "any other environmental liabilities asserted in the Government Proofs of Claim" fails to recognize the context in which that phrase appears. *Id.* The phrase follows a specific list of potential statutes under which RACER could be held liable—CERCLA, RCRA, and other State environmental statutes. Under the "*ejusdem generis*" principle (that's Latin for "of the same kind"), a more general phrase that comes at the end of a specific list takes on the qualities of the list. *See, e.g., Pfizer, Inc. v. United States Department of Health and Human Services*, 42 F.4th 67, 76 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 626 (2023). So the "other environmental liabilities asserted in the Government Proofs of Claim," App'x 476, is properly understood as "any

other statutes or authority under which the Governments could assert claims

against RACER" with respect to the Properties.

It's worth remembering the context in which the Proofs of Claim were

filed. In 2009, numerous states and environmental agencies, including the EPA

and NYSDEC, filed proofs of claim against GM, in the wake of its bankruptcy, to

preserve ongoing remediation work at GM sites across the country, including the

former IFG plant site and its environs. These proofs of claim did not create

obligations under CERCLA where none had previously existed. Rather, they

aimed to preserve the status quo and ensure that GM's bankruptcy did not cause

its many environmental responsibilities that it had negotiated and agreed to over

the previous decades to vanish into thin air. *See, e.g.*, *id.* at 316–60 (1997 Consent

Decree between GM and NYSDEC).[14]

For the above reasons, we conclude that the 2011 Settlement Agreement

unambiguously resolves RACER's liability as to the Properties, and the

migration of hazardous substances emanating from those Properties, and does

_____

[14] We have no reason to look beyond the four corners of this unambiguous contract. Nevertheless, we note that in the 2015 and 2021 Consent Orders, the history of the GM-IFG Site and enforcement activity is extensively recapped, including descriptions of the 1980s and 1990s-era Consent Decrees and, of course, the 2011 Settlement Agreement. But the 2009 Proofs of Claim are never mentioned. *See, e.g.*, App'x 152, 660. This suggests the parties here—EPA, NYSDEC, and RACER—did not understand the 2009 Proofs of Claim to have altered GM's or RACER's obligations concerning the GM-IFG Property.

not resolve its liability with respect to costs incurred in connection with sites that fall outside of this definition. The final question, then, is whether the costs incurred by RACER for remediation in OU-2 and the Expanded Territory are costs for remediation of a defined Property or contamination that emanated from such a Property, in which case RACER's claims are time-barred.

### C. OU-2 and the Expanded Territory

Nothing in the Complaint or attached documents establishes that OU-2 and the Expanded Territory fit within the definition of a Property in the 2011 Agreement. In fact, all signs suggest the opposite. And whether part or all of the costs incurred by RACER in those areas resulted from the migration of hazardous substances emanating from a defined Property is a factual question that cannot be resolved on a motion to dismiss. So we cannot conclude as a matter of law that RACER's CERCLA liability as to OU-2 and the Expanded Territory was resolved by the 2011 Settlement Agreement. We consider the two possibilities—that OU-2 and the Expanded Territory are part of a defined

63

Property, or that contamination from a defined Property migrated to those areas—in more depth.

### i. Defined Property

The relevant defined property at issue here is identified in Exhibit A to the 2011 Settlement Agreement as the "GM-IFG Syracuse" site.  App'x 510.  An attachment to the 2011 Trust Agreement, itself an attachment to the 2011 Settlement Agreement, contains the legal descriptions of the Properties by metes and bounds.  We cannot conclude on the basis of the pleadings alone that the metes-and-bounds description of the GM-IFG Property encompasses part or all of OU-2 and the Expanded Territory.  In fact, the signs suggest otherwise, as Defendants do not contest RACER's representation that the metes-and-bounds description describes the situs of the IFG Plant, or the area identified as OU-1.[15] That makes sense—as the legal definition of the Property is a deed description, whereas OU-2 is somewhat amorphous.  That should be the end of the inquiry. A metes-and bounds description should leave no mystery as to the contours of the GM-IFG Property.

---

[15] If Defendants contend that the metes-and-bounds description attached to the 2011 Trust Agreement *does* include OU-2 and the Expanded Territory, or any part thereof, that would raise a factual dispute that we cannot resolve on the pleadings.  Defendants do not appear to make that argument.

64

But Defendants don't tie the contours of the GM-IFG Syracuse Property to the legal description attached to the 2011 Settlement Agreement. Instead, they point to a term in the Agreement that allots approximately $8.5 million in funding for remediation "for the property extending from the [GM-IFG] facility property boundaries to the Route 11 Bridge." *Id.* at 457–58. Defendants argue that this funding provision shows that the intent of the Agreement was to include "the property in Upper Ley Creek between Townline Road and the Route 11 Bridge" within the GM-IFG Syracuse property. Appellees' Br. at 25.

In so arguing, Defendants stray from the clear terms of the 2011 Settlement Agreement pursuant to which a "Property" for purposes of the Agreement is (1) listed in Attachment A and (2) clearly defined by a metes-and-bounds description.

The funding provision does not change the definition of the GM-IFG Syracuse Property. And given that the 2011 Settlement Agreement assigns RACER responsibility for remediation of hazardous substances that emanated from a Property and migrated elsewhere, there is nothing incongruous about allocating funding for cleanup beyond the borders of a defined Property. Here, the 2011 Agreement expressly contemplates that RACER may have cleanup obligations situated within OU-2 or the Expanded Territory resulting from the

65

emanation and migration of contaminants from OU-1. Moreover, as set forth more fully below, the 2011 Settlement Agreement expressly contemplates that RACER will assume GM's ongoing obligations arising from the 1997 Consent Order, including obligations in OU-2, making the funding provision even more sensible. For these reasons, the funding provision does not morph the definition of the GM-IFG Syracuse "Property," which is established by a legal metes-and-bounds description, to necessarily encompass the *entirety* of OU-2 and the Expanded Territory, as Defendants contend.

True, the funding provision in question refers to the area between the GM-IFG facility and the Route 11 bridge as a (lower-case p) "property," but given that the 2011 Agreement always capitalizes the word "Property" when referring to the 89 Properties listed in Attachment A, it's clear the provision does not transform the definition of the GM-IFG "Property" into something broader. Holding otherwise—that is, holding that the funding provision modifies the clearly delineated bounds of the GM-IFG Syracuse Property under the Agreement—would place "undue emphasis" on the use of the lower-case-p "property" in that provision, *Bailey*, 8 N.Y.3d at 528, and would render the

metes-and-bounds description of the GM-IFG Syracuse Property "superfluous," *Scholastic, Inc.*, 259 F.3d at 83.

Moreover, taking the 2011 Settlement Agreement at its word, and defining the GM-IFG Property with reference to the metes-and-bounds description in the 2011 Trust Agreement, would best harmonize with the 1997 Consent Decree between GM and NYSDEC—which is directly incorporated into the 2011 Agreement and became part of RACER's own obligations.

Recall that pursuant to the 1997 Consent Order, GM did not settle its CERCLA liability with NYSDEC, but agreed to begin conducting an RI/FS for the "GM-IFG Site," defined for purposes of that Order as consisting of both the former plant boundaries and the "Deferred Media" in Ley Creek between Townline Road and the Route 11 Bridge. App'x 323–24. In subsequent years, the Site for purposes of the 1997 Consent Order was split into two operable units: OU-1 (consisting of the former plant boundaries) and OU-2 (consisting of the Deferred Media in Ley Creek between Townline Road and the Route 11 Bridge). The 2011 Settlement Agreement specifically references the 1997 Consent Order, substitutes RACER for GM in connection with that Order, and requires RACER to comply with the Order "so long as the amended or substituted [order is] not

67

inconsistent with the terms of, and funding provided under, this Settlement

Agreement and the Trust Agreement." *Id.* at 474–75.

Importantly, the 1997 Consent Order made clear that GM was not

receiving contribution protection or settling liability by agreeing to conduct the

RI/FS. In fact, Exhibit E to the 1997 Consent Order defined the scope of work

required by the Order and provided that "upstream sample locations will need

to be collected in order to assist in evaluating impacts from the GM site relative

to other potential contaminant sources upstream." D. Ct. Dkt. No. 334-11 at 57.

In other words, part of the investigatory mission of the RI/FS was to determine

whether and to what extent GM was responsible for the contamination in Ley

Creek between Townline Road and the Route 11 Bridge.

Given this, it makes sense that the 2011 Settlement Agreement *did not*

resolve RACER's liability as to the entirety of OU-2 and the Expanded Territory,

*did* require RACER to continue GM's work in OU-2 pursuant to the RI/FS to the

extent not inconsistent with the 2011 Settlement Agreement and funding

allocations, did hold RACER accountable for contamination within OU-2 and the

Expanded Territory to the extent it resulted from the migration of hazardous

68

substances that emanated from the IFG Plant, and established funding for further activities in OU-2 pursuant to the 1997 Consent Order.

In addition, nothing about our conclusion is inconsistent with the Reservation of Rights provision in the 2011 Settlement Agreement reserving "any general unsecured claim with respect to the release of Hazardous Substances into . . . . the entire portion of Ley Creek which is downstream from the Route 11 Bridge." App'x 479. In Defendants' view, this reservation of rights with respect to the *Lower* Ley Creek, downstream from the Route 11 Bridge, "would not have been necessary (and would be rendered meaningless) if, in the first instance, the covenants not to sue only extended to the GM plant located far upstream and the areas to which contaminants directly migrated therefrom." Appellees' Br. at 30. But the Settlement Agreement contemplates that *some* portion of OU-2 or the Expanded Territory may lie within the area resolved by the 2011 Settlement Agreement; the Route 11 Bridge serves as the outer limit of RACER's established CERCLA liability under that Agreement.

In short, neither OU-2 nor the Expanded Territory are part of the GM-IFG Syracuse Property. Thus, the 2011 Settlement Agreement only resolved RACER's

69

liability as to those areas if the contamination in those areas resulted from migration of substances emanating from the GM-IFG Plant.

###### ii.  Migration and Emanation

Whether and to what extent hazardous substances emanated from the GM-IFG Plant (OU-1) and migrated to OU-2 and the Expanded Territory is exactly the kind of question we cannot resolve at the pleading stage.  RACER emphasizes that in the context of the various administrative consent orders described above, it never admitted that any contaminants emanating from OU-1 migrated to OU-2 or the Expanded Territory, and no adjudication has made such a determination.  And RACER's complaint contains extensive allegations—that we must credit at this stage—concerning how PCBs could have reached OU-2 and the Expanded Territory by means other than emanation and migration from the GM-IFG Plant, including from the dredging of Ley Creek in the 1970s and 1980s.

Thus, to the extent Defendants argue that RACER cannot seek recovery for the costs it incurred in OU-2 and the Expanded Territory because the remediation it conducted addressed contamination that emanated from the IFG

70

Plant and contaminated those areas, they cannot press this argument at the pleading stage.

Determining the provenance of hazardous substances contaminating OU-2 and the Expanded Territory will be—as Defendants grouse—a fact-intensive, time-intensive process. We leave the development of the factual record necessary to make this determination in the able hands of the district court.

### D. Conclusion

To summarize, we conclude that (1) RACER's CERCLA claims must proceed under CERCLA § 113, and are time-barred under that provision, only to the extent that RACER seeks contribution or recovery of costs incurred for remediation of areas with respect to which RACER's CERCLA liability was resolved by the 2011 Agreement; (2) RACER's liability was resolved by the 2011 Settlement Agreement only with respect to (a) the GM-IFG Syracuse Property, as defined by the metes-and-bounds description in the 2011 Settlement Agreement and (b) all areas affected by migration of such substances emanating from that Property, but no further downstream than the Route 11 Bridge; (3) whether the metes-and-bounds description of the GM-IFG Syracuse Property in the 2011 Settlement Agreement encompasses OU-2 and the Expanded Territory, or whether and to what extent the contamination in those areas arose from

migration of hazardous substances emanating from the GM-IFG Syracuse Property, are factual questions that cannot be resolved on a motion to dismiss.

Accordingly, the district court erred in dismissing RACER's claims at the pleading stage, and we vacate the district court's judgment of dismissal.

## III.  Reassignment

Finally, we reject RACER's request to reassign this case on remand, as we find no grounds for reassignment.  We have held that reassignment is proper only in "unusual circumstances." *United States v. Robin*, 553 F.2d 8, 9–10 (2d Cir. 1977) (en banc).  Reassignment "is an extreme remedy, rarely imposed . . . but occasionally warranted, even in the absence of bias, to avoid an appearance of partiality." *United States v. City of New York*, 717 F.3d 72, 99 (2d Cir. 2013) (internal citations omitted).  RACER claims reassignment is nonetheless appropriate here, pointing to certain language in *RACER III* as evidence that the district judge has a "particular disdain" for its case.  Appellants' Br. 55.  Plus, RACER argues, in light of this second remand, "the appearance of justice would

72

be well-served by reassignment." *Id.* (quoting *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 142 (2d Cir. 2007)).

We consider the following "principal factors" when determining if reassignment is warranted:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Robin*, 553 F.2d at 10.

In this case, there are no grounds for reassignment. We have no reason to believe that the district judge would not accept our decision or follow our instructions on remand. The district judge's descriptions of RACER's claims in the decision below, even if they do suggest a certain disposition, do not rise to the level of partiality such that reassignment is warranted. *See Ketcham v. City of Mount Vernon*, 992 F.3d 144, 152 (2d Cir. 2021) (declining to reassign a case because it found "no basis to conclude that the district court would be unable to set aside its previously expressed views and fairly shepherd the case to conclusion."). Plus, given the complex factual and procedural background of this case, reassignment to another judge would likely entail waste and

73

duplication of effort.  *See Federal Insurance Co. v. United States*, 882 F.3d 348, 374

(2d Cir. 2018) (citing "complicated facts and a lengthy procedural history" as

factors in concluding reassignment was not warranted).  Accordingly, we decline

to reassign the case.

<center>***</center>

For the reasons stated above, we **VACATE** the district court's judgment

dismissing the Second Amended Complaint and **REMAND** for further

proceedings consistent with this opinion.

<center>74</center>